## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., 11250 Waples Mill Rd. Fairfax, VA 22030, | **Case No.:** |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| NRA FOUNDATION, INC., 11250 Waples Mill Rd. Fairfax, VA 22030, | |
| Defendant. | |

Plaintiff National Rifle Association of America, Inc. ("Plaintiff" or "NRA"), by and through its attorneys, for its Complaint against Defendant NRA Foundation, Inc. ("Defendant" or "Foundation"), alleges as follows:

## NATURE OF THE ACTION

1.      The NRA brings this action to stop the Foundation from passing itself off to donors and the public as the NRA or an authorized NRA affiliate and misappropriating the many millions of dollars that NRA supporters contributed to fund the NRA's educational and other charitable activities. Founded by the NRA in 1990 to support the NRA's charitable activities, the Foundation has been seized by a disgruntled faction of former NRA directors who lost control of the NRA's Board following revelations of financial improprieties, mismanagement, and breaches of fiduciary duty and member trust. Booted out of power by the NRA's members, they now seek to reclaim it through the Foundation. First, they sought to sever the relationship between the NRA and the Foundation by attempting to strip the NRA of its right to appoint the Foundation's directors and seizing that power for themselves. And now they seek to jettison the Foundation's historic purpose of supporting NRA's charitable programs and transform the Foundation into a vehicle for personal

1

reprisal, against the reformers who displaced them at the NRA, and for their self-aggrandizement, by building up the Foundation as a competitor to the NRA. They seek to achieve those ends through hijacking the NRA's trademarks, including the "NRA" name, and repurposing millions of dollars that were contributed to support the NRA's charitable programs. That is unlawful. Donor intent matters, and the NRA members and supporters attending "Friends of *NRA*" fundraising events and responding to the NRA's solicitations intended to support the NRA's public-interest programs, not the vendettas and thirst for power of those who failed the NRA. And the Foundation's current leaders have no right to mislead donors who intend to support the NRA into supporting an organization that has turned against it. The NRA therefore seeks and is entitled to judgment barring the Foundation's use of the NRA's trademarks, including its famous "NRA" mark, and requiring that the millions in funds raised to support the NRA's charitable programs continue to be put to that use.

2.      The NRA's claims for federal trademark infringement, unfair competition, and trademark dilution under the Lanham Act, 15 U.S.C. § 1051 *et seq*., as well as common law trademark infringement and unfair competition, arise from the Foundation's unlawful free-riding off the NRA's goodwill through the Foundation's unauthorized use of the NRA's trademarks. The Foundation's infringing use of the NRA's trademarks is likely to cause consumer confusion as to (1) the origin and source of the Foundation's goods and services and (2) the NRA's association, sponsorship, and/or affiliation with the Foundation and its goods and services. The Foundation willfully disregards the NRA's valuable trademark rights in an attempt to profit from the NRA's reputation and goodwill.

3.      The NRA's other claims concern the Foundation's ongoing and threatened misuse of approximately $160,000,000 raised by or with the NRA and through solicitations representing

to donors that their contributions would be used to support NRA's charitable activities, including its educational programs and financial support of mission-aligned local nonprofit organizations ("NRA Charitable Activities"). The use of these "NRA-Restricted Funds" for other purposes violates the law of charitable trusts, well-established equitable doctrines binding nonprofits to their solicitations and representations to donors, and the rights of the NRA as the party that raised these funds and is, with respect to the NRA Charitable Activities, their intended beneficiary.

4.      The NRA seeks preliminary and permanent injunctive relief on its trademark-related claims; declaratory and injunctive relief concerning the permissible use of funds contributed to the Foundation to support NRA Charitable Activities; and declaratory and injunctive relief concerning the validity of the Foundation's attempted amendments to its governing documents.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338, and pursuant to the principles of supplemental jurisdiction under 28 U.S.C. § 1367, in that this Complaint raises federal questions under the Lanham Act, 15 U.S.C. § 1051 *et seq*., and brings claims related to the same case or controversy arising under the Lanham Act.

6.      This Court has personal jurisdiction over Defendant because Defendant is incorporated in this district, and Defendant conducts business and committed acts of infringement and unfair competition in this district. This Court's exercise of personal jurisdiction over Defendant is also proper because Defendant has purposefully availed itself of the opportunity to conduct commercial activities in this district and this Complaint arises out of those commercial activities.

7.     Venue is proper in this district under 28 U.S.C. § 1391(b) & (c) because Defendant is incorporated is in this district, Defendant is subject to personal jurisdiction in this district, and a substantial portion of the events giving rise to this Complaint occurred in this district.

**PARTIES**

8.     Plaintiff National Rifle Association of America, Inc. is a nonprofit civil rights organization incorporated under the laws of the State of New York having its principal place of business at 11250 Waples Mill Road, Fairfax, Virginia 22030. The NRA is recognized as tax-exempt under Section 501(c)(4) of the Internal Revenue Code.

9.     Defendant NRA Foundation, Inc. is a nonprofit organization incorporated under the laws of the District of Columbia. The Foundation is recognized as tax-exempt under Section 501(c)(3) of the Internal Revenue Code.

**FACTUAL BACKGROUND**

**The NRA**

10.     Formed over 150 years ago in November 1871, the NRA is widely recognized as America's foremost defender of Second Amendment rights. The NRA advocates for U.S. citizens' firearm rights, including through lobbying and other political activities. In 1975, the NRA formed the NRA Institute for Legislative Action to function as the lobbying arm of the NRA, committed to preserving the right of law-abiding individuals to purchase, possess, and use firearms.

11.     In addition to its Second Amendment advocacy, the NRA offers programs and events related to firearm education, training, and safety. The NRA began building rifle shooting ranges and holding shooting competitions in the late 1800s and early 1900s. Its shooting competitions continue today. The NRA has also developed firearm training materials for the military, law enforcement, and civilians. The NRA introduced the *NRA Police Firearms Instructor*

*Certification Program* in 1960. Today, the NRA offers firearm training for recreational users through more than 125,000 certified instructors and related courses. For example, the NRA has established an educational program for young hunters known as the *Youth Hunter Education Challenge* and has held *Refuse to Be a Victim* seminars focused on personal safety plans.

12.     The NRA's non-advocacy programs include: Youth Programs; Women's Programs; Range Services; Clubs & Associations; Disabled Shooting Sports; Eddie Eagle; Education & Training; Law Enforcement; Competitive Shooting; Hunter Safety & Services; and the National Firearms Museum.

