# EXHIBIT 6

**IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| DISTRICT OF COLUMBIA,<br>a municipal corporation,<br>441 Fourth Street N.W.<br>Washington, D.C. 20001,<br><br>        Plaintiff,<br><br>        v.<br><br>NRA FOUNDATION, INC.,<br>a D.C. nonprofit corporation,<br>11250 Waples Mill Road<br>Fairfax, VA 22030, and<br><br>NATIONAL RIFLE ASSOCIATION OF<br>AMERICA, INC.,<br>a New York nonprofit corporation,<br>11250 Waples Mill Road<br>Fairfax, VA 22030<br><br>        Defendants. | Civil Action No. <u>2020 CA 003454 B</u> |

**SECOND AMENDED COMPLAINT FOR EQUITABLE AND INJUNCTIVE RELIEF**
**FOR VIOLATIONS OF THE NONPROFIT CORPORATION ACT**
**AND COMMON LAW**

Plaintiff, the District of Columbia (the "District"), through its Attorney General, brings this action against Defendants the NRA Foundation, Inc. ("Foundation") and the National Rifle Association of America, Inc. ("NRA") pursuant to the District of Columbia's Nonprofit Corporation Act, D.C. Code § 29-412.20, and the common law seeking to obtain equitable and injunctive relief to ensure that the Foundation is operated in an independent manner that honors its own nonprofit charitable purposes. In support of this Complaint, the District states as follows:

## INTRODUCTION

1.    The Foundation is a District nonprofit established to operate solely for charitable purposes related to promoting firearm and hunting safety.  As a charity with status as a 501(c)(3) organization under federal tax law, donors can give money to the Foundation tax free.  The Foundation is affiliated with the NRA and one of its purposes is to financially support activities of the NRA that are consistent with the Foundation's charitable purposes.  However, the Foundation is an independent nonprofit and serves charitable purposes separate and apart from the NRA.

2.    In recent years, the NRA has experienced financial problems related, in large part, to low membership and the NRA's decision to continue to waste funds on improper, lavish spending.  To plug financial holes caused by its own poor management, the NRA turned to the Foundation's funds.  Because the Foundation's Board of Trustees and executives are dominated by the NRA, and the NRA had subverted the Foundation's independence, the Foundation has allowed itself to be financially exploited through, among other things, unfair loans and management fee payments to the NRA.  In allowing its funds to be diverted from charitable purposes and wasted to prop up the NRA in impermissible ways, the Foundation Board of Trustees has failed to provide meaningful oversight and failed in its fiduciary duties.  Through this enforcement action, the District seeks injunctive relief sufficient to reform the Foundation's lack of proper independent governance and a constructive trust over Foundation funds improperly wasted on the NRA.

## PARTIES

3.    Plaintiff District of Columbia, a municipal corporation empowered to sue and be sued, is the local government for the territory constituting the permanent seat of the government of the United States.  The District is represented by and through its chief legal officer, the Attorney General for the District of Columbia.  The Attorney General has general charge and conduct of all

legal business of the District and all suits initiated by and against the District, and is responsible for upholding the public interest.  D.C. Code § 1-301.81(a)(l).  The Attorney General is responsible for ensuring that nonprofits operating in the District or under its laws operate for a public purpose and is expressly authorized to enforce the provisions of the District's Nonprofit Corporation Act ("NCA") as stated in D.C. Code § 29-412.20(a).

4.  Defendant NRA Foundation, Inc. is a nonprofit organization incorporated under the laws of the District of Columbia.  The Foundation is a nonprofit charitable corporation exempt from taxation under section 501(c)(3) of the Internal Revenue Code of 1986, and required to operate exclusively for one or more nonprofit charitable purposes as defined in the NCA in D.C. Code § 29-401.02(3)-(4)(A).

5.  Defendant the National Rifle Association of America, Inc. ("NRA"), is a nonprofit organization incorporated under the laws of the state of New York.  It is also registered as a foreign nonprofit corporation in the District of Columbia.  The NRA is a social welfare organization federally exempt from taxation under Internal Revenue Code section 501(c)(4).

## JURISDICTION

6.  This Court has subject matter jurisdiction over this case pursuant to D.C. Official Code § 11-921, § 29-412.20(a)(l), and § 1-301.81.

