## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., WILLIAM BACHENBERG, and DOUGLAS HAMLIN, 11250 Waples Mill Rd. Fairfax, VA 22030, | **Case No.: 1:26-cv-00015** |
| Plaintiffs, | **AMENDED COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| THE NRA FOUNDATION, INC., 11250 Waples Mill Rd. Fairfax, VA 22030, | |
| Defendant. | |

Plaintiffs National Rifle Association of America, Inc. ("NRA"), William Bachenberg, and Douglas Hamlin (collectively, "Plaintiffs"), by and through their attorneys, for their Amended Complaint against Defendant the NRA Foundation, Inc. ("Defendant" or "Foundation"), allege as follows:

### NATURE OF THE ACTION

1.    Plaintiffs bring this action to stop the Foundation from passing itself off to donors and the public as the NRA or an authorized NRA affiliate and misappropriating the many millions of dollars that NRA supporters contributed to fund the NRA's educational and other charitable activities. Founded by the NRA in 1990 to support the NRA's charitable activities, the Foundation has been seized by a disgruntled faction of former NRA directors who lost control of the NRA's Board following revelations of financial improprieties, mismanagement, and breaches of fiduciary duty and member trust. Booted out of power by the NRA's members, they now seek to reclaim it through the Foundation. First, they sought to sever the relationship between the NRA and the Foundation by attempting to strip the NRA of its right to appoint the Foundation's directors and

seizing that power for themselves. And now they seek to jettison the Foundation's historic purpose of supporting NRA's charitable programs and transform the Foundation into a vehicle for personal reprisal, against the reformers who displaced them at the NRA, and for their self-aggrandizement, by building up the Foundation as a competitor to the NRA. They seek to achieve those ends through hijacking the NRA's trademarks, including the "NRA" name, and repurposing millions of dollars that were contributed to support the NRA's charitable programs. That is unlawful. Donor intent matters, and the NRA members and supporters attending "Friends of *NRA*" fundraising events and responding to the NRA's solicitations intended to support the NRA's public-interest programs, not the vendettas and thirst for power of those who failed the NRA. And the Foundation's current leaders have no right to mislead donors who intend to support the NRA into supporting an organization that has turned against it. The NRA therefore seeks and is entitled to judgment barring the Foundation's use of the NRA's trademarks, including its famous "NRA" mark, and requiring that the millions in funds raised to support the NRA's charitable programs continue to be put to that use.

2.      The NRA's claims for federal trademark infringement, unfair competition, and trademark dilution under the Lanham Act, 15 U.S.C. § 1051 *et seq*., as well as common law trademark infringement and unfair competition, arise from the Foundation's unlawful free-riding off the NRA's goodwill through the Foundation's unauthorized use of the NRA's trademarks. The Foundation's infringing use of the NRA's trademarks is likely to cause consumer confusion as to (1) the origin and source of the Foundation's goods and services and (2) the NRA's association, sponsorship, and/or affiliation with the Foundation and its goods and services. The Foundation

willfully disregards the NRA's valuable trademark rights in an attempt to profit from the NRA's reputation and goodwill.

3.      Plaintiffs' other claims concern the Foundation's ongoing and threatened misuse of approximately $160,000,000 raised by or with the NRA and through solicitations representing to donors that their contributions would be used to support NRA's charitable activities, including its educational programs and financial support of mission-aligned local nonprofit organizations ("NRA Charitable Activities"). The use of these "NRA-Restricted Funds" for other purposes violates the law of charitable trusts, well-established equitable doctrines binding nonprofits to their solicitations and representations to donors, and the rights of the NRA as the party that raised these funds and is, with respect to the NRA Charitable Activities, their intended beneficiary.

4.      Plaintiffs seek preliminary and permanent injunctive relief on the NRA's trademark-related claims; declaratory and injunctive relief concerning the permissible use of funds contributed to the Foundation to support NRA Charitable Activities; and declaratory and injunctive relief concerning the validity of the Foundation's attempted amendments to its governing documents.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338, and pursuant to the principles of supplemental jurisdiction under 28 U.S.C. § 1367, in that this Amended Complaint raises federal questions under the Lanham Act, 15 U.S.C. § 1051 *et seq*., and brings claims related to the same case or controversy arising under the Lanham Act.

6.      This Court has personal jurisdiction over Defendant because Defendant is incorporated in this district, and Defendant conducts business and committed acts of infringement

and unfair competition in this district. This Court's exercise of personal jurisdiction over Defendant is also proper because Defendant has purposefully availed itself of the opportunity to conduct commercial activities in this district and this Amended Complaint arises out of those commercial activities.

7.      Venue is proper in this district under 28 U.S.C. § 1391(b) & (c) because Defendant is incorporated is in this district, Defendant is subject to personal jurisdiction in this district, and a substantial portion of the events giving rise to this Amended Complaint occurred in this district.

## PARTIES

8.      Plaintiff National Rifle Association of America, Inc. is a nonprofit civil rights organization incorporated under the laws of the State of New York having its principal place of business at 11250 Waples Mill Road, Fairfax, Virginia 22030. The NRA is recognized as tax-exempt under Section 501(c)(4) of the Internal Revenue Code.

9.      Plaintiff William Bachenberg is the President of the NRA. Bachenberg was elected to that position by the NRA's Board of Directors at the NRA's 2025 Annual Meeting in April 2025. Accordingly, per the Foundation's Bylaws, Bachenberg was entitled to serve as an *ex officio* member of the Foundation's board. Bachenberg is currently a member of the NRA Board of Directors.

10.      Plaintiff Douglas Hamlin is the current Executive Vice President of the NRA. Hamlin was elected to that position by the NRA's Board of Directors at the NRA's 2024 Annual

Meeting in May 2024. Accordingly, per the Foundation's Bylaws, Hamlin was entitled to serve as an *ex officio* member of the Foundation's board.

11.    Defendant NRA Foundation, Inc. is a nonprofit organization incorporated under the laws of the District of Columbia. The Foundation is recognized as tax-exempt under Section 501(c)(3) of the Internal Revenue Code.

## FACTUAL BACKGROUND

### The NRA

12.    Formed over 150 years ago in November 1871, the NRA is widely recognized as America's foremost defender of Second Amendment rights. The NRA advocates for U.S. citizens' firearm rights, including through lobbying and other political activities. In 1975, the NRA formed the NRA Institute for Legislative Action to function as the lobbying arm of the NRA, committed to preserving the right of law-abiding individuals to purchase, possess, and use firearms.

13.    In addition to its Second Amendment advocacy, the NRA offers programs and events related to firearm education, training, and safety. The NRA began building rifle shooting ranges and holding shooting competitions in the late 1800s and early 1900s. Its shooting competitions continue today. The NRA has also developed firearm training materials for the military, law enforcement, and civilians. The NRA introduced the *NRA Police Firearms Instructor Certification Program* in 1960. Today, the NRA offers firearm training for recreational users through more than 125,000 certified instructors and related courses. For example, the NRA has established an educational program for young hunters known as the *Youth Hunter Education Challenge* and has held *Refuse to Be a Victim* seminars focused on personal safety plans.

14.    The NRA's non-advocacy programs include: Youth Programs; Women's Programs; Range Services; Clubs & Associations; Disabled Shooting Sports; Eddie Eagle;

Education & Training; Law Enforcement; Competitive Shooting; Hunter Safety & Services; and the National Firearms Museum.

15.    The NRA also publishes firearms-related periodicals: the *NRA Newsletter*, discussing NRA's advocacy efforts, programs, and events; *The American Rifleman*, discussing new firearm legislation; and *The American Hunter*, discussing hunting issues and offering reviews of firearms and ammunition.

16.    The NRA provides information to the public regarding Second Amendment rights advocacy as well as its firearm-related programs and events.

17.    The NRA also offers clothing, apparel, accessories, and other merchandise bearing its trademarks through its online retail store, https://nrastore.com/, including, but not limited to, T-shirts, vests, hoodies, jackets, hats, belts, shoes, watches, wallets, firearm cases, holsters, targets, knives, safety equipment, bags, and decals. Representative examples of such merchandise are below:







18.    The NRA offers certain of its programs, events, periodicals, merchandise, and related goods and services to the public through paid memberships. NRA memberships also include access to a diverse community of firearm owners and firearm rights advocates, as well as deals on firearms, gear, and accessories offered by participating brands and stores.

**The NRA's Federal Trademark Registrations and Applications**

19.    The NRA offers its programs, events, periodicals, charitable services, merchandise

and related goods and services under its NRA trademark and other marks.

20.     The NRA has expended substantial time, money, and resources marketing, advertising, and promoting the firearms-related goods and services offered under its trademarks, including through promotion of such goods and services through its website and sale of NRA memberships.

21.     The NRA has registered many of its marks with the United States Patent and Trademark Office ("USPTO").

22.     The NRA owns incontestable U.S. Trademark Registration No. 1,885,345 for NRA for the following services (the "'345 Mark"):

- "educational services; namely, conducting courses of instruction on firearm and wild life conservation; and publication services; namely, publishing magazines, text books, manuals, targets, rule books and other books and articles of interest to hunters, collectors, competitive shooters and other gun owners" in Class 41, and

- "association services; namely, promoting the interests of owners of firearms, and research services in the field of firearm development and improvement" in Class 42,

which issued on March 21, 1995. The '345 Mark has been used in commerce throughout the United States continuously and exclusively by the NRA since at least as early as December 1871. Accordingly, in addition to its rights in the federal registration of the '345 Mark, the NRA has common law rights in the '345 Mark. Attached hereto as **Exhibit A** is a true and correct copy of the Registration Certificate and prosecution history of the '345 Mark.

23.     The NRA owns U.S. Trademark Registration No. 5,538,391 for NRA for the goods and services listed below (the "'391 Mark"), which issued on August 14, 2018. The '391 Mark has been used in commerce throughout the United States continuously and exclusively by the NRA in connection with such goods and services since at least as early as the years listed below:

- 1871 in connection with "Association services to promote awareness of the Second Amendment right to keep and bear arms; promoting public awareness in the fields of firearms, hunting, shooting sports; promoting the interests of owners of firearms; Online retail store services featuring clothing, hunting, shooting and firearm gear, jewelry, watches, books, dvds, and gifts for home, office and outdoor activities; providing a website featuring consumer information in the field of firearms and firearm gear and information about the Second Amendment right to keep and bear arms; promoting legislative action, advocacy, and public awareness of the Second Amendment right to the U.S. Constitution" in Class 35;

- 1922 in connection with "Targets for pistols, targets for rifles" in Class 28;

- 1923 in connection with "Printed publications, namely, magazines, pamphlets and books in the field of firearms; printed paper signs; stickers; posters" in Class 16;

- 1982 in connection with "Shirts, pants, shorts, leggings, belts, hats, footwear, vests, coats, ties, jackets, bolo ties" in Class 25;

- 1992 in connection with "Charitable fundraising services" in Class 36;

- 1998 in connection with "Jewelry; bolo ties with precious metal tips; rings; watches; chronological instruments, namely, clocks; lapel pins" in Class 14;

- 2011 in connection with "hunting knives" in Class 08;

- 2012 in connection with "Downloadable podcasts and video recordings in the field of firearms, gun safety, marksmanship, hunting and shooting sports; Downloadable electronic publications in the nature magazines and newsletters in the field of firearms, gun safety, marksmanship, hunting and shooting sports; glasses, namely, sunglasses and shooting glasses in the nature of safety eyewear" in Class 09;

- 2012 in connection with "Association services in the nature of an education and entertainment web site featuring current events, news and charitable events in the fields of firearms, hunting, shooting sports, and the Second Amendment right to keep and bear arms; Providing on-line non-downloadable videos, podcasts and publications, namely, e-magazines in the fields of firearms, hunting, shooting sports, and the Second Amendment right to keep and bear arms; Providing and publishing online non-downloadable magazines featuring articles in the fields, fashion, art, culture, current events, fitness, and general lifestyles; conducting educational programs featuring outdoor shooting sports and hunting activities and firearm training courses and instruction; Providing a web site featuring recreational and sporting information and news in the field of firearms, hunting, shooting sports, firearm training; providing current event news on legislative action on the Second Amendment right to the U.S. Constitution; Providing on-line non-downloadable magazines, videos, and podcasts in the field of firearms, namely, marksmanship, hunting and shooting sports; Providing a website for entertainment purposes

featuring videos about firearms, namely, marksmanship, hunting, shooting sports, sports training, sports education, and self-defense; Entertainment services, namely, providing non-downloadable podcasts and video podcasts in the field of gun safety; museum services; educational services, namely, conducting courses of instruction on firearm and wild life conservation" in Class 41;

- 2016 in connection with "flashlights" in Class 11;

- 2017 in connection with "Rifles; Range bags especially adapted to carry firearms and munitions to gun ranges" in Class 13; and

- 2017 in connection with "Bags, namely, backpacks, carry-all bags" in Class 18.

Accordingly, in addition to its rights in the federal registration of the '391 Mark, the NRA has common law rights in the '391 Mark, and the '391 Mark is widely recognized by the general consuming public in the United States as a designation of source of the goods and services offered by the NRA thereunder. Attached hereto as **Exhibit B** is a true and correct copy of the Registration Certificate and prosecution history of the '391 Mark.

24.    The NRA owns incontestable U.S. Trademark Registration No. 1,683,307 for NATIONAL RIFLE ASSOCIATION for the following goods and services (the "'307 Mark"):

- "educational services; namely, conducting courses of instruction on firearm and wild life conservation; and publication services; namely, publishing magazines, text books, manuals, targets, rule books and other books and articles of interest to hunters, collectors, competitive shooters and other gun owners" in Class 41, and

- "association services; namely, promoting the interests of owners of firearms, and research services in the field of firearm development and improvement" in Class 42,

which issued on April 14, 1992. The '307 Mark has been used in commerce throughout the United States continuously and exclusively by the NRA since at least as early as December 1871. Accordingly, in addition to its rights in the federal registration of the '307 Mark, the NRA has common law rights in the '307 Mark. Attached hereto as **Exhibit C** is a true and correct copy of the Registration Certificate and prosecution history of the '307 Mark.

10

25.    The NRA owns incontestable U.S. Trademark Registration No. 4,364,231 for THE NRA FOUNDATION TEACH FREEDOM for "charitable fundraising services" in Class 36 (the "'231 Mark"), which issued on July 9, 2013. The '231 Mark has been used in commerce throughout the United States continuously and exclusively by the NRA since at least as early as December 31, 2004. Accordingly, in addition to its rights in the federal registration of the '231 Mark, the NRA has common law rights in the '231 Mark. Attached hereto as **Exhibit D** is a true and correct copy of the Registration Certificate and prosecution history of the '231 Mark.

26.    The NRA owns U.S. Trademark Registration No. 4,997,790 for FRIENDS OF NRA for "charitable fundraising services" in Class 36, which issued on July 12, 2016 (the "'790 Mark"). The '790 Mark has been used in commerce throughout the United States continuously and exclusively by the NRA since at least as early as December 31, 1993. Accordingly, in addition to its rights in the federal registration of the '790 Mark, the NRA has common law rights in the '790 Mark. Attached hereto as **Exhibit E** is a true and correct copy of the Registration Certificate and prosecution history of the '790 Mark.



27.    The NRA owns U.S. Trademark Registration No. 7,080,695 for (NRA SCHOOL SHIELD & Design) for "Development and dissemination of printed educational material for others in the fields of community and school safety and security; educational services, namely, providing classes, seminars, workshops and training in the fields of community and school safety and security, including the aforementioned services provided online via the internet; providing temporary use of online non-downloadable resource guides and publications in the nature of news and information columns and articles, magazines, pamphlets, and instructional manuals, all in the fields of community and school safety and security" in Class 41, which issued

on June 13, 2023 (the "'695 Mark"). The '695 Mark has been used in commerce throughout the United States continuously and exclusively by the NRA since at least as early as August 2, 2022. Accordingly, in addition to its rights in the federal registration of the '695 Mark, the NRA has common law rights in the '695 Mark. Attached hereto as **Exhibit F** is a true and correct copy of the Registration Certificate and prosecution history of the '695 Mark.

28. The NRA owns U.S. Trademark Application Serial No. 99/359,339 for THE NRA FOUNDATION for the following services (the "'339 Mark"):

- "Charitable fundraising; Charitable fundraising to support activities that promote safe and responsible firearms ownership, educational services and activities in the field of hunting and shooting sports, and providing grants and endowment programs therefor; Charitable fundraising services by means of organizing and conducting special events; Charitable foundation services, namely, providing fundraising activities, funding, scholarships and/or financial assistance for First Responders, Law Enforcement Officers, and Military personnel for educational costs of tuition and expenses of colleges, universities, and higher education" in Class 36, and

- "Providing educational mentoring services and programs in the field of firearm safety, hunting and shooting sports, and related community activities and in support of the Second Amendment; Education services, namely, providing classes, seminars, workshops, meetings and expositions in the fields of firearm safety, hunting and shooting sports, and related community activities and in support of the Second Amendment" in Class 41,

which the NRA applied to register with the USPTO on August 26, 2025. The '339 Mark is distinctive of such charitable fundraising and educational services, and has been used in commerce throughout the United States continuously and exclusively by the NRA since at least as early as December 31, 1990. Accordingly, in addition to seeking rights in a federal registration, the NRA has common law rights in the '339 Mark. Attached hereto as **Exhibit G** is a true and correct copy of the application and prosecution history for the '339 Mark.

**The NRA Establishes the Foundation and Raises Funds for It to Benefit the NRA Charitable Activities**

29.    The NRA established the Foundation in 1990 to support NRA Charitable Activities.

30.    Although the NRA is a 501(c)(4) organization, to which contributions are not deductible as charitable contributions for donors, many of the NRA's activities are in furtherance of charitable, educational, and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code, such that they can be funded by a 501(c)(3) organization, to which contributions may be deductible as charitable contributions for donors. The NRA established the Foundation, a 501(c)(3) organization, as a vehicle through which individuals and corporations could make tax-deductible contributions in support of the NRA's charitable, educational, and scientific activities connected with the lawful ownership and use of firearms.

31.    The "NRA Charitable Activities" include: educational services such as courses, classes, workshops, etc. of instruction on firearms and firearms safety; publications that educate the public on firearms and firearm safety and the importance of civil rights under the Second Amendment; research services in the field of firearm development, improvement, and safety; and financial support of mission-aligned local charitable organizations. For example, the NRA runs the "Eddie Eagle GunSafe" program, which educates children on gun safety and how to respond in situations involving firearms.

32.    The NRA Charitable Activities are not restricted to NRA members and qualify as activities that may be supported by a 501(c)(3) organization.

33.    The NRA Charitable Activities do not include non-qualifying activities, such as lobbying or political activity, or activities undertaken for purposes beyond those enumerated under section 501(c)(3).

34.     The NRA caused the Foundation's Articles of Incorporation and the Form 1023 application for recognition of exemption under Section 501(c)(3) to be created.

35.     The NRA controlled all elements of the creation of the Foundation.

36.     The NRA funded all elements of the creation of the Foundation, including all legal fees.

37.     The NRA hired, paid, and directed three attorneys of Cadwalader, Wickersham & Taft to bring the Foundation into legal existence.

38.     When the three attorneys of Cadwalader, Wickersham & Taft incorporated the Foundation on or around August 3, 1990, they were acting as attorney-agents of the NRA.

39.     On or around on August 3, 1990, they incorporated the Foundation as a District of Columbia nonprofit corporation.

40.     That same day, August 3, 1990, Warren L. Cheek, NRA Secretary, informed the Corporations Division of the District of Columbia Department of Consumer and Regulatory Affairs that the NRA consented to the use of "NRA" in the Foundation's name because the Foundation "is a subsidiary of the NRA."

41.     That consent was implicitly contingent on the Foundation's ongoing relation to the NRA as established in the Foundation's governing documents, including provisions described below (¶¶ 47-49).

42.     The original slate of Trustees of the Foundation included James W. Carlson as President and Trustee. Carlson signed the founding documents of the Foundation, including Form 1023. Carlson was a longtime NRA leader, who served as an NRA Director from 1976 to 1994 and was elected twelve times to the NRA Board's Executive Committee.

43.    The original Vice-President of the Foundation was NRA Director Joe Foss, who had just completed his tenure as President of the NRA in June of 1990. Brigadier General Foss—a World War II fighter ace, Medal of Honor recipient, former governor of South Dakota, and commissioner of the American Football League—was another longtime NRA leader, serving as a Director from 1982 to 1991 (including four years as Second Vice President, four as President, and six years on the Executive Committee). He returned to the NRA Board in 1994 and served as a Director until his death in 2003.

44.    The original Treasurer of the Foundation was J. Warren Cassidy, the Executive Vice President of the NRA. Cassidy—an experienced business executive—had previously served on the NRA Board from 1978 to 1984, before becoming the head of the NRA's legislative arm and, eventually, its chief executive officer.

45.    The attorney-agents and other agents of the NRA submitted the Form 1023 to the IRS, stating that "The Foundation has been organized by the National Rifle Association of America ('NRA')." The Form 1023 made clear to the government that "The Trustees of the Foundation (other than the ex officio Trustees) are elected by the Board of Directors of the NRA" and that "the directors and officers of the NRA will review the books and records of the Foundation."

46.    The NRA provided the Foundation the Foundation's startup needs, including office space and fundraising.

47.    Article Eight of the Foundation's Articles of Incorporation specifies: "For the purposes of any statute or rule of law relating to corporations, the Directors ('Trustees') shall be taken to be the members of the Foundation. The Bylaws of the Foundation shall set forth the respective rights and method of selection of Directors ('Trustees') and such other provisions as shall pertain to and control the Board of Directors ('Trustees')."

48.     From the Foundation's establishment in 1990, and pursuant to its Bylaws, the Foundation's trustees, who comprise its board, were selected by the NRA or were NRA officers serving in *ex officio* capacity. The Foundation's 1990 Bylaws provided that the NRA's Executive Vice President (in effect, the NRA's CEO) "shall be a Trustee of the Foundation," that non-*ex officio* trustees "shall be elected by the Board of Directors of the National Rifle Association ('NRA') at the Annual Meeting of the Directors of the NRA," that "the majority of the members of the Board of Trustees of the Foundation shall be Directors of the NRA," and that the "remaining members of the Board of Trustees of the Foundation shall be persons who are members of the NRA." A subsequent amendment provided that the NRA's President serve as an *ex officio* member of the Foundation's board with full powers.

49.     Article 10 of the Foundation's Articles of Incorporation provided, "The number of Directors ('Trustees') may be increased or decreased but may not be fewer than seven (7) or more than nine (9)." Article 12 provided, "The Foundation may by its Bylaws make any other provisions or requirements for the arrangement or conduct of the business of the Foundation provided the same shall not be inconsistent with these Articles of Incorporation or contrary to the laws of the District of Columbia or the United States."

50.     From the Foundation's establishment in 1990 and into approximately 2025, the Foundation had no independent employees. Instead, NRA employees carried out services and activities related to the Foundation.

51.     From the Foundation's establishment in 1990 and into 2025, the NRA employed its staff, trademarks, reputation, and other resources to raise funds for the Foundation based on the mutual understanding that the Foundation would, through grants, support NRA Charitable Activities.

52.    The NRA raised funds for the Foundation through solicitations and events, including its well-known and successful Friends of NRA program, which the NRA has operated since approximately 1993.

53.    The Friends of NRA program conducts hundreds of fundraising events around the United States each year.

54.    The NRA conducts the Friends of NRA program through its field representatives, who are NRA employees in the NRA's Office of Advancement.

55.    The Friends of NRA program has raised approximately 1.2 billion dollars in total contributions for the Foundation. The success of the Friends of NRA program has depended and continues to depend on the NRA's efforts and the use of the NRA's name and trademarks.

56.    The NRA has also raised funds for the Foundation through the NRA's relationships with NRA members and supporters and through solicitations.

57.    All or substantially all of the funds contributed to the Foundation over its existence have been raised by the NRA and through use of the NRA name and the NRA's trademarks.

**The Foundation Receives Contributions Solicited to Fund NRA Charitable Activities**

58.    Donors to the Foundation intended, based on solicitations, representations, and other circumstances, that contributed funds would be put to the specific purpose of supporting NRA Charitable Activities.

59.    The Friends of NRA program conveys in its very name that funds raised at Friends of NRA events will be used to support NRA Charitable Activities. That was reinforced through Friends of NRA advertising materials and solicitations, through communications by NRA field representatives, and through speeches and messaging at Friends of NRA events. Participants in Friends of NRA events intended that their contributions would be put to the specific purpose of supporting NRA Charitable Activities. Friends of NRA participants often speak of their support

for the NRA and its programs. During these events, the speakers and participants consistently state that proceeds from the event will support NRA Charitable Activities and thank participants for that support.

60.    Donors were also solicited by NRAF through Friends of NRA fliers and solicitations to donate to the Foundation for the specific purpose of benefiting the NRA Charitable Activities.

61.    Solicitations, invitations, and other donor communications concerning the Foundation refer to the NRA and NRA programs. As a result, donors to the Foundation intended that their contributions would be put to the specific purpose of supporting NRA Charitable Activities.

62.    Indeed, the Foundation's most recent annual report from 2024 states, "The vision of the NRA Foundation is to provide lasting financial stability for the NRA's programs, teaching the safe and responsible use of firearms in a free society and the understanding of one simple truth – that personal freedom must be preserved by the right of individuals to keep and bear arms."

63.    The Foundation's most recent annual report from 2024 acknowledges that, as of December 31, 2024, the Foundation held $36,389,536 "designated for the NRA as beneficiary in investments and net assets with donor restrictions."

64.    That figure represents only a portion of the NRA-Restricted Funds.

65.    Whether or not donors made contributions subject to express restrictions, donors' contributions to the Foundation over its existence were made with the intent that their contributed funds would be put to the specific purpose of supporting NRA Charitable Activities.

**The Foundation's Leaders Attempt to Sever Its Relationship with the NRA and Seek to Repurpose the NRA-Restricted Funds to Their Own Ends**

66.    The Foundation's beef with the NRA is personal. It is driven by a clique of former NRA leaders who are bitter that their faction lost control of the NRA's Board following a series of scandals that led to a loss of member confidence, and the rise of a competing movement to reform the NRA that ultimately gained control of the NRA Board. The current legal dispute was sparked by the unlawful attempt of the Foundation's current leaders to undermine the NRA and establish the Foundation as a competitor to the NRA using funds that the NRA raised and donors contributed to support NRA Charitable Activities.

67.    The Foundation's current leaders, including its chairman and the majority of its trustees, are former members of the NRA Board of Directors who were members of a faction allied with former NRA Executive Vice President and CEO Wayne LaPierre.

68.    An investigation of and then civil action against the NRA by the New York Attorney General's office (the "NYAG Action") beginning in approximately 2018 revealed misuse of funds and breach of fiduciary duty by certain NRA officers, including LaPierre, and inadequate oversight, including by then-members of the Audit Committee of the NRA's Board of Directors. LaPierre announced his resignation on the eve of trial in 2024 and was ultimately adjudged liable to the NRA for breach of fiduciary duty and barred from serving in any fiduciary position as an officer or director of the NRA for ten years.

69.    The final judgment in the NYAG Action permanently barred certain former members of the NRA Board's Audit Committee who had served during LaPierre's tenure from future service on the Audit Committee. Individuals subject to this bar now serve on the Foundation's board include David Coy, who also serves as the Foundation's Treasurer, and Charles Cotton.

70.    In addition, three current Foundation trustees—Bob Barr, Charles Cotton, David Coy—are former NRA directors who served on the NRA's now-defunct Special Litigation Committee that presided over controversial litigation and excessive legal spending. Charles Cotton served three terms as NRA President at the tail-end of LaPierre's tenure.

71.    The revelations of the NYAG Action, the NRA's shielding of LaPierre during the course of that action, and the litigation campaign and excessive legal spending caused a backlash among NRA members and supporters and a drop in NRA members' financial support of the NRA.

72.    Around the same time that the NYAG Action was commenced, the District of Columbia Attorney General ("DCAG") office brought an investigation and complaint against the NRA Foundation and the NRA collectively, alleging the Foundation violated D.C. law through a series of loan, grant, and other payments to the NRA.

73.    Both the Foundation and the NRA actively defended the lawsuit. The DCAG sought some forms of relief, based on then-extant concerns of the type described above, that would have severed or weakened the relationship between the NRA and the Foundation. Both the Foundation and the NRA resisted all assertions in support of such relief.

74.    The DCAG's legal action concluded on April 16, 2024, when the DCAG entered into a consent order (the "2024 Consent Judgment") with the Foundation and the NRA to dismiss the case. The Consent Judgment contained no finding of liability and instead ordered the Foundation to: (1) continue to adhere to its Articles and Bylaws, which then generally provided for appointment of Foundation trustees by the NRA's Board; (2) establish annual nonprofit compliance trainings for Foundation officers and trustees; (3) establish an Audit Committee; (4) adopt a new conflict of interest policy; (5) adopt a new grantmaking policy; (6) adopt a new shared services agreement with the NRA; and (7) adopt a new loan policy.

75.    The 2024 Consent Judgment did not order the Foundation to separate itself from, or otherwise weaken its relationship with, the NRA.

76.    The NRA would not have executed the 2024 Consent Judgment if it in any way ordered or contemplating the Foundation severing its relationship with the NRA.

77.    NRA directors are elected by the NRA membership, and the Board had for many years been dominated by directors allied with and deferential to LaPierre.

78.    Beginning in or around 2023 substantial numbers of NRA members began voting for director candidates unaligned with LaPierre campaigning on a platform of reform, transparency, and fiscal restraint.

79.    As the reform movement grew, candidate slates and the Board were split between two competing groups, generally referred to as the "Reformers" and the "Old Guard," the latter generally consisting of LaPierre allies and others who facilitated or abided the perceived mismanagement of the NRA during LaPierre's tenure.

80.    The concerns of the Reformers echoed certain of the concerns raised by the New York and District of Columbia Attorneys General, including private inurement, misuse of funds, and lack of accountability.

81.    Building on gains in 2023 and 2024, the Reformers obtained a Board majority in 2025 and elected their preferred candidate to serve as NRA President.

82.    The Foundation board, however, remained stacked with trustees associated with the Old Guard faction that had lost control of the NRA, including Foundation Chairman Tom King, whom NRA members had voted off of the NRA Board in 2025.

83.     As the Reformers gained power at the NRA, the Foundation's board undertook a series of attempted article and bylaw amendments seeking to entrench the Old Guard's control of the Foundation and sever the Foundation's relationship with the NRA.

84.     Following defeat of the Old Guard-supported candidate to serve as NRA's Executive Vice President in 2024, the Foundation attempted to strip that office of its *ex officio* membership on the Foundation's board.

85.     The Foundation's board also attempted to strip the NRA's President of voting rights on the Foundation's board.

86.     Following the election of a Reformer-favored NRA President, Foundation Chairman Tom King disputed the NRA President's rights to notice of, and to participate in, one or more of its meetings. The Foundation board subsequently attempted, by resolution, to strip the office of NRA President of its *ex officio* membership on the Foundation's board.

87.     The Foundation's board attempted to eliminate the requirement that a majority of Foundation trustees be members of the NRA's Board.

88.     The Foundation's board attempted to sever the historic connection between the two organizations and entrench the Old Guard's control of the Foundation.

89.     One means of self-entrenchment attempted by the Foundation's board was a bylaw amendment purporting to eliminate the NRA Board's right to appoint Foundation trustees and providing instead that the Foundation's board would be self-perpetuating—that is, its trustees would elect themselves. Effectively, this amendment would shield the trustees from any democratic oversight. Whereas the Foundation's board in the past has been selected by the NRA's Board, which in turn was popularly elected by the NRA's members, the Foundation's trustees believe they should serve at their own pleasure indefinitely.

90.     The Foundation's board attempted to remove the limitation on the number of trustees authorized under its Articles of Incorporation, to permit further stacking of the Board by the Old Guard.

91.     None of these bylaw amendments were necessary to comply with any legal requirement or obligation.

92.     None of these bylaw amendments were necessary to comply with the 2024 Consent Judgment. To the contrary, the bylaw amendments mark an effort to continue the pattern of private inurement that raised the concerns underpinning actions by the New York and District of Columbia Attorneys General.

93.     Indeed, these attempted amendments were undertaken in violation of the Foundation's governing documents and the D.C. Nonprofit Corporation Act.

94.     The Foundation's board failed to provide required notice to all Foundation trustees of the meetings at which it purported to adopt these amendments, including specifically Plaintiff Hamlin.

95.     The actions of the Foundation's board at these meetings violated the limitation of the Foundation's Articles of Incorporation on the number of board members.

96.     The minutes of the meeting of the Foundation's board on August 23, 2024—at which the board purported to adopt most of these amendments—failed to specify or even describe the substantive changes that the board purportedly adopted to the Foundation's Bylaws and Articles of Incorporation.

97.     The Foundation failed to provide notice to the NRA of any of these amendments. Instead, it acted secretively to separate the Foundation from the NRA and the NRA Board, whose members represent the NRA's membership; to cement in place Old Guard control of the

Foundation in the face of the NRA membership's loss of confidence in their faction; and to arrogate the NRA's rights respecting the Foundation and its assets.

98.    The Foundation failed to obtain the NRA's consent to any of these amendments. The NRA did not and does not consent to any of these amendments.

99.    Notwithstanding the conduct of the Foundation's board, the NRA and the Foundation continued their working relationship until approximately late 2025, with the NRA continuing to raise funds for the Foundation and the Foundation continuing to fund NRA activities.

100.    Although the Foundation had previously had no employees of its own, its Old Guard-dominated Board hired a disgruntled former NRA employee as the Foundation's executive director, and he began in late 2025 making onerous demands upon, harassing, and seeking to control NRA employees engaged in activities supported by the Foundation.

101.    Demanding that the NRA hand over donor lists and social-media accounts, the Foundation's executive director informed the NRA that the Foundation intended to conduct its own fundraising and public-facing activities.

102.    On approximately January 7, 2026, the Foundation informed the NRA that that the Foundation would substantially reduce its funding of NRA Charitable Activities in 2026. Subsequently, the Foundation has threatened to cut off all funding of NRA Charitable Activities.

103.    The Foundation's executive director has stated that the Foundation intends to cut off or substantially reduce its financial support of the NRA, to sue the NRA, to take control of certain NRA programs, and to undermine the NRA's finances and financial stability.

104.    On information and belief, the Foundation's leadership intends to withdraw grant and other funding of the NRA, to undertake fundraising activities in competition with the NRA, and to conduct its own programmatic activities in competition with those of the NRA.

105.    These actions would conflict with the solicitations, representations, and other communications made to the donors who contributed the Foundation's endowment, conflict with those donors' understanding and intent respecting the use of the funds they contributed, and conflict with the NRA's intent in conducting fundraising for and with the Foundation over a period of decades.

106.    The NRA, in anticipation of the Foundation's continued support of NRA Charitable Activities in the same manner that has prevailed for many years, has taken steps to implement the programs, including hiring staff, making up-front expenditures, and continued use of its trademarks and other communications to donors and the public regarding NRA programming.

107.    The sudden reduction in funding by the Foundation frustrates the NRA's ability to plan, manage its finances, and ensure that it is able to operate NRA Charitable Activities at their full and planned capacity.

108.    Furthermore, the Foundation's attempt to position itself as a competitor to the NRA, using the NRA's own trademarks and the NRA-Restricted Funds, disadvantages the NRA in the markets that it serves and violates the NRA's rights in its trademarks and otherwise.

**The Foundation's Bad Faith Registration and Use of the Infringing Domain**

109.    The NRA has owned and operated the domain name <nrafoundation.org> since its registration in 1998.

110.    The NRA's Managing Director of Information Services maintains the domain name on behalf of the NRA as the domain registrant contact with the domain registrar.

111.    For years, the NRA has provided information about its charitable fundraising services, including programs and events related thereto, at the website associated with its <nrafoundation.org> domain name.

112.    The NRA also solicits donations and communicates with donors and NRA members through its @nrahq.org email domain.

113.    On July 30, 2025, the Foundation registered the domain name <thenrafoundation.org> with GoDaddy.com, LLC (the "Infringing Domain").

114.    The Foundation registered the Infringing Domain using a privacy service and identified itself using the fictitious name "Foundation Foundation" and false contact information, namely, the following address: "Fred VA, VA, Virginia 22407."

115.    The Foundation remains the current registrant of the Infringing Domain.

116.    The Infringing Domain Name incorporates the NRA's '345 Mark (NRA), '391 Mark (NRA), and '339 Mark (THE NRA FOUNDATION) in their entireties.

117.    The Foundation never obtained permission from the NRA to use the '345 Mark (NRA), '391 Mark (NRA), or '339 Mark (THE NRA FOUNDATION) in the Infringing Domain.

118.    The Foundation selected and registered the Infringing Domain with knowledge of the NRA's rights in the NRA's '345 Mark (NRA), '391 Mark (NRA), and '339 Mark (THE NRA FOUNDATION), as well as the NRA's nearly identical <nrafoundation.org> domain name. Upon information and belief, the Foundation intentionally selected and registered the Infringing Domain because of its similarity to the NRA Marks and the NRA's <nrafoundation.org> domain name.

119.    On September 3, 2025, the NRA requested in writing that the Foundation assign the Infringing Domain to the NRA.

120.    On September 8, 2025, the Foundation responded to the NRA's request for assignment of the Infringing Domain by stating that the Foundation "would ordinarily comply happily with past practice and assign [the Infringing Domain] to the [NRA], but for certain administrative/practical/legal considerations" declined to do so in this instance. The Foundation's

response confirmed that the NRA "would ordinarily" be entitled to transfer of the Infringing Domain.

121.    On October 30, 2025, the NRA sent a letter to the Foundation demanding that the Foundation assign the Infringing Domain to the NRA. In that letter, the NRA explained that the Infringing Domain was confusingly similar to the NRA's '345 Mark (NRA), '391 Mark (NRA), and '339 Mark (THE NRA FOUNDATION), and was likely to confuse consumers into mistakenly believing that the Infringing Domain was affiliated with or originated with the NRA.

122.    The Foundation refused to assign the Infringing Domain Name to the NRA, despite the NRA's repeated requests and the Foundation's concession that such assignment was consistent with ordinary practice.

123.    The Infringing Domain resolves to a landing page where the Foundation announces that the Foundation's website will be "Launching Soon" and which prominently displays the Infringing Domain, including the NRA's '345 Mark (NRA), '391 Mark (NRA), and '339 Mark (THE NRA FOUNDATION). Below are screenshots of the landing page associated with the Infringing Domain:





124.    On the landing page associated with the Infringing Domain, the Foundation solicits donor contact information, including names and email addresses, and asks visitors to sign up for its "email list for updates, promotions, and more."

125.    The Foundation also uses the Infringing Domain in connection with its illegitimate charitable fundraising activities independent from and in direct competition with the NRA,

including donor solicitations and other communications with donors, without any permission or other authorization from the NRA. For example, the Foundation communicates with donors through emails using the @thenrafoundation.org email domain.

126.    The Foundation's use of the Infringing Domain in connection with its illegitimate charitable fundraising activities is likely to confuse consumers because the NRA uses its nearly identical <nrafoundation.org> domain name, as well as its @nrahq.org email domain, in connection with its own charitable fundraising activities, including donor solicitations and other communications.

127.    The Foundation's conduct in registering and using the Infringing Domain is intended to trade on the goodwill of the NRA's '345 Mark, '391 Mark, and '339 Mark, cause confusion in the marketplace, divert Internet users searching for the NRA's website at <nrafoundation.org>, and directly compete with the NRA's charitable fundraising activities.

**The Foundation's Trademark Infringing Activities**

128.    The Foundation seeks to offer identical and substantially similar programs, events, and services under trademarks identical to those owned by the NRA without the NRA's authorization.

129.    On January 5, 2026, the NRA sent the Foundation a cease-and-desist letter on "NRA Foundation's Unauthorized Use of NRA's Trademarks," wherein the NRA demanded that the Foundation "cease and desist all use of the NRA Marks (and any marks confusingly similar thereto) immediately." This letter confirmed revocation of any previous license, consent, permission, or other authorization, whether express or implied, for the Foundation to use the NRA's trademarks, including "uses thereof in the Foundation's trade name." Attached hereto as **Exhibit H** is a true and correct copy of the cease and desist letter.

130.    Since January 5, 2026, the Foundation has continued to use the NRA's valuable trademarks without permission, including without limitation the '345 Mark (NRA), '391 Mark (NRA), '307 Mark (NATIONAL RIFLE ASSOCIATION), '231 Mark (THE NRA FOUNDATION TEACH FREEDOM), '790 Mark (FRIENDS OF NRA), '695 Mark (NRA SCHOOL SHIELD & Design), and '339 Mark (THE NRA FOUNDATION) (collectively, the "NRA Marks"), in connection with its association and charitable fundraising services, among others.

131.    The Foundation's post-January 5, 2026 use of the NRA Marks also includes continued unauthorized use of the NRA's '345 Mark (NRA), '391 Mark (NRA), and '339 Mark (THE NRA FOUNDATION) in the Infringing Domain in connection with donor solicitations and other communications, and otherwise in connection with the Foundation's illegitimate and independent charitable fundraising activities. The Foundation also continues to solicit donor contact information on the landing page associated with the Infringing Domain.

132.    The Foundation provides its association and charitable services to consumers through programs and events identical and substantially similar to those through which the NRA provides its firearms-related goods and services (including its association and charitable services) to consumers.

133.    The Foundation provides its association, charitable, and related services to the same types of consumers as the NRA.

134.    The Foundation is using the NRA Marks in its public communications and in its donor solicitations and other communications, to the detriment of the NRA and in derogation of the NRA's rights in the NRA Marks.

## COUNT I
### Federal Trademark Infringement
### (15 U.S.C. § 1114)

135.    The NRA repeats and realleges all of the allegations contained in the preceding paragraphs of this Amended Complaint as though the same were fully set forth herein.

136.    The NRA owns common law and incontestable federal trademark rights in the NRA Marks.

137.    The NRA has made exclusive use of the NRA Marks throughout the United States.

138.    The NRA's common law and federal trademark rights in the NRA Marks predate the Foundation's recent adoption and commercial use of identical marks for identical and substantially similar programs, events, and related goods and services.

139.    The NRA Marks are well-known to the public, due to the longstanding and widespread use and promotion by the NRA, with some marks in use for over 150 years. The public generally associates the NRA Marks with the NRA, including as an indication of the source of the NRA's goods and services.

140.    The Foundation's use of identical marks for identical services is likely to cause confusion, mistake, and deception among the relevant consuming public as to the origin and source of the programs, events, charitable services, merchandise, and related services provided thereunder. Such uses are also likely to deceive the relevant consuming public as to whether the programs, events, and services provided under the Foundation's identical marks originate from, are associated with, and/or are otherwise authorized by the NRA. The Foundation's uses of the NRA Marks thus cause damage to the NRA's reputation and goodwill.

141.    Upon information and belief, the Foundation's use of the NRA Marks without authorization is willful and intended to cause confusion, mistake, or deception as to the origin and

source of the programs, events, and related goods and services offered thereunder for purposes of trading off the NRA's reputation and goodwill.

142.    The NRA has been damaged by the Foundation's infringing conduct in an amount to be proven at trial.

143.    The NRA is entitled to recover its damages arising from the Foundation's infringing conduct, as well as the costs of litigation, including attorneys' fees, from the Foundation.

144.    The NRA has no adequate remedy at law. The Foundation's infringing conduct has caused and, unless enjoined, will continue to cause irreparable damage to the NRA's trademark rights in the NRA Marks and to the NRA's business, reputation, and goodwill.

**COUNT II**
**False Designation of Origin and Federal Unfair Competition**
**(15 U.S.C. § 1125(a))**

145.    The NRA repeats and realleges all of the allegations contained in the preceding paragraphs of this Amended Complaint as though the same were fully set forth herein.

146.    By misappropriating and using the NRA Marks in commerce, the Foundation misrepresents and falsely describes to the general public the origin, source, sponsorship, and/or affiliation of the Foundation's programs, events, and services, and is likely to confuse consumers as to whether such programs, events, and services are provided, sponsored, endorsed, or authorized by the NRA.

147.    Upon information and belief, the Foundation's wrongful and deceptive actions were done willfully with: (a) knowledge of the NRA's reputation and goodwill as well as the public's recognition of the NRA Marks with the NRA; (b) knowledge that the Foundation was misrepresenting the nature, characteristics, and qualities of its and/or the NRA's goods, services, and commercial activities to the general public; and (c) the intent to deceive the consuming public and trade off of the NRA's goodwill.

148.    The NRA has been damaged by the Foundation's wrongful and deceptive conduct in an amount to be proven at trial.

149.    The NRA is entitled to recover its damages arising from the Foundation's wrongful and deceptive conduct, as well as the costs of litigation, including attorneys' fees, from the Foundation.

150.    The NRA has no adequate remedy at law. The Foundation's wrongful and deceptive conduct has caused and, unless enjoined, will continue to cause irreparable damage to the NRA's rights in the NRA Marks and to its business, reputation, and goodwill.

**COUNT III**
**Federal Trademark Dilution**
**(15 U.S.C. § 1125(c))**

151.    The NRA repeats and realleges all of the allegations contained in the preceding paragraphs of this Amended Complaint as though the same were fully set forth herein.

152.    The NRA Marks are either inherently distinctive of the NRA's goods and services provided thereunder or have acquired distinctiveness through the NRA's longstanding exclusive and continuous use thereof.

153.    The NRA Marks are "famous marks" within the meaning of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), in that the NRA Marks are widely recognized by the general consuming public in the United States as a designation of source of the goods and services offered by the NRA thereunder.

154.    The NRA Marks were distinctive and famous prior to the Foundation's adoption and use of identical marks for identical and substantially similar programs, events, and services.

155.    The Foundation's use of marks identical to the NRA Marks for identical and/or similar programs, events, and services dilute and are likely to continue diluting the distinctiveness of the NRA's famous NRA Marks.

33

156.     Upon information and belief, the Foundation's wrongful use of marks identical to the NRA Marks for identical and substantially similar programs, events, and services is intentional and willful in violation of Section 43(c) of the Lanham Act.

157.     The NRA is entitled to recover its damages arising from the Foundation's dilution of the NRA Marks, as well as the costs of litigation, including attorneys' fees, from the Foundation.

158.     The NRA has no adequate remedy at law. The Foundation's use of marks identical to the NRA Marks for identical and/or similar programs, events, and services have caused and, unless enjoined, will continue to cause irreparable damage to the distinctiveness of the NRA Marks and the NRA's business, reputation, and goodwill.

### COUNT IV
**Common Law Trademark Infringement and Unfair Competition**

159.     The NRA repeats and realleges all of the allegations contained in the preceding paragraphs of this Amended Complaint as though the same were fully set forth herein.

160.     The NRA owns common law rights in the NRA Marks, which the NRA acquired through its extensive, continuous, and exclusive use of the NRA Marks in the United States.

161.     Without the Plaintiffs' consent or approval, the Foundation has wrongfully used the NRA Marks in connection with the provision of its goods and services, including charitable and fundraising services, and continues to advertise and provide such services under the NRA Marks.

162.     The Foundation's unauthorized use of the NRA Marks has caused and is likely to cause confusion, mistake, and deception as to its affiliation, connection, association with, or sponsorship or approval by the NRA, in violation of District of Columbia or other applicable state common law.

163.     The NRA has suffered and will continue to suffer damages as a result of the Foundation's infringement and unfair competition.

164.    The NRA is entitled to recover damages arising from the Foundation's infringement and unfair competition, as well as the costs of litigation, including attorneys' fees from the Foundation.

165.    The NRA is suffering and will continue to suffer serious and irreparable damage and is therefore entitled to injunctive relief restraining the Foundation from engaging in further infringement and unfair competition.

## COUNT V
### Cybersquatting Under the Anti-Cybersquatting Consumer Protection Act (ACPA) 15 U.S.C. § 1125(d)

166.    The NRA repeats and realleges all of the allegations contained in the preceding paragraphs of this Amended Complaint as though the same were fully set forth herein.

167.    The NRA's '345 Mark (NRA), '391 Mark (NRA), and '339 Mark (THE NRA FOUNDATION) are distinctive and/or famous, and achieved distinctiveness and/or fame prior to the Foundation's registration of the Infringing Domain, <thenrafoundation.org>.

168.    The Infringing Domain encompasses the entirety of the NRA's '345 Mark (NRA), '391 Mark (NRA), and '339 Mark (THE NRA FOUNDATION).

169.    The Infringing Domain is confusingly similar to the NRA's '345 Mark (NRA), '391 Mark (NRA), and '339 Mark (THE NRA FOUNDATION), as well as the NRA's own <nrafoundation.org> domain name.

170.    The Foundation registered and is using the Infringing Domain with knowledge of the NRA's rights in the NRA's '345 Mark (NRA), '391 Mark (NRA), and '339 Mark (THE NRA FOUNDATION), as well as the NRA's registration and use of its nearly identical <nrafoundation.org> domain name.

171.    The Foundation registered, trafficked in, or used the Infringing Domain with a bad faith intent to profit from the NRA's '345 Mark (NRA), '391 Mark (NRA), and '339 Mark (THE NRA FOUNDATION), as well as the goodwill associated therewith.

172.    The Foundation registered and uses the Infringing Domain to profit from the NRA's '345 Mark (NRA), '391 Mark (NRA), and '339 Mark (THE NRA FOUNDATION) by using the Infringing Domain in connection with the Foundation's independent and illegitimate charitable fundraising activities, including in connection with donor solicitations and other communications, and creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the Foundation's website and charitable fundraising activities by the NRA.

173.    The Foundation registered and uses the Infringing Domain with an intent to divert consumers searching for the NRA's charitable fundraising services, including online at <nrafoundation.org>, to the Foundation's independent and illegitimate charitable fundraising activities for commercial gain.

174.    The Foundation's registration and use of the Infringing Domain is intended primarily to capitalize on the associated goodwill with the NRA's '345 Mark (NRA), '391 Mark (NRA), and '339 Mark (THE NRA FOUNDATION).

175.    The Foundation provided a fictitious name and incomplete contact information when registering the Infringing Domain.

176.    The likely confusion resulting from the Foundation's use of the Infringing Domain has harmed and continues to harm the distinctiveness of the NRA's '345 Mark (NRA), '391 Mark (NRA), and '339 Mark (THE NRA FOUNDATION).

177.    The NRA has no adequate remedy at law and is suffering irreparable harm and damage as a result of the Foundation's conduct as alleged herein in an amount thus far not determined.

178.    Upon information and belief, the Foundation has obtained gains, profits, and advantages as a result of its conduct as alleged herein in an amount thus far not determined.

<u>COUNT VI</u>
**Third Party Beneficiary Breach of Contract**

179.    The NRA repeats and realleges all of the allegations contained in the preceding paragraphs of this Amended Complaint as though the same were fully set forth herein.

180.    A third party may sue on a contract if the contracting parties intended the third party to benefit.

181.    Because donors' charitable contributions may "be provided to a corporation, charitable or otherwise, with a contractual understanding as to how the funds were to be used," *Fam. Fed'n for World Peace v. Hyun Jin Moon*, 129 A.3d 234, 247 (D.C. 2015), the NRA, as the identified intended third-party beneficiary of contributions made to the Foundation for the purpose of supporting NRA Charitable Activities, has the right to enforce the terms of those contracts.

182.    Donors were solicited by the NRA and its employees to donate to the Foundation for the specific purpose of supporting NRA Charitable Activities.

183.    The restrictions on the use of contributed funds were created by solicitations and other related communications, which led donors to intend that funds they contributed to the Foundation would be used for the purpose of supporting NRA Charitable Activities.

184.    Donor's making of charitable contributions to the Foundation in response to the NRA's solicitations for NRA Charitable Activities created contracts where the Foundation, in

consideration for the contributions, would ensure that the contributions were used for the purpose of supporting NRA Charitable Activities.

185.    The NRA was intended to benefit from those contributions because the contracting donors believed their contributions would be used for the purpose of supporting NRA Charitable Activities conducted by the NRA.

186.    The Foundation is in breach of the contracts with donors by using the restricted funds for purposes other than supporting NRA Charitable Activities and retaining the funds with the intent to fund activities other than NRA Charitable Activities.

187.    As a result of this breach, the NRA is not receiving and will not receive funds to support NRA Charitable Activities, causing it present and future damages, including loss of financial support and reduced ability to carry out its activities for the benefit of the public.

**<u>COUNT VII</u>**
**Third Party Beneficiary and Settlor Breach of Trust**
**(Common Law and D.C. Code § 19-1304.05)**

188.    The NRA repeats and realleges all of the allegations contained in the preceding paragraphs of this Amended Complaint as though the same were fully set forth herein.

189.    Under D.C.'s Uniform Trust Act law, an intended beneficiary of assets may sue for enforcement of a trust. D.C. Code § 19-1304.05 provides that "[t]he settlor of a charitable trust, among others, may maintain a proceeding to enforce the trust." The "others" who may enforce the trust include persons with a "special interest in the enforcement of a charitable trust." *YMCA of the City of Wash. v. Covington*, 484 A.2d 589, 591 (D.C. 1984); *Hooker v. Edes Home*, 579 A.2d 608, 612 (D.C. 1990) ("a clearly identified intended beneficiary has a justiciable interest in enforcement of the trust." *Family Fed. for World Peace v. Moon*, 129 A.3d 234, 244 n.15 (D.C.

2015) ("[W]e have recognized the applicability of the rules relating to charitable trusts to [charitable] corporations.").

190.    In establishing the Foundation in 1990, initially contributing to the Foundation, and raising funds for the Foundation to support NRA Charitable Activities, the NRA created a charitable trust for the benefit of NRA Charitable Activities. The NRA was therefore the settlor of the trust.

191.    The NRA appointed the trustees of the Foundation to hold the funds for the benefit of NRA Charitable Activities. From the establishment of the trust in 1990 until 2025, the Foundation used its assets for NRA Charitable Activities.

192.    In addition, a donor's contribution to a charitable corporation for a specific purpose "creates a charitable trust of which the institution is the trustee." *Fam. Fed'n for World Peace*, 129 A.3d at 247 n.20.  It is actionable for a nonprofit to receive a gift restricted to specific purpose and use it for a different purpose. *Id*.

193.    The NRA, as the intended beneficiary of the NRA-Restricted Funds, has a right to enforce the terms of that trust.

194.    Foundation donors made their contributions intending to benefit the NRA by supporting NRA Charitable Activities.

195.    Contributions made to the Foundation are the trust property.

196.    The trust property is estimated to exceed 160 million dollars.

197.    The NRA is the identified, intended beneficiary of the donors' contributions.

198.    Because the donors contributed specifically for the benefit of NRA Charitable Activities, that created a beneficial interest for the NRA in those NRA-Restricted Funds.

199.    The Foundation breached the trust by diverting funds away from the intended purpose and retaining the funds with the intent to use them for other purposes.

200.    This breach harms the NRA by denying it funds it had expected to receive to support NRA Charitable Activities, causing it present and future damages, including loss of financial support and reduced ability to carry out its activities for the benefit of the public.

## COUNT VIII
### Breach of Implied Contract

201.    The NRA repeats and realleges all of the allegations contained in the preceding paragraphs of this Amended Complaint as though the same were fully set forth herein.

202.    The NRA seeks to recover damages the NRA experienced as a result of a breach of duty by the Foundation under an implied contract with the Foundation and to enforce the terms of that contract.

203.    The NRA's provision of valuable services to the Foundation, including fundraising, which the Foundation accepted under circumstances wherein the Foundation reasonably understood that the funds raised would be used to support NRA Charitable Activities created an implied contract.

204.    The NRA's and Foundation's mutual understanding and intentions are confirmed by years in the course of dealing. This arrangement has been upheld every year, until now, since the Foundation was created by NRA as a fundraising vehicle to support NRA Charitable Activities.

205.    The Foundation breached its obligation under the implied contract by diverting funds away from the intended purpose and retaining the funds with the intent to use them for other purposes.

206.    This breach means that the NRA is not receiving funds it expected to receive to fund its charitable programs.

207.    As a result of this breach, the NRA is not receiving and will not receive funds to support NRA Charitable Activities, causing it present and future damages, including loss of financial support and reduced ability to carry out its activities for the benefit of the public.

## COUNT IX
### Promissory Estoppel

208.    The NRA repeats and realleges all of the allegations contained in the preceding paragraphs of this Amended Complaint as though the same were fully set forth herein.

209.    A claim for promissory estoppel lies when a plaintiff shows: (1) a promise; (2) that the promise reasonably induced reliance on it; and (3) that the promisee relied on the promise to its detriment.

210.    The NRA and the Foundation agreed that funds raised by the NRA for the Foundation would be used to fund NRA Charitable Activities.

211.    The NRA's understanding with the Foundation contained definite terms, even if not rising to level of contract, namely that the NRA would raise funds for the Foundation and that the funds so raised would be used to fund NRA Charitable Activities.

212.    The NRA relied on that promise to its detriment by conducting fundraising for the Foundation over many years and by building up and hiring employees for NRA Charitable Activities that it understood would be supported by the Foundation, and which were supported by the Foundation for many years, when the Foundation now acts to use the funds raised for other purposes and substantially reduce or curtail its support of NRA Charitable Activities.

## COUNT X
### Unjust Enrichment

213.    The NRA repeats and realleges all of the allegations contained in the preceding paragraphs of this Amended Complaint as though the same were fully set forth herein.

214.    A plaintiff may recover under a quasi-contract unjust enrichment claim when the (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust.

215.    The NRA conferred massive benefits on the Foundation through its establishment of and fundraising for the Foundation, use of the NRA's name and valuable trademarks to conduct such fundraising, and use of the NRA's reputation among potential donors. Even going beyond the Foundation's very existence, which it owes to the NRA, the Foundation would have not even a small fraction of its current assets were it not for the NRA's fundraising and use of the NRA's name, trademarks, and reputation to benefit the Foundation.

216.    The Foundation's retention of the funds is unjust because the NRA conferred such great benefits on the Foundation on the understanding that the Foundation would support NRA Charitable Activities and thereby facilitate the continuation and expansion of the NRA' important public-interest programs—from teaching gun safety to kids to educating Americans on firearms handling, self-defense, hunting, and marksmanship. It is a further injustice upon the donors that their money—donated with these same noble purposes in mind—be misappropriate for other purposes to further the Foundation leaders' personal vendetta against the NRA's current leadership.

**COUNT XI**
**Unauthorized Diversion of Charitable Assets**
**(D.C. Code § 29-410.03, § 44-1633)**
**(All Plaintiffs)**

217.    Plaintiffs repeat and reallege all of the allegations contained in the preceding paragraphs of this Amended Complaint as though the same were fully set forth herein.

218.    D.C. Code § 29-410.03(a) provides that "[p]roperty held in trust or otherwise dedicated to a charitable purpose shall not be diverted from its purpose." D.C. Code § 44-1633

provides that "assets in an endowment fund are donor restricted assets" and "[s]ubject to the intent of the donor."

219.   The Foundation was organized for, and holds the NRA-Restricted Funds to, support NRA Charitable Activities in accordance with donor intent.

220.   The Articles of Incorporation is a record that NRA Foundation would hold assets for the benefit of NRA Charitable Activities.

221.   In response to institutional solicitations, donors transferred property to the NRA Foundation for the Foundation to hold such assets to support NRA Charitable Activities.

222.   The Foundation's actions to stop or significantly reduce funding for NRA Charitable Activities are an attempt to divert its primary charitable asset away from its restricted charitable purpose.

223.   The Foundation therefore has violated and is continuing to violate D.C. Code § 29-410.03(a) and § 44-1633.

**COUNT XII**
**Ultra Vires Violations of Organizing Documents**
**(D.C. Code §§ 29-412.20, 29-401.22, 29-403.04, 29-408-20, 29-408.22, 29-406.12)**
**(All Plaintiffs)**

224.   Plaintiffs repeat and reallege all of the allegations contained in the preceding paragraphs of this Amended Complaint as though the same were fully set forth herein.

225.   Under the statutory and common law governing D.C. nonprofit corporations, the Foundation is required to act in accordance with the D.C. Code and its organizational documents, including its Articles of Incorporation and Bylaws.

226.    The Foundation was required to provide proper notice of its board meetings to all directors, including Plaintiff Hamlin as an NRA officer *ex officio* director, and the Foundation failed to do so.

227.    The Foundation's board size was limited to nine directors under its Articles of Incorporation, and required to include the Executive Vice President of the NRA as *ex officio* voting member with full powers, but the Foundation purported to count over 14 voting directors and failed to notify or count as a director all of its *ex officio* directors.

228.    Actions taken at any Foundation board meeting, including the attempted meeting of August 23, 2024, conducted without proper notice to all directors or while the Foundation's board was improperly constituted in violation of its Bylaws are invalid, ultra vires, and void or voidable, including any actions purporting to amend the Articles or Bylaws.

229.    In addition, the Foundation board's attempt to amend the Foundation Bylaws to remove the NRA's rights as a designated body with appointment power of the Foundation board is ultra vires and void because it was undertaken without the consent of the NRA, as required under D.C. Code §§ 29-408.20 and 29-408.22.

230.    Accordingly, the Foundation board's attempted amendments in 2024 and 2025 of its Articles and Bylaws, as identified herein, are ultra vires and void under D.C. Code §§ 29-412.20, 29-401.22, 29-403.04 and attempted amendment in 2024 of its Bylaws to remove the NRA's rights as a designated body is ultra vires and void under D.C. Code §§ 29-408-20, 29-408.22 and 29-406.12.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs National Rifle Association of America, Inc., William Bachenberg, and Douglas Hamlin hereby demand a trial by jury on all issues so triable and

respectfully request that this Court enter judgment in their favor and against Defendant NRA Foundation, Inc., and further requests:

1.  That Defendant and its agents, employees, representatives, successors, and assigns and all other persons, firms, or corporations in active concert or participation with Defendant who receive actual notice of an Order from this Court be preliminary and permanently enjoined from:

    a.  Directly or indirectly engaging in unfair competition with Plaintiff NRA by means of any activities, including but not limited to, providing, promoting, and/or advertising its association, charitable fundraising, and related services under the NRA Marks or any other activities which infringe Plaintiff NRA's NRA Marks;

    b.  Using Plaintiff NRA's NRA Marks and any marks similar thereto in connection with providing, promoting, and/or advertising its association, charitable fundraising, and related services;

    c.  Directly or indirectly engaging in unfair competition with Plaintiff NRA by distributing advertising or promotional materials which in any manner misrepresent the nature, characteristics, or qualities of Plaintiff NRA's or Defendant's goods and services; and

    d.  Engage in any conduct that is likely to confuse, mislead, or deceive consumers, NRA's members, and/or members of the public to believe that the association, charitable fundraising, and other firearms-related services provided by Defendant are sponsored, endorsed, or authorized by, or associated or connected with, Plaintiff NRA;

2. That Defendant be required:

    a. To pay Plaintiffs such damages as Plaintiffs have suffered and as were caused by Defendant's wrongful conduct as alleged herein; and

    b. To account for and pay to Plaintiffs all gains, profits, benefits, and advantages derived from Defendant's wrongful conduct as alleged herein;

3. An order finding that, by the acts complained of above, Defendant has infringed the NRA's federally registered trademarks in violation of 15 U.S.C. § 1114;

4. An order finding that Defendant had a bad faith intent to profit from Plaintiff NRA's '345 Mark (NRA), '391 Mark (NRA), and '339 Mark (THE NRA FOUNDATION) in registering and using the Infringing Domain, such that Defendant's registration and use of the Infringing Domain constitutes cybersquatting in violation of 15 U.S.C. §1125(d);

5. An order transferring the Infringing Domain from Defendant to Plaintiff NRA;

6. An order directing Defendant to refrain from registering, using, or trafficking in any domain names that are identical or confusingly similar to the NRA Marks;

7. That Plaintiff NRA be awarded its actual damages and Defendant's profits, or statutory damages, resulting from Defendant's violation of 15 U.S.C. § 1125(d) pursuant to 15 U.S.C. § 1117;

8. That Plaintiff NRA be awarded treble damages pursuant to 15 U.S.C. § 1117;

9. That Plaintiffs be awarded their attorneys' fees and costs incurred in this action, as well as prejudgment interest, in accordance with 15 U.S.C. § 1117 and D.C. Code § 19-1310.04 and the Uniform Trust Code § 1004, upon which D.C. Code § 19-1310.04 is based;

10. A declaration under 28 U.S.C. § 2201 and D.C. Code §§ 29-401.05, 29-410.03, and 44-1633 that funds raised for the purpose of supporting NRA Charitable Activities are

restricted to that purpose, and that the Foundation's use or retention of such funds for other purposes is in contravention of law;

11. An order ordering special performance of the contract or quasi contract between Plaintiff NRA and the Foundation that the Foundation designate and allocate the NRA-Restricted Funds to NRA Charitable Activities through grants;

12. An order enjoining the Foundation from making any further expenditure or transfer of the NRA-Restricted Funds to support activities other than NRA Charitable Activities, and an injunction ordering the Foundation to accurately designate the NRA-Restricted Funds and allocate them to NRA Charitable Activities through grants;

13. An order appointing a temporary independent trustee(s), director(s), officer(s), receiver(s), or other agents to take custody of the NRA-Restricted Funds to ensure that they are used to support NRA Charitable Activities in accordance with donor intent, or alternatively, an order appointing a monitor of Plaintiff NRA's choosing to ensure that the Foundation uses and distributes the NRA-Restricted Funds to support NRA Charitable Activities in accordance with donor intent;

14. An order under D.C. Code §§ 29-401.22, 29-403.04 29-408.09, and 29-408.23, confirming the continued validity of the Foundation's Articles of Incorporation and Bylaws as they existed before the improper and unlawful attempts to amend them or, alternatively, an order rescinding or setting aside the unlawful amendments of the Foundation's Articles of Incorporation and Bylaws;

15. An order enjoining the Foundation from acting under the unlawful amendments of the Foundation's Articles of Incorporation and Bylaws;

16. An accounting to determine the funds that constitute the "NRA Restricted Funds" and an accounting of all funds expended by the Foundation since January 1, 2024;

17. An order granting equitable restitution, disgorgement of profits, and other appropriate equitable monetary relief against Defendant such as constructive trust; and

18. That Plaintiffs be awarded such other and further relief as the Court deems just and proper.

*/s/ Andrew M. Grossman*
Andrew M. Grossman (D.C. Bar No. 985166)
Mark W. DeLaquil (D.C. Bar No. 493545)
Mark H. Tidman (D.C. Bar No. 441310)
**BAKER & HOSTETLER LLP**
1050 Connecticut Avenue, Suite 1100
Washington, D.C. 20036
Phone: 202.861.1500
Email: agrossman@bakerlaw.com

*Counsel for Plaintiffs NATIONAL RIFLE*
*ASSOCIATION OF AMERICA, WILLIAM*
*BACHENBERG, and DOUGLAS HAMLIN*

Dated:  March 6, 2026