**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., WILLIAM BACHENBERG, and DOUGLAS HAMLIN, <br><br> Plaintiffs, <br><br> v. <br><br> THE NRA FOUNDATION, INC., <br><br> Defendant. | **Case No.: 1:26-cv-00015 (SLS)** |

**PLAINTIFFS NATIONAL RIFLE ASSOCIATION OF AMERICA'S,
WILLIAM BACHENBERG'S, AND DOUGLAS HAMLIN'S
<u>OPPOSITION TO DEFENDANT'S MOTION TO DISMISS</u>**

Plaintiffs National Rifle Association of America, Inc. ("NRA"), William Bachenberg, and

Douglas Hamlin, (collectively "Plaintiffs"), by and through their attorneys, hereby submit this

Opposition to Defendant The NRA Foundation, Inc.'s ("Defendant" or "Foundation") Motion to

Dismiss (ECF No. 20) ("Motion to Dismiss" or "MTD") Plaintiffs' Amended Complaint (ECF

No. 19) ("Amended Complaint" or "FAC").

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................... iv

INTRODUCTION ............................................................................................................... 1

STANDARD OF REVIEW .................................................................................................. 3

BACKGROUND ................................................................................................................. 4

ARGUMENT ....................................................................................................................... 6

I.      The NRA Has Sufficiently Pleaded its Trademark and Cybersquatting Claims (Counts I-V) ................................................................................................................ 6

II.     The NRA Has Stated a Claim as a Third-Party Beneficiary of Charitable Contracts (Count VI) ............................................................................................................... 11

       A.    The Foundation's Diverting Funds Meant to Support the NRA Concretely Injures the NRA ......................................................................................................... 11

       B.    The 2026 Grant Agreement Is Immaterial ................................................. 12

       C.    This Dispute Is Ripe ................................................................................... 13

       D.    The NRA Plausibly Alleged Its Breach of Contract Claim ....................... 14

III.    The Foundation Has Breached the Charitable Trusts Established by the NRA and Donors (Count VII) ............................................................................................................. 16

       A.    The NRA Has Settlor Standing ................................................................. 16

       B.    The NRA Has Special Interest Standing as a Third-Party Beneficiary ..... 20

       C.    The Foundation's Diversion of Assets Breached the Trust ....................... 23

IV.    The NRA's Quasi-Contract Claims Are All Well-Pleaded (Counts VIII-X) ................... 24

       A.    Breach of Implied Contract (Count VIII) .................................................. 25

       B.    Promissory Estoppel (Count IX) ............................................................... 27

       C.    Unjust Enrichment (Count X) ................................................................... 28

V.     The 2024 Amendments Are Ultra Vires and Void (Count XII) .................................... 29

       A.    The NRA Has Standing as the Foundation's Designated Body ................. 31

       B.    Plaintiff Hamlin Has Standing as an Ousted Director ............................... 33

       C.    Bachenberg Has Standing as an Ousted Directorship Holder .................... 35

       D.    Count XII Is Not "Moot" Because of Post-Complaint Attempted "Ratification" of the Illegal Amendments ............................................................................. 36

       E.    The NRA Board's Approval Was Required ................................................ 39

       F.    Hamlin's Notice of the Bylaw Amendments Was Also Required ............. 41

       G.    All Amendments Made with Excess Number of Directors Are Void ....... 42

VI.    The Foundation's Diversion of Assets Also Violates the Nonprofit Corporations Act (Count XI) ............................................................................................................... 42

A.    The NRA Has Standing to Challenge Fund Diversion as the Settlor and Beneficiary of the Foundation Trust............................................................................................ 43

B.    Hamlin and Bachenberg Have Standing ................................................................... 43

C.    The Foundation's Diversion of Assets Is Unlawful................................................... 43

CONCLUSION.................................................................................................................... 44

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................... 3

*Bd. of Directors, Washington City Orphan Asylum v. Bd. of Trs., Washington City Orphan
  Asylum*,
  798 A.2d 1068 (D.C. 2002) ........................................................................... 34, 35

*Bloomgarden v. Coyer*,
  479 F.2d 201 (D.C. Cir. 1973)............................................................................... 25

*Bob Jones Univ. v. United States*,
  461 U.S. 574 (1983) ............................................................................................. 26

*Boyd v. Kilpatrick Townsend & Stockton*,
  164 A.3d 72 (D.C. 2017)....................................................................................... 25

*Branch Ministries v. Rossotti*,
  211 F.3d 137 (D.C. Cir. 2000)............................................................................... 28

*Bronner v. Duggan*,
  249 F. Supp. 3d 27 (D.D.C. 2017)......................................................................... 30

*CarrAmerica Realty Corp. v. Kaidanow*,
  321 F.3d 165 (D.C. Cir. 2003)............................................................................... 37

*Coach House Rest., Inc. v. Coach and Six Rest., Inc.*,
  934 F.2d 1551 (11th Cir. 1991) ............................................................................... 8

*Colorado Nat. Bank of Denver v. Comm'r*,
  30 T.C. 933 (1958) ............................................................................................... 19

*Compton v. Alpha Kappa Alpha Sorority, Inc.*,
  64 F. Supp. 3d 1 (D.D.C. 2014)............................................................................. 31

*CorpCar Servs. Houston, Ltd. v. Carey Licensing, Inc.*,
  325 A.3d 1235 (D.C. 2024) ................................................................................... 14

*Crown EMAK Partners, LLC v. Kurz*,
  992 A.2d 377 (Del. 2010)................................................................................. 36, 37

*D & G Stout, Inc. v. Bacardi Imports, Inc.*,
  805 F. Supp. 1434 (N.D. Ind. 1992) ...................................................................... 27

*Daley v. Alpha Kappa Alpha Sorority, Inc.*,
  26 A.3d 723 (D.C. 2011) .................................................................................. 30, 37

* *Depu v. Oath Holdings, Inc.*,
  715 F. Supp. 3d 1 (D.D.C. 2022)................................................................. 18, 20, 24

*District of Columbia v. Campbell*,
  580 A.2d 1295 (D.C. 1990) ................................................................................... 14

*Fam. Fed'n for World Peace & Unification Int'l v. Moon*,
   338 A.3d 10 (D.C. 2025) .................................................................................................. 29

*\* Fam. Fed'n for World Peace v. Hyun Jin Moon*,
   129 A.3d 234 (D.C. 2015) ..........................................................................................Passim

*Farina v. Janet Keenan Hous. Corp.*,
   335 A.3d 537 (D.C. 2025) ............................................................................................... 19

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ........................................................................................................ 11

*Green v. U.S. Dep't of Just.*,
   392 F. Supp. 3d 68 (D.D.C. 2019)..................................................................................... 3

*Gustave-Schmidt v. Chao*,
   226 F. Supp. 2d 191 (D.D.C. 2002)................................................................................... 3

*He Depu v. Yahoo! Inc.*,
   950 F.3d 897 (D.C. Cir. 2020)................................................................................... 18, 19

*Hooker v. Edes Home*,
   579 A.2d 608 (D.C. 1990) ........................................................................................ 20, 22

*In re Breast Cancer Prevention Fund*,
   574 B.R. 193 (Bankr. W.D. Wash. 2017).......................................................................... 21

*In re Se. Neighborhood House*,
   93 B.R. 303 (Bankr. D.D.C. 1988).................................................................................... 42

*In re Sterling Mining Co.*,
   No. 09-20178TLM, 2009 WL 2475302 (Bankr. D. Idaho Aug. 11, 2009) .............................. 38

*In re U.S. Office Prods. Co. Sec. Litig.*,
   251 F. Supp. 2d 77 (D.D.C. 2003)............................................................................... 27, 28

*Jackson v. Callan Pub., Inc.*,
   826 N.E.2d 413 (Ill. 2005)................................................................................................ 21

*Kowal v. MCI Commc'ns Corp.*,
   16 F.3d 1271 (D.C. Cir. 1994)........................................................................................... 3

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ......................................................................................................... 4

*Lutheran Ass'n of Missionaries & Pilots, Inc. v. Lutheran Ass'n of Missionaries & Pilots, Inc.*,
   No. CIV.03-6173, 2004 WL 2730104 (D. Minn. Nov. 19, 2004).......................................... 8, 9

*Martin v. FBI*,
   145 F.4th 1345 (D.C. Cir. 2025)........................................................................................ 36

*Mount Jezreel Christians Without a Home v. Bd. of Trs. of Mount Jezreel Baptist Church*,
   582 A.2d 237 (D.C. 1990) ................................................................................................ 20

*Myers v. Alutiiq Int'l Solutions, LLC*,
   811 F. Supp. 2d 261 (D.D.C. 2011).................................................................................... 27

*Nat'l Treasury Emps. Union v. United States*,
  101 F.3d 1423 (D.C. Cir. 1996) .................................................................................. 13

*Nevins v. Bryan*,
  885 A.2d 233 (Del. Ch.) ............................................................................................. 37

*North Jersey Brain & Spine Center v. Aetna Life Ins. Co.*,
  No. L-5817-18, 2019 WL 4889507 (N.J. Super. L. Oct. 01, 2019) ........................... 28

*Olincy v. Merle Norman Cosms., Inc.*,
  200 Cal. App. 2d 260 (Ct. App. 1962) ....................................................................... 37

*Parnigoni v. St. Columba's Nursery Sch.*,
  681 F. Supp. 2d 1 (D.D.C. 2010) ................................................................................ 27

*Peart v. D.C. Hous. Auth.*,
  972 A.2d 810 (D.C. 2009) ........................................................................................... 29

*Re'ese Adbarat Debre Selam Kidest Mariam Ethiopian Orthodox Tewahedo Church, Inc. v. Habte*,
  300 A.3d 784 (D.C. 2023) ........................................................................................... 42

*Riley v. Nat. Fed. of the Blind of N.C.*,
  487 U.S. 781 (1988) .................................................................................................... 28

*Schroder v. Scotten, Dillon Co.*,
  299 A.2d 431 (Del. Ch. 1972) .............................................................................. 37, 42

*Sealey v. Am. Soc. of Hypertension, Inc.*,
  26 A.D.3d 254 (N.Y. Sup. Ct. App. Div. 2006) ......................................................... 37

*Sigma Phi Society (Inc.) v. Mich. Sigma Phi, Inc.*,
  No. 20-12817, 2024 WL 1396255 (E.D. Mich. Mar. 31, 2024) ................................... 8

*Silberberg v. Becker*,
  191 A.3d 324 (D.C. 2018) ........................................................................................... 14

*Trs. of Dartmouth Coll. v. Woodward*,
  17 U.S. 518 (1819) ...................................................................................................... 14

*Turlock Irrigation Dist. v. FERC*,
  786 F.3d 18 (D.C. Cir. 2015) ...................................................................................... 11

*Twin Rivers Paper Co. LLC v. SEC*,
  934 F.3d 607 (D.C. Cir. 2019) .................................................................................... 11

*United States v. Kellogg Brown & Root Servs., Inc.*,
  800 F. Supp. 2d 143 (D.D.C. 2011) ............................................................................ 24

*Villanova Univ. v. Villanova Alumni Educ. Found., Inc.*,
  123 F. Supp. 2d 293 (E.D. Pa. 2000) ................................................................... 7, 8, 9

*W. Union Tel. Co. v. Massman Const. Co.*,
  402 A.2d 1275 (D.C. 1979) ......................................................................................... 15

*Yah Kai World Wide Enters. v. Napper*,
  195 F. Supp. 3d 287 (D.D.C. 2016) ....................................................................... 7, 10

vi

*YMCA of the City of Wash. v. Covington,*
  484 A.2d 589 (D.C. 1984) ...................................................................................... 20

## Statutes

D.C. Code § 19-1301.03(2)..................................................................................... 21

D.C. Code § 19-1301.03(16)................................................................................... 19

D.C. Code § 19-1304.01 ......................................................................................... 20

D.C. Code § 19-1304.05 .................................................................................... 17, 20

D.C. Code § 29-401.02(24)................................................................................ 33, 40

D.C. Code § 29-401.02(26)....................................................................................... 40

D.C. Code § 29-401.20 ............................................................................................. 30

D.C. Code § 29-401.22 ...................................................................................... 30, 33, 36

D.C. Code § 29-403.02 ............................................................................................. 31

D.C. Code § 29-403.04 .................................................................................. 30, 33, 34, 36

D.C. Code § 29-406.01 ............................................................................................. 31

D.C. Code § 29-406.04 ....................................................................................... 32, 33

D.C. Code § 29-406.12 ....................................................................................... 32, 33

D.C. Code § 29-408.22 .................................................................................. 31, 40, 41

D.C. Code § 29-408.22(a)(1) ............................................................................... 37, 39

D.C. Code § 29-408.22(a)(3) ............................................................................... 41, 42

D.C. Code § 29-408.22(a)(7) ................................................................................... 39

D.C. Code § 29-410.03(a)..................................................................................... 43, 44

D.C. Code § 29-411.01 ............................................................................................. 35

D.C. Code § 29-411.02 ............................................................................................. 35

D.C. Code § 44-1633 ............................................................................................... 43

I.R.C. § 170(e)(1)..................................................................................................... 19

Va. Code § 55-541.03 (same) .................................................................................. 19

## Rules

Fed. R. Civ. P. 17(a) ............................................................................................... 31

Federal Rule of Civil Procedure 12(b)(1) ................................................................. 3

Rule 12(b)(6)............................................................................................................ 4

## Other Authorities

2 Fletcher Cyc. Corp. § 406 (perm. ed 1982) ................................................................ 42

2A Fletcher Cyc. Corp. § 755 ......................................................................................... 38

7A Fletcher Cyc. Corp. § 3399 (2006) ........................................................................... 37

McCarthy on Trademarks & Unfair Competition § 18:52 (5th ed. 2026) ...................... 9

*Practitioner Perspectives on Using § 501(c)(4) Organizations for Charitable Lobbying: Realities and an Alternative,*
21 N.Y.U. J. Legis. & Pub. Pol'y 535 (2018) ........................................................... 28

Restatement (Second) of Trusts § 348 ............................................................................ 18

Restatement (Third) of Restitution and Unjust Enrichment §§ 1–2 (2011) .................... 29

Restatement (Third) of Trusts § 3 ................................................................................... 21

Restatement (Third) of Trusts § 10(e) ....................................................................... 19, 20

Restatement (Third) of Trusts § 94 ................................................................................. 21

Uniform Trust Code § 401 .............................................................................................. 20

**INTRODUCTION**

This case challenges the attempt of disgruntled former NRA insiders—allies of its disgraced former leader Wayne LaPierre—to divert funds that were donated to support NRA's charitable activities to further their own personal ambition of standing up a competitor to the NRA. Those insiders were part of the cabal that enabled the misappropriation of millions of dollars by NRA executives and then spent hundreds of millions of dollars trying to evade accountability. When rank-and-file NRA members rebelled and voted their faction out—in favor of reform candidates dedicated to transparency, accountability, and a tight focus on the mission—they unlawfully sought to seize control of the Foundation, steal the NRA's intellectual property, and misdirect the millions of dollars given by charitable donors to support NRA's charitable activities—like gun safety programs for children—to undermine the NRA and build up the Foundation as a new vehicle for their ambitions.

Called to account for their actions in this lawsuit, the Foundation claims that the NRA is improperly attempting to use the Foundation as a piggybank, threatening its tax-exempt status. That claim is rich coming from members of what the New York Attorney General deemed "the cabal…who circled the wagons around Wayne LaPierre" to shield his "illegal conduct."[1]  In fact, the lawsuits brought by the attorneys general of New York and the District of Columbia were aimed at the same general objective as this case: preventing the misuse of donor-contributed funds. The Foundation was created and funded to support the NRA's charitable activities, not as a landing spot for disaffected LaPierre loyalists who betrayed the trust of the NRA membership and were voted out of control of the NRA.

The Foundation's Motion is premised on five general misunderstandings.

---

[1] Phase II Trial Tr. 2212, August 5, 2024, *New York v. National Rifle Association et al.*, No. 451625/2020, Doc. No. 3431.

*First*, the NRA can and has revoked its consent regarding its intellectual property. The NRA's prior consent to use its intellectual property was limited to use of the NRA mark in the Foundation's name as "a subsidiary of the NRA," not to as a competitor, and all consent was, in any event, unambiguously revoked.

*Second*, the 2026 Grant Agreement does not control the entirety of the NRA's relationship with the Foundation. That agreement by its express terms covers only the Foundation's 2026 grants to the NRA and does not purport to define the broader NRA–Foundation relationship, including the Foundation's obligations respecting the many millions its holds for the benefit of the NRA and, specifically, the NRA'scharitable activities. The claims in this lawsuit concern those funds, as well as the Foundation's violations of D.C. non-profit law and the Foundation's misappropriation of the NRA's intellectual property. The 2026 Grant Agreement has nothing to say about those things.

*Third*, the Foundation misunderstands the supposed "discretion" it exercises concerning funds contributed to it for the purpose of supporting the NRA's charitable activities. Whatever discretion the Foundation may have as to choosing precise activities to support, it has no lawful discretion to expend those funds for purposes other than those for which they were contributed. Fund raised to support the NRA's charitable activities—as the funds at issue here were, based on solicitations, representations, and other circumstances—are restricted by law to that use, whether or not the restriction was expressed in a written agreement. Yet the Foundation's leaders proclaim they intend to use that money to stand up the Foundation's own programs, aggrandizing their own power, in lieu of funding the NRA's charitable activities. The law forbids that.

*Fourth*, under D.C. law, a charitable corporation may administer a charitable trust. The Foundation's contrary argument is not colorable.

2

*Fifth*, the Foundation cannot repudiate its obligations to the NRA and the NRA's charitable activities. The Foundation was established by the NRA, and funded through the efforts of NRA officials and employees, to provide support for the NRA's charitable activities. That purpose is the only reason that the Foundation exists, and the only reason anyone ever donated to it. The Foundation's leaders have no authority to upend the Foundation's fundamental purpose and betray its reason for existence so as to further their own personal ambitions and retaliate against the reformers who displaced them from the leadership of the NRA.

## STANDARD OF REVIEW

A complaint is legally sufficient when it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Green v. U.S. Dep't of Just.*, 392 F. Supp. 3d 68, 80 (D.D.C. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted)). A claim is facially plausible when the facts pleaded in the complaint allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The standard does not amount to a "probability requirement," but it does require more than a "sheer possibility that a defendant has acted unlawfully." *Id*. The court must give the plaintiff the "benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). The Court may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice," *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002).

Challenges to Article III standing are "reviewed under Federal Rule of Civil Procedure 12(b)(1)." *Green*, 392 F. Supp. at 80. The Foundation challenges Article III standing for the NRA's contract claims. But the "standing" challenges to the NRA as settlor and third-party beneficiary (Count VI), and the "standing" challenges to all three Plaintiffs under the D.C. Nonprofit

Corporation Acts (Counts XI and XII), are all challenges to "statutory standing" because they concern whether Plaintiffs "fall[] within the class of plaintiffs whom [D.C.] has authorized to sue under" the respective trust and nonprofit laws. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014). These challenges, though stylized otherwise, are in fact challenges to the existence of a cause of action, which "does not implicate subject-matter jurisdiction." *Id.* at 128 n.4. They are therefore reviewed under Rule 12(b)(6), without consideration of evidence extrinsic to the complaint.

## BACKGROUND

The NRA created the Foundation to be a trust vehicle by which donors could make tax-deductible contributions in support of the NRA's charitable, educational, and scientific activities connected with the lawful ownership and use of firearms, as well as its financial support of mission-aligned local nonprofit organizations (the "NRA Charitable Activities"). FAC ¶ 30. To that end the NRA acted to establish the Foundation, through attorneys working at the NRA's direction. FAC ¶¶ 34–39. The NRA caused the Foundation to be incorporated, its Articles of Incorporation to be drafted, and its exempt application to be submitted and prosecuted. FAC ¶¶ 34, 38, 45. The NRA named NRA leaders as the original trustees (i.e., directors) of the Foundation, including its original President (Dr. James W. Carlson), Vice President (Joe Foss), and Treasurer (J. Warren Cassidy). FAC ¶¶ 42–46. The NRA also contributed office space and initial fundraising to stand up the Foundation. FAC ¶ 46. Indeed, the NRA controlled and funded every aspect of the process of launching the Foundation. FAC ¶¶ 35–36.

The NRA and Foundation then proceeded to work collaboratively for over 30 years to carry out the Foundation's mission of supporting NRA Charitable Activities. Since the beginning, they operated on the understanding that the NRA would use its staff, resources, contacts, and reputation to raise funds for the Foundation, and the Foundation would in turn fund NRA Charitable

Activities. FAC ¶¶ 29–31, 58–65. Pursuant to that arrangement, NRA staff raised funds for the Foundation and carried out its activities; the Foundation "had no independent employees." *Id*. ¶ 50.

As is typical for supporting foundations, the NRA maintained control over the Foundation through its board. From the very beginning, the Foundation's trustees, who comprise its board, were selected by the NRA's Board or were NRA officers serving in *ex officio* capacity. The Foundation's 1990 Bylaws provided that the NRA's Executive Vice President (in effect, the NRA's CEO) "shall be a Trustee of the Foundation," that non-*ex officio* trustees "shall be elected by the Board of Directors of the National Rifle Association ('NRA') at the Annual Meeting of the Directors of the NRA," that "the majority of the members of the Board of Trustees of the Foundation shall be Directors of the NRA," and that the "remaining members of the Board of Trustees of the Foundation shall be persons who are members of the NRA." FAC ¶ 48. A subsequent amendment provided that the NRA's President serve as an *ex officio* member of the Foundation's board with full powers. *Id*.

In light of the Foundation's status and role, the NRA lent the Foundation its brand. FAC ¶¶ 40–41. Specifically, the NRA authorized use of the NRA mark in the Foundation's name as "a subsidiary of the NRA." *Id*. at Ex. 1 at 11 (emphasis added); *see also* FAC ¶ 40. The NRA also used its trademarks in raising funds for the Foundation. FAC ¶ 51.

The Foundation's leadership now seeks to break away from the NRA and enter into competition with the NRA by standing up its own programs, with the goal of overtaking the NRA. FAC ¶¶ 103–04. The Foundation's executive director "has stated that the Foundation intends to cut off or substantially reduce its financial support of the NRA, to sue the NRA, to take control of certain NRA programs, and to undermine the NRA's finances and financial stability." FAC ¶ 103. The Foundation "informed the NRA that that the Foundation would substantially reduce its

funding of NRA Charitable Activities in 2026. Subsequently, the Foundation has threatened to cut off all funding of NRA Charitable Activities." FAC ¶ 102.

To separate itself from the NRA, the Foundation has attempted a series of bylaw and article amendments that would fundamentally alter the character and purpose of the Foundation. FAC ¶¶ 83–98. These include removing the NRA's Executive Vice President and President as *ex officio* members of the Foundation's board, stripping the NRA of its power to appoint other trustees to the board, and ultimately severing the link between the NRA membership, which elects the NRA's Board, and the Foundation. *Id.* ¶¶ 83–89.

On January 5, 2026, the NRA terminated any authorization the Foundation had to use the NRA's trademarks and directed it to cease and desist from the use of the NRA's marks. *Id.* ¶ 129.

**ARGUMENT**

## I. The NRA Has Sufficiently Pleaded its Trademark and Cybersquatting Claims (Counts I-V)

The Foundation's request for dismissal of the NRA's trademark and cybersquatting claims is based on its untenable position that the NRA's consent for the NRA's own subsidiary to use the NRA's valuable intellectual property in its name extends to use for fundraising activities independent from and in competition with the NRA. *See* Mot.38–42. Unable to locate legal support for this position, the Foundation resorts to a strained interpretation of its governing documents and related materials. *Id.*

At the motion to dismiss stage, the Foundation must show that the NRA has failed to allege that it revoked its consent. But the NRA has, in fact, revoked any consent for the Foundation to use its marks. FAC ¶ 129 & Ex. H. In addition, the NRA maintained control over the use of its marks. *See* FAC ¶¶ 34–57. Among other things, the NRA alleged that there was a "mutual understanding" that the NRA's "staff, trademarks, reputation, and other resources" were employed

6

for decades to raise funds for the Foundation, and that the Foundation would support the NRA's charitable, scientific, and educational programs and activities. FAC ¶ 51. The NRA also alleged that its own staff carried out fundraising for the Foundation, as well as the Foundation's activities for decades until recently because the Foundation "had no independent employees." *Id*. ¶ 50. And, as described above, the Foundation's Bylaws provided from the beginning that the NRA would select the Foundation's trustees, who were required to be members of the NRA. *Id*. ¶ 48.

Furthermore, the NRA alleged that the Foundation is actively attempting to sever ties with the NRA. *See* FAC ¶¶ 66–108. In addition to attempting to alter its governing documents, *see id*. ¶¶ 83–98, the Foundation informed the NRA in January 2026 that it would substantially reduce funding of the NRA's programs and activities—*the very programs and activities that the Foundation was formed to support, promote, and manage*—and later that it may cut off funding altogether. *See id*. ¶ 102; MTD Ex. 2 at 27–32. The Foundation's Executive Director specifically threatened to cut off all such funding, sue the NRA, and compete with the NRA's fundraising activities. *See* FAC ¶¶ 102–04. The NRA responded that the Foundation could not use the NRA's trademarks in connection with the Foundation's independent and competitive fundraising efforts, culminating in the January 5, 2026 cease-and-desist letter terminating any permission to use the NRA's trademarks. *See id*. ¶ 129.

Courts have resolved analogous disputes in favor of the licensor at later stages in litigation. *See Yah Kai World Wide Enters. v. Napper*, 195 F. Supp. 3d 287, 308–319 (D.D.C. 2016) (holding former member of African Hebrew Israelite community infringed the community's registered trademark by continuing to operate his own independent business under the same mark after leaving the community and receiving a letter terminating any license). The decision in *Villanova Univ. v. Villanova Alumni Educ. Found., Inc.* is instructive. 123 F. Supp. 2d 293 (E.D. Pa. 2000).

The defendant there—an alumni organization for the University of Villanova—continued use of the University's trademarks after the University terminated the defendant's affiliation with the University. *Id*. at 295–300. The University moved for a preliminary injunction and the Court found that the University was likely to succeed on the merits of its trademark claims because the University had granted an implied trademark license (later ratified in written agreements), the University exercised sufficient control over the defendant's use of the licensed marks, the license terminated upon disaffiliation (as well as a later cease-and-desist letter), and the defendant's post-termination use of the previously licensed marks (including in the defendant's name) was an infringement. *Id*. at 301–310. Similarly, in *Lutheran Ass'n of Missionaries & Pilots, Inc. v. Lutheran Ass'n of Missionaries & Pilots, Inc*., No. CIV.03-6173, 2004 WL 2730104 (D. Minn. Nov. 19, 2004), the U.S.-based affiliate formed by a Canadian organization (to permit U.S. citizens to receive tax deductions for donations) sought to continue using the Canadian organization's trademarks following termination of the two organization's relationship. *Id*. at *1–2. The court found that the Canadian organization had granted an implied license to use its trademarks and retained sufficient control over such use, the U.S. affiliate acquired no ownership rights in the licensed marks, the Canadian organization properly terminated the implied license, and post-termination use of the marks was infringing. *Id*. at *8–12. *See also Coach House Rest., Inc. v. Coach and Six Rest., Inc*., 934 F.2d 1551, 1563 (11th Cir. 1991) ("Usually an implied license is terminable at will. Therefore, [the licensor] may terminate the license at any time …."); *Sigma Phi Society (Inc.) v. Mich. Sigma Phi, Inc*., No. 20-12817, 2024 WL 1396255, at *7 (E.D. Mich. Mar. 31, 2024) (implied license for local chapter to use national chapter's trademarks "did not entitle [local chapter] to the unfettered use of the [t]rademarks because implied licenses are terminable at will"). The NRA has at the very least alleged this much.

Because the NRA has pleaded facts that would win if proven at summary judgment under these precedents, a fortiori the NRA has met the motion to dismiss standard. Any license for the Foundation to use the NRA's trademarks (including in its name) was conditioned upon the Foundation's ongoing relationship with the NRA. *See* FAC ¶¶ 40–41; MTD Exs. 1–2. The Foundation, as a licensee, did not obtain any ownership interest in the licensed marks. *See* McCarthy on Trademarks & Unfair Competition § 18:52 (5th ed. 2026). The NRA exercised sufficient control over the Foundation's use of the licensed marks. *See* FAC ¶¶ 34–57. In response to threats that the Foundation would sever ties, cut off funding for the NRA's charitable programs and activities, and conduct its own independent fundraising activities in competition with the NRA, the NRA terminated any permission for the Foundation to use the NRA's trademarks (including in the Foundation's name). *Id*. at ¶ 129. The Foundation has nonetheless continued to use the NRA's trademarks as an indication of source for the Foundation's independent and competitive activities, including, but not limited to, in the Foundation's name, domain name, and communications with the NRA's donors. *Id*. ¶¶ 109–34. The Foundation's post-termination use "'presents a particular danger of confusion to the public'" such that confusion is especially likely to occur, and is therefore infringing. *Lutheran Ass'n of Missionaries and Pilots, Inc. (Canada)*, 2004 WL 2730104, at *12 (quoting *Villanova Univ.*, 123 F. Supp.2d at 309).

The Foundation's attempt (at 39-42) to avoid these well-pleaded allegations is predicated on the erroneous theory that certain provisions in its governing documents to argue that "the only plausible inference" is that the NRA's consent was "irrevocable" and "perpetual," and extends to use of the NRA's trademarks for the Foundation's independent and competitive fundraising activities. The Foundation's contention falls apart upon review of the Foundation's governing documents, Form 1023 submission to the IRS, and related materials.

9

For example, the Letter of Consent from the NRA's then-Secretary was limited to use of the NRA mark in the Foundation's name *as "a subsidiary of the NRA*." *Id*. at Ex. 1 at 11 (emphasis added); *see also* FAC ¶ 40, ECF No. 19. This limitation upon the NRA's consent is corroborated by the Foundation's Form 1023 submission and related materials. *See* MTD Ex. 2. Exhibit C to the Foundation's Form 1023 submission confirms that "[t]he Foundation has been formed by the [NRA] … as a vehicle through which individuals and corporations could make tax-deductible contributions …." *Id*. at 11. The Foundation's letter to the IRS explains that "[i]n furtherance of [the Foundation's stated] purpose, the Foundation will support, promote, and manage many of the purely charitable, scientific and educational activities of the [NRA] … and … of other already existing section 501(c)(3) organizations," many of which are associated with the NRA (*e.g.*, the NRA Special Contribution Fund). *Id*. at 27–28. The letter goes on to list numerous programs conducted by or otherwise associated with the NRA that "the Foundation will support, promote, and manage," such as the NRA's Elementary Gun Safety Education Program, Youth Shooting Programs, and others. *Id*. at 29–32. Exhibit D to the Foundation's Form 1023 submission also confirms that its original President (Dr. James W. Carlson), Vice President (Joe Foss), and Treasurer (J. Warren Cassidy) were NRA executives. *Id*. at 13; *see also* FAC ¶¶ 42–44. These materials support the NRA's allegation that its consent for the Foundation to use the NRA's marks "was implicitly contingent upon on the Foundation's ongoing relation to the NRA as established in the Foundation's governing documents." FAC ¶ 41.

Finally, the Court should disregard the Foundation's half-hearted attempt to raise an acquiescence defense, which requires a showing "that 'the plaintiff actively represented [he] would not assert a right or claim.'" *Yah Kai World Wide Enters.*, 195 F. Supp.3d at 313–14 (citation omitted). Acquiescence is an affirmative defense that rarely, if ever, is appropriate at the pleadings

stage.  This case is no exception; the Court's consideration of acquiescence is limited to the Complaint and any incorporated documents, none of which plead facts showing that the only plausible conclusion is that the "actively represented" that it would not assert an infringement claim if the Foundation severed ties with the NRA but continued to use the NRA's marks for its own independent activities.

## II.     The NRA Has Stated a Claim as a Third-Party Beneficiary of Charitable Contracts (Count VI)

The NRA has alleged both concrete harm to its financial interests and charitable activities traceable to the Foundation's actions. Furthermore, because it is well-established law that a donor's gift pursuant to an institutional solicitation creates a contract benefiting the donor's intended beneficiary, the NRA may bring a third-party contract claim.

### A.     The Foundation's Diverting Funds Meant to Support the NRA Concretely Injures the NRA

The Foundation argues the NRA lacks a concrete Article III injury because it is "continuing to receive the restricted grant funding to which it claims to be entitled." Mot.26. This is factually wrong and fails to address the injuries alleged in the Amended Complaint.

The loss of anticipated funding is a pocketbook injury, and "even a small financial injury confers Article III standing," *Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607, 616 (D.C. Cir. 2019), not to mention the many millions at issue in this case. In addition, the Foundation's "actions directly affected and interfered with [the NRA's] core [charitable] activities," *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024), and as a result "the [Foundation's] conduct perceptibly impaired the organization's ability to provide services," *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015).

That is more than enough to establish concrete pocketbook and organizational injuries. Not only does the Foundation's leadership currently intend to engage in outright competition against

11

the NRA, FAC ¶ 104, but the Foundation's executive director "has stated that the Foundation intends to cut off or substantially reduce its financial support of the NRA, to sue the NRA, to take control of certain NRA programs, and to undermine the NRA's finances and financial stability." FAC ¶ 103. Indeed, "the Foundation informed the NRA that that the Foundation would substantially reduce its funding of NRA Charitable Activities in 2026" and subsequently "threatened to cut off all funding of NRA Charitable Activities." FAC ¶ 104. The NRA has a legal interest in these funds, because they were contributed by donors for the purpose of supporting the NRA Charitable Activities. FAC ¶¶ 58–65. And now the Foundation seeks to divert them to other purposes. *Id*. ¶¶ 103–05. Furthermore, the Foundation's reduction or termination of funding would impair the NRA's fundraising activities and substantially frustrate the NRA's ability to plan and operate the NRA Charitable Activities. FAC ¶¶ 105–08. All of these are concrete injuries supporting standing.

The Foundation's argument (at 26) misrepresents the NRA's Amended Complaint by ignoring entirely paragraphs 102–103 and 105–108, even while accusing the NRA of relying on "conclusory" allegations. But there can be no serious doubt that a threat to cut off a beneficiary's entitlement to funding injures the beneficiary, especially when the party leveling that threat has already begun to carry it out.

### B.    The 2026 Grant Agreement Is Immaterial

The Foundation's argument (at 25–27) that a provision of the 2026 Grant Agreement defeats the NRA's standing is badly mistaken. The plain language of that provision expressly disposes of that theory: "The relationship between the Foundation *established by this Agreement* is that of grantor and grantee and not that of principal/agent or beneficiary/trustee." MTD Ex. 5, ECF No. 20-6 at 3. None of the NRA's claims rely on any relationship established by the 2026 Grant Agreement, and the 2026 Grant Agreement does not purport to alter any aspect of the parties'

preexisting relationship, including the rights and obligations established through the NRA's establishment of the Foundation, the NRA's fundraising for it, and donors' contributing money to it for support of NRA Charitable Activities. The NRA's claims contend that it is entitled to *all of the restricted funds* raised to support NRA Charitable Activities, which necessarily goes beyond those funds conveyed pursuant to the 2026 Grant Agreement.

Attempting to confuse the issue, the Foundation's arguments assume (at, e.g., 10) that there are only two categories of funds, those subject to express (i.e., written) restrictions and those that are unrestricted and therefore (in the Foundation's telling) "discretionary funds." But the crux of the NRA's allegations in this case is that all or substantially all funds contributed to the Foundation that are not subject to express restrictions are subject to the implied restriction that they be used to fund NRA Charitable Activities "based on solicitations, representations, and other circumstances" in which those funds were raised. FAC ¶ 48; *see also id*. ¶¶ 59–65; *see generally* Restatement of Charitable Nonprofit Orgs. § 4.02 (recognizing bases for implied restriction). The Foundation is not free to put those funds to purposes other than the NRA Charitable Activities, and the NRA therefore has a clear interest in their disposition and is injured by the Foundation's diverting them to other purposes.

### C.      This Dispute Is Ripe

The Foundation's "unripeness" argument (at 26) is likewise premised on the incorrect notion that the NRA's claim is limited to funds subject to express restrictions, with which the Foundation claims it is complying. But the Foundation has already substantially reduced its funding of the NRA Charitable Activities from funds subject to implied restriction and denies that it has any obligation to use such funds to support the NRA Charitable Activities. FAC ¶¶ 102–04. Moreover, the Foundation has threatened to cut off *all* funding to the NRA. *Id*. ¶ 102. The parties' dispute over the NRA's contractual rights respecting those funds is therefore ripe. See *Nat'l*

13

*Treasury Emps. Union v. United States*, 101 F.3d 1423, 1428 (D.C. Cir. 1996) ("if a threatened injury is sufficiently 'imminent' to establish standing, the constitutional requirements of the ripeness doctrine will necessarily be satisfied.").

### D.      The NRA Plausibly Alleged Its Breach of Contract Claim

Contrary to the Foundation's argument (at 30–33), the NRA plausibly alleged all the elements of its third-party breach of contract claim. Soliciting donors to contribute money for a specified purposes gives rise, upon contribution, to a contract restricting the use of the contributed funds to that purpose. *See generally* Restatement of Charitable Nonprofit Orgs. § 4.02. And a "third party may sue on a contract if the contracting parties intended the third party to benefit," even if the third party was not a party to that contract. *District of Columbia v. Campbell*, 580 A.2d 1295, 1302 (D.C. 1990). That intent to benefit the third party may be express or implied. *Silberberg v. Becker*, 191 A.3d 324, 332 (D.C. 2018). Breach of contract includes four elements: "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *CorpCar Servs. Houston, Ltd. v. Carey Licensing, Inc.*, 325 A.3d 1235, 1244–45 (D.C. 2024). The NRA has pleaded that it was the intended beneficiary of the charitable contracts.

*First*, the solicitations made to Foundation donors, and other circumstances surrounding their contributions, gave rise to valid contracts. Donors' charitable contributions in response to charitable solicitations create a contract because donations may "be provided to a corporation, charitable or otherwise, with a contractual understanding as to how the funds were to be used." *Fam. Fed'n for World Peace v. Hyun Jin Moon*, 129 A.3d 234, 247 (D.C. 2015). This concept, *contra* Mot.32, has a long pedigree in American law. *Cf. Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. 518, 689–90 (1819). While such a contract may arise from a writing such as a "gift instrument," it may also be implied without a writing based on "a solicitation by a charity" or other

14

"circumstances surrounding the donation." Restatement of the Law, Charitable Nonprofit Orgs. § 4.02(a). D.C. case law recognizes as much. *Fam. Fed'n for World Peace*, 129 A.3d at 247. Here, the NRA alleged both express gift instruments identifying it as a third-party beneficiary and implied agreements arising from gift solicitations, representations, and other circumstances. FAC ¶¶ 48, 58–65.

The Foundation asserts (at 32) that the NRA has not named specific terms of the contracts or identified the specific donors. But the NRA identified all material terms, including the one that the Foundation repudiates and intends to breach: that the donated funds be used to support NRA Charitable Activities. FAC ¶¶ 29–31, 58–65. That term is plainly binding on the Foundation, as a matter of law. A solicitation for a charitable gift is, in contract terms, the offer, and when the donor accepts that offer by making the contribution, that creates a "contractual understanding as to how the funds were to be used." *Fam. Fed'n for World Peace*, 129 A.3d at 247. When the NRA solicited gifts to the Foundation, such as at Friends of NRA events, it made clear that the contributed funds would be used to support NRA Charitable Activities. FAC ¶¶ 58–65. The NRA, as the administrator of NRA Charitable Activities, is therefore an intended beneficiary under the resulting donor contracts.

The Foundation faults the NRA (at 32) for not identifying each and every one of the millions of donors who contributed money to the Foundation in response to these solicitations, but it identifies no authority requiring that as an element of a third-party beneficiary claim. The D.C. Court of Appeals has never required such a thing, nor would that make any sense. Third-party claims focus on the intent to benefit, and the "absence" of contractual specificities "is not fatal" where "surrounding circumstances tend to identify the third-party beneficiary." *W. Union Tel. Co. v. Massman Const. Co.*, 402 A.2d 1275, 1277 (D.C. 1979). It has to be that way. Charities regularly

15

raise money from anonymous donors for specific purposes, including through cash donations. Similarly, mass fundraising campaigns can reach millions of donors—as in this case. The Foundation's view of the law would mean that even the most clear-cut third-party beneficiaries—for example, a homeless shelter funded by a separate supporting foundation that holds funds raised to support the shelter's activities—would have no legal or practical ability to enforce implied gift restrictions. No court has ever held that, and for good reason.

*Second*, the obligation arising from the solicited contributions is that the Foundation use the contributed funds to support NRA Charitable Activities. FAC ¶¶ 29–31, 58–65.

*Third*, the NRA has alleged breach for the reasons stated above—that is, that the Foundation denies it is obligated to use the restricted funds to support NRA Charitable Activities and intends to divert those funds to other purposes. FAC ¶¶ 102–08. The Foundation again assumes (at 46) that the NRA's claim is limited to expressly restricted funds, but that is (as described) wrong.

*Fourth*, as discussed above, at 11–12, the Foundation's breach presently injures the NRA.

Accordingly, the NRA has properly pleaded its third-party contract claim.

## III. The Foundation Has Breached the Charitable Trusts Established by the NRA and Donors (Count VII)

The NRA brings a breach of trust claim under two legal theories: (i) the NRA is the settlor of a charitable trust it created when it created the Foundation and has standing as such to enforce the trust's terms; and (ii) the NRA is a third-party beneficiary of the trust created by donors when they contributed restricted funds to the Foundation for the benefit of the NRA's charitable activities. Under both theories, the NRA has standing and has pleaded a claim.

### A. The NRA Has Settlor Standing

16

Under D.C.'s Uniform Trust Act, the "settlor of a charitable trust, among others, may maintain a proceeding to enforce the trust." D.C. Code § 19-1304.05(c). A "settlor" is a person "who creates, *or* contributes property to, a trust." § 19-1301.03(16) (emphasis added). The statute by its terms does not restrict the term "settlor" to an initial contributor.

Because the NRA created the Foundation, giving it all it needed to function and bring in donations restricted for use to support NRA Charitable Activities, the NRA is the settlor of a charitable trust administered by the Foundation. The NRA established the Foundation to function as a charitable corporation with a separate fund as a charitable trust to the benefit of the NRA Charitable Activities.

It is indisputable that the NRA created the Foundation. The NRA caused the Foundation to be incorporated, caused the Articles of Incorporation to be drafted, and caused the application for tax-exempt status to be filed and prosecuted, hiring and directing the attorneys who did so. FAC ¶¶ 34, 38, 45. The NRA lent its brand to the Foundation. FAC ¶¶ 40–41. The original Trustees of the Foundation were all NRA leaders and/or officers. FAC ¶¶ 42–46. The NRA controlled and funded every single part of this process. FAC ¶¶ 35–36. It provided office space and initial fundraising. FAC ¶ 46. None of this is disputed at this stage by the Foundation; indeed, its exhibits confirm these facts.

Furthermore, the NRA created the Foundation to be a trust vehicle by which individuals and corporations could make tax-deductible contributions in support of the NRA's charitable, educational, and scientific activities connected with the lawful ownership and use of firearms. FAC ¶ 30. That is plain on the face of the application for exempt status, *see* MTD Ex. 2, ECF No. 20-3 at 11, as well as in the founding documents, see MTD Ex. 1, ECF No. 20-2 at 2 (identifying the purpose of supporting NRA Charitable Activities in the Foundation's Articles of

17

Incorporation). These same documents make clear that the beneficiary was to be the NRA, for the provision of NRA Charitable Activities. It was understood that the NRA would do the work of fundraising to fund the trust. *E.g.*, FAC ¶ 51 ("From the Foundation's establishment in 1990 and into 2025, the NRA employed its staff, trademarks, reputation, and other resources to raise funds for the Foundation based on the mutual understanding that the Foundation would, through grants, support NRA Charitable Activities."). Unable to assault the facts, the Foundation resorts to obfuscation. For example, the Foundation inexplicably omits attachments to Stephen Shulman's letter to the IRS, dated February 19, 1991. MTD Ex. 2, ECF No. 20-3 at 27–28. These omitted attachments confirm that the organizations listed on pages 1 and 2 of the letter are either the NRA itself or NRA affiliates—further proof that NRA was the settlor.

The NRA has pleaded it is a settlor of a charitable trust under D.C. law's requirements. "A charitable trust is 'a fiduciary relationship with respect to property arising as a result of a manifestation of an intention to create it, and subjecting the person by whom the property is held to equitable duties to deal with the property for a charitable purpose.'" *Depu v. Oath Holdings, Inc.*, 715 F. Supp. 3d 1, 21 (D.D.C. 2022) (quoting Restatement (Second) of Trusts § 348)). A charitable trust is created when the settlor manifests the intention that property be kept as a "separate fund for the benefit of the payor or a third person." *Id*. No magic words (i.e. "trust") are required. *He Depu v. Yahoo! Inc.*, 950 F.3d 897, 901–02 (D.C. Cir. 2020). All that is needed is for the settlor to articulate the essential elements of a trust: "1) a trustee, who holds the trust property and is subject to equitable duties to deal with it for the benefit of another; 2) a beneficiary, to whom the trustee owes such duties; [and] 3) the trust property, which is held by the trustee for the beneficiary." *Id*. This is satisfied by providing for a charitable foundation as a trustee; property held in trust; and a charitable purpose to serve persons meeting specified criteria. *Id.* at 902.

18

As in *He Depu*, the NRA's creation of the Foundation provided all three elements. The NRA created the Foundation to hold property, the immediate beneficiary of which would be the NRA for the undertaking of NRA Charitable Activities. FAC ¶¶ 29–31. The founding of the Foundation envisioned the creation of trust *res* through fundraising. FAC ¶ 51. For decades, the NRA built up the trust with donor dollars through its fundraising efforts. *See* Restatement (Third) of Trusts § 10(e) ("a trust may be created by … beneficiary designation that creates enforceable rights in a person who immediately or later holds those rights as trustee, or who pursuant to those rights later receives property as trustee, for one or more persons."). And the charitable purpose was to support NRA Charitable Activities.

The Foundation's primary argument is that, under *Farina v. Janet Keenan Hous. Corp.*, 335 A.3d 537 (D.C. 2025), the NRA had to provide seed money to be a settlor. But it omits that *Farina* explicitly recognized that "there may be exceptions to the rule that a settlor must contribute trust assets." *Id.* at 549–50. While the court had no cause to go further than that, the statutory text does do so. As noted, it expressly provides that a settlor may be a person who creates a trust without contributing property. *See* D.C. Code § 19-1301.03(16) (defining "settlor" as a person "who creates, or contributes property to, a trust"). In so providing, D.C. law is consistent with the laws of other states. *Cf.* Md. Code, Est. & Trusts § 14.5-103(w)(1) ("creates or contributes property to a trust"); Va. Code § 55-541.03 (same). The NRA indisputedly satisfies the statutory definition.

In any event, the NRA did contribute property in two ways. First, the NRA provided initial in-kind contributions to the Foundation by paying to incorporate, apply for exempt status, and otherwise establish the Foundation. FAC ¶¶ 34–39. In-kind contributions are a well-recognized form of contributions. *Cf.* I.R.C. § 170(e)(1); *Colorado Nat. Bank of Denver v. Comm'r*, 30 T.C. 933, 935–36 (1958) ("Charitable contributions [to a trust] are recognized as paid and deductible

even though made" as a "payment in kind"). Second, the NRA contributed property through its intention and actual activities raising funds for the Foundation, as discussed above. *See* Restatement (Third) of Trusts § 10(e); Uniform Trust Code § 401 cmt. (adopting Restatement); D.C. Code § 19-1304.01 (following Uniform Trust Code).

Finally, the Foundation is simply wrong that a charitable corporation cannot administer a charitable trust. Courts consistently treat organizations like the Foundation as controlled by the law of charitable trusts, including the Uniform Trust Code that D.C. has adopted. *Fam. Fed'n for World Peace*, 129 A.3d at 244 & n.16. A nonprofit may be "incorporated for the purpose" of a charitable activity, and hold "property…in trust for that purpose." *Mount Jezreel Christians Without a Home v. Bd. of Trs. of Mount Jezreel Baptist Church*, 582 A.2d 237, 239 (D.C. 1990). Simply stated, a charitable corporation may hold a "separate fund" that is a charitable trust. *Depu*, 715 F. Supp. 3d at 23. The Foundation's contrary claim is without merit.

### B.      The NRA Has Special Interest Standing as a Third-Party Beneficiary

The NRA also has standing because it is the intended beneficiary of charitable trusts created by donations of restricted funds. Under the Uniform Trust Act, "others" may sue to enforce a charitable trust. D.C. Code § 19-1304.05. These "others" include persons with a "special interest in the enforcement of a charitable trust." *YMCA of the City of Wash. v. Covington*, 484 A.2d 589, 591 (D.C. 1984); *Hooker v. Edes Home*, 579 A.2d 608, 612 (D.C. 1990) ("A] clearly identified intended beneficiary has a justiciable interest in enforcement of the trust."); *Family Fed. for World Peace*, 129 A.3d at 244 n.15 ("[W]e have recognized the applicability of the rules relating to charitable trusts to [charitable] corporations."). This applies to beneficiaries of a charitable trust held by a charitable incorporation, *Mount Jezreel Christians Without a Home*, 582 A.2d at 239, who must show "the *Hooker* requirement that a beneficiary be in a class limited in number and

20

that the nature of the challenge be to an extraordinary measure," *Fam. Fed'n for World Peace*, 129 A.3d at 245.

The Foundation argues (at 19–21) that no charitable trusts have been created by donors and that the NRA is not the intended beneficiary of the solicited donations. But a donor's contribution to a charitable corporation for a specific purpose "creates a charitable trust of which the institution is the trustee." *Fam. Fed'n for World Peace*, 129 A.3d at 247 n.20; accord Restatement (Third) of Trusts § 94 ("restricted gift" is treated by law "as a charitable trust."). It is actionable for a nonprofit to receive a gift restricted to specific purpose and retain or divert it for a different purpose. *Id*. Courts recognize that "monetary donations" made in response to such solicitations constitute trust property. *E.g., Jackson v. Callan Pub., Inc*., 826 N.E.2d 413, 422 (Ill. 2005) (allowing plaintiffs to bring breach of charitable trust claim by sufficiently alleging settlor-donors' intention, monetary donations, charitable purpose, and conveyance to trustees); *In re Breast Cancer Prevention Fund*, 574 B.R. 193, 217 (Bankr. W.D. Wash. 2017) ("[T]he corpus of donations solicited on behalf of [the foundation] constituted a charitable trust. When the individual donors transferred their property to [the foundation], [the foundation] took the donations in a fiduciary capacity, in trust, for the beneficiaries.").

The NRA, with respect to the NRA Charitable Activities, is the intended beneficiary of the donors' funds given in trust to the Foundation. Beneficiaries "ha[ve] a present or future beneficial interest in a trust, vested or contingent." D.C. Code § 19-1301.03(2) (defining "beneficiary"); *see also* Restatement (Third) of Trusts § 3 (defining trust beneficiary as "[a] person for whose benefit property is held in trust"). The NRA established the Foundation as a vehicle by which donors could make tax-deductible contributions to support NRA Charitable Activities, FAC ¶ 30, the NRA is the one that undertake the NRA Charitable Activities, FAC ¶ 31, and donors contributed to the

21

Foundation through the Friends of NRA dinners and other fundraising programs specifically to support NRA Charitable Activities, FAC ¶¶ 58–65.

As the beneficiary, the NRA has standing to sue because it has alleged it is "a class limited in number and that the nature of the challenge be to an extraordinary measure." *Fam. Fed'n for World Peace*, 129 A.3d at 245. The class is "limited in number" because it consists of one entity, the NRA, which is clearly identified in the founding documents of the Foundation. In this regard, a nonprofit organization that "was a major beneficiary from [the affiliate nonprofit] for three decades" must "comfortably fall[] within the *Hooker* requirement." *Id.* Here, the NRA has been the major beneficiary of the Foundation for decades. FAC ¶¶ 29–33; 50–65.

The Foundation attempts to sidestep this straightforward application of *Family Federation* by arguing that, because tax-exempt organizations under Section 501 of the Tax Code benefit the "general public," beneficiaries cannot have special interest standing. Mot.20–21. If that were right, then no tax-exempt organization would ever have special-interest standing or be able to sue to enforce beneficiary rights. But courts regularly recognize suit against such tax-exempt organizations by beneficiaries with special interest standing. *See Fam. Fed'n for World Peace*, 129 A.3d at 245. Furthermore, the funds that the Foundation intends to misappropriate are *not* for charitable activities undertaken by the general public, but those undertaken by the NRA—which in turn benefit the general public.

In addition, the Foundation's attempt to use restricted funding to compete with the NRA is "an extraordinary measure threatening the existence of the trust." *Hooker*, 579 A.2d at 615. An "extraordinary measure" threatening the existence of a trust is a measure "fundamentally changing the purpose of [the trust] and taking steps to divest itself from the [charitable parent organization]." *Fam. Fed'n for World Peace*, 129 A.3d at 245. The NRA alleges just that: that the Foundation is

22

trying to reinvent itself as a competitor to the NRA instead of supporting the NRA's charitable activities. The Foundation's argument misses the point by focusing on a different question, whether the Foundation's existence as an *incorporated entity* is at risk. Mot.21. While that situation might also constitute an extraordinary measure, it is not the only extraordinary measure that fits the bill under *Hooker*. The Foundation's attempt to misappropriate millions of dollars in restricted funds that it accepted to support NRA Charitable Activities but now wants to use to undermine those activities does as well.

Nor is the Foundation's diversion of funds part of its "ordinary discretion." Mot.21. *Hooker* and its progeny make clear that "restricted" gifts, as here, are the opposite of money that may be expended under an organization's "ordinary discretion." *See Fam. Fed'n for World Peace*, 129 A.3d at 247 n.20. As discussed above, what the Foundation wrongly calls "discretionary funds" are in fact restricted funds that are by law required to be used to support NRA Charitable Activities. Any discretion the Foundation may have is limited to *how*—not whether—the funds are used to support NRA Charitable Activities. It is that discretion—"how" discretion, not "whether" discretion—that Plaintiff Douglas Hamlin was referencing in the language quoted by the Foundation (at 22).

### C.     The Foundation's Diversion of Assets Breached the Trust

The Foundation does not dispute that the Foundation is currently taking and intends to divert funds from NRA Charitable Activities to other purposes, including standing up the Foundation as a competitor to the NRA and attacking the NRA, a fundamental alteration of the Foundation's purpose. FAC ¶¶ 1, 66, 103–05.

When a corporation is established for a particular purpose and solicits donations to that end, it is then a breach of trust duty to "change substantially the objects and purposes of the corporation." *Fam. Fed'n for World Peace*, 129 A.3d at 252 (quoting 7A Fletcher Cyc. Corp. §

23

3718 (2006)). Similarly, breach includes "diverting funds away from the specified purposes for which they were contributed." *Id*. at 247. The NRA has plausibly pleaded both kinds of breach.

*First*, through a series of illegal amendments, leadership changes, and expressed objectives, the Foundation seeks to fundamentally alter its character and establish itself as a competitor against the NRA, abandoning its role as a trust to support NRA Charitable Activities. The Foundation informed the NRA it would reduce or curtail its funding of NRA Charitable Activities, FAC ¶ 102; the Foundation's executive director made clear that the Foundation intended to cut off or substantially reduce financial support of the NRA and attempt a hostile takeover of certain NRA programs, FAC ¶ 103; the Foundation is setting itself up as a competitor to the NRA, FAC ¶¶ 103, 104, 108; and the Foundation has attempted a series of bylaw and article amendments to separate itself from the NRA and fundamentally alter its character and purpose, FAC ¶¶ 83–98.

*Second*, as discussed above the NRA has alleged that the Foundation is using and intends to use restricted funds for purposes other than those for which they were donated—specifically, to support its fundamental changes just described and the self-aggrandizement of the Foundation's current leaders. FAC ¶¶ 1, 102–08.

## IV.    The NRA's Quasi-Contract Claims Are All Well-Pleaded (Counts VIII-X)

Counts VIII (Breach of Implied Contract), IX (Promissory Estoppel), and X (Unjust Enrichment) are quasi-contract claims that the NRA brings directly, not as a third-party beneficiary.

As an initial matter, the 2026 Grant Agreement does not defeat standing nor displace the quasi-contract claims. *See supra*, at 12–13. "[Q]uasi-contractual remedies like these are inapposite" only "when an express contract governs interaction between two parties." *United States v. Kellogg Brown & Root Servs., Inc*., 800 F. Supp. 2d 143, 160 (D.D.C. 2011). The 2026 Grant Agreement does not purport to alter the parties' preexisting relationship, rights, or

obligations. FAC ¶ 64; MTD Ex. 5, ECF No. 20-6 at 3 ("[t]he relationship between the Foundation and NRA *established by this Agreement*.") (emphasis added). Counts VI, VIII, IX, and X do not arise out of the 2026 Grant Agreement and extend beyond the funds conveyed under the Agreement to reach the full amount of restricted funds raised by the NRA for the Foundation to support NRA Charitable Activities. *See* FAC ¶¶ 179–87 (NRA is third-party beneficiary of *all* restricted funds, not just those covered by the 2026 Grant Agreement); ¶¶ 201–07 (Foundation breached implied contract regarding fundraising and funding relationship); ¶¶ 208–12 (fundraising and funding relationship was based on promise from Foundation); ¶¶ 213–16 (Foundation's retention of all funds raised by the NRA's work is unjust). These claims stand outside the scope of the 2026 Grant Agreement.

### A.    Breach of Implied Contract (Count VIII)

The Foundation's argument (at 34) that the NRA provided no benefit to the Foundation fails in the face of the fact that the NRA provided the Foundation with valuable services over a period of literally decades. "There is an implied-in-fact contract when: (1) valuable services [were] rendered, (2) for the person sought to be charged, (3) which services were accepted by the person sought to be charged, used and enjoyed by him or her, and (4) under such circumstances as reasonably notified the person sought to be charged that the [person rendering the services] expected to be paid by him or her." *Boyd v. Kilpatrick Townsend & Stockton*, 164 A.3d 72, 81 (D.C. 2017) (quotation marks and citations omitted). Valuable services are those "beneficial to the recipient." *Bloomgarden v. Coyer*, 479 F.2d 201, 209 (D.C. Cir. 1973).

For decades, the NRA and the Foundation have operated on the understanding that the NRA would raise funds for the Foundation, and the Foundation would in turn fund NRA Charitable Activities. FAC ¶¶ 29–31, 58–65. This arrangement, confirmed by years in the course of dealing, is contractual and nature and represents the Foundation's reason for existence as a vehicle to

25

support NRA Charitable Activities. FAC ¶ 204. On that basis, the NRA (1) provided valuable fundraising and operational services, as well as use of its marks, (2) to the Foundation, (3) which the Foundation accepted and enjoyed, (4) with the understanding that the Foundation would use those funds to support NRA Charitable Activities.

The Foundation does not dispute the final three elements but argues (at 34) that "the NRA has not alleged any benefit or service to the Foundation," even though the NRA alleged that it conducted fundraising for the Foundation and otherwise "carried out services and activities related to the Foundation," which had no independent employees of its own. FAC ¶¶ 50, 203. The benefit was that the NRA's services allowed the Foundation to function and thrive in carrying out its founding purpose of supporting the NRA Charitable Activities. *Id.* ¶ 30, 50–51. If the Foundation wants to dispute the factual allegation that these services benefited it, the proper time is after discovery not on a motion to dismiss.

The Foundation also argues that, because NRA Charitable Activities would be the ultimate beneficiary of the fundraising, the NRA's services did not benefit the Foundation. This reflects yet another fundamental misunderstanding: that the raised funds being used to support NRA Charitable Activities cannot be considered valuable to the Foundation. But benefitting others is what charities do. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 591 (1983) (501(c)(3) organization cannot serve its own private "benefit"). By the Foundation's light, no charity could ever itself benefit from or be party to an implied contract. That's nonsense.

Contrary to that view, funds raised to support the NRA's Charitable Activities benefit the Foundation's *core purpose* of supporting the NRA's Charitable Activities, which the Foundation has touted for decades. *E.g.*, FAC ¶ 62 (Foundation 2024 Annual Report: "The vision of the NRA Foundation is to provide lasting financial stability for the NRA's programs"); FAC ¶ 58–61

26

(Foundation solicitations stated donations were for the benefit of NRA's Charitable Activities); MTD Ex. 2, ECF No. 20-3 at 11–13 (Foundation explaining to IRS that its purpose is to raise funds to support NRA Charitable Activities); MTD Ex. 1, ECF No. 20-2 at 2 (Articles of Incorporation: Purpose of Foundation is to support NRA Charitable Activities). It is valuable to the Foundation, as a charitable institution, to fund charitable activities, not retain the funds in a Scrooge McDuck-style money bin.

## B.    Promissory Estoppel (Count IX)

For similar reasons, the NRA properly pleaded its promissory estoppel claim. The elements are "(1) a promise; (2) that the promise reasonably induced reliance on it; and (3) that the promisee relied on the promise to his or her detriment." *Myers v. Alutiiq Int'l Solutions, LLC*, 811 F. Supp. 2d 261, 272 (D.D.C. 2011). The terms must be sufficiently definite to create reasonable reliance, but the promise "need not be as specific and definite as a contract." *In re U.S. Office Prods. Co. Sec. Litig.*, 251 F. Supp. 2d 77, 97 (D.D.C. 2003).

As discussed in the preceding section, the NRA established and provided services to the Foundation based on the promise that the Foundation would support NRA Charitable Activities, a longstanding arrangement upon which the NRA has relied for decades. FAC ¶ 30; *id*. ¶ 106 ("The NRA, in anticipation of the Foundation's continued support of NRA Charitable Activities in the same manner that has prevailed for many years, has taken steps to implement the programs").

Here again the Foundation makes only a narrow challenge (at 34–35): that the Foundation's promise to use the funds to support NRA Charitable Activities is "vague" and "nonsensical and contrary to law." But the promise is at least as specific the promises enforced in other cases. *See, e.g., Parnigoni v. St. Columba's Nursery Sch.*, 681 F. Supp. 2d 1, 26 (D.D.C. 2010) (oral promise of employment based on past course of dealing); *cf. D & G Stout, Inc. v. Bacardi Imports, Inc.*, 805 F. Supp. 1434, 1444–45 (N.D. Ind. 1992) (promise of somewhat "indefinite nature" to

27

continue business partnership under past course of dealing not too ambiguous or vague); *North Jersey Brain & Spine Center v. Aetna Life Ins. Co.*, No. L-5817-18, 2019 WL 4889507, at *16 (N.J. Super. L. Oct. 01, 2019) (promise existed under course of dealing because the defendant's prior authorization of payment or an advisement that such authorization was unnecessary).

And it is not at all "nonsensical" for a recipient of charitable funding to raise funds for the donor organization; indeed, it happens all the time, to the point that fundraising through a "supporting foundation" is a common arrangement. *See, e.g.*, *Branch Ministries v. Rossotti*, 211 F.3d 137, 143 (D.C. Cir. 2000) (describing how "related organization[s]" under 501(c)(3) and 501(c)(4) may function); Rosemary E. Fei, Eric K. Gorovitz, *Practitioner Perspectives on Using § 501(c)(4) Organizations for Charitable Lobbying: Realities and an Alternative*, 21 N.Y.U. J. Legis. & Pub. Pol'y 535, 568–69 (2018) (describing the IRS-endorsed setup). And there is nothing unlawful about it. Even for-profit entities (which the NRA is not) may lawfully raise money for tax-exempt charities and be paid for so doing. *See Riley v. Nat. Fed. of the Blind of N.C.*, 487 U.S. 781 (1988). The NRA's establishing the Foundation as a vehicle for tax-exempt contributions to support NRA Charitable Activities and supporting it through fundraising activities, FAC ¶ 30, were entirely lawful and *approved by the IRS*, *see* MTD Ex. 2, ECF No. 20-3 at 11. Indeed, if the Foundation's promise to support NRA Charitable Activities was not too vague for the IRS, it is surely not too vague for the purposes of promissory estoppel, which has relaxed standards of definiteness. *See In re U.S. Office Prods. Co. Sec. Litig.*, 251 F. Supp. 2d at 97.

### C.    Unjust Enrichment (Count X)

The NRA's unjust enrichment claim is also properly pleaded, for similar reasons. "Unjust enrichment occurs when: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *Peart v. D.C. Hous. Auth.*, 972 A.2d 810, 813 (D.C. 2009) (quotation marks and citations

omitted). As described above, the NRA conferred many benefits on the Foundation in the form of (i) creating the Foundation; (ii) fundraising for the Foundation and provision of other services; (iii) use of the NRA's name and valuable trademarks contingent on the ongoing relationship; and (iv) use of the NRA's reputation among potential donors. The NRA has plausibly pleaded that it conferred these benefits, which the Foundation has used.

This retention is unjust because the Foundation was intended to support NRA Charitable Activities and thereby facilitate the continuation and expansion of the NRA's important public-interest programs—from teaching gun safety to children to educating Americans on firearm handling, self-defense, hunting, and marksmanship. It is also unjust that the donors' money is being retained by the Foundation and for its own divergent purposes, to wit, the Foundation leaders' quest for self-aggrandizement and personal vendetta against the NRA's current leadership. All the Foundation donors' money raised by the NRA and restricted to supporting the NRA Charitable Activities is the Foundation's unjust "gain." *Peart*, 972 A.2d at 820. The "observable loss" of these resources is the NRA's handicapped programming, FAC ¶¶ 105–08, and, for the discussed above, *see supra*, at 23–24, the Foundation's retention and diversion of the Restricted Funds is "in a manner that the law regards as unjustified," *Fam. Fed'n for World Peace & Unification Int'l v. Moon*, 338 A.3d 10, 33 (D.C. 2025) (citing Restatement (Third) of Restitution and Unjust Enrichment §§ 1–2 (2011)).

The Foundation's sole argument is that it has fulfilled its legal obligations through the 2026 Grant Agreement. But, again, the NRA's claim does not seek to enforce that Agreement and reaches funds not subject to it.

## V.    The 2024 Amendments Are Ultra Vires and Void (Count XII)

Count XII challenges the validity of the Foundation's attempted 2024 amendments to its bylaws and articles of incorporation. In response, the Foundation argues (1) that the Plaintiffs have

no standing under D.C.'s Nonprofit Corporation to challenge the 2024 amendments, Mot.23–24 and (2) that this claim is "unsupported" by factual allegations, Mot.37–38. But each of the Plaintiffs has standing under D.C. law, and the 2024 amendments were unlawfully adopted in contravention of the Foundation's governing documents and D.C. law.

Plaintiffs' standing to challenge nonprofit action comes from multiple sources. Any member, director, or member of a designated body may challenge any corporate act as ultra vires. D.C. Code § 29-403.04. And where "the individual rights of the plaintiffs were affected by the alleged failure to follow the dictates of the constitution and by-laws," plaintiffs have a "direct, personal interest in the cause of action." *Daley v. Alpha Kappa Alpha Sorority, Inc.*, 26 A.3d 723, 729 (D.C. 2011); *accord Bronner v. Duggan*, 249 F. Supp. 3d 27, 47 (D.D.C. 2017). Similarly, "a person whose status as, or whose rights or duties as, a member, delegate, director, member of a designated body, or officer of a corporation are or may be affected by any corporate action" may also bring suit. D.C. Code § 29-401.22. Corporate action includes "the suspension, removal, or expulsion of members, delegates, directors, members of a designated body, or officers of a nonprofit corporation" as well as "taking of any action on any matter that is required under this chapter or under any other provision of law to be, or which under the articles of incorporation or bylaws may be, submitted for action to the members, delegates, directors, members of a designated body, or officers of a nonprofit corporation." D.C. Code § 29-401.20.

As to the merits, the NRA has pleaded that the actions were in fact ultra vires. Under D.C. law, the definition of ultra vires is broad, encompassing all actions "expressly prohibited by statute," actions "expressly prohibited … by by-law," and actions taken in violation of the powers conferred in the articles of incorporation. *Compton v. Alpha Kappa Alpha Sorority, Inc.*, 64 F. Supp. 3d 1, 18 (D.D.C. 2014), *aff'd*, 639 F. App'x 3 (D.C. Cir. 2016).

The attempted 2024 amendments sought to (1) eliminate the NRA Board's right to appoint trustees, with the Foundation's board arrogating that power to itself; (2) remove the requirement that a majority of trustees be NRA directors, (3) remove the *ex officio* trustee status of the NRA Executive Vice President, (4) strip the voting power of the NRA President, (5) remove the consecutive-term limit on trustee service, and (6) eliminate the automatic appointment of the NRA Executive Director of Advancement as Executive Director of the Foundation. FAC ¶¶ 84–90.

These attempted amendments violate the Foundation's governing instruments and the D.C. Nonprofit Corporations Act. FAC ¶¶ 93–98. For one, they were undertaken without the NRA's approval, in violation of D.C. Code § 29-408.22. The Foundation board's actions are also void because it acted in violation of the nine-director limit set forth in the Articles. And the Foundation board's actions also fail because they were taken without valid notice.

### A.    The NRA Has Standing as the Foundation's Designated Body

As the Foundation's designated body, the NRA Board has the right to challenge the attempted amendments.[2]

D.C. nonprofit corporations may delegate corporate rights and powers to a separate entity called a "designated body" under D.C.'s Nonprofit Corporations Act. A designated body is an entity "vested by the articles of incorporation or bylaws with powers that, if not vested by the articles or bylaws in that person or group, would be required by this chapter to be exercised by the board or the members." *Id.* § 29-401.02(8). The Act authorizes nonprofit corporations to vest certain governance "powers, authority, or functions" that would otherwise be vested in the

---

[2] The NRA is the real party in interest under Fed. R. Civ. P. 17(a) because it, not the Board, is the corporate entity holding the claims in its own name with "the power to: (1) Sue … in its corporate name." D.C. Code § 29-403.02. Under D.C. Code § 29-406.01, the NRA Board exercises the NRA's corporate powers, but it is the NRA that is the corporate person, real party in interest, and plaintiff. In any event, Plaintiff Bachenberg is a member of the NRA's Board and therefore has statutory authority to enforce its rights, as discussed below.

31

nonprofit corporation's board of directors in an external "designated body." D.C. Code § 29-406.12(a). Similarly, nonprofit corporations may vest certain governance "rights or obligations of the members" in the designated body. *Id*. § 29-406.12(b).

The Foundation's articles and bylaws render the NRA's Board of Directors a designated body twice over. *First*, the D.C. Code vests the power to elect directors in the members of a membership corporation as the default rule, § 29-406.04(a), and the Foundation's 1990 Bylaws vested that power in the NRA Board of Directors, pursuant to D.C. Code § 29-406.12. FAC ¶ 48; 1990 Bylaws Article III, Section 1(C). MTD Ex. 2, ECF 20-3 at 19. *Second*, the Foundation's Bylaws gave the NRA Board the power to appoint individuals as directors of the Foundation by virtue of selecting the NRA Executive Vice President and NRA President who serve *ex officio* on the Foundation's board of directors. FAC ¶ 48; *compare* D.C. Code § 29-406.04 (default rule placing appointment power of Foundation's directors in Foundation's members) *with* 1990 Bylaws Article III, Section 1(D) (overriding default rule to vest appointment power in NRA's Board of Directors regarding the NRA Executive Vice President who serves *ex officio* on Foundation's board) *and* 2014 Bylaws Article III, Section 1(D) (vesting in the NRA's board the power to appoint both the Executive Vice President and President of the NRA to the Foundation's Board). Because these appointment rights would ordinarily by default be vested in a corporation's members or directors, the vesting of them in the NRA Board makes it a designated body.

As a designated body, the NRA Board, and its members, have the same rights as directors or members[3] of the corporation. Specifically, they are subject to "[t]he rights, duties, and liabilities

---

[3] Members of a nonprofit corporation are akin to the shareholders of a for-profit corporation, in that they both have the power to appoint the board. *See* D.C. Code § 29-401.02(24). The primary difference is that, unlike a shareholder, a member has no economic right to the earnings of the nonprofit corporation.

of the board of directors or directors individually," and "[m]eetings, notice, and the manner of acting of the board of directors shall also apply to the designated body." *Id*. § 29-406.12(a). Likewise, "[t]he rights and obligations of members shall also apply to the designated body and to the members of the designated body individually," and "[m]eetings, notice, and the manner of acting of members shall also apply to the designated body." *Id*. § 29-406.12(b). The D.C. Code defines a nonprofit "member" as a "person" who has "right, in accordance with the articles of incorporation or bylaws…to select or vote for the election of directors." *Id.* § 29-401.02(24). The NRA Board is a member of the Foundation as a matter of D.C. law because D.C. Code § 29-406.04(a) gives members the default right and duty to select directors, and the Foundation's Bylaws lawfully vested that selection power in the NRA Board.

Accordingly, the NRA Board is a designated body of the Foundation and a member under D.C. law. The NRA, as well as its officers with *ex officio* status on the Foundation board and its own directors, has the right to challenge ultra vires actions under both §§ 29-403.04 and 29-401.22.

## B.    Plaintiff Hamlin Has Standing as an Ousted Director

Hamlin has standing under D.C. Code § 29-403.04, as a wrongfully ousted director with interest in the use of the Foundation's funds and as a person whose rights as a director were affected by the corporate action under D.C. Code § 29-401.22.

First, Hamlin has standing to challenge his own ouster and other of the amendments under D.C. Code 29-401.22. That provision authorizes "a person whose status as, or whose rights or duties as, a…member [or] director…of a corporation are or may be affected by any corporate action" to challenge the "validity" of that action. Hamlin is the Executive Vice President of the NRA, a role he assumed in May 2024. FAC ¶ 10. Accordingly, he was entitled to serve as an *ex officio* member of the Foundation's board. FAC ¶ 10. In addition, as discussed above, the Foundation's Articles also established that Hamlin, as a trustee, became a "member[] of the

Foundation" for "purposes of any statute or rule of law relating to corporations." Articles, Article VIII. In August 2024, the Foundation board purported to adopt the challenged amendments. FAC ¶¶ 84, 96. Hamlin has standing to challenge the amendment removing his *ex officio* status and also the amendments changing the manner of selection and qualifications of Foundation trustees and board size, which all relate to Hamlin's "rights or duties" as a member or director.

Second, Hamlin is also a "member" or "director" who can challenge the ultra vires actions of the Foundation under D.C. Code § 29-403.04(b), which authorizes such persons to challenge "[t]he power of a nonprofit corporation to act." He accordingly has standing to challenge all the attempted amendments.

Third, Hamlin also has standing under the Uniform Trust Code's treatment of "ousted directors" as continuing stewards of charitable trusts. *Fam. Fed'n for World Peace*, 129 A.3d at 245 n.16. The D.C. Court of Appeals has held that ousted directors of a charitable corporation occupy "a status both as the alleged successor trustees to the [] trust and as directors of a charitable corporation akin to a charitable trust." *Id.* at 244. Former directors challenging their own ouster therefore have standing to sue on their own behalf to challenge the misuse of funds. *Bd. of Directors, Washington City Orphan Asylum v. Bd. of Trs., Washington City Orphan Asylum*, 798 A.2d 1068, 1074 (D.C. 2002). When co-trustees are appointed to act as stewards of a trust, "[e]ach trustee shall exercise reasonable care to ... [p]revent a co[-]trustee from committing a serious breach of trust; and ... [c]ompel a co[-]trustee to redress a serious breach of trust." *Id*. For the reasons stated above, the Foundation functioned as a charitable corporation "akin to a charitable trust," making Hamlin a co-trustee along with the other directors of the Foundation's board. He thus has standing—indeed, a legal obligation—to ensure the Foundation does not break the law and divert the funds for other purposes.

34

The Foundation does not dispute that Hamlin would have standing but for the challenged 2024 amendments. Instead, its argument (at 24) is that Hamlin is not currently a member of the Foundation's board. But a director who is removed may of course challenge the validity of the removal. *See Bd. of Directors, Washington City Orphan Asylum*, 798 A.2d at 1070–71 (ousted directors had standing to sue *after* ouster). While D.C. law may limit the ability of a wrongfully ousted director to bring a derivative action,[4] D.C. Code § 29-411.02, this case is not such an action. Hamlin has standing for his claim.

### C.    Bachenberg Has Standing as an Ousted Directorship Holder

Like Hamlin, Bachenberg has standing as a director. By virtue of his position as President of the NRA, he is legally entitled to sit on the Foundation's board under the Foundation's Bylaws.

Plaintiffs' claim is that the 2024 amendments were unlawful, and that such unlawful amendments are null and void ab initio. Under that theory, Bachenberg is currently a legally appointed director of the Foundation and also a member. Bachenberg is the President of the NRA, a role he assumed in April 2025. FAC ¶ 9. Having been elected to that role, he is legally entitled under the Foundation's 2014 bylaws and articles to serve as an *ex officio* member of the Foundation's board. FAC ¶¶ 9, 48. The Foundation attempted to strip the NRA President's ability to have voting rights on the Foundation's board, FAC ¶ 84, disputed the President's rights under the Bylaws, FAC ¶ 85, and then membership on the board itself, FAC ¶ 86. By operation of law, notwithstanding the unlawful and ineffective amendments, Bachenberg has a "directorship" on the board of the Foundation in April 2025. *See Crown EMAK Partners, LLC v. Kurz*, 992 A.2d 377, 400 (Del. 2010) (noting that corporate law recognizes the legal concept of a "directorship" created

---

[4] A "derivative action" is one brought on behalf of the corporation to enforce a corporate claim when the corporation's own managers refuse to do so. *See* D.C. Code § 29-411.01.

35

by law in contrast to "directors actually in office"). Like Hamlin, Bachenberg therefore has standing to sue under Section 29-403.04 and Section 29-401.22.

Bachenberg is also an NRA Director and therefore also has standing as a member of a designated body, the NRA Board, for both Counts XI and XII. Specifically, Bachenberg has standing as a "member" of that "designated body" for purposes of both D.C. Code § 29-403.04 ("member of a designated body" may bring ultra vires claim "against the corporation to enjoin the act") and D.C. Code § 29-401.22 ("a person whose status as, or whose rights or duties as, a … member of a designated body, or officer of a corporation are or may be affected by any corporate action" may sue).

### D.    Count XII Is Not "Moot" Because of Post-Complaint Attempted "Ratification" of the Illegal Amendments

Lacking any viable defense to the NRA's claim challenging the attempted bylaw amendments, the Foundation claims it has just now acted to "ratify" the amendments and thereby (it contends) moot Plaintiffs' challenge. *See* Mot.24–25. But the Foundation's attempt at ratification does nothing but reinforce the illegality of its actions.

The Foundation's theory is that an illegally constituted board may vote to "ratify" its illegally constituted nature. This is an entirely novel theory with no basis in caselaw or reason. The Foundation provides no basis for this argument whatsoever. The only case cited, *Martin v. FBI*, 145 F.4th 1345, 1351 (D.C. Cir. 2025), has nothing to do with ratification and is only a rote recital of the well-known mootness rule.

The problem for the Foundation is that ultra vires amendments are void ab initio and cannot be ratified. "[O]nly voidable acts [are] open to ratification." *CarrAmerica Realty Corp. v. Kaidanow*, 321 F.3d 165, 171 (D.C. Cir. 2003), *supplemented*, 331 F.3d 999 (D.C. Cir. 2003) (citing Delaware law). Void acts—meaning "illegal acts or acts beyond the authority of the

corporation"—are not ratifiable "because the corporation cannot, in any case, lawfully accomplish them." *Nevins v. Bryan*, 885 A.2d 233, 245 (Del. Ch.), *aff'd*, 884 A.2d 512 (Del. 2005) (quotation omitted). In D.C., "ultra vires" acts are those "where the corporate action is expressly prohibited by statute or *by-law*" and where a board "exceeded the powers conferred upon them by the certificate of incorporation, the bylaws, and the statute statutes regulating corporate powers." *Daley v. Alpha Kappa Alpha Sorority, Inc*., 26 A.3d 723, 731 (D.C. 2011) (citing 7A Fletcher Cyc. Corp. § 3399 (2006)). Actions taken at a special meeting without due notice, as here, are void, not voidable. *Schroder v. Scotten, Dillon Co*., 299 A.2d 431, 435 (Del. Ch. 1972) ("A special meeting held without due notice to all directors as required by the by-laws is not lawful and all acts done at such a meeting are void."). And the Foundation's attempt to strip the NRA of its powers as a designated body are expressly prohibited by D.C. law, as discussed further below. *See* D.C. Code § 29-408.22(a)(1), (a)(7) (expressly prohibiting such amendments).

And courts have found that bylaw amendment votes and other corporate actions taken by an illegally constituted "board" are "null and void." *E.g.*, *Sealey v. Am. Soc. of Hypertension, Inc*., 26 A.D.3d 254, 255 (N.Y. Sup. Ct. App. Div. 2006); *Olincy v. Merle Norman Cosms., Inc*., 200 Cal. App. 2d 260, 272–73 (Ct. App. 1962). Delaware law recognizes that a properly constituted board with a specific number of directors required by bylaw is mandatory, not a mere procedural requirement, such that bylaw amendments illegally constituting a board are void. *See Crown EMAK Partners, LLC*, 992 A.2d at 400–01 (not contemplating that the illegal board could simply vote to "ratify" its illegal composition"). The NRA's claims are that the Foundation's ultra vires acts when amending the bylaws were void, never in effect, and should be enjoined; these actions cannot be ratified.

Furthermore, the Foundation's unsupported theory simply cannot be right. If it were so, a corporate board could always wrongfully remove a director or designated body and then overcome the voidness of that act by "ratifying" the wrongful action. For example, if a resolution fails by a couple votes, the board could hold a meeting without giving notice to several of the dissenters, vote them off the board, pass the resolution, and then ratify everything. As a practical matter, this would mean that no wrongfully removed director or designated body could ever obtain relief, because any competent corporate counsel would be ready with a ratification to nullify the claim. In short, this theory, if accepted, would defeat all of the D.C. Code's elaborate protections for directors, members, and designated bodies.

Ratification cannot is ineffective here for two additional reasons. First, the "board" itself that did the so-called "ratification" was the very illegally constituted board challenged by this present action. It is axiomatic that "the person (or entity) ratifying the unauthorized act must be one who had authority to do the act in the first place." *In re Sterling Mining Co*., No. 09-20178TLM, 2009 WL 2475302, at *6 (Bankr. D. Idaho Aug. 11, 2009). Accordingly, if the Foundation "board" was illegally constituted in August 2024, then it remains so in March 2026. Any later purported "ratification" by the same improperly constituted board is just as ineffective as the purported bylaw amendments because a body lacking lawful authority cannot ratify its own ultra vires attempt to exclude the rightful directors and remove the NRA Board power. "Ratification of such an act or contract cannot render it any less ultra vires." 2A Fletcher Cyc. Corp. § 755.

Second, as discussed further below, the Plaintiffs' approval was required because the NRA Board was the Foundation's designated body and the individual Plaintiffs holds offices that entitle them to be *ex officio* members of the Foundation's board with voting power. Accordingly, the

38

attempt to strip the NRA's designated powers, FAC ¶ 89, by law still requires the NRA's approval.

That approval was not given in 2024, nor was it given in March 2026. FAC ¶ 98.

### E.    The NRA Board's Approval Was Required

Whether the Foundation is viewed as a membership or a nonmembership corporation under the Act—which is addressed below—the NRA Board's approval was required to alter its rights as a designated body. For a membership corporation, Section 29-408.22—titled "Bylaw amendments requiring member approval"—requires member approval for bylaw amendments made under "Section 29-406.12," which is the provision authorizing a corporation to vest rights in a designated body and giving such a designated body and its members the rights of directors and members. D.C. Code § 29-408.22(a)(7). The Challenged Amendments clearly implicate that provision, because they alter rights (regarding the appointment of trustees and powers of those trustees) vested in the NRA Board as a designated body. In addition, Section 29-408.22(a)(1) requires member approval for bylaw amendments made under "Section 29-404.10 providing that some of the members have different rights or obligations than other members with respect to voting, dissolution, transfer of memberships or other matters." The Challenged Amendments implicate that provision because they alter bylaws vesting the NRA Board with appointment rights not provided to other members.[5]

The result is the same if the Foundation is viewed as a nonmembership corporation under the Act. Section 29-406.12(b) provides that, when a designated body is vested with any member rights under the Act, the Acts provisions governing "[t]he rights and obligations of members shall also apply to the designated body and to the members of the designated body individually." The Act defines member rights to include those the Foundation vested in the NRA Board: "the right…to select or vote for the election of directors." D.C. Code § 29-401.02(24)(A). Accordingly,

---

[5] As discussed below, the Foundation's Articles of Incorporation establish other classes of members.

by operation of Section 29-406.12(b), the NRA Board and its members enjoy the rights provided by the Act to members, including the provisions of Section 29-408.22 that, as described in the preceding paragraph, require member approval for amendments that affect member rights.

Although it is not necessary to reach the issue, the best view is that the Foundation is a membership corporation. A nonprofit corporation the bylaws or articles of which "provide that it must have members" is a membership corporation. D.C. Code § 29-401.02(26). This is true of the Foundation. The Foundation's articles of incorporation and bylaws create four member classes.

*First*, the Foundation's directors are members because the articles of incorporation definitively created the Foundation as a membership corporation under the D.C. Code. Article VIII states: "For the purposes of any statute or rule of law relating to corporations, the Directors ('Trustees') shall be taken to be the members of the Foundation." MTD Ex. 1, ECF No. 20-2 at 4. The trustees are, therefore, a membership class.

*Second*, the NRA Board, as a designated body of the Foundation, has a distinct membership class. As described above, when a corporation gives the rights of members—here, selection of directors—to a designated body, that body is a "member." The NRA Board "has the right…in accordance with the [Foundation] bylaws…to select or vote for the election of [Foundation] directors" pursuant to the NRA Board Appointment Bylaw. D.C. Code § 29-401.02(24). By so doing, the Foundation created a designated body membership class for purposes of selecting Foundation directors and vested it in the NRA Board.

*Third*, for the same reason, NRA directors are also individual members by virtue of their right to appoint Foundation trustees by making appointments to NRA offices with *ex officio* status on the Foundation's board. The NRA Board has the power under the NRA's bylaws to elect the

NRA officers, two of whom, the President and Executive Vice President, are *ex officio* Foundation trustees under the Foundation's bylaws.

*Fourth*, members of the State Committees are members of the Foundation for purposes of charitable gaming and charitable giving. The Foundation's Bylaws state that, for purposes of "any statute, ordinance, regulation, or other rule of law relating to charitable gaming," the members of the individual State Fund Committees are members of the Foundation. 2014 Bylaws Article II; Purported 2024 Bylaws Article II. The 2024 attempted amendments specified that such members are members for purposes of laws about "charitable … giving" as well.

Accordingly, the Foundation is a membership organization, and the approval requirement of Section 29-408.22(a) therefore applies—as it likewise would were the Foundation a nonmembership organization.

**F.    Hamlin's Notice of the Bylaw Amendments Was Also Required**

The Foundation unconvincingly states (at 37) that Plaintiff Hamlin received the required notice of the 2024 special meeting or, alternatively, that he did not identify the meeting in question. Neither argument holds water.

To begin with, the contention that the meeting in question was not identified in the Amended Complaint is baffling. It was. *See* FAC ¶ 96 (identifying August 23, 2024 meeting as when the Foundation board voted on the illegal amendments); FAC ¶ 94 (no notice given to Hamlin); FAC ¶ 97 (no notice given to NRA).

Nor did Hamlin receive the required notice. Under § 29-408.22(a)(1), (3), Hamlin's formal notice and approval were required for bylaw amendments that removed his rights and terminated his membership. As noted above, Hamlin (i) is an *ex officio* member of the NRA's Board of Directors, and (ii) was, under the pre-2024 Articles and Bylaws of the Foundation, an *ex officio* member of the Foundation's board. FAC ¶ 10. The 2024 bylaw amendments purported to revoke

Plaintiff Hamlin's *ex officio* trustee status and terminate his status as a trustee-member, which required member approval under § 29-408.22(a)(3) and § 29-408.22(a)(1). Because member-approval was required, notice that "shall state the purpose" that the meeting was to vote on the amendment was likewise required. *Id*. § 29-408.03(6). Under the operative Bylaws, notice must be given "by the Secretary not … fewer than three days before the date of such meeting." *Cf*. MTD Ex. 8, ECF No. 20-9 at 5 (2024 Bylaws as purportedly amended not changing this requirement). As alleged, Plaintiff Hamlin was not provided that notice. FAC ¶ 94.

That, in turn, renders the amendments void. Any decision of the Board at a special meeting not properly noticed is invalid and is not binding on the corporation." *In re Se. Neighborhood House*, 93 B.R. 303, 305 (Bankr. D.D.C. 1988) (citing 2 Fletcher Cyc. Corp. § 406 (perm. ed 1982)); *see also Schroder*, 299 A.2d at 435 ("A special meeting held without due notice to all directors as required by the by-laws is not lawful and all acts done at such a meeting are void."); *Re'ese Adbarat Debre Selam Kidest Mariam Ethiopian Orthodox Tewahedo Church, Inc. v. Habte*, 300 A.3d 784, 803 (D.C. 2023) (recognizing that, for member meetings, "deficient notice…might well require invalidation of the decisions made thereafter").

### G.    All Amendments Made with Excess Number of Directors Are Void

The Foundation has nothing to say about the fact that the challenged 2024 amendments were voted on by directors in excess of the number authorized by the Foundation's controlling documents. FAC ¶¶ 49, 90, 95–96. That also renders the amendments ultra vires, void ab initio, and therefore invalid. On that basis alone, Count XII must stand.

### VI.    The Foundation's Diversion of Assets Also Violates the Nonprofit Corporations Act (Count XI)

The NRA has alleged facts that the property donated to the Foundation restricted for support of the NRA Charitable Activities has been and is being diverted to other purposes in

42

violation of the DC Nonprofit Corporations Act. The Act requires that "[p]roperty held in trust or otherwise dedicated to a charitable purpose shall not be diverted from its purpose." D.C. Code § 29-410.03(a). And "assets in an endowment fund are donor restricted assets" are "[s]ubject to the intent of the donor." D.C. Code § 44-1633. All three Plaintiffs have standing to right this wrong.

### A. The NRA Has Standing to Challenge Fund Diversion as the Settlor and Beneficiary of the Foundation Trust

The NRA has standing to challenge the unlawful diversion of assets for the reasons discussed above. *See supra*, at 16–23. The NRA is both the settlor and intended beneficiary of the funds held for a charitable purpose. As the intended beneficiary of property "dedicated to a charitable purpose," the NRA has standing.

### B. Hamlin and Bachenberg Have Standing

For the reasons stated above, Hamlin and Bachenberg, as wrongly ousted directors, have standing to sue to correct all of the illegal amendments under § 29-403.04. *See supra*, at 33–36. Hamlin has standing under § 29-401.22(a) to challenge the corporate actions taken to remove him as a director of the Foundation and to divert funds illegally. Under the same section, Bachenberg has standing to challenge the suspension of his legal right to be a director of the Foundation and of his voting right. And both have standing as ousted directors to challenge the illegal diversion of funds. *Fam. Fed'n for World Peace*, 129 A.3d at 245 & n.16.

### C. The Foundation's Diversion of Assets Is Unlawful

The Foundation's diversion of assets violates D.C. law. As described above, the Foundation is currently and has expressed intention to continue diverting restricted funds away supporting NRA Charitable Activities. That is a straightforward violation of D.C. Code § 29-410.03(a), which generally provides that "[p]roperty held in trust or otherwise dedicated to a charitable purpose shall not be diverted from its purpose."

The Foundation does not dispute the central premise of Count XI, that funds are being diverted from NRA Charitable Activities. Rather, as in so many other places, it relies (at 7) on the 2026 Grant Agreement. But as discussed above, at 12–13, Plaintiffs' claims, including this one, do not arise from the 2026 Grant Agreement and concern funds not subject to the Agreement.

**CONCLUSION**

Defendant's Motion to Dismiss should be denied.

April 10, 2026                          Respectfully submitted,

                                        /s/ Andrew M. Grossman
                                        Andrew M. Grossman (D.C. Bar No. 985166)
                                        Mark W. DeLaquil (D.C. Bar No. 493545)
                                        Mark H. Tidman (D.C. Bar No. 441310)
                                        **BAKER & HOSTETLER LLP**
                                        1050 Connecticut Avenue, Suite 1100
                                        Washington, D.C. 20036
                                        Phone: 202.861.1500
                                        Email: agrossman@bakerlaw.com

                                        *Counsel for Plaintiffs NATIONAL RIFLE*
                                        *ASSOCIATION OF AMERICA, WILLIAM*
                                        *BACHENBERG, and DOUGLAS HAMLIN*

44