**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> THE NRA FOUNDATION, INC., *initially sued as* NRA FOUNDATION, INC. <br><br> *Defendant*. | Civil Action No. 1:26-cv-00015 (SLS) |

**DEFENDANT THE NRA FOUNDATION, INC.'S REPLY IN SUPPORT OF
ITS MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ................................................................................................. 1

II.  ARGUMENT ...................................................................................................... 3

    A.   The NRA's Response Rests Primarily on Four Legally Untenable Positions. ....... 3

        1.   The NRA Is Not Entitled to Grants Outside of the Grant Agreement. ....... 3

        2.   The Foundation Is Not a Trust, Nor Does It Administer a Trust Created for the Benefit of the NRA. ................................................................... 5

            a.   The NRA Is Not a Settlor with a Manifested Intent to Create a Trust. ................................................................................................ 5

            b.   The Foundation Was Created to Benefit the General Public. ......... 6

            c.   The NRA Has Not Identified Any Trust Property. ......................... 8

        3.   Donations Made to the Foundation to Benefit the NRA Do Not Automatically Create a Trust or a Contract for the Benefit of a Third Party. ................................................................................................... 8

        4.   The NRA Is Not a Designated Body of the Foundation. ........................... 9

    B.   The NRA Failed to Establish Subject Matter Jurisdiction. .................................. 10

        1.   The NRA Failed to Establish Standing for Breach of Trust (Count VII). 11

        2.   Plaintiffs Failed to Establish Standing Under the D.C. Nonprofit Corporations Act (Counts XI and XII), and Count XII Is Still Moot. ....... 11

            a.   The NRA Is Not a Designated Body. ........................................... 12

            b.   The Individual Plaintiffs' Additional Standing Arguments Fail... 12

            c.   In Any Event, Count XII Is Moot Due to Ratification. ................ 13

        3.   The Response Confirms that the NRA's Claims Sounding in Contract (Counts VI, VIII, IX, and X) Should Be Dismissed for Lack of Standing and Ripeness. ...................................................................................... 15

    C.   The NRA Has Failed to Establish the Elements Required to State Any of Its Claims. ............................................................................................................... 17

        1.   The NRA Still Has Not Identified a Trust or Breach Thereof. ................. 17

        2.   The NRA's Contract-Based Claims (Counts VI and VIII–X) Remain Barred by the Express Contract Between the NRA and the Foundation. . 18

        3.   The NRA's Contract-Based Claims Separately Fail Because the NRA's Own Allegations Confirm the Foundation Has Complied with Its Contracts. ........................................................................................... 19

a. The NRA's Third-Party Breach of Contract Claim (Count VI) Fails. ............................................................................................... 19

b. The NRA's Breach of Implied Contract Claim (Count VIII) Fails. ............................................................................................... 20

c. The NRA's Promissory Estoppel Claim (Count IX) Fails. .......... 21

d. The NRA's Unjust Enrichment Claim (Count X) Fails. ............... 22

4. Plaintiffs Fail to Allege Any Plausible Violation of the D.C. Nonprofit Corporations Act (Counts XI–XII). .......................................................... 22

5. The NRA's Intellectual Property Claims (Counts I–V) Fail. ................... 23

III. CONCLUSION ...................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Board of Directors v. Board of Trustees*,
   798 A.2d 1068 (D.C. 2002) ........................................................................................13

*Bowhead Info. Tech. v. Catapult Tech.*,
   377 F. Supp. 2d 166 (D.D.C. 2005) .............................................................................9

*\*CarrAmerica Realty Corp. v. Kaidanow,*
   321 F.3d 165 (D.C. Cir. 2003) ...................................................................................14

*Coach House Rest., Inc v. Coach & Six Rests, Inc.*,
   934 F.2d 1551 (11th Cir. 199) ………………………………………………………… 24, 25

*Crown EMAK Partners, LLC v. Kurz*,
   992 A.2d 377 (Del. 2010) ...........................................................................................15

*Daley v. Alpha Kappa Alpha Sorority, Inc.*,
   26 A.3d 723 (D.C. 2011) .............................................................................................15

*\*Duggan v. Keto*,
   554 A.2d 1126 (D.C. 1989) .................................................................5, 6, 7, 8, 18

*\*Family Federation for World Peace & Unification International v. Hyun Jin
   Moon*,
   129 A.3d 234 (D.C. 2015) ........................................................................................8, 13

*Farina v. Janet Keenan Hous. Corp*,
   335 A.3d 537 (D.C. 2025) ..........................................................................................6, 10

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024)......................................................................................................16

*Geier v. Conway, Homer & Chin-Caplan, P.C.*,
   983 F. Supp. 2d 22 (D.D.C. 2013).............................................................................20

*Hancock v. Urban Outfitters, Inc.*,
   830 F.3d 511 (D.C. Cir. 2016)...................................................................................15

*Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*,
   238 F. Supp. 2d 174 (D.D.C. 2002).......................................................................11, 22

*In re Akers*,
   445 B.R. 1 (Bankr. D.D.C. 2011) ................................................................................9

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992)..................................................................................................15

*Lutheran Ass'n of Missionaries & Pilots, Inc. v. Lutheran Ass'n of Missionaries
    & Pilots, Inc.*,
    No. Civ. 03-6173, 2004 WL 2730104 (D. Minn. Nov. 19, 2004) .........................24

*\*Marshall v. Honeywell Tech. Sys.*,
    828 F.3d 923 (D.C. Cir. 2016) ..................................................................................5

*NAACP v. NAACP Legal Defense & Educational Fund, Inc.*,
    753 F.2d 131 (D.C. Cir. 1985), *cert. denied*, 472 U.S. 1021 (1985) ....................25

*\*National Treasury Employees Union v. United States*,
    101 F.3d 1423 (D.C. Cir. 1996)........................................................................16, 17

*\*Nevins v. Bryan*
    885 A.2d 233 (Del. Ch. 2005), *aff'd*, 884 A.2d 512 (Del. 2005)......................14, 15

*Oatlands, Inc. v. Nat'l Tr. for Historic Pres. in the United States*,
    No. 1:23-cv-344, 2023 WL 7301433 (E.D. Va. Nov. 6, 2023) .................................9

*Olincy v. Merle Norman Cosms., Inc.*,
    200 Cal. App. 2d 260 (1962) ...................................................................................15

*OverDrive, Inc. v. Open eBook Forum*,
    288 A.3d 305 (D.C. 2023) .......................................................................................12

*Parnigoni v. St. Columba's Nursery School*
    681 F. Supp. 2d 1 (D.D.C. 2010)..............................................................................21

*Saline Parents v. Garland*,
    88 F.4th 298 (D.C. Cir. 2023).................................................................................16

*Schroder v. Scotten, Dillon Co.*,
    299 A.2d 431 (Del. Ch. 1972)..................................................................................15

*Sealey v. Am. Soc'y of Hypertension, Inc.*,
    809 N.Y.S.2d 421 (App. Div. 2005).........................................................................15

*Sigma Phi Soc'y (Inc.) v. Mich. Sigma Phi, Inc.*,
    No. 20-12817, 2024 WL 1396255 (E.D. Mich. Mar. 31, 2024) .............................25

*Singh v. D.C.*,
    55 F. Supp. 3d 55 (D.D.C. 2014).........................................................................6, 12

*Turlock Irrigation Dist. v. FERC*,
    786 F.3d 18 (D.C. Cir. 2015)...................................................................................16

iv

*Twin Rivers Paper Co. v. SEC*,
 934 F.3d 607 (D.C. Cir. 2019) ..................................................................................15, 16

*United States v. Kellogg Brown & Root Servs.*,
 800 F. Supp. 2d 143 (D.D.C. 2011) ................................................................................19

*Villanova Univ. v. Villanova Alumni Educ. Found., Inc.*,
 123 F. Supp. 2d 293 (E.D. Pa. 2000) ..............................................................................24

*Whiting v. AARP*,
 701 F. Supp. 2d 21 (D.D.C. 2010) ..................................................................................22

*Yah Kai World Wide Enters., Inc. v. Napper*,
 195 F. Supp. 3d 287 (D.D.C. 2016) ................................................................................24

## Statutes

D.C. Code § 29–402.06(b)....................................................................................................10

D.C. Code § 29–405.01(a) ...................................................................................................10

D.C. Code § 29-401.02(8).......................................................................................................9

D.C. Code § 29-401.22 ........................................................................................................12

D.C. Code § 29-403.04 ........................................................................................................13

D.C. Code § 29-403.04(b).....................................................................................................12

D.C. Code § 29-406.04(b).....................................................................................................10

D.C. Nonprofit Corporations Act...............................................................................9, 11, 12, 22

Line Item Veto Act ...............................................................................................................16

## Other Authorities

Fed. R. Civ. P. 12(b)(1).........................................................................................................10

Fed. R. Civ. P. 12(b)(6).........................................................................................................10

## I.    INTRODUCTION

While the NRA's Response leans heavily on the "NRA insiders" trope,[1] the NRA's own description of its claims demonstrates what this case is really about: "[T]he crux of the NRA's allegations in this case is that *all or substantially all funds contributed to the Foundation* that are not subject to express restrictions are subject to the implied restriction that they be used to fund NRA Charitable Activities[.]" Resp. at 13 (emphasis added). The NRA boldly asks this Court to unwind the enforcement efforts of the Office of the Attorney General for the District of Columbia ("DC AG") and cede control of *all* Foundation assets to the NRA for a specific reason. As of December 31, 2025, the Foundation's cash represents nearly 70% of the cash reported on the NRA's consolidated financial statement, and the Foundation's net assets account for nearly 70% of the NRA's consolidated net assets. According to the NRA's own interpretation of applicable accounting standards, the NRA would not be able to include the Foundation's assets on its consolidated financial statement unless it took the position that the Foundation's now-majority independent board was improperly constituted. Plaintiffs thus bring this sham lawsuit, forcing the Foundation to spend resources defending claims that Plaintiffs have no standing to bring or that otherwise lack any basis in law, as their Response confirms.

The pretextual nature of the NRA's claims is apparent from the inconsistencies and omissions in the Amended Complaint ("FAC") and Response. Before this Court, for example, the NRA asserts, without support, that "[t]he Foundation is not free to put those [donated] funds to purposes other than the NRA Charitable Activities." *Id.* But before the D.C. Superior Court, the NRA acknowledged in a Consent Judgment that "[t]he Foundation Board *retains* the right to reject an application for grant funding by the NRA." Mot., Ex. 7 at 5 (emphasis added). In other words,

---

[1] Plaintiffs fail to disclose that Hamlin and Bachenberg are long-time "NRA insiders."

the NRA subscribed to a court order recognizing the Foundation not only has, but expressly retains, the right to decline funding to the NRA, but now asserts multiple counts against the Foundation based on the premise that the Foundation has no such right because virtually all of its funds are restricted for the NRA's benefit. The NRA's position is not only untenable, it is contrived.

Perhaps most egregiously, Plaintiffs claim that certain amendments to the Foundation Bylaws are *ultra vires* and void (Count XII) because the Foundation allegedly "failed to provide notice to the NRA of any of these amendments" and "acted secretively to separate the Foundation from the NRA." FAC ¶ 97. The NRA knows these claims are false. Indeed, the NRA omits from its pleading that Plaintiff Hamlin received ***actual*** notice of the meeting, reviewed advance copies of the changes, asked questions about them, and ***agreed to the changes in writing***. *See* Ex. 1.

When undersigned counsel informed NRA's counsel of the misleading allegations and asked them to withdraw Count XII or correct the record before the Court, the NRA (and counsel) refused. Instead, the NRA doubles down, asserting the Bylaw amendments are void because "notice must be given 'by the Secretary not . . . fewer than three days before the date of such meeting,'" and "Plaintiff Hamlin was not provided ***that*** notice." Resp. at 42 (emphasis added).

While nothing in the Foundation's organizational documents require the NRA's approval for the Foundation to amend its Articles and Bylaws, it still matters—factually and legally—that Plaintiff Hamlin received actual notice of the August 23, 2024 meeting and stated in writing he was "OK" with the proposed amendments. Ex. 1. That the NRA and Mr. Hamlin would pursue this lawsuit while concealing this fact confirms that the NRA brings this action for reasons other than having any plausible right to relief. But, even accepting the NRA's factual allegations as true (although many are verifiably false), and even after the NRA had an opportunity to amend, all of its claims are improper and must be dismissed.

## II.    ARGUMENT

### A.    The NRA's Response Rests Primarily on Four Legally Untenable Positions.

The NRA's arguments rely on legally unsound propositions, which are refuted below.

### 1.    The NRA Is Not Entitled to Grants Outside of the Grant Agreement.

Far from being "[i]mmaterial," Resp. at 12, the 2026 Grant Agreement sets forth the terms pursuant to which "[t]he Foundation shall pay the Grant Funds to the NRA." Mot., Ex. 5, § 1.1. The "Agreement represents the *entire agreement* between the Parties with respect to its subject matter"—i.e., grants. *Id.* § 6.1 (emphasis added).

Ignoring that agreement, the NRA asks this Court to allow it to proceed on claims based on its allegations "that *all or substantially all* funds contributed to the Foundation that are not subject to express restrictions are subject to the implied restriction that they be used to fund NRA Charitable Activities[.]" Resp. at 13 (emphasis added). The NRA further proclaims that "provid[ing] support for the NRA's charitable activities . . . is the *only* reason that the Foundation exists, and the *only* reason anyone ever donated to it." *Id.* at 3 (emphases added). In other words, the NRA asserts that all funds donated to the Foundation are either expressly or impliedly restricted for use by the NRA. This statement is implausible and legally foreclosed for at least two reasons.

*First*, the Foundation was established to fulfill several charitable purposes, and only "*[o]ne* of the Foundation's purposes is to 'support the activities of the [NRA.]'" Mot. at 7 (emphasis added) (quoting Mot., Ex. 1, Articles at Art. 3). The NRA's theory that "all or substantially all" donations to the Foundation are restricted for the NRA is based on the NRA's misplaced argument that the Foundation's *sole* purpose is to support the NRA. Resp. at 3, 13. The NRA's position is contradicted by its 2026 Grant Agreement with the Foundation, entered on January 7, 2026—*after* it commenced this lawsuit—wherein Plaintiff Hamlin, for the NRA, acknowledged the Foundation "was founded, *in part*, to help fund the NRA's . . . projects." Mot., Ex. 5 (emphasis added).

3

The Foundation's IRS Form 1023 also provides that the Foundation was formed "as a vehicle through which individuals and corporations could make tax-deductible contributions"—not specifically for the NRA—but, consistent with the Foundation's purposes, "in support of educational and scientific activities connected with the lawful ownership and use of firearms." Mot., Ex. 2, Form 1023 at Ex. C. The Form 1023 further states that the activities of the Foundation "will consist of . . . making gifts or grants-in-aid"—not solely to the NRA—but "to *organizations* [plural] and *individuals* [i.e., not the NRA] for specific projects or activities." *Id.* (emphases added). Furthermore, the Form 1023 makes clear that providing funds to the NRA and other organizations and individuals for projects consistent with the Foundation's purposes would not be the Foundation's only activity; rather, "[o]ver time," it was "intended that the Foundation itself [might] conduct many of these or similar types of activities." Mot., Ex. 2, Form 1023, Letter to M. Shaw at 2; Mot., Ex. 2, Form 1023, Ex. C ("[I]t is contemplated that the Foundation will develop, manage and promote new programs[.]"). The NRA's argument is disingenuous and falls flat.

*Second*, in the DC AG Action, the NRA expressly agreed that all grant funds provided to the NRA by the Foundation will be pursuant to a written application and "distributed to the NRA upon execution of a written grant agreement between the Foundation and the NRA[.]" Mot., Ex. 7, Consent Judgment at 4. The NRA also agreed that "[t]he Foundation Board retains the right to reject an application for grant funding by the NRA." *Id.* at 5. Thus, the NRA has taken the position in the D.C. Superior Court that all grants to the NRA must be applied for in writing, disbursed pursuant to a written agreement, and approved by the Foundation, which has authority to deny such funding. The NRA is therefore estopped from asserting claims in this Court on the contrary positions that "all or substantially all" funds donated to the Foundation are restricted for the NRA, and "[t]he Foundation is not free to put those funds to purposes other than the NRA[.]" Resp. at

4

13; *see Marshall v. Honeywell Tech. Sys.*, 828 F.3d 923, 928 (D.C. Cir. 2016) ("Judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." (internal quotation marks and citation omitted)).

### 2. The Foundation Is Not a Trust, Nor Does It Administer a Trust Created for the Benefit of the NRA.

As detailed in the Foundation's Motion, the Foundation is not a trust. *See* Mot. at 15–17. The NRA takes inconsistent positions in its effort to argue otherwise. On one hand, the NRA concedes the Foundation is not a trust, claiming instead that "[t]he NRA established the Foundation to function as a charitable corporation ***with a separate fund as a charitable trust*** to the benefit of the NRA." Resp. at 17 (emphasis added); *see also id.* ("[T]he NRA is the settlor of a charitable trust administered by the Foundation."); *id.* at 20 ("[A] charitable corporation may hold a 'separate fund' that is a charitable trust."). On the other hand, the NRA reverts to the position it pleaded in the FAC that "the NRA created the Foundation ***to be a trust***[.]" *Id.* at 17 (emphasis added); *id.* at 19 ("The NRA created the Foundation to hold property[.]"); *see also* FAC ¶ 190 ("In establishing the Foundation in 1990, . . . the NRA created a charitable trust for the benefit of NRA[.]").

Under either of its conflicting theories, the NRA has alleged no facts to establish the elements of a trust: (1) a settlor with an expressed "intention to create a trust"; (2) "a trustee, who holds the trust property and is subject to equitable duties to deal with it for the benefit of another"; (3) "a beneficiary, to whom the trustee owes such duties"; and (4) "trust property, which is held by the trustee for the beneficiary." *Duggan v. Keto,* 554 A.2d 1126, 1133 (D.C. 1989).

### a. The NRA Is Not a Settlor with a Manifested Intent to Create a Trust.

The NRA contends that its creation of the Foundation alone is enough to make the Foundation a trust, and that the NRA need not contribute property to be a settlor. Resp. at 19. In purported support, the NRA quotes *dicta* for the proposition that "there may be exceptions to the

5

rule that a settlor must contribute trust assets[.]" *Id.* (quoting *Farina v. Janet Keenan Hous. Corp*, 335 A.3d 537, 550 (D.C. 2025)). But the NRA identifies no "exception" to displace "***the rule*** that a settlor ***must*** contribute trust assets." *Farina*, 335 A.3d at 550 (emphases added). Nor could it.

The NRA also has not identified a separate trust created for the Foundation to administer. Rather, all of its creation arguments are that the NRA created the Foundation. Resp. at 17. As a result, the NRA's alternative theory that it is the settlor of a separate trust administered by the Foundation is entirely unpled and must be rejected. *Singh v. D.C.*, 55 F. Supp. 3d 55, 70 (D.D.C. 2014) ("It is 'axiomatic' that a party may not amend his complaint through an opposition brief.").

Regardless, under either theory, the NRA fails to address the requirement that a settlor manifest an "intention to create a trust." *Duggan,* 554 A.2d at 1133. The NRA alleges only that it "is plain on the face of the application for exempt status" and "the founding documents" that "the NRA created the Foundation to be a trust vehicle[.]" Resp. at 17. Those bald statements are directly contradicted by the founding documents, which state an intent for the Foundation be formed as a "[c]orporation"; not as a "[t]rust." Ex. 2, Form 1023 at 1. And, insofar as the Foundation intended to engage in fundraising and grant-giving activities, such activities were expressly intended to support many "organizations and individuals," not solely the NRA. Mot., Ex. 2, Ex. C at 1.

### b.     The Foundation Was Created to Benefit the General Public.

The NRA argues the Foundation is a trust created for the benefit of the NRA, but that position is foreclosed by the Foundation's organizational documents. The Articles provide that the Foundation was formed for "the well-being of the general public[.]" Mot., Ex. 1, Art. 3. The Foundation's Form 1023 states unequivocally that the Foundation's purpose "is to support a ***broad range*** of charitable, scientific and educational activities on behalf of the general public." Mot., Ex. 2, Letter to M. Shaw at 1 (emphasis added). In serving that purpose, the Foundation was formed and operates today "as a vehicle through which individuals and corporations [can] make tax-

6

deductible contributions, gifts, and/or bequests in support of educational and scientific activities connected with the lawful ownership and use of firearms." Mot., Ex. 2, Ex. C. That support has never gone exclusively to the NRA, but rather to multiple "organizations and individuals." *Id.*; *see also* Mot., Ex. 4 at 9, 30 (less than half of 2024 grant funds from the Foundation went to NRA).

The NRA claims that attachments it does not provide "confirm that the organizations listed . . . [in] the letter [to the IRS] are either the NRA itself or NRA affiliates[.]"[2] Resp. at 18. That is not surprising. After all, ***one*** of the purposes of the Foundation is to support the NRA. Mot., Ex. 1, Articles at Art. 3. But that is not its ***sole*** purpose. *See id.* The organizational documents make clear that the Foundation's purpose is to support multiple organizations and individuals, and that the Foundation might also develop and support its own programs. Mot., Ex. 2, Ex. C at 1–2. Accordingly, a list of NRA and NRA-affiliated entities provides no "proof that NRA was the settlor" of a private trust for the NRA's sole benefit. Resp. at 18. Rather, it merely confirms that "***initially***, it [was] contemplated that the Foundation [would] provide financial support for the . . . NRA" before casting a wider net. Mot., Ex. 2, Letter to M. Shaw at 2.

As for the NRA's alternative theory, the FAC lacks any factual allegations about a separate, private trust that the NRA created for the Foundation to administer for the NRA's sole benefit. *See generally* FAC. And the NRA identifies no legal authority to support the notion that forming a charitable corporation automatically forms a private trust to be held by the trustee for the sole benefit of the settlor-beneficiary. Any such rule would be contrary to D.C. law, which requires "proof of the settlor's intention to create a trust." *See Duggan,* 554 A.2d at 1133.

---

[2] The NRA accuses the Foundation of "obfuscation" because it did not "assault the facts." Resp. at 18. But, for purposes of the Motion only, the Foundation accepts the NRA's well-pleaded facts. Mot. at 11. For this same reason, the NRA's assertions that the Foundation "does not dispute" facts are false. *See, e.g.*, Resp. at 23. The Foundation vigorously disputes the false and spurious allegations in the FAC, but those disputes are not before this Court on this Motion.

### c. The NRA Has Not Identified Any Trust Property.

The NRA first suggests that no trust property is needed, and it may merely "envision[] the creation of trust *res* through fundraising." Resp. at 18. The NRA does not cite any legal authority for its position. "[T]rust property" is required for trust formation. *Duggan,* 554 A.2d at 1133.

The NRA next contends that it "did contribute property in two ways": (1) "the NRA provided initial in-kind contributions . . . by paying to incorporate, apply for exempt status, and otherwise establish the Foundation," and (2) "the NRA contributed property through its intention and actual activities raising funds for the Foundation." Resp. at 19–20. Both arguments are nonsensical. The money the NRA paid to establish the Foundation was used for actual costs; those funds were not "held by the trustee" and are thus not trust property. *Duggan,* 554 A.2d at 1133.

The second argument fares no better. The NRA provides no legal support for the idea that raising funds for a charitable corporation makes the fundraiser a settlor of a trust. This argument also conflicts with the NRA's argument that each donor was a settlor of a private trust for the NRA because the same trust property cannot be used for two separate trusts. *See* Resp. at 20. The NRA therefore lacks any plausible allegations that it contributed trust property to the Foundation.

### 3. Donations Made to the Foundation to Benefit the NRA Do Not Automatically Create a Trust or a Contract for the Benefit of a Third Party.

The case the NRA principally relies on, *Family Federation for World Peace & Unification International v. Hyun Jin Moon*, 129 A.3d 234 (D.C. 2015), does not stand for the sweeping proposition that a donor's contribution to a charitable corporation for a specific purpose "creates a charitable trust of which the institution is the trustee." Resp. at 21. Nor does it support the NRA's novel theory that every dollar it helped fundraise created a third-party contract for its own benefit. Resp. at 14–16. Indeed, "critical" to the court's holding in *Family Federation* were the specific allegations that ***the plaintiff*** intended to make "a restricted gift" to the defendant. *Id.* at 247.

8

The NRA does not allege that *the NRA* donated funds to the Foundation subject to express restrictions. Instead, it argues that *its own* conduct in soliciting funds somehow created intent for thousands of third-party donors. *See* FAC ¶¶ 58, 60, 61, 65. The NRA cannot plausibly allege that the Foundation's thousands of donors intended to restrict their donations for NRA programs simply because the NRA alleges it had some involvement in helping to raise the funds. *See In re Akers*, 445 B.R. 1, 8 (Bankr. D.D.C. 2011) ("[T]he parties to a contract must directly and unequivocally intend to benefit a third-party[.]" (quoting *Bowhead Info. Tech. v. Catapult Tech.*, 377 F. Supp. 2d 166, 171 (D.D.C. 2005)); *see also Oatlands, Inc. v. Nat'l Tr. for Historic Pres. in the United States*, No. 1:23-cv-344, 2023 WL 7301433, at *8 (E.D. Va. Nov. 6, 2023) ("No . . . trust is created simply because a nonprofit corporation has received 'real property' and 'funds donated' by benefactors for particular charitable purposes." (citation omitted)). Moreover, the NRA's trust theory is foreclosed by the Foundation's organizational documents. *See* § II(A)(2), *supra*.

### 4.    The NRA Is Not a Designated Body of the Foundation.

In an effort to avoid dismissal of Counts XI and XII under the D.C. Nonprofit Corporations Act, Plaintiffs argue the NRA has standing for those claims as a designated body of the Foundation. Resp. at 31–36. But, as a matter of law, the NRA is *not* a designated body.

As Plaintiffs acknowledge, a designated body is "a person or group . . . that has been vested by the articles of incorporation or bylaws with powers that, if not vested by the articles or bylaws in that person or group, would be required by this chapter to be exercised by the board or the members." D.C. Code § 29-401.02(8). The NRA does not point to any specific provision of the Foundation's Articles or Bylaws that by its terms gives the NRA a vested, irrevocable power that would qualify it as a designated body. There is none. Instead, the NRA argues that it is a designated body because "the D.C. Code vests the power to elect directors in the members of a *membership corporation* as the default rule," and "the Foundation's Bylaws gave the NRA Board the power to

9

appoint individuals as directors of the Foundation[.]" Resp. at 32 (emphasis added). The Foundation, however, is ***not*** a "membership" corporation.

The Foundation's organizing documents make this point explicitly. The Articles state, "The Foundation shall not have a separate membership as such." Mot., Ex. 1, Art. 8. The NRA's attorneys that formed the Foundation confirmed this point in writing to the IRS when seeking tax-exempt status for the Foundation, stating unequivocally: "The Foundation has no members." Mot., Ex. 2, Letter to M. Shaw at 13. This exact phrase is also in the original Bylaws. Mot., Ex. 2, Bylaws, Art. II. While the Bylaws, as amended August 23, 2024, contain a savings clause to account for certain state laws that require a nonmembership corporation to have deemed members for purposes of applying the law, they do not contain any mention of member rights, member meetings, voting, or other provisions required by statute for a membership corporation. *See* D.C. Code § 29–405.01(a). This confirms the Foundation is and always has been a nonmembership corporation as expressly stated in its Articles. *See* Mot., Ex. 1, Art. 8; Mot., Ex. 8, Art. II; *see also* D.C. Code § 29–402.06(b) (requiring bylaws to be consistent with articles of incorporation).

In a nonmembership corporation, the directors are not elected by the members because there are no members. D.C. Code § 29-406.04(b) ("The directors of a nonmembership corporation . . . shall be elected, appointed, or designated as provided in the articles or bylaws."). Thus, to the extent the NRA previously had authority to elect trustees to the Foundation's board, *see* Mot., Ex. 2, Bylaws, Art. III.1.C., that authority was not taken from members (as there were none) and vested in the NRA. Accordingly, Plaintiffs' argument that the NRA was a designated body is incorrect as a matter of law and does not support standing here.

**B.      The NRA Failed to Establish Subject Matter Jurisdiction.**

The NRA has not satisfied its "burden to establish standing" for Counts VI through XII, *Farina*, 335 A.3d at 549 (citation omitted), whether considered under Rule 12(b)(1) or 12(b)(6).

10

### 1.    The NRA Failed to Establish Standing for Breach of Trust (Count VII).

The NRA lacks standing for breach of trust because it is not the Attorney General, the Foundation is not a trust, no exception to the Attorney General's exclusive standing applies, and standing is foreclosed because the NRA improperly challenges the Foundation's discretion and seeks to vindicate its individual interest. Mot. at 21–23. The NRA failed to rebut these arguments.

*First*, the NRA attempts to evade its admission in the 2026 Grant Agreement that the relationship of the parties is not that of "beneficiary/trustee" by asserting that the "The 2026 Grant Agreement Is Immaterial." Resp. at 12. According to the NRA, its "claims contend that it is entitled to *all of the restricted funds* raised to support NRA Charitable Activities, which necessarily *goes beyond* those funds conveyed pursuant to the 2026 Grant Agreement." *Id.* (second emphasis added). The NRA, however, is not entitled to funds beyond those available to it through the parties' written grant agreement. *See* § II(A)(1), *supra*. The NRA knows this, because it subscribed to a Consent Judgment stating this limitation and requiring it to return to the Foundation "[a]ny funds not used consistent with the written grant agreement[.]" Ex. 7, Consent Judgment at 5.

*Second*, the NRA argues, without on-point legal support, that it is both (1) the settlor of a trust that is either the Foundation or administered by the Foundation and (2) the beneficiary of an untold number of trusts, created each time a donor contributes to the Foundation. Resp. at 16–23. These arguments fail for reasons already discussed. *See* §§ II(A)(2)–(3), *supra*.

*Finally*, the NRA does not meaningfully engage with the Foundation's remaining arguments, thus forfeiting the points. *See Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) (explaining failure to respond amounts to concession).

### 2.    Plaintiffs Failed to Establish Standing Under the D.C. Nonprofit Corporations Act (Counts XI and XII), and Count XII Is Still Moot.

"The District's Nonprofit Corporation Act carefully circumscribes the types of challenges

11

to nonprofit corporate actions that can be raised in court, and it further details who can raise those challenges and under what circumstances." *OverDrive, Inc. v. Open eBook Forum*, 288 A.3d 305, 316 (D.C. 2023). Plaintiffs are not among those individuals with standing under the statute.

### a.    The NRA Is Not a Designated Body.

To the extent Plaintiffs argue they have standing to assert claims under the D.C. Nonprofit Corporations Act because the NRA is a designated body of the Foundation and the individual plaintiffs are members of that designated body, *see* Resp. at 33–36, their position is foreclosed as a matter of law for the reasons previously addressed. *See* § II(A)(4), *supra*.

### b.    The Individual Plaintiffs' Additional Standing Arguments Fail.

The Foundation established that the individual plaintiffs cannot assert standing by alleging, as they do, that under an ***inoperative*** (1990) version of the Foundation's Bylaws, they were entitled to—***but did not***—serve as members of the Foundation's Board. Mot. at 24. In Response, Plaintiffs argue they have standing as ousted directors. Resp. at 33–36. But Plaintiffs are bound by their allegations and cannot rewrite them through briefing. *See Singh*, 55 F. Supp. 3d at 70. In any event, Plaintiffs' argument for standing as ousted directors fails as a matter of law for multiple reasons.

***First***, Plaintiffs argue that "Hamlin is also a 'member' or 'director' who can challenge the ultra vires actions of the Foundation under D.C. Code § 29-403.04(b)" and that "Bachenberg has standing as a director." Resp. at 34, 35. But the Foundation has no members. *See* § II(A)(4), *supra*. At best, Plaintiffs have alleged they are former directors. *See* Mot. at 24. The language of D.C. Code § 29-403.04(b) governs, and former directors are not among the individuals granted standing.

***Second***, Plaintiffs argue they have standing under D.C. Code § 29-401.22. Resp. at 33–36. That provision, however, does not apply here. Section 29-401.22(a) provides that "[u]pon petition of a person whose status as, or whose rights or duties as, a member, delegate, director, member of a designated body, or officer of a corporation are or may be affected by any corporate action, ***the***

*Superior Court* may hear and determine the validity of the corporate action." (emphasis added).

As the language makes clear, this provision provides a means for the D.C. Superior Court to hear

petitions concerning internal corporate disputes. *See id.* It does not apply where, as here, alleged

former directors sue in federal court to challenge the validity of corporate action.

   *Third*, Plaintiffs argue they have standing "under the Uniform Trust Code's treatment of

'ousted directors' as continuing stewards of charitable trusts." Resp. at 34. This argument fails

because the Foundation is not a trust. *See* § II(A)(2), *supra*. Moreover, the cases Plaintiffs cite do

not support their position. *Board of Directors v. Board of Trustees*, 798 A.2d 1068 (D.C. 2002),

was decided nine years before the enactment of D.C. Code § 29-403.04, which enumerates the

individuals with authority to challenge the validity of corporate actions. And in *Family Federation*,

the plaintiffs were "alleged successor trustees to the Moon trust." 129 A.3d at 244. Accordingly,

neither case helps Plaintiffs' cause.

### c.  In Any Event, Count XII Is Moot Due to Ratification.

   Count XII is moot because the challenged Board actions have been ratified. Mot. at 24–25.

The NRA attempts to manufacture an active controversy by arguing the Foundation's Board was

"illegally constituted" because it had more directors than allowed under the Articles, such that the

challenged "amendments are void ab initio and cannot be ratified." Resp. at 36. The NRA's alleged

concern is a problem of its own making and is foreclosed by the very case law it cites.

   As an initial matter, the NRA complains that the Foundation's Board was "illegally

constituted" for having more than the maximum number of directors allowed under the Articles of

Incorporation. Resp. at 37; FAC ¶ 227. But, as the NRA knows—but failed to disclose to this

Court—*the NRA created that problem* when it dominated the Foundation's Board. *See* Resp. at

4–5 (claiming "[t]he NRA caused the Foundation to be incorporated, its Articles of Incorporation

to be drafted" and "maintained control over the Foundation through its board"). As far back as

13

2007, the Foundation's Board (dominated by the NRA) amended the Foundation's Bylaws to provide—contrary to the Articles of Incorporation—that "[a]t no time . . . shall there be fewer than seven (7) or more than fourteen (14) Trustees." Ex. 2, March 13, 2007 Bylaws of The NRA Foundation, Inc., Art. III, § 1(F). The Foundation, through its recent ratification, corrected a problem of the NRA's own making, and the NRA should not be heard now to complain about it.

Moreover—and quite glaringly—the NRA has not argued that *every* action taken by the Foundation Board since 2007 is ultra vires. It does not contest the many millions in grant funding the Foundation Board provided to it during that 20-year span nor propose to return that money.

In any event, the NRA's argument that the Foundation was incapable of correcting a technical issue that the NRA created 20 years ago is foreclosed by the cases the NRA cites. As the D.C. Circuit explained in *CarrAmerica Realty Corp. v. Kaidanow*, "the essential distinction between voidable and void acts are that those acts which the corporation could accomplish lawfully but which it has undertaken to accomplish in an inappropriate manner are voidable." 321 F.3d 165, 170 (D.C. Cir. 2003) (applying Delaware law). Another case relied on by the NRA, Resp. at 37, *Nevins v. Bryan*, demonstrates how this principle applies and is instructive here. 885 A.2d 233 (Del. Ch. 2005), *aff'd*, 884 A.2d 512 (Del. 2005). In *Nevins*, a former director challenged "corporate actions taken at [a] September 12, 2001 meeting," including "(1) a member vote to elect [members] to the Board, (2) election of [one board member] as Chairman of the Board," and (3) ratification of two prior board actions. *Id.* at 245. The court held that these actions "were voidable actions susceptible to cure" because the corporation's "certificate of incorporation authorize[d] the Board of Directors to approve individuals for membership in the Corporation" and no law "prohibit[ed] such action." *Id.* at 246; *see also id.* ("[A]ll of the disputed corporate actions . . . lawfully could have been accomplished . . . had they given proper notice[.]").

14

Similarly, the actions challenged by the NRA here include amending the Foundation's Articles and Bylaws. *See* FAC ¶ 228; *see also* Resp. at 36–37. It is undisputed that the Foundation's Articles and Bylaws give the Foundation's Board authority to amend: "These Bylaws may be amended at any meeting of the Board of Trustees of the Foundation by a majority of the Trustees then serving." Mot., Ex. 2, Bylaws, Art. VIII, § 1; Mot., Ex. 1, Articles, Art. 13. Accordingly, here, as in *Nevins*, the challenged actions "were voidable actions susceptible to cure."[3] *Nevins*, 885 A.2d at 246. The Foundation cured any defects through ratification, such that no case or controversy exists. *See* Mot. at 24–25 & Exs. 9–10.

### 3. The Response Confirms that the NRA's Claims Sounding in Contract (Counts VI, VIII, IX, and X) Should Be Dismissed for Lack of Standing and Ripeness.

"'[T]he irreducible constitutional minimum of standing' requires 'an injury in fact' that is both 'concrete and particularized,' and 'actual or imminent, not conjectural or hypothetical.'" *Hancock v. Urban Outfitters, Inc.*, 830 F.3d 511, 513 (D.C. Cir. 2016) (alteration in original) (quoting *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560 (1992)). Faced with this standard, which the NRA does not address, the NRA argues that it has done "more than enough to establish concrete pocketbook and organizational injuries." Resp. at 11. In purported support, the NRA argues that "[t]he loss of anticipated funding is a pocketbook injury." *Id.* (citing *Twin Rivers Paper Co. v. SEC,* 934 F.3d 607, 616 (D.C. Cir. 2019), in purported support).

---

[3] The NRA misstates or misapplies its remaining cases in a strained effort to avoid dismissal of Count XII, but they do not support its position. *See, e.g*, *Daley v. Alpha Kappa Alpha Sorority, Inc.*, 26 A.3d 723, 729 (D.C. 2011) (allowing claims to survive dismissal where sorority members alleged sorority made unlawful payments and blocked discussion of issue in violation of bylaws); *Schroder v. Scotten, Dillon Co.*, 299 A.2d 431, 435–36 (Del. Ch. 1972) (holding complaining director's contention that he did not receive notice was "without merit" and not grounds to deem actions at meeting void); *Sealey v. Am. Soc'y of Hypertension, Inc.*, 809 N.Y.S.2d 421 (App. Div. 2005) (finding proposed bylaw provision inconsistent with **statutory** requirements was void); *Olincy v. Merle Norman Cosms., Inc.*, 200 Cal. App. 2d 260, 272–73 (1962) (applying California and Nevada corporations law); *Crown EMAK Partners, LLC v. Kurz*, 992 A.2d 377, 400–01 (Del. 2010) (finding bylaw amendments conflicted with Delaware law).

15

The NRA, however, has not alleged any *loss* of *anticipated* funding; it has alleged an *anticipated* loss of funding. The distinction matters because speculative harm, contingent on future events cannot support subject matter jurisdiction. *See Saline Parents v. Garland*, 88 F.4th 298, 306 (D.C. Cir. 2023). The cases the NRA relies on (which are all cases where courts found plaintiffs *lacked* standing) did not hold otherwise and do not support the NRA's position.[4] The NRA's own Response confirms that the harm it alleges in the FAC is hypothetical and speculative:

- "[T]he Foundation's leadership currently *intend[s]* to engage in outright competition against the NRA." Resp. at 10–11 (emphasis added).

- "[T]he Foundation *intends* to cut off or substantially reduce its financial support of the NRA." *Id.* at 12 (emphasis added).

- "[T]he Foundation informed the NRA that that [sic] the Foundation *would* substantially reduce its funding of NRA[.]" *Id.* (emphasis added).

- "[T]he Foundation's reduction or termination of funding *would* impair the NRA's fundraising activities[.]" *Id.* (emphasis added).

Contrary to the NRA's unsupported assertion, these are *not* concrete injuries; they are speculative future injuries. Under these circumstances, where the alleged harm "depends on 'contingent future events that may not occur as anticipated, or indeed may not occur at all,'" the claims are unripe and must be dismissed. *Saline Parents,* 88 F.4th at 306 (citation omitted).

The NRA relies on *National Treasury Employees Union v. United States*, 101 F.3d 1423 (D.C. Cir. 1996), in an effort to escape dismissal. *See* Resp. at 13–14. But that case does not help the NRA here. In *National Treasury*, the Supreme Court held that the plaintiff's claim challenging the Line Item Veto Act was unripe because the President both (1) had not exercised the veto power

---

[4] *See Twin Rivers Paper Co.*, 934 F.3d at 616 (finding no cognizable injury); *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395–96 (2024) (finding no cognizable injury where regulation did not impede associations' advocacy business); *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 25 (D.C. Cir. 2015) (finding injury based on "predictions" too speculative to confer standing).

and (2) would not be able to do so until the following year. *Id.* at 1431. Thus, the injury was not "sufficiently imminent to create a current justiciable controversy." *Id.* at 1430.

Rather than support the NRA's theory, *National Treasury* confirms the NRA's claims are unripe. Here, the Foundation has not discontinued funding, as the 2026 Grant Agreement confirms. Moreover, the NRA fails to identify any charitable activities for which it claims the Foundation has or will cut off funding, nor has it provided a date at which it asserts this cut off will occur. Further, if the Court does not decide this issue now, it may never need to do so because the cut off may never come to pass. That is the quintessential ripeness test. *Id.* at 1431 ("Further supporting our decision that this case is prudentially unripe is the usually unspoken element of the rationale underlying the ripeness doctrine: If we do not decide it now, we may never need to.").

**C.      The NRA Has Failed to Establish the Elements Required to State Any of Its Claims.**

**1.      The NRA Still Has Not Identified a Trust or Breach Thereof.**

The NRA's breach of trust claim (Count VII) fails as a matter of law because the NRA has not identified any trust. *See* § II(A)(2), *supra*. Indeed, the NRA's "two legal theories"—(1) "the NRA is the settlor of a charitable trust it created when it created the Foundation"; and (2) that "[t]he NRA also . . . is the intended beneficiary of charitable trusts created by donations of restricted funds," Resp. 16, 20—demonstrate the frivolousness of this claim.

For its first theory, the NRA asserts that it is the settlor of a trust created when it formed the Foundation—although it flips between asserting that the Foundation is a trust or that the NRA created a separate trust for the Foundation to administer.[5] Under this theory, the NRA offers two alternatives of what the trust *res* was, but it does not settle on either option. *See* Resp. at 19–20.

One option, according to the NRA, is that the trust property was the money the NRA paid

---

[5] Both theories fail for reasons discussed at length above. *See* § II(A)(2), *supra*.

"to incorporate, apply for exempt status, and otherwise establish the Foundation." *Id.* at 19. But those funds, of course, were spent on actual costs and therefore could not be "held by the trustee for the beneficiary." *Duggan,* 554 A.2d at 1133. That money is not trust property. *See id.*

A second option, according to the NRA, is that the trust *res* did not exist at the trust's formation but was "envisioned" to be created "through fundraising." Resp. at 19. Under this theory, the trust property is allegedly all of the money donated to the Foundation for the NRA's benefit, which, per the NRA, is all or substantially all of the money ever donated. This would mean that anyone who forms a nonprofit charitable corporation and helps raise money for it creates a trust notwithstanding the express terms of the charity's organizational documents establishing it is a corporation, not a trust. The NRA cites no case supporting such an illogical result.

Even if the NRA had successfully identified a trust (it did not), Count VII would still fail because the NRA has not alleged facts to identify any breach or harm. Instead, the NRA repeats its same chorus of speculative injuries. *See id.* at 24 ("The Foundation informed the NRA it ***would*** reduce or curtail its funding of NRA." (emphasis added)); *id.* ("[T]he Foundation's executive director made clear that the Foundation ***intended*** to cut off or substantially reduce financial support of the NRA and ***attempt*** a hostile takeover of certain NRA programs." (emphases added)). Those potential future harms are insufficient as a matter of law. *See* § II(B)(3), *supra*.

### 2. The NRA's Contract-Based Claims (Counts VI and VIII–X) Remain Barred by the Express Contract Between the NRA and the Foundation.

The NRA, again, attempts to disavow its agreement under the 2026 Grant Agreement (although it has never sought to disavow the substantial grant funding provided thereunder) by arguing that "Counts VI, VIII, IX, and X do not arise out of the 2026 Grant Agreement and extend beyond the funds conveyed under the Agreement to reach the full amount of restricted funds raised by the NRA for the Foundation." Resp. at 25. For reasons already discussed at length above, this

18

position is foreclosed. *See* § II(A)(1), *supra*.

Moreover, the 2026 Grant Agreement "represents the entire agreement between the Parties with respect to its subject matter," that is, the provision of donor funds through grants. Mot., Ex. 5, § 6.1. Grant funding is, likewise, the subject matter of Counts VI, VIII, IX, and X. *See* FAC ¶¶ 179–87 (alleging third-party breach of contract with respect to donor-contributed funds); *id.* ¶¶ 201–07 (alleging breach of implied contract with respect to donor-contributed funds); *id.* ¶¶ 208–12 (alleging promissory estoppel with respect to donor-contributed funds); *id.* ¶¶ 213–16 (alleging unjust enrichment with respect to donor-contributed funds). As a result, the 2026 Grant Agreement governs the parties' relationship with respect to this issue, and all of the NRA's contract-based claims are barred. *See United States v. Kellogg Brown & Root Servs.*, 800 F. Supp. 2d 143, 160 (D.D.C. 2011); *see also* Mot. at 29–36.

### 3. The NRA's Contract-Based Claims Separately Fail Because the NRA's Own Allegations Confirm the Foundation Has Complied with Its Contracts.

#### a. The NRA's Third-Party Breach of Contract Claim (Count VI) Fails.

The NRA's third-party breach of contract claim fails. *See* Mot. at 30–33. The NRA seeks to avoid dismissal with an indefensible theory that every donor that ever donated to the Foundation intended to create a contract with the Foundation for the benefit of the NRA, such that all or substantially all funds donated to the Foundation are for the benefit of the NRA. *See* Resp. at 14. The NRA's theory is foreclosed by the Foundation's organizational documents, which provide that NRA is one of many "organizations" that the Foundation supports through grant funding for the benefit of the general public. Mot., Ex. 2, Form 1023 at Ex. C; *see also* § II(A)(2)(b), *supra*.

Even if the NRA's sweeping third-party contract theory were colorable (and it is not), the claim would fail because the NRA's own allegations foreclose the elements of breach and harm.

With respect to breach, the NRA specifically alleges that the Foundation "***intends*** to

19

breach" a purported contract term "that the donated funds be used to support the NRA." Resp. at 15 (emphasis added). The NRA then confirms the speculative nature of this alleged breach, asserting "that the Foundation denies it is obligated to use the restricted funds to support NRA . . . and *intends* to divert those funds to other purposes." *Id.* at 16 (emphasis added).

With respect to damages, the NRA's entire argument is: "[A]s discussed above, at 11–12, the Foundation's breach presently injures the NRA." *Id.* That's it. The argument on pages 11 and 12 merely recites additional allegations of what the Foundation has allegedly "threatened" or "intends" to do. Resp. at 11–12. Those are not allegations of present harm. *See* § II(B)(3), *supra*.

**b.      The NRA's Breach of Implied Contract Claim (Count VIII) Fails.**

The NRA agrees that "[t]o recover under an implied contract, a plaintiff must show that (1) valuable services were rendered; (2) for the person sought to be charged; (3) which services were accepted, used, and enjoyed by the person sought to be charged; (4) under such circumstances as reasonably notified the person sought to be charged that the person rendering the service reasonably expected to be paid by him." *Geier v. Conway, Homer & Chin-Caplan, P.C.*, 983 F. Supp. 2d 22, 39–40 (D.D.C. 2013); *see also* Resp. at 25 (acknowledging elements). According to the NRA, it "(1) provided valuable fundraising and operational services, as well as use of its marks, (2) to the Foundation, (3) which the Foundation accepted and enjoyed, (4) with the understanding that the Foundation would use those funds to support NRA Charitable Activities." Resp. at 26.

The NRA's circular logic amounts to an assertion that the NRA provided the valuable service of raising funds to support its own charitable activities. That equation does not include any value for the Foundation, and it is not what the Foundation's organizational documents provide. *See, e.g.*, Mot., Ex. 2, Ex. C at 1 ("[I]t is anticipated that *the Foundation* will engage in fund-raising efforts." (emphasis added)); *id.* at 7 ("[O]ne of the vital functions that the Foundation will provide is that it will raise funds in support of these educational and training programs.").

20

Moreover, the NRA cannot, as a 501(c)(4), raise tax-deductible donations for itself. Mot. at 5.

In any event, even if the NRA had alleged facts sufficient to identify an implied contract (it has not), the claim would still fail for lack of breach and harm. As repeatedly discussed above, the NRA has alleged only that the Foundation *intends* to withhold grant funding from the NRA. *See* § II(B)(3), *supra*. Besides being speculative, those allegations are foreclosed by the 2026 Grant Agreement, through which the Foundation is providing substantial grant funds to the NRA. Mot., Ex. 5.

### c.    The NRA's Promissory Estoppel Claim (Count IX) Fails.

The NRA's promissory estoppel claim fails for all of the reasons set forth in the Foundation's Motion. *See* Mot. at 34–35. The NRA addresses only the issue of whether it has identified a specific promise. Resp. at 27–28. While the NRA argues that the promise it has identified "is at least as specific [as] the promises enforced in other cases," *id.* at 27, the promises in those cases were nothing like the promise asserted by the NRA here.

For example, in *Parnigoni v. St. Columba's Nursery School*, the only case the NRA cites on this point from within this Circuit, a school director promised a teacher that her employment contract would be renewed for the following year. 681 F. Supp. 2d 1, 25–26 (D.D.C. 2010). In reliance on that straightforward promise, the teacher did not seek other employment. *Id.* When the director broke his promise, the teacher was without a job, and she sustained that detriment as a result of her reasonable reliance on a clear promise that the director would renew her contract. *Id.*

Here, in contrast, the NRA asserts that it relied on a promise "that the NRA would raise funds for the Foundation and that the funds so raised would be used to fund NRA Charitable Activities,'" FAC ¶ 211. The NRA's meritless lawsuit against the Foundation is plainly contrary to the NRA's purported promise to raise funds for the Foundation, but, presumably, that is not the alleged breach the NRA is asserting. Instead, the NRA appears to suggest that the Foundation has

breached its promise to fund the NRA's charitable activities. *See id.* The need to speculate as to the promise proves its vagueness.

Regardless, the latter promise is foreclosed by the parties' 2026 Grant Agreement, pursuant to which the Foundation *is* funding the NRA's charitable activities. Mot., Ex. 5. For that same reason, the promissory estoppel claim fails for lack of breach and detriment. *See* Mot. at 29–30.

### d.      The NRA's Unjust Enrichment Claim (Count X) Fails.

The NRA agrees on the elements of an unjust enrichment claim: "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *Whiting v. AARP*, 701 F. Supp. 2d 21, 31 (D.D.C. 2010) (citation omitted); *see also* Resp. at 29. The NRA argues that it would be unjust to allow the Foundation to retain the benefit of being created and receiving donations from donors "because the Foundation was intended to support NRA Charitable Activities." Resp. at 29.

The NRA does not dispute that the Foundation *is* supporting its charitable activities. *Id.* Rather, the NRA's claim is based on its desire for *more* than it is entitled to under the 2026 Grant Agreement: "[T]he NRA's claim does not seek to enforce that Agreement and *reaches funds not subject to it*." *Id.* (emphasis added). The NRA, however, has no claim to grants not subject to the written grant agreement and is estopped from taking a contrary position. *See* § II(A)(1), *supra*.

### 4.      Plaintiffs Fail to Allege Any Plausible Violation of the D.C. Nonprofit Corporations Act (Counts XI–XII).

Plaintiffs have not plausibly alleged violations of the D.C. Nonprofit Corporations Act. *See* Mot. at 36–38. The NRA offers no reasoned rebuttal to the Motion's arguments on this point and thus concedes them. *See Hopkins*, 238 F. Supp. 2d at 178.

In Count XI, Plaintiffs allege that the Foundation violated the D.C. Nonprofit Corporations Act by diverting funds that are restricted for use for NRA charitable activities. Those allegations

are implausible given the NRA's admission that the Foundation is continuing to fund restricted grants and the parties' 2026 Grant Agreement. *See* Mot. at 37. Plaintiffs' only retort is that their "claims, including this one, do not arise from the 2026 Grant Agreement and concern funds not subject to the Agreement." Resp. at 44. That argument is foreclosed. *See* § II(A)(1), *supra*.

In Count XII, Plaintiffs allege that the amendments to the Articles and Bylaws in 2024 and 2025 were ultra vires and void because Plaintiff Hamlin did not receive proper notice and the NRA was required to approve the changes. Those allegations are implausible. Mot. at 37–38. The NRA tries to avoid dismissal by arguing that the NRA's approval was required because the NRA is a designated body and because Plaintiff Hamlin did not receive perfect notice. Both arguments fail.

The NRA has never been a designated body of the Foundation. *See* § II(A)(4), *supra*.

In addition, Plaintiff Hamlin received actual notice of the meeting where the challenged amendments were adopted, reviewed the proposed amendments in advance, asked questions about them, and affirmatively stated in writing his agreement with the changes. *See* Ex. 1. When confronted with dispositive evidence of these facts, Plaintiffs refused to correct the record and instead redoubled their efforts to mislead this Court. *See id.*

### 5.      The NRA's Intellectual Property Claims (Counts I–V) Fail.

The NRA's trademark claims are implausible because the Foundation's organizational documents show that the NRA provided irrevocable and unconditional consent for use of the name "The NRA Foundation, Inc." in perpetuity and with the stated intent that the Foundation would eventually "develop, manage and promote new programs."[6] Mot., Ex. 2, Form 1023, Ex. C.

The NRA argues its consent was "limited to use of the NRA mark in the Foundation's

---

[6] The Foundation has concerns that the NRA's characterization of the parties' licensing arrangement may not be complete or accurate, but because the Foundation is limited to the pleadings and incorporated documents, the Foundation will raise this issue at the appropriate time.

name as 'a subsidiary of the NRA.'" Resp. at 10. But the consent merely identified the Foundation as "a subsidiary"; it did not limit its consent on this basis. Mot., Ex. 1. Moreover, the Foundation's Articles granted the Foundation the right to use "NRA" in its name in perpetuity and without condition by confirming that: (1) the name of the corporation is "The NRA Foundation, Inc." and (2) the duration of the Foundation is "perpetual." Mot., Ex. 1, Art. 1, 2. These provisions prevailed despite the NRA knowing that the Articles and Bylaws allowed the Foundation to change its Board. Mot., Ex. 2, Bylaws, Art. VIII, § 1; Mot., Ex. 1, Articles, Art. 13.

Notwithstanding this perpetual grant, the NRA argues that it revoked consent on the day it filed this lawsuit because the Foundation has expressed an intent to reduce funding for the NRA and engage in similar programs. Resp. at 7. But the Foundation's organizing documents—which the NRA allegedly controlled—make clear that was always the plan. Those documents repeatedly confirm that "the Foundation itself may conduct many of these or similar types of activities," which "will be consolidated within the Foundation." Mot., Ex. 2, Letter to M. Shaw at 2.

The NRA claims that "[c]ourts have resolved analogous disputes in favor of the licensor," Resp. at 7, but the cases it cites are not on point. All of those cases involve situations where the alleged infringer had (1) no implied or express license to use the mark; (2) had only an implied license to use the mark; or (3) had a limited license to use the mark for specific, limited purposes. *See Yah Kai World Wide Enters., Inc. v. Napper*, 195 F. Supp. 3d 287, 313 (D.D.C. 2016) (no express or implied license to use mark, but even if there had been, it was revoked); *Villanova Univ. v. Villanova Alumni Educ. Found., Inc.*, 123 F. Supp. 2d 293, 297 (E.D. Pa. 2000) (permission to use mark only if "all money collected [by alumni club] was . . . contributed to University); *Lutheran Ass'n of Missionaries & Pilots, Inc. v. Lutheran Ass'n of Missionaries & Pilots, Inc.*, No. Civ. 03-6173, 2004 WL 2730104, at *9 (D. Minn. Nov. 19, 2004) (implied license); *Coach*

24

*House Rest., Inc v. Coach & Six Rests, Inc.*, 934 F.2d 1551, 1563 (11th Cir. 1991) (no implied license, only acquiescence); *Sigma Phi Soc'y (Inc.) v. Mich. Sigma Phi, Inc.*, No. 20-12817, 2024 WL 1396255, at *7 (E.D. Mich. Mar. 31, 2024) (implied license).

These cases are not "analogous disputes" as none involved a scenario where, as here, the plaintiff consented to use of a name in a perpetual corporate charter of a 501(c)(3) charitable corporation that was explicitly intended to ultimately develop and run programs similar to the NRA's programs that the Foundation was intended to fund "initially." Mot., Ex. 2, Letter to M. Shaw at 2. As a result, they do not support the NRA's misplaced position here.

Finally, the NRA would have this Court believe that the Foundation's ongoing use "presents a particular danger of confusion to the public." Resp. at 9 (citation omitted). This notion is belied by this Circuit's decision, *NAACP v. NAACP Legal Defense & Educational Fund, Inc.*, 753 F.2d 131 (D.C. Cir. 1985), *cert. denied*, 472 U.S. 1021 (1985). In that case a panel of Circuit Judges Mikva, Bork, and Bazelon held that the NAACP could not withdraw consent for the NAACP Legal Defense Fund's use of its name simply because the 40-year relationship was severed. *Id.* at 141. The Court noted that there was never a mutual agreement for the licensing arrangement to be revocable and stated: "These two great organizations, like brilliant but quarreling family members, must continue to share the NAACP initials with which they were born." *Id.* The same reasoning and outcome apply with equal force here.

### III.   CONCLUSION

For the foregoing reasons, and the reasons set forth in the Foundation's Motion, which the NRA has failed to meaningfully rebut, the Foundation respectfully requests that this Court grant the Motion and dismiss the entire Amended Complaint with prejudice.

Dated: April 24, 2026

Respectfully submitted,

**DLA PIPER LLP**

*/s/ Mary Gately*
Mary E. Gately (D.C. Bar No. 419151)
500 Eighth Street NW
Washington, DC 20004
Tel: (202) 799-4507
Fax: (202) 799-5507
mary.gately@dlapiper.com

Christopher Oprison (D.C. Bar No. 489087)
200 S. Biscayne Blvd., Suite 2500
Miami, FL 33131
Tel: (305) 423-8522
Fax: (305) 657-6366
chris.oprison@dlapiper.com

Meagan D. Self (admitted *pro hac vice*)
1900 N. Pearl Street, Suite 2200
Dallas, TX 75201
Tel: (214) 743-4556
Fax: (972) 813-6254
meagan.self@dlapiper.com

Marie Bussey-Garza
1650 Market Street
One Liberty Place, Suite 5000
Philadelphia, PA 19103
Tel: (215) 656-3300
Fax: (215) 656-3301
marie.bussey-garza@dlapiper.com

*Attorneys for Defendant The NRA*
*Foundation, Inc.*

26

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2026, I caused the foregoing Defendant The NRA Foundation, Inc.'s Reply in Support of Its Motion to Dismiss Plaintiff's Amended Complaint to be electronically filed using the Court's CM/ECF system, which will send notification of such filing to all current counsel of record.

*/s/ Mary E. Gately*
Mary E. Gately