13.     The NRA also publishes firearms-related periodicals: the *NRA Newsletter*, discussing NRA's advocacy efforts, programs, and events; *The American Rifleman*, discussing new firearm legislation; and *The American Hunter*, discussing hunting issues and offering reviews of firearms and ammunition.

14.     The NRA provides information to the public regarding Second Amendment rights advocacy as well as its firearm-related programs and events.

15.     The NRA also offers clothing, apparel, accessories, and other merchandise bearing its trademarks through its online retail store, https://nrastore.com/, including, but not limited to, T-shirts, vests, hoodies, jackets, hats, belts, shoes, watches, wallets, firearm cases, holsters, targets, knives, safety equipment, bags, and decals. Representative examples of such merchandise are below:







16.     The NRA offers certain of its programs, events, periodicals, merchandise, and related goods and services to the public through paid memberships. NRA memberships also include access to a diverse community of firearm owners and firearm rights advocates, as well as deals on firearms, gear, and accessories offered by participating brands and stores.

**The NRA's Federal Trademark Registrations and Applications**

17.     The NRA offers its programs, events, periodicals, charitable services, merchandise and related goods and services under its NRA trademark and other marks.

18.     The NRA has expended substantial time, money, and resources marketing, advertising, and promoting the firearms-related goods and services offered under its trademarks, including through promotion of such goods and services through its website and sale of NRA memberships.

19.     The NRA has registered many of its marks with the United States Patent and Trademark Office ("USPTO").

20.     The NRA owns incontestable U.S. Trademark Registration No. 1,885,345 for NRA for the following services (the "'345 Mark"):

- "educational services; namely, conducting courses of instruction on firearm and wild life conservation; and publication services; namely, publishing magazines, text books, manuals, targets, rule books and other books and articles of interest to hunters, collectors, competitive shooters and other gun owners" in Class 41, and

- "association services; namely, promoting the interests of owners of firearms, and research services in the field of firearm development and improvement" in Class 42,

which issued on March 21, 1995. The '345 Mark has been used in commerce throughout the United States continuously and exclusively by the NRA since at least as early as December 1871. Accordingly, in addition to its rights in the formal registration of the '345 Mark, the NRA has common law rights in the '345 Mark. Attached hereto as **Exhibit A** is a true and correct copy of the Registration Certificate and prosecution history of the '345 Mark.

21.    The NRA owns U.S. Trademark Registration No. 5,538,391 for NRA for the goods and services listed below (the "'391 Mark"), which issued on August 14, 2018. The '391 Mark has been used in commerce throughout the United States continuously and exclusively by the NRA in connection with such goods and services since at least as early as the years listed below:

- 1871 in connection with "Association services to promote awareness of the Second Amendment right to keep and bear arms; promoting public awareness in the fields of firearms, hunting, shooting sports; promoting the interests of owners of firearms; Online retail store services featuring clothing, hunting, shooting and firearm gear, jewelry, watches, books, dvds, and gifts for home, office and outdoor activities; providing a website featuring consumer information in the field of firearms and firearm gear and information about the Second Amendment right to keep and bear arms; promoting legislative action, advocacy, and public awareness of the Second Amendment right to the U.S. Constitution" in Class 35;

- 1922 in connection with "Targets for pistols, targets for rifles" in Class 28;

- 1923 in connection with "Printed publications, namely, magazines, pamphlets and books in the field of firearms; printed paper signs; stickers; posters" in Class 16;

- 1982 in connection with "Shirts, pants, shorts, leggings, belts, hats, footwear, vests, coats, ties, jackets, bolo ties" in Class 25;

- 1992 in connection with "Charitable fundraising services" in Class 36;

- 1998 in connection with "Jewelry; bolo ties with precious metal tips; rings; watches; chronological instruments, namely, clocks; lapel pins" in Class 14;

- 2011 in connection with "hunting knives" in Class 08;

- 2012 in connection with "Downloadable podcasts and video recordings in the field of firearms, gun safety, marksmanship, hunting and shooting sports; Downloadable electronic publications in the nature magazines and newsletters in the field of firearms, gun safety, marksmanship, hunting and shooting sports; glasses, namely, sunglasses and shooting glasses in the nature of safety eyewear" in Class 09;

- 2012 in connection with "Association services in the nature of an education and entertainment web site featuring current events, news and charitable events in the fields of firearms, hunting, shooting sports, and the Second Amendment right to keep and bear arms; Providing on-line non-downloadable videos, podcasts and publications, namely, e-magazines in the fields of firearms, hunting, shooting sports, and the Second Amendment right to keep and bear arms; Providing and publishing online non-downloadable magazines featuring articles in the fields, fashion, art, culture, current events, fitness, and general lifestyles; conducting educational programs featuring outdoor shooting sports and hunting activities and firearm training courses and instruction; Providing a web site featuring recreational and sporting information and news in the field of firearms, hunting, shooting sports, firearm training; providing current event news on legislative action on the Second Amendment right to the U.S. Constitution; Providing on-line non-downloadable magazines, videos, and podcasts in the field of firearms, namely, marksmanship, hunting and shooting sports; Providing a website for entertainment purposes featuring videos about firearms, namely, marksmanship, hunting, shooting sports, sports training, sports education, and self-defense; Entertainment services, namely, providing non-downloadable podcasts and video podcasts in the field of gun safety; museum services; educational services, namely, conducting courses of instruction on firearm and wild life conservation" in Class 41;

- 2016 in connection with "flashlights" in Class 11;

- 2017 in connection with "Rifles; Range bags especially adapted to carry firearms and munitions to gun ranges" in Class 13; and

- 2017 in connection with "Bags, namely, backpacks, carry-all bags" in Class 18.

Accordingly, in addition to its rights in the formal registration of the '391 Mark, the NRA has common law rights in the '391 Mark, and the '391 Mark is widely recognized by the general consuming public in the United States as a designation of source of the goods and services offered

by the NRA thereunder. Attached hereto as **Exhibit B** is a true and correct copy of the Registration

Certificate and prosecution history of the '391 Mark.

  22.  The NRA owns incontestable U.S. Trademark Registration No. 1,683,307 for

NATIONAL RIFLE ASSOCIATION for the following goods and services (the "'307 Mark"):

- "educational services; namely, conducting courses of instruction on firearm and wild life conservation; and publication services; namely, publishing magazines, text books, manuals, targets, rule books and other books and articles of interest to hunters, collectors, competitive shooters and other gun owners" in Class 41, and

- "association services; namely, promoting the interests of owners of firearms, and research services in the field of firearm development and improvement" in Class 42,

which issued on April 14, 1992. The '307 Mark has been used in commerce throughout the United

States continuously and exclusively by the NRA since at least as early as December 1871.

Accordingly, in addition to its rights in the formal registration of the '307 Mark, the NRA has

common law rights in the '307 Mark. Attached hereto as **Exhibit C** is a true and correct copy of

the Registration Certificate and prosecution history of the '307 Mark.

  23.  The NRA owns incontestable U.S. Trademark Registration No. 4,364,231 for THE

NRA FOUNDATION TEACH FREEDOM for "charitable fundraising services" in Class 36 (the

"'231 Mark"), which issued on July 9, 2013. The '231 Mark has been used in commerce

throughout the United States continuously and exclusively by the NRA since at least as early as

December 31, 2004. Accordingly, in addition to its rights in the formal registration of the '231

Mark, the NRA has common law rights in the '231 Mark. Attached hereto as **Exhibit D** is a true

and correct copy of the Registration Certificate and prosecution history of the '231 Mark.

  24.  The NRA owns U.S. Trademark Registration No. 4,997,790 for FRIENDS OF

NRA for "charitable fundraising services" in Class 36, which issued on July 12, 2016 (the "'790

Mark"). The '790 Mark has been used in commerce throughout the United States continuously and

exclusively by the NRA since at least as early as December 31, 1993. Accordingly, in addition to its rights in the formal registration of the '790 Mark, the NRA has common law rights in the '790 Mark. Attached hereto as **Exhibit E** is a true and correct copy of the Registration Certificate and prosecution history of the '790 Mark.



25.    The NRA owns U.S. Trademark Registration No. 7,080,695 for (NRA SCHOOL SHIELD & Design) for "Development and dissemination of printed educational material for others in the fields of community and school safety and security; educational services, namely, providing classes, seminars, workshops and training in the fields of community and school safety and security, including the aforementioned services provided online via the internet; providing temporary use of online non-downloadable resource guides and publications in the nature of news and information columns and articles, magazines, pamphlets, and instructional manuals, all in the fields of community and school safety and security" in Class 41, which issued on June 13, 2023 (the "'695 Mark"). The '695 Mark has been used in commerce throughout the United States continuously and exclusively by the NRA since at least as early as August 2, 2022. Accordingly, in addition to its rights in the formal registration of the '695 Mark, the NRA has common law rights in the '695 Mark. Attached hereto as **Exhibit F** is a true and correct copy of the Registration Certificate and prosecution history of the '695 Mark.

26.    The NRA owns U.S. Trademark Application Serial No. 99/359,339 for THE NRA FOUNDATION for the following services (the "'339 Mark"):

- "Charitable fundraising; Charitable fundraising to support activities that promote safe and responsible firearms ownership, educational services and activities in the field of hunting and shooting sports, and providing grants and endowment programs therefor; Charitable fundraising services by means of organizing and conducting special events; Charitable foundation services, namely, providing fundraising

activities, funding, scholarships and/or financial assistance for First Responders, Law Enforcement Officers, and Military personnel for educational costs of tuition and expenses of colleges, universities, and higher education" in Class 36, and

- "Providing educational mentoring services and programs in the field of firearm safety, hunting and shooting sports, and related community activities and in support of the Second Amendment; Education services, namely, providing classes, seminars, workshops, meetings and expositions in the fields of firearm safety, hunting and shooting sports, and related community activities and in support of the Second Amendment" in Class 41,

which the NRA applied to register with the USPTO on August 26, 2025. The '339 Mark has been used in commerce throughout the United States continuously and exclusively by the NRA since at least as early as December 31, 1990. Accordingly, in addition to its rights in the formal registration of the '339 Mark, the NRA has common law rights in the '339 Mark. Attached hereto as **Exhibit G** is a true and correct copy of the '339 Mark.

**The NRA Establishes the Foundation and Raises Funds for It to Benefit the NRA Charitable Activities**

27.     The NRA established the Foundation in 1990 to support NRA Charitable Activities.

28.     Although the NRA is a 501(c)(4) organization, to which contributions are not deductible as charitable contributions for donors, many of the NRA's activities are in furtherance of charitable, educational, and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code, such that they can be funded by a 501(c)(3) organization, to which contributions may be deductible as charitable contributions for donors. The NRA established the Foundation, a 501(c)(3) organization, as a vehicle through which individuals and corporations could make tax-deductible contributions in support of the NRA's charitable, educational, and scientific activities connected with the lawful ownership and use of firearms.

29.     The "NRA Charitable Activities" include: educational services such as courses, classes, workshops, etc. of instruction on firearms and firearms safety; publications that educate

the public on firearms and firearm safety and the importance of civil rights under the Second Amendment; research services in the field of firearm development, improvement, and safety; and financial support of mission-aligned local charitable organizations. For example, the NRA runs the "Eddie Eagle GunSafe" program, which educates children on gun safety and how to respond in situations involving firearms.

30.    The NRA Charitable Activities are not restricted to NRA members and qualify as activities that may be supported by a 501(c)(3) organization.

31.    The NRA Charitable Activities do not include non-qualifying activities, such as lobbying or political activity, or activities undertaken for purposes beyond those enumerated under section 501(c)(3).

32.    From the Foundation's establishment in 1990, and pursuant to its bylaws, the Foundation's trustees, who comprise its board, were selected by the NRA or were NRA officers serving in *ex officio* capacity. The Foundation's 1990 bylaws provided that the NRA's Executive Vice President (in effect, the NRA's CEO) "shall be a Trustee of the Foundation," that non-*ex officio* trustees "shall be elected by the Board of Directors of the National Rifle Association ('NRA') at the Annual Meeting of the Directors of the NRA," that "the majority of the members of the Board of Trustees of the Foundation shall be Directors of the NRA," and that the "remaining members of the Board of Trustees of the Foundation shall be persons who are members of the NRA." A subsequent amendment provided that the NRA's President serve as an *ex officio* member of the Foundation's board.

33.    Article 10 of the Foundation's articles of incorporation provided, "The number of Directors ('Trustees') may be increased or decreased but may not be fewer than seven (7) or more than nine (9)." Article 12 provided, "The Foundation may by its Bylaws make any other provisions

or requirements for the arrangement or conduct of the business of the Foundation provided the same shall not be inconsistent with these Articles of Incorporation or contrary to the laws of the District of Columbia or the United States."

34.    From the Foundation's establishment in 1990 and into approximately 2025, the Foundation had no independent employees. Instead, NRA employees carried out services and activities related to the Foundation.

35.    From the Foundation's establishment in 1990 and into 2025, the NRA employed its staff, trademarks, reputation, and other resources to raise funds for the Foundation based on the mutual understanding that the Foundation would, through grants, support NRA Charitable Activities.

36.    The NRA raised funds for the Foundation through its well-known and successful Friends of NRA program, which the NRA has operated since approximately 1993.

37.    The Friends of NRA program conducts hundreds of fundraising events around the United States each year.

38.    The NRA conducts the Friends of NRA program through its field representatives, who are NRA employees in the NRA's Office of Advancement.

39.    The Friends of NRA program has raised approximately 1.2 billion dollars in total contributions for the Foundation. The success of the Friends of NRA program has depended and continues to depend on the NRA's efforts and the use of the NRA's name and trademarks.

40.    The NRA has also raised funds for the Foundation through the NRA's relationships with NRA members and supporters and through solicitations.

41.    All or substantially all of the funds contributed to the Foundation over its existence have been raised by the NRA and through use of the NRA name and the NRA's trademarks.

**The Foundation Receives Contributions Solicited to Fund NRA Charitable Activities**

42.     Donors to the Foundation intended, based on solicitations, representations, and other circumstances, that contributed funds would be put to the specific purpose of supporting NRA Charitable Activities.

43.     The Friends of NRA program conveys in its very name that funds raised at Friends of NRA events will be used to support NRA Charitable Activities. That was reinforced through Friends of NRA advertising materials and solicitations, through communications by NRA field representatives, and through speeches and messaging at Friends of NRA events. Participants in Friends of NRA events intended that their contributions would be put to the specific purpose of supporting NRA Charitable Activities. Friends of NRA participants often speak of their support for the NRA and its programs.

44.     Solicitations, invitations, and other donor communications concerning the Foundation refer to the NRA and NRA programs. As a result, donors to the Foundation intended that their contributions would be put to the specific purpose of supporting NRA Charitable Activities.

45.     Indeed, the Foundation's most recent annual report from 2024 states, "The vision of the NRA Foundation is to provide lasting financial stability for the NRA's programs, teaching the safe and responsible use of firearms in a free society and the understanding of one simple truth – that personal freedom must be preserved by the right of individuals to keep and bear arms."

46.     The Foundation's most recent annual report from 2024 acknowledges that, as of December 31, 2024, the Foundation held $36,389,536 "designated for the NRA as beneficiary in investments and net assets with donor restrictions."

47.     That figure represents only a portion of the NRA-Restricted Funds.

48.     Whether or not donors made contributions subject to express restrictions, donors' contributions to the Foundation over its existence were made with the intent that their contributed funds would be put to the specific purpose of supporting NRA Charitable Activities.

**The Foundation's Leaders Attempt to Sever Its Relationship with the NRA and Seek to Repurpose the NRA-Restricted Funds to Their Own Ends**

49.     The Foundation's beef with the NRA is personal. It is driven by a clique of former NRA leaders who are bitter that their faction lost control of the NRA's Board following a series of scandals that led to a loss of member confidence, and the rise of a competing movement to reform the NRA that ultimately gained control of the NRA Board. The current legal dispute was sparked by the unlawful attempt of the Foundation's current leaders to undermine the NRA and establish the Foundation as a competitor to the NRA using funds that the NRA raised and donors contributed to support NRA Charitable Activities.

50.     The Foundation's current leaders, including its chairman and the majority of its trustees, are former members of the NRA Board of Directors who were members of a faction allied with former NRA Executive Vice President and CEO Wayne LaPierre.

51.     An investigation of and then civil action against the NRA by the New York Attorney General's office (the "NYAG Action") beginning in approximately 2018 revealed misuse of funds and breach of fiduciary duty by certain NRA officers, including LaPierre, and inadequate oversight, including by then-members of the Audit Committee of the NRA's Board of Directors. LaPierre announced his resignation on the eve of trial in 2024 and was ultimately adjudged liable to the NRA for breach of fiduciary duty and barred from serving in any fiduciary position as an officer or director of the NRA for ten years.

52.     The final judgment in the NYAG Action permanently barred certain former members of the NRA Board's Audit Committee who had served during LaPierre's tenure from

16

future service on the Audit Committee. Individuals subject to this bar now serve on the Foundation's board include David Coy, who also serves as the Foundation's Treasurer, and Charles Cotton.

53.    In addition, three current Foundation trustees—Bob Barr, Charles Cotton, David Coy—are former NRA directors who served on the NRA's now-defunct Special Litigation Committee that presided over controversial litigation and excessive legal spending. Charles Cotton served three terms as NRA President at the tail-end of LaPierre's tenure.

54.    The revelations of the NYAG Action, the NRA's shielding of LaPierre during the course of that action, and the litigation campaign and excessive legal spending caused a backlash among NRA members and supporters and a drop in NRA members' financial support of the NRA.

55.    NRA directors are elected by the NRA membership, and the Board had for many years been dominated by directors allied with and deferential to LaPierre.

56.    Beginning in or around 2023 substantial numbers of NRA members began voting for director candidates unaligned with LaPierre campaigning on a platform of reform, transparency, and fiscal restraint.

57.    As the reform movement grew, candidate slates and the Board were split between two competing groups, generally referred to as the "Reformers" and the "Old Guard," the latter generally consisting of LaPierre allies and others who facilitated or abided the perceived mismanagement of the NRA during LaPierre's tenure.

58.    Building on gains in 2023 and 2024, the Reformers obtained a Board majority in 2025 and elected their preferred candidate to serve as NRA President.

59. The Foundation board, however, remained stacked with trustees associated with the Old Guard faction that had lost control of the NRA, including Foundation Chairman Tom King, whom NRA members had voted off of the NRA Board in 2024.

60. As the Reformers gained power at the NRA, the Foundation's board undertook a series of attempted article and bylaw amendments seeking to entrench the Old Guard's control of the Foundation and sever the Foundation's relationship with the NRA.

61. Following defeat of the Old Guard-supported candidate to serve as NRA's Executive Vice President in 2024, the Foundation attempted to strip that office of its *ex officio* membership on the Foundation's board.

62. The Foundation's board also attempted to strip the NRA's President of voting rights on the Foundation's board and then, following the election of a Reformer-favored NRA President, attempted to strip the office of NRA President of its *ex officio* membership on the Foundation's board.

63. The Foundation's board attempted to eliminate the requirement that a majority of Foundation trustees be members of the NRA's Board.

64. The Foundation's board attempted to sever the historic connection between the two organizations and entrench the Old Guard's control to of the Foundation through a bylaw amendment purporting to eliminate the NRA Board's right to appoint Foundation trustees and providing instead that the Foundation's board would be self-perpetuating—that is, its trustees would elect themselves.

65. The Foundation's board attempted to remove the limitation on the number of trustees authorized under its articles of incorporation, to permit further stacking of the Board by the Old Guard.

66. None of these bylaw amendments were necessary to comply with any legal requirement or obligation.

67. Indeed, these attempted amendments were undertaken in violation of the Foundation's governing documents and the D.C. Nonprofit Corporation Act.

68. The Foundation's board failed to provide required notice to all Foundation trustees of the meetings at which it purported to adopt these amendments.

69. The actions of the Foundation's board at these meetings violated the limitation of the Foundation's articles of incorporation on the number of board members.

70. The minutes of the meeting of the Foundation's board on August 23, 2025—at which the board purported to adopt most of these amendments—failed to specify or even describe the substantive changes that the board purportedly adopted to the Foundation's bylaws and articles of incorporation.

71. The Foundation failed to provide notice to the NRA of any of these amendments. Instead, it acted secretively to separate the Foundation from the NRA and the NRA Board, whose members represent the NRA's membership; to cement in place Old Guard control of the Foundation in the face of the NRA membership's loss of confidence in their faction; and to arrogate the NRA's rights respecting the Foundation and its assets.

72. The Foundation failed to obtain the NRA's consent to any of these amendments. The NRA did not and does not consent to any of these amendments.

73. Notwithstanding the conduct of the Foundation's board, the NRA and the Foundation continued their working relationship until approximately late 2025, with the NRA continuing to raise funds for the Foundation and the Foundation continuing to fund NRA activities.

74.     Although the Foundation had previously had no employees of its own, its Old Guard-dominated Board hired a disgruntled former NRA employee as the Foundation's executive director, and he began in late 2025 making onerous demands upon, harassing, and seeking to control NRA employees engaged in activities supported by the Foundation.

75.     Demanding that the NRA hand over donor lists and social-media accounts, the Foundation's executive director informed the NRA that the Foundation intended to conduct its own fundraising and public-facing activities.

76.     The Foundation has declined, to date, to authorize 2026 funding of NRA Charitable Activities.

77.     The Foundation's executive director has stated that the Foundation intends to cut off or substantially reduce its financial support of the NRA, to sue the NRA, to take control of certain NRA programs, and to undermine the NRA's finances and financial stability.

78.     On information and belief, the Foundation's leadership intends to withdraw grant and other funding of the NRA except for grants required by the terms of express restrictions, to undertake fundraising activities in competition with the NRA, and to conduct its own programmatic activities in competition with those of the NRA.

79.     These actions would conflict with the solicitations, representations, and other communications made to the donors who contributed the Foundation's endowment, conflict with those donors' understanding and intent respecting the use of the funds they contributed, and conflict with the NRA's intent in conducting fundraising for and with the Foundation over a period of decades.

80.     The NRA, in anticipation of the Foundation's continued support of NRA Charitable Activities in the same manner that has prevailed for many years, has taken steps to implement the

programs, including hiring staff, making up-front expenditures, and continued use of its trademarks and other communications to donors and the public regarding NRA programming.

81.    The sudden reduction in funding by the Foundation frustrates the NRA's ability to plan, manage its finances, and ensure that it is able to operate NRA Charitable Activities at their full and planned capacity.

82.    Furthermore, the Foundation's attempt to position itself as a competitor to the NRA using the NRA's own trademarks and the NRA-Restricted Funds disadvantages the NRA in the markets that it serves and violates the NRA's rights in its trademarks and otherwise.

**The Foundation's Trademark Infringing Activities**

83.    The Foundation seeks to offer identical and substantially similar programs, events, and services under trademarks identical to those owned by the NRA without the NRA's authorization.

84.    The Foundation uses a number of the NRA's valuable trademarks without permission, including the '345 Mark, '391 Mark, '307 Mark, '231 Mark, '790 Mark, '695 Mark, and '339 Mark (collectively, the "NRA Marks"), in connection with its association and charitable fundraising services, among others.

85.    The Foundation provides its association and charitable services to consumers through programs and events identical and substantially similar to those through which the NRA provides its firearms-related goods and services (including its association and charitable services) to consumers.

86.    The Foundation provides its association, charitable, and related services to the same types of consumers as the NRA.

87.     The Foundation is using the NRA Marks in its public communications and in its donor solicitations and other communications, to the detriment of the NRA and in derogation of the NRA's rights in the NRA Marks.

**COUNT I**
**Federal Trademark Infringement**
**(15 U.S.C. § 1114)**

88.     The NRA repeats and realleges all of the allegations contained in the preceding paragraphs of this Complaint as though the same were fully set forth herein.

89.     The NRA owns common law and federal trademark rights in the NRA Marks.

90.     The NRA has made exclusive use of the NRA Marks throughout the United States.

91.     The NRA's common law and federal trademark rights in the NRA Marks predate the Foundation's recent adoption and commercial use of identical marks for identical and substantially similar programs, events, and related goods and services.

92.     The NRA Marks are well-known to the public. The public generally associates the NRA Marks with the NRA, including as an indication of the source of the NRA's goods and services.

93.     The Foundation's use of marks identical to the NRA Marks is likely to cause confusion, mistake, and deception among the relevant consuming public as to the origin and source of the programs, events, charitable services, merchandise, and related services provided thereunder. Such uses are also likely to deceive the relevant consuming public as to whether the programs, events, and services provided under the Foundation's identical marks originate from, are associated with, and/or are otherwise authorized by the NRA. The Foundation's uses of the NRA Marks thus cause damage to the NRA's reputation and goodwill.

94.     Upon information and belief, the Foundation's use of the NRA Marks without authorization is willful and intended to cause confusion, mistake, or deception as to the origin and

source of the programs, events, and related goods and services offered thereunder for purposes of trading off the NRA's reputation and goodwill.

95.    The NRA has been damaged by the Foundation's infringing conduct in an amount to be proven at trial.

96.    The NRA is entitled to recover its damages arising from the Foundation's infringing conduct, as well as the costs of litigation, including attorneys' fees, from the Foundation.

97.    The NRA has no adequate remedy at law. The Foundation's infringing conduct has caused and, unless enjoined, will continue to cause irreparable damage to the NRA's trademark rights in the NRA Marks and to the NRA's business, reputation, and goodwill.

## COUNT II
**False Designation of Origin and Federal Unfair Competition**
**(15 U.S.C. § 1125(a))**

98.    The NRA repeats and realleges all of the allegations contained in the preceding paragraphs of this Complaint as though the same were fully set forth herein.

99.    By misappropriating and using the NRA Marks in commerce, the Foundation misrepresents and falsely describes to the general public the origin, source, sponsorship, and/or affiliation of the Foundation's programs, events, and services, and is likely to confuse consumers as to whether such programs, events, and services are provided, sponsored, endorsed, or authorized by the NRA.

100.    Upon information and belief, the Foundation's wrongful and deceptive actions were done willfully with: (a) knowledge of the NRA's reputation and goodwill as well as the public's recognition of the NRA Marks with the NRA; (b) knowledge that the Foundation was misrepresenting the nature, characteristics, and qualities of its and/or the NRA's goods, services, and commercial activities to the general public; and (c) the intent to deceive the consuming public and trade off of the NRA's goodwill.

23

101.    The NRA has been damaged by the Foundation's wrongful and deceptive conduct in an amount to be proven at trial.

102.    The NRA is entitled to recover its damages arising from the Foundation's wrongful and deceptive conduct, as well as the costs of litigation, including attorneys' fees, from the Foundation.

103.    The NRA has no adequate remedy at law. The Foundation's wrongful and deceptive conduct has caused and, unless enjoined, will continue to cause irreparable damage to the NRA's rights in the NRA Marks and to its business, reputation, and goodwill.

## COUNT III
### Federal Trademark Dilution
### (15 U.S.C. § 1125(c))

104.    The NRA repeats and realleges all of the allegations contained in the preceding paragraphs of this Complaint as though the same were fully set forth herein.

105.    The NRA Marks are either inherently distinctive of the NRA's goods and services provided thereunder or have acquired distinctiveness through the NRA's longstanding exclusive and continuous use thereof.

106.    The NRA Marks are "famous marks" within the meaning of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), in that the NRA Marks are widely recognized by the general consuming public in the United States as a designation of source of the goods and services offered by the NRA thereunder.

107.    The NRA Marks were distinctive and famous prior to the Foundation's adoption and use of identical marks for identical and substantially similar programs, events, and services.

108.    The Foundation's use of marks identical to the NRA Marks for similar programs, events, and services dilute and are likely to continue diluting the distinctiveness of the NRA's famous NRA Marks.

109.    Upon information and belief, the Foundation's wrongful use of marks identical to the NRA Marks for identical and substantially similar programs, events, and services are intentional and willful in violation of Section 43(c) of the Lanham Act.

110.    The NRA is entitled to recover its damages arising from the Foundation's dilution of the NRA Marks, as well as the costs of litigation, including attorneys' fees, from the Foundation.

111.    The NRA has no adequate remedy at law. The Foundation's use of marks identical to the NRA Marks for similar programs, events, and services have caused and, unless enjoined, will continue to cause irreparable damage to the distinctiveness of the NRA Marks and the NRA's business, reputation, and goodwill.

### COUNT IV
### Common Law Trademark Infringement and Unfair Competition

112.    The NRA incorporates and realleges each of the foregoing paragraphs as if fully set forth herein.

113.    The NRA owns common law rights in the NRA Marks, which the NRA acquired through its extensive, continuous, and exclusive use of the NRA Marks in the United States.

114.    Without the NRA's consent or approval, the Foundation has wrongfully used the NRA Marks in connection with the provision of its goods and services, including charitable and fundraising services, and continues to advertise and provide such services under the NRA Marks.

115.    The Foundation's unauthorized use of the NRA Marks has caused and is likely to cause confusion, mistake, and deception as to its affiliation, connection, association with, or sponsorship or approval by the NRA, in violation of District of Columbia or other applicable state common law.

116.    The NRA has suffered and will continue to suffer damages as a result of the Foundation's infringement and unfair competition.

117.    The NRA is entitled to recover damages arising from the Foundation's infringement and unfair competition, as well as the costs of litigation, including attorneys' fees from the Foundation.

118.    The NRA is suffering and will continue to suffer serious and irreparable damage and is therefore entitled to injunctive relief restraining the Foundation from engaging in further infringement and unfair competition.

## COUNT V
### Third Party Beneficiary Breach of Contract

119.    The NRA incorporates and realleges each of the foregoing paragraphs as if fully set forth herein.

120.    A third party may sue on a contract if the contracting parties intended the third party to benefit.

121.    Because donors' charitable contributions may "be provided to a corporation, charitable or otherwise, with a contractual understanding as to how the funds were to be used," *Fam. Fed'n for World Peace v. Hyun Jin Moon*, 129 A.3d 234, 247 (D.C. 2015), the NRA, as the identified intended third-party beneficiary of contributions made to the Foundation for the purpose of supporting NRA Charitable Activities, has the right to enforce the terms of those contracts.

122.    Donors were solicited by the NRA and its employees to donate to the Foundation for the specific purpose of supporting NRA Charitable Activities.

123.    The restrictions on the use of contributed funds were created by solicitations and other related communications, which led donors to intend that funds they contributed to the Foundation would be used for the purpose of supporting NRA Charitable Activities.

124.    Donor's making of charitable contributions to the Foundation in response to the NRA's solicitations for NRA Charitable Activities created contracts where the Foundation, in

consideration for the contributions, would ensure that the contributions were used for the purpose of supporting NRA Charitable Activities.

125.    The NRA was intended to benefit from those contributions because the contracting donors believed their contributions would be used for the purpose of supporting NRA Charitable Activities conducted by the NRA.

126.    The Foundation is in breach of the contracts with donors by using the restricted funds for purposes other than supporting NRA Charitable Activities and retaining the funds with the intent to fund activities other than NRA Charitable Activities.

127.    As a result of this breach, the NRA is not receiving and will not receive funds to support NRA Charitable Activities, causing it present and future damages, including loss of financial support and reduced ability to carry out its activities for the benefit of the public.

<u>COUNT VI</u>
**Third Party Beneficiary and Settlor Breach of Trust**

128.    The NRA incorporates and realleges each of the foregoing paragraphs as if fully set forth herein.

129.    Under D.C. law, an intended beneficiary of assets may sue for enforcement of a trust. D.C. Code § 19-1304.05 provides that "[t]he settlor of a charitable trust, among others, may maintain a proceeding to enforce the trust." The "others" who may enforce the trust include persons with a "special interest in the enforcement of a charitable trust." *YMCA of the City of Wash. v. Covington*, 484 A.2d 589, 591 (D.C. 1984); *Hooker v. Edes Home*, 579 A.2d 608, 612 (D.C. 1990) ("a clearly identified intended beneficiary has a justiciable interest in enforcement of the trust." *Family Fed. for World Peace v. Moon*, 129 A.3d 234, 244 n.15 (D.C. 2015) ("[W]e have recognized the applicability of the rules relating to charitable trusts to [charitable] corporations.").

130.    In establishing the Foundation in 1990, initially contributing to the Foundation, and raising funds for the Foundation to support NRA Charitable Activities, the NRA created a charitable trust for the benefit of NRA Charitable Activities. The NRA was therefore the settlor of the trust.

131.    The NRA appointed the trustees of the Foundation to hold the funds for the benefit of NRA Charitable Activities. From the establishment of the trust in 1990 until 2025, the Foundation used its assets for NRA Charitable Activities.

132.    In addition, a donor's contribution to a charitable corporation for a specific purpose "creates a charitable trust of which the institution is the trustee." *Fam. Fed'n for World Peace*, 129 A.3d at 247 n.20.  It is actionable for a nonprofit to receive a gift restricted to specific purpose and use it for a different purpose. *Id*.

133.    The NRA, as the intended beneficiary of the NRA-Restricted Funds, has a right to enforce the terms of that trust.

134.    Foundation donors made their contributions intending to benefit the NRA by supporting NRA Charitable Activities.

135.    Contributions made to the Foundation are the trust property.

136.    The trust property is estimated to exceed 160 million dollars.

137.    The NRA is the identified, intended beneficiary of the donors' contributions.

138.    Because the donors contributed specifically for the benefit of NRA Charitable Activities, that created a beneficial interest for the NRA in those NRA-Restricted Funds.

139.    The Foundation breached the trust by diverting funds away from the intended purpose and retaining the funds with the intent to use them for other purposes.

140.    This breach harms the NRA by denying it funds it had expected to receive to support NRA Charitable Activities, causing it present and future damages, including loss of financial support and reduced ability to carry out its activities for the benefit of the public.

## COUNT VII
## Breach of Implied Contract

141.    The NRA incorporates and realleges each of the foregoing paragraphs as if fully set forth herein.

142.    The NRA seeks to recover damages the NRA experienced as a result of a breach of duty by the Foundation under an implied contract with the Foundation and to enforce the terms of that contract.

143.    The NRA's provision of valuable services to the Foundation, including fundraising, which the Foundation accepted under circumstances wherein the Foundation reasonably understood that the funds raised would be used to support NRA Charitable Activities created an implied contract.

144.    The NRA's and Foundation's mutual understanding and intentions are confirmed by years in the course of dealing. This arrangement has been upheld every year, until now, since the Foundation was created by NRA as a fundraising vehicle to support NRA Charitable Activities.

145.    The Foundation breached its obligation under the implied contract by diverting funds away from the intended purpose and retaining the funds with the intent to use them for other purposes.

146.    This breach means that the NRA is not receiving funds it expected to receive to fund its charitable programs.

147.    As a result of this breach, the NRA is not receiving and will not receive funds to support NRA Charitable Activities, causing it present and future damages, including loss of financial support and reduced ability to carry out its activities for the benefit of the public.

## COUNT VIII
### Promissory Estoppel

148.    The NRA incorporates and realleges each of the foregoing paragraphs as if fully set forth herein.

149.    A claim for promissory estoppel lies when a plaintiff shows: (1) a promise; (2) that the promise reasonably induced reliance on it; and (3) that the promisee relied on the promise to its detriment.

150.    The NRA and the Foundation agreed that funds raised by the NRA for the Foundation would be used to fund NRA Charitable Activities.

151.    The NRA's understanding with the Foundation contained definite terms, even if not rising to level of contract, namely that the NRA would raise funds for the Foundation and that the funds so raised would be used to fund NRA Charitable Activities.

152.    The NRA relied on that promise to its detriment by conducting fundraising for the Foundation over many years and by building up and hiring employees for NRA Charitable Activities that it understood would be supported by the Foundation, and which were supported by the Foundation for many years, when the Foundation now acts to use the funds raised for other purposes and substantially reduce or curtail its support of NRA Charitable Activities.

## COUNT IX
### Unjust Enrichment

153.    The NRA incorporates and realleges each of the foregoing paragraphs as if fully set forth herein.

154.    A plaintiff may recover under a quasi-contract unjust enrichment claim when the (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust.

155.    The NRA conferred massive benefits on the Foundation through its establishment of and fundraising for the Foundation, use of the NRA's name and valuable trademarks to conduct such fundraising, and use of the NRA's reputation among potential donors. Even going beyond the Foundation's very existence, which it owes to the NRA, the Foundation would have not even a small fraction of its current assets were it not for the NRA's fundraising and use of the NRA's name, trademarks, and reputation to benefit the Foundation.

156.    The Foundation's retention of the funds is unjust because the NRA conferred such great benefits on the Foundation on the understanding that the Foundation would support NRA Charitable Activities and thereby facilitate the continuation and expansion of the NRA' important public-interest programs—from teaching gun safety to kids to educating Americans on firearms handling, self-defense, hunting, and marksmanship. It is a further injustice upon the donors that their money—donated with these same noble purposes in mind—be misappropriate for other purposes to further the Foundation leaders' personal vendetta against the NRA's current leadership.

<u>**COUNT X**</u>
**Unauthorized Diversion of Charitable Assets**
**(D.C. Code §§ 29-401.05, 29-410.03, § 44-1633)**

157.    The NRA incorporates and realleges each of the foregoing paragraphs as if fully set forth herein.

158.    D.C. Code § 29-401.05(b) and § 29-410.03(a) provide that "[p]roperty held in trust or otherwise dedicated to a charitable purpose shall not be diverted from its purpose." D.C. Code

§ 44-1633 provides that "assets in an endowment fund are donor restricted assets" and "[s]ubject to the intent of the donor."

159.    The Foundation was organized for, and holds the NRA-Restricted Funds to, support NRA Charitable Activities in accordance with donor intent.

160.    The Foundation's actions to stop or significantly reduce funding for NRA Charitable Activities are an attempt to divert its primary charitable asset away from its restricted charitable purpose.

161.    The Foundation therefore has violated and is continuing to violate D.C. Code §§ 29-401.05(a), 29-410.03(a), and 44-1633.

### COUNT XI
### Ultra Vires Violations of Organizing Documents
### (D.C. Code §§ 29-412.20, 29-401.22, 29-403.04, 29-408-20, 29-408.22, 29-406.12)

162.    The NRA incorporates and realleges each of the foregoing paragraphs as if fully set forth herein.

163.    Under the statutory and common law governing D.C. nonprofit corporations, the Foundation is required to act in accordance with the D.C. Code and its organizational documents, including its articles of incorporation and bylaws.

164.    The Foundation was required to provide proper notice of its board meetings to all directors, including the NRA officer *ex officio* directors, and the Foundation failed to do so.

165.    The Foundation's board size was limited to nine directors under its articles of incorporation, and required to include the Executive Vice President of the NRA as *ex officio* voting

member with full powers, but the Foundation purported to count over 14 voting directors and failed to notify or count as a director all of its *ex officio* directors.

166.    Actions taken at any Foundation board meeting, including the attempted meeting of August 23, 2024, conducted without proper notice to all directors or while the Foundation's board was improperly constituted in violation of its bylaws are invalid, ultra vires, and void or voidable, including any actions purporting to amend the articles or bylaws.

167.    In addition, the Foundation board's attempt to amend the Foundation bylaws to remove the NRA's rights as a designated body with appointment power of the Foundation board is ultra vires and void because it was undertaken without the consent of the NRA, as required under D.C. Code §§ 29-408.20 and 29-408.22.

168.    Accordingly, the Foundation board's attempted amendments in 2024 and 2025 of its articles and bylaws, as identified herein, are ultra vires and void under D.C. Code §§ 29-412.20, 29-401.22, 29-403.04 and attempted amendment in 2024 of its bylaws to remove the NRA's rights as a designated body is ultra vires and void under D.C. Code §§ 29-408-20, 29-408.22 and 29-406.12.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff National Rifle Association of America, Inc. hereby demands a trial by jury on all issues so triable and respectfully requests that this Court enter judgment in its favor and against Defendant NRA Foundation, Inc., and further requests:

1.    That Defendant and its agents, employees, representatives, successors, and assigns and all other persons, firms, or corporations in active concert or participation with Defendant who receive actual notice of an Order from this Court be preliminary and permanently enjoined from:

a. Directly or indirectly engaging in unfair competition with Plaintiff by means of any activities, including but not limited to, providing, promoting, and/or advertising its association, charitable fundraising, and related services under the NRA Marks or any other activities which infringe Plaintiff's NRA Marks;

b. Using Plaintiff's NRA Marks and any marks similar thereto in connection with providing, promoting, and/or advertising its association, charitable fundraising, and related services;

c. Directly or indirectly engaging in unfair competition with Plaintiff by distributing advertising or promotional materials which in any manner misrepresent the nature, characteristics, or qualities of Plaintiff's or Defendant's goods and services; and

d. Engage in any conduct that is likely to confuse, mislead, or deceive consumers, Defendant's members, and/or members of the public to believe that the association, charitable fundraising, and other firearms-related services provided by Defendant are sponsored, endorsed, or authorized by, or associated or connected with, Plaintiff;

2. That Defendant be required:

a. To pay Plaintiff such damages as Plaintiff has suffered and as were caused by Defendant's wrongful conduct as alleged herein; and

b. To account for and pay to Plaintiff all gains, profits, benefits, and advantages derived from Defendant's wrongful conduct as alleged herein;

3.   An order finding that, by the acts complained of above, Defendant has infringed the NRA's federally registered trademarks in violation of 15 U.S.C. § 1114.

4.   That Plaintiff be awarded treble damages pursuant to 15 U.S.C. § 1117;

5.   That Plaintiff be awarded its attorneys' fees and costs incurred in this action, as well as prejudgment interest, in accordance with 15 U.S.C. § 1117 and D.C. Code § 19-1310.04 and the Uniform Trust Code § 1004, upon which D.C. Code § 19-1310.04 is based;

6.   A declaration under 28 U.S.C. § 2201 and D.C. Code §§ 29-401.05, 29-410.03, and 44-1633 that funds raised for the purpose of supporting NRA Charitable Activities are restricted to that purpose, and that the Foundation's use or retention of such funds for other purposes is in contravention of law;

7.   An order ordering special performance of the contract or quasi contract between NRA and the Foundation that the Foundation designate and allocate the NRA-Restricted Funds to NRA Charitable Activities through grants;

8.   An order enjoining the Foundation from making any further expenditure or transfer of the NRA-Restricted Funds to support activities other than NRA Charitable Activities, and an injunction ordering the Foundation to accurately designate the NRA-Restricted Funds and allocate them to NRA Charitable Activities through grants;

9.   An order appointing a temporary independent trustee(s), director(s), officer(s), receiver(s), or other agents to take custody of the NRA-Restricted Funds to ensure that they are used to support NRA Charitable Activities in accordance with donor intent, or alternatively, an order appointing a monitor of NRA's choosing to ensure that the Foundation uses and distributes the NRA-Restricted Funds to support NRA Charitable Activities in accordance with donor intent;

10. An order under D.C. Code §§ 29-401.22, 29-403.04 29-408.09, and 29-408.23, confirming the continued validity of the Foundation's articles of incorporation and bylaws as they existed before the improper and unlawful attempts to amend them or, alternatively, an order rescinding or setting aside the unlawful amendments of the Foundation's articles of incorporation and bylaws;

11. An order enjoining the Foundation from acting under the unlawful amendments of the Foundation's articles of incorporation and bylaws;

12. An accounting to determine the funds that constitute the "NRA Restricted Funds" and an accounting of all funds expended by the Foundation since January 1, 2024;

13. An order granting equitable restitution, disgorgement of profits, and other appropriate equitable monetary relief against Defendant such as constructive trust; and

14. That Plaintiff be awarded such other and further relief as the Court deems just and proper.

/s/ Andrew M. Grossman
Andrew M. Grossman (D.C. Bar No. 985166)
Mark W. DeLaquil (D.C. Bar No. 493545)
Mark H. Tidman (D.C. Bar No. 441310)
**BAKER & HOSTETLER LLP**
1050 Connecticut Avenue, Suite 1100
Washington, D.C. 20036
Phone: 202.861.1500
Email: agrossman@bakerlaw.com

*Counsel for Plaintiff NATIONAL RIFLE ASSOCIATION OF AMERICA*

Dated:  January 5, 2026