7.   This Court has personal jurisdiction over the Foundation pursuant to D.C. Official Code § 13-422 and § 13-423.

8.  This Court has personal jurisdiction over the NRA pursuant to D.C. Official Code § 13-423.

## LEGAL FRAMEWORK

9.  At their most basic level, 501(c)(3) nonprofit organizations (hereinafter referred to as "charitable corporations") are set up to benefit the public and must operate exclusively for public purposes.  The Attorney General is empowered by common law and statute to police the nonprofit activities in the District to ensure that nonprofits operate and spend their funds consistent with the public purpose for which the nonprofits were created.

10. Charitable corporations receive various federal and state tax benefits, including eligibility to receive tax deductible contributions.  Charitable corporations hold their assets for the benefit of the public and must ensure those assets are used for their intended and tax subsidized purpose. Charitable corporations are not permitted to engage in or fund political campaign activity; may not engage in more than an insubstantial amount of lobbying activity; their assets may not inure to the benefit of insiders, and they may not be organized and operated for the benefit of private interests.

11. In the District, a charitable corporation must adhere to the nonprofit purposes outlined in its bylaws and articles of incorporation.  D.C. Code § 29-402.06(b).

12. While charitable corporations may be part of a complex structure of other related organizations whose nonprofit purposes vary, the 501(c)(3) organization must ensure that all funds flowing to related entities are used for 501(c)(3) charitable purposes.

13. Transactions between related parties must be at arm's length and for fair value to the charitable organization; grants by a charitable corporation to a related party must be for the specific charitable purposes of the charitable corporation and may not be used to fund the general operations of a related entity that engages in noncharitable activities.

14. The NCA broadly empowers the Attorney General to police charitable corporations incorporated under District law.  This includes the ability to secure broad injunctive and equitable

relief whenever a District charitable corporation "has exceeded or abused and is continuing to exceed or abuse the authority conferred on it by law" or "has continued to act contrary to its nonprofit purposes." D.C. Code § 29-412.20(a)(1)(B) and (C).

15. The Attorney General also is empowered under common law to ensure that a charitable corporation spends its funds in a manner that promotes its charitable purpose and avoids waste. Simply because a charitable corporation has a substantial amount of funds at its disposal does not mean it can enter into unreasonable and unfair transactions that waste charitable funds.

16. The Attorney General's broad authority extends to foreign nonprofit corporations when they conduct business with, or obtain funds from, District nonprofit corporations. The Attorney General may obtain a constructive trust over funds held by foreign nonprofit corporations when those funds are wasted assets of a District charitable corporation.

## RELEVANT CORPORATE BACKGROUND

### A.  The NRA Foundation, Inc. is a 501(c)(3) charitable organization

17. As a District charitable corporation, the Foundation must operate in accordance with the requirements of the NCA, the Foundation's articles of incorporation and bylaws, and in furtherance of its nonprofit purposes by maintaining appropriate corporate governance, oversight, and financial accountability.

18. The Foundation's articles of incorporation define its nonprofit purposes as follows:

The Foundation is organized and is to be operated exclusively to carry out the following charitable, educational and scientific purposes:

(a) To promote, advance and encourage firearms and hunting safety;

(b) To educate individuals, including the youth of the United States, with respect to firearms and firearms history and hunting safety and marksmanship, as well as with respect to other subjects that are of importance to the well-being of the general public;

(c) To conduct research in furtherance of improved firearms safety and marksmanship facilities and techniques;

(d) To support the activities of the National Rifle Association of America ("NRA"), but only to the extent that such activities are in furtherance of charitable, educational and scientific purposes within the meaning of section 501(c)(3) of the Internal Revenue Code of 1986, as amended ("Code"), or any similar provision subsequently enacted; [and]

...

(f) To engage in any other activity that is incidental to, connected with or in advancement of the foregoing purposes and that is within the definition of charitable, educational and scientific for purposes of Section 501(c)(3) of the Code.

Articles of Incorporation of the NRA Foundation, Inc., Art. 3 (Aug. 3, 1990).

19. As part of the Foundation's purpose, each year it awards grants and sponsorships to organizations across the country that further the charitable purposes of the Foundation. These programs are funded from contributions made to the Foundation.

20. While supporting the NRA is one of the Foundation's charitable nonprofit purposes, it may only fund NRA activities that are in furtherance of charitable, educational, and scientific purposes within the meaning of section 501(c)(3) of the Internal Revenue Code of 1986. The Foundation is strictly prohibited from funding other activities of the NRA, including political and substantial lobbying activities.

21. The Foundation Board of Trustees has a fiduciary duty to conserve and use all organization assets for the Foundation's specified charitable purposes. This includes ensuring that Foundation funds are used by the NRA only for purposes consistent with the Foundation's 501(c)(3) status. To assist the Board in carrying out their fiduciary duties, the Foundation Board of Trustees established, at all relevant times, an Investment Committee, comprised of the Foundation Treasurer and at least three Board members, with decision-making authority for some investment decisions.

22. The Foundation's Investment Committee is responsible for hiring and supervising an investment consultant to assist in the design, implementation, and evaluation of the Foundation's investment policies.  These investment policies must be designed to protect the Foundation's funds and charitable purposes, establish oversight, prevent conflicts of interest, document investments, and provide criteria for performance of managers and consultants.  The Investment Committee is responsible for the integrity of the Foundation's asset allocation strategy and for providing regular performance reports to the Board of Trustees.

23. At all times relevant to this Complaint, the Foundation Board and Investment Committee have abdicated their fiduciary responsibilities by ceding operational control of the Foundation to the NRA.

B. The National Rifle Association of America is a 501(c)(4) social welfare organization

24. Unlike the Foundation, the NRA is not a charitable corporation.  Rather, as a 501(c)(4) organization, the NRA is permitted to, and does engage in, political campaign activity and may engage in unlimited lobbying activity.  Unlike the Foundation, donations to the NRA are not tax deductible as charitable contributions.

25. The NRA's mission is:

1.    To protect and defend the Constitution of the United States, especially with reference to the inalienable right of the individual American citizen guaranteed by such Constitution to acquire, possess, collect, exhibit, transport, carry, transfer ownership of, and enjoy the right to use arms, in order that the people may always be in a position to exercise their legitimate individual rights of self-preservation and defense of family, person, and property, as well as to serve effectively in the appropriate militia for the common defense of the Republic and the individual liberty of its citizens;

2.    To promote public safety, law and order, and the national defense;

3.    To train members of law enforcement agencies, the armed forces, the militia, and people of good repute in marksmanship and in the safe handling and efficient use of small arms;

4.    To foster and promote the shooting sports, including the advancement of amateur competitions in marksmanship at the local, state, regional, national, and international levels;

5.    To promote hunter safety, and to promote and defend hunting as a shooting sport and as a viable and necessary method of fostering the propagation, growth and conservation, and wise use of our renewable wildlife resources. The Association may take all actions necessary and proper in the furtherance of these purposes and objectives.

26. The NRA is supported financially by the Foundation, which "raises tax-deductible contributions in support of a wide range of firearm-related public interest activities of the [NRA]." https://www.nrafoundation.org/about-us/.

C. The NRA's Control Over the Foundation's Board of Trustees

27. Under the NCA and the Foundation's Articles of Incorporation, the Foundation must have a Board of Trustees ("Board") that directs and oversees the Foundation's affairs.   This Board must act independently to protect the interests of the Foundation, especially where the Foundation's interests diverge from, or are contrary to, the NRA.

28.  In function and in practice, during times relevant to this Complaint, the Foundation has been operated as a wholly controlled subsidiary of the NRA, without independence or a separate identity from the NRA.   The Foundation Board of Trustees, contrary to its fiduciary duties, repeatedly chose to serve the interests of the NRA above those of the charitable nonprofit purposes of the Foundation.

29. The Foundation's Board is controlled by the NRA. The Foundation's Trustees must be elected by the NRA's Board of Directors following the NRA's Annual Meeting. Foundation Bylaws Art. III, § 1(C).

30. Membership on the Foundation's Board substantially overlaps with membership on the NRA's Board.   Under the Foundation's bylaws, a majority of the members of the Foundation

Board of Trustees must also be Directors of the NRA, and all remaining members must be outstanding members of the NRA.

31. The NRA President and the NRA Executive Vice President are automatically "ex officio" members of the Foundation Board of Trustees with "full powers." Bylaws of the NRA Foundation, Inc., Art. III, § 1(D).

32. The NRA has the power to vote out a Trustee at the expiration of their term. Trustees also can be voted out before their term ends by a majority of Trustees, all of which could be concurrently sitting on the NRA Board of Directors.

33. The NRA exercises power with respect to key offices of the Foundation. The Foundation's Executive Director is appointed by the NRA Executive Director of Advancement. Foundation Bylaws Art. IV, § 1.

34. The Treasurer for the NRA and for the Foundation are the same person (formerly Wilson H. "Woody" Phillips). Additionally, the Foundation has no employees; all individuals that have Foundation-related responsibilities are employed by the NRA and are under NRA supervision and control.

## IMPROPER RAIDING OF FOUNDATION FUNDS BY THE NRA

35. In recent years, the NRA began to experience cash flow problems. It was publicly reported that the NRA grappled with legal battles and declining membership. The majority of the Foundation's Board members are on the NRA's Board and were aware of the NRA's cash flow problems.

36. Despite its serious financial troubles, the NRA continued to make unreasonable expenditures on items such as the following:

    a.  Consulting Service Agreements with individuals who provided little or no consulting services, or work of any kind, to anyone in the NRA or the Foundation, including but not limited to:

        i.  In November 2016, the NRA entered into an agreement for consulting services with a former NRA Executive Director of General Operations. That person was terminated and the agreement was made to prevent them from "badmouthing the NRA," according to NRA Executive Vice President Wayne LaPierre. The agreement provided payments to that person totaling $1.83 million. That person provided no consulting services under this agreement.

        ii.  In May 2018, then-NRA Treasurer and CFO and Foundation Treasurer, Woody Phillips, entered into a Consulting Agreement with the NRA to provide consulting services at a rate of $30,000 a month beginning on January 1, 2019, one day after his retirement. Phillips offered limited, if any, consulting and was not required to account for any service provided to the NRA. He performed no consulting services to the current NRA Treasurer and CFO and Foundation Treasurer.

    b.  Travel for NRA Executive Vice President, Wayne LaPierre, his family, friends, employees, donors, and celebrities, via private air. In some instances, LaPierre-approved private air travel cost the NRA upwards of $66,000 per trip. The NRA paid for private travel for LaPierre whether it was for professional or personal reasons, including trips to the Bahamas.

    c.  Extensive Black Car service expenditures at times totaling more than $98,000 for a 2-week European excursion.

## A.  NRA Demands Loans from the Foundation

37. In order to address its cash flow problems and maintain the lavish expenses of its Executive Director, officers, and "consultants," the NRA used its control over the Foundation to raid the Foundation's funds. For instance, in October 2017, the NRA requested a $5 million loan from the Foundation's Investment Committee.

38. In assessing whether to extend the loan, the Foundation's Investment Committee consulted with the Foundation's investment consultant, which agreed that the loan would "make sense" if the NRA was able to repay the loan in three months and pay a 7% interest rate, netting the Foundation a total of $87,500 in interest in that three month period.

39. In agreeing to provide the loan to the NRA, the Foundation's Board did not maintain any semblance of (or actual) independence from the NRA.  Phillips, who was both the NRA and Foundation Treasurer at the time, worked on both sides of the transaction as lender and borrower. Phillips was a member of the Foundation Investment Committee and was actively involved in the Foundation's discussions about the soundness of the loan.  He communicated with the Investment Committee, in-house counsel, and with the Foundation's investment consultant regarding the loan between the NRA and Foundation.  Phillips abstained from voting to approve the loan as an officer of the Foundation, but was involved in all other aspects.

40. On November 2, 2017, the Foundation Board approved the $5 million loan to the NRA. Despite being actively involved in counseling the Foundation's Investment Committee on the loan, Phillips signed the loan agreement on behalf of the NRA, not the Foundation.

41. Pursuant to the loan agreement, the NRA agreed that "No part of the loan shall be used for any partisan political activities nor shall any part of the loan be used in any way to provide any private benefit or inurement or to otherwise jeopardize the 501(c)(3) status of the [Foundation] or the 501(c)(4) status of the [NRA]."  The NRA further agreed that it would "[u]se the proceeds of the loans solely to pay payroll obligations and other overhead obligations or to pay for costs of mailings or periodicals, all in the ordinary course of business consistent with past practices[.]" Notwithstanding the stated purpose, the funds were intermingled into the NRA's general financial accounts and neither the NRA nor the Foundation tracked how the funds were used.   The Foundation Investment Committee did not establish oversight of the funds nor ensure they were being used for their stated purpose.

42. Rather than repaying the loan timely, in January 2018, the NRA requested an extension of the loan's maturity date to June 2018.  Prior to granting the extension, the Foundation Investment

Committee asked Phillips (as NRA Treasurer) if the NRA would be willing to make a partial principal payment "as a good faith reduction in the face amount of the extended loan[.]" Phillips (still a member of the Foundation Investment Committee) responded on behalf of the NRA that "[w]e would prefer not to make a partial principal repayment at this time.  NRA has started an RFP process for its banking relationship, and that, along with the obvious good faith that exists between the organizations should suffice."

43. The Foundation's Investment Committee approved a resolution to extend the loan.  Under the terms of the extension, which is memorialized in an addendum to the loan agreement, the NRA would only make interest payments during the extension period; no payments on the loan's principal was required.  Despite the loan now bearing a term of over six months, the Foundation's Investment Committee did not conduct a new assessment with its investment consultant regarding the prudence of the extension.

44. As with the initial loan, Phillips acted on both sides of the loan extension transaction. While he was part of the Foundation's Investment Committee's discussions on the transaction, including speaking with the Foundation's outside counsel, Phillips ultimately signed the extension document on behalf of the NRA.

45. While the NRA paid back this initial loan in March 2018, only three months later, the NRA requested another $5 million loan from the Foundation.  As with the November 2017 loan, this transaction was approved by the Foundation's Investment Committee without implementing an investment strategy to protect and monitor the Foundation's asset allocation.  The second loan bore a 7% interest rate and a six-month maturity date.  The Foundation Board did not consult its investment consultant before agreeing to this second loan.

46. At least as early as October 2018, it became clear to the Foundation that the NRA was in default of a separate loan it had with a large national bank. As a result of the NRA's default with the bank, the NRA needed the Foundation to drastically alter the terms of the Foundation's second loan.  The NRA demanded that the Foundation extend the maturity date of the second loan to October 2019, and that the Foundation subordinate its loan to the bank and agree that:

> the Borrower shall not prepay or repay and the Lender shall not accept any prepayment or repayment of principal of the loan, whether pursuant to this Section, Section VI hereof, or otherwise, unless all outstanding amounts owed by the Borrower to Wells Fargo under the Wells Fargo Term Loan Agreement have been paid to Wells Fargo in full.

47. The loan subordination greatly benefitted the NRA, with no ascertainable benefit to the Foundation.  In a moment of candor, the Foundation's President and member of the Foundation Investment Committee, William "Bill" Satterfield, told Susan Hayes, Chairman of the Foundation Investment Committee, that if she skipped the vote approving the NRA's drastic loan alteration request "it will enable both of us to avoid voting on a very bad deal for the Foundation[ ]."

48. Notwithstanding the Foundation Board of Trustees' knowledge of the NRA's default with the bank and continued cash flow problems, the Board approved the NRA's loan subordination request and other requests regarding extensions of the second loan.  Again, the Foundation's Investment Committee failed to obtain outside investment advice to assist in the evaluation of the Foundation's investment, asset allocation, or integrity of the loan subordination.

49. In October 2019, the maturity date on the second loan came and went, and the NRA did not pay off the loan.

50. In January 2020, nearly three months after the loan was in default, the Foundation agreed to another extension through October 2020.  Again, the Foundation failed to obtain independent

investment advice and did not perform any oversight to ensure the loan funds were being used for the stated purpose.

51. In approving the first and second loans, including all extensions, the Foundation's Investment Committee improperly abdicated operational control to the NRA, ignored their independent fiduciary duties to the Foundation, and permitted the NRA to divert the Foundation's charitable funds for noncharitable purposes with dubious assurances that the loan would be repaid.

B. The NRA Greatly and Unjustifiably Increases the Foundation's Management Fees

52. The Foundation does not have its own employees or administrative support staff to run day to day operations. It relies on the NRA to provide those services to it. The Foundation pays the NRA a management fee each year to cover the costs of these services, including employee salaries, rent, field operation expenses, and miscellaneous expenses incurred by the NRA to support the Foundation. In recent years, these management fees have been another way for the NRA to siphon off Foundation funds to cover the NRA's misspending.

53. On September 17, 2018, at a Foundation Board of Trustees meeting, the current NRA Treasurer told the Foundation Board that the NRA had done a "study" and determined that there should be an increase in the management fees paid by the Foundation to the NRA. The increase totaled $5,868,048, including a 2018 "catch-up fee" of nearly $4 million to be paid immediately. This determination to increase the management fees was a surprise to the Foundation Board who did not know the study, purportedly intended to calculate the benefits provided to their organization, was occurring.

54. At the beginning of the same meeting, the current NRA Treasurer was elected as Treasurer for the Foundation. He replaced Phillips who retired shortly after.

55. Foundation personnel, including the Foundation's Managing Director of Finance, Treasurer, Secretary and CFO were heavily involved with the study and determination to increase the Foundation management fees, but they failed to provide notice to the Foundation Board, completely ignoring their fiduciary duties to the Foundation and allowing the NRA to control their actions.

56. Despite the surprise information that nearly doubled the Foundation's management fees, the Foundation Board voted to increase the 2018 management fees by $5,868,048, including approval to transfer nearly $4 million to the NRA immediately. The vote was taken without further investigation or negotiation, in a closed session meeting that lasted less than 50 minutes.

57. This multi-million-dollar management fee increase for 2018 was approved without the Foundation Board conducting an assessment of the fees' fair market value compared to other such arrangements or obtaining the input of an independent auditor. It was approved without knowing what any of the employees did for the Foundation or how their services furthered the purposes and mission of the Foundation.

58. The Foundation did not receive proper documentation from the NRA to show that the dramatic increase in management fees was accurate or fair. The NRA also did not provide any details to the Foundation to demonstrate that the management fees were being used for proper purposes, and not to pay employees for work on prohibited tasks like political activities and substantial lobbying. The increase was approved based solely on the word of the NRA employees and the conflicted Foundation Treasurer. Due to the Foundation's lack of independence, the Foundation permitted the NRA to control the management fee process. In effect, the Foundation did not receive any assurances that it was receiving fair value for its payments to the NRA or that Foundation funds were being used exclusively for Foundation purposes.

59. Given its precarious financial position at that time, the NRA had a strong incentive to increase the management fees as much as possible.

60. An example of the improper allocation of funds in the new management fees is the 75% allocation to the Foundation of compensation to the Foundation's former Executive Director. As of 2018, a highly compensated consulting agreement between the NRA and Executive Director had been in place for years without the Foundation's knowledge. The Executive Director did not provide services to the Foundation as a part of this consulting agreement. The Executive Director's role did not change and the consulting agreement was never updated to include the Foundation. According to NRA employees, the Executive Director's title within the Foundation was "honorific," and the Executive Director did not perform any of the typical tasks that would be expected of an Executive Director. Yet, the new management fee attributed 75% of the Executive Director's compensation to the Foundation, by August 2018 this totaled about $233,000 to be paid by the Foundation.

61. After approving the surprise management fee increase for 2018, some Foundation Trustees requested more information regarding how the fees were determined, including who the employees were that supposedly worked for the Foundation and what benefit they added to the Foundation. These Trustees wanted to obtain more information before setting a budget for 2019, which would include the new millions-dollar management fee increase.

62. Accordingly, in or about December 2018, the Foundation's Investment Committee requested that, in addition to getting answers to questions about the NRA's process for setting the management fees, the Foundation engage an outside firm to conduct audits of NRA-related quarterly funding and management fees, including "to ascertain the market cost of these services and to provide a basis of comparison of price/value on an ongoing basis. Further, [the audit would]

ascertain the possibility of outside contracting of said services to the Foundation;" and a separate outside firm to ensure that the NRA's use of Foundation-issued funds are "in keeping with the Mission Statement of the Foundation and are within the regulatory compliance of a 501(c)(3)/(4) organization(s)."

63. On January 2, 2019, a Foundation Investment Committee meeting was held to discuss the 2019 budget and the concerns raised by some Board members. LaPierre attended this meeting because it was going to be "controversial" in that some Trustees wanted more information on the management fee. It was not LaPierre's normal practice to attend Foundation Investment Committee meetings. He and other NRA members told the Investment Committee that it was not a good time to hire any sort of outside auditor or conduct any of the requested research. After that meeting, the Foundation Board took no formal action to investigate the management fees. No external auditor was engaged. No audit was conducted.

64. The Foundation Board approved the management fee increase for the 2019 budget, abandoning their fiduciary responsibilities and again relinquishing operational control to the NRA.

## THE DOMINANCE BY THE NRA HAS HARMED THE FOUNDATION'S INDEPENDENT CHARITABLE MISSION

65. The Foundation's Trustees and Officers have a fiduciary duty to manage the activities and affairs of the Foundation in good faith and in a manner they reasonably believe to be in the best interest of the Foundation.

66. The Trustees and Officers further owe a duty of loyalty to the Foundation. This duty of loyalty includes ensuring that the activities and transactions of the Foundation advance the nonprofit's charitable mission, and that decisions are in the best interest of the organization. In exercising their duties, the Trustees must ensure that the nonprofit adheres to applicable laws, its own bylaws, and its stated purpose and mission.

67. The NRA and the Foundation are two separate and distinct nonprofit organizations. The governing board and officers of each organization must manage and oversee the affairs of their respective nonprofit. However, because of the control by the NRA over the Foundation and the governing overlap between the NRA and the Foundation, the Foundation Board and Officers have conflicting loyalties, with loyalty to the NRA taking precedence, thereby subverting the independence of the Foundation.

68. The Foundation has allowed itself to be run in a manner that best suits the NRA's financial interests rather than the Foundation's charitable purposes. This bias toward the NRA's financial health is evident in the loan transactions and management fees discussed above.

69. By subverting the Foundation's interests to those of the NRA, the Foundation's Trustees and Officers failed to abide by their obligations to act in the best interest of the Foundation and consistently with the Foundation's charitable purposes.

70. The Foundation raises millions of dollars in funds per year through Friends of the NRA (FONRA), a Foundation funded program. The Foundation awards half of those funds via state-grants and gives the other half to the NRA on a quarterly basis.

71. The Foundation allows the NRA to circumvent its grant process. Third-party grantees must submit grant applications and proposals prior to funding and submit post-grant reports detailing how they spent their grant. In contrast, the NRA does not have to submit grant applications or post-grant reports.

72. As part of the Foundation's purpose, it awards national grants and sponsorships to organizations across the country that meet the charitable purpose of the Foundation. These programs are funded from contributions made to the Foundation. After the Foundation's approval of the two loans and the increase in management fees, there was a decline in Foundation funds

available to issue these national grants between 2017 and 2019, thus compromising one of the Foundation's stated nonprofit charitable purposes.

73. The Foundation's transactions benefit the NRA over the Foundation. The Foundation's lack of adequate oversight over its transactions with the NRA jeopardizes its nonprofit purpose and independence from the NRA.

## **COUNT I**

### **(Against Defendants for Exceeding or Abusing the Authority Conferred by Law in Violation of D.C. Code § 29-412.20(a)(1)(B))**

74. The allegations contained in paragraphs 1 through 73 are realleged as though fully restated herein.

75. The District's NCA broadly empowers the Attorney General to police nonprofits incorporated under District law.  This includes the ability to secure broad injunctive and equitable relief whenever a District nonprofit "has exceeded or abused and is continuing to exceed or abuse the authority conferred on it by law." D.C. Code § 29-412.20(a)(1)(B).

76. The NRA Foundation has exceeded or abused, and continues to exceed or abuse, the authority conferred on it by law, in violation of the District's NCA.

77. By failing to render proper oversight and ceding operational control to the NRA, the Foundation allowed its funds to be utilized by the NRA in a manner that is contrary to the authority conferred on the Foundation by law.

78. Through loans and management fee agreements, as well as other acts, the Foundation has subverted its own charitable nonprofit purposes and interests to those of the NRA and has allowed the NRA to continually divert Foundation funds to benefit the NRA without proper oversight, thus diminishing the Foundation's ability to further its other charitable purposes.

## COUNT II

### (Against Defendants for Continuing to Act Contrary to
### Nonprofit Purposes in violation of D.C. Code § 29-412.20(a)(1)(C))

79. The allegations contained in paragraphs 1 through 73 are realleged as though fully restated herein.

80. The District's NCA broadly empowers the Attorney General to police nonprofits incorporated under District law.  This includes the ability to secure broad injunctive and equitable relief whenever a District nonprofit "has continued to act contrary to its nonprofit purposes."  D.C. Code § 29-412.20(a)(1)(C).

81. The NRA Foundation continues to act contrary to its charitable purposes in violation of the District's NCA.

82. By failing to render proper oversight and ceding operational control to the NRA, the Foundation allowed its funds to be utilized by the NRA in a manner that is contrary to the Foundation's charitable purposes.

83. Through loans and management fee agreements, as well as other acts, the Foundation has subverted its own charitable nonprofit purposes and interest to those of the NRA and has allowed the NRA to continually divert Foundation funds to benefit itself without proper oversight, thus diminishing the Foundation's ability to further its other charitable purposes.

## COUNT III

### (Against Defendants Pursuant to the Common Law)

84. The allegations contained in paragraphs 1 through 73 are realleged as though fully restated herein.

85. By failing to render proper oversight and ceding operational control to the NRA, the Foundation allowed its funds to be utilized by the NRA in a manner that is contrary to the Foundation's charitable purposes and the authority conferred on the Foundation by law.

86. Through loans and management fee agreements, as well as other acts, the Foundation has subverted its own charitable nonprofit purposes and interests to those of the NRA and has allowed the NRA to continually divert Foundation funds to benefit the NRA in ways contrary to the Foundation's charitable purposes.

87. The Attorney General has broad common law authority to ensure that the funds of a District charitable corporation are spent in ways that benefit the public and that those charitable funds are not wasted.

88. The Foundation Board's and Officers' failure to meet their fiduciary duties in ensuring that Foundation funds are spent in ways that benefit the public and in accordance with the Foundation's charitable purposes violates these responsibilities of a charitable corporation under the common law.

## **PRAYER FOR RELIEF**

WHEREFORE the District requests that this Court:

a)  Impose a constructive trust, over Foundation funds improperly diverted to the NRA in violation of District law and the Foundation's nonprofit purpose;

b)  Modify Foundation governance policies to ensure proper independence from the NRA;

c)  Appoint an independent receiver or other Court-supervised official to:

    i.  Monitor all Foundation financial decisions and transactions;

    ii.  Oversee and Monitor the revision and modification of the Foundation-NRA relationship to ensure modification of governance policies result in independence from

the NRA, including replacement of Trustee membership, and in the operation and management of the Foundation's affairs;

d) Require all current Foundation Board of Trustees and Officers to partake in charitable nonprofit corporate governance training; and

e) Order such other relief as the Court determines to be just and proper.

Dated: September 8, 2022

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

KATHLEEN KONOPKA
Deputy Attorney General
Public Advocacy Division

*/s/ Adam Gitlin*
ADAM GITLIN[*]
Section Chief, Public Integrity Section

RYAN WILSON (#1013907)
Senior Trial Counsel
Public Advocacy Division

*/s/ Leonor Miranda*
LAURA BECKERMAN (#1008120))
LEONOR MIRANDA (#1044293)
CARA J. SPENCER (#1023182)
Assistant Attorneys General
Office of the Attorney General
400 6th St., N.W., 10th Floor
Washington, D.C. 20001
(202) 442-9810 (phone)
(202) 741-8871 (fax)
leonor.miranda@dc.gov
cara.spencer@dc.gov
laura.beckerman@dc.gov

*Attorneys for the District of Columbia*

---

[*] Admitted to practice only in California and New York. Practicing in the District of Columbia under the direct supervision of Kathleen Konopka, a member of the D.C. Bar, pursuant to D.C. Court of Appeals Rule 49(c).