**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

NATIONAL RIFLE ASSOCIATION OF
AMERICA, *et al.*,

       *Plaintiffs*,

    v.

THE NRA FOUNDATION, INC.,

       *Defendant*.

Civil Action No. 26‑15 (SLS)

Judge Sparkle L. Sooknanan

---

**MEMORANDUM OPINION**

This case involves an increasingly acrimonious dispute between the National Rifle Association (NRA), a nonprofit organization devoted to protecting Second Amendment rights, and The NRA Foundation, Inc. (the Foundation), an affiliate nonprofit incorporated by the NRA in 1990 to support the NRA's charitable programs. For over three decades, the NRA and the Foundation worked hand-in-glove on educational services, publications, research, and other programs. As the NRA tells the story, the relationship between the two organizations began to sour in 2025, after "reform-minded" candidates obtained majority control of the NRA's Board of Directors. At that point, so-called "old-guard" leadership at the Foundation—*i.e.*, allies of the faction that had lost control of the NRA—sought to sever the Foundation from the NRA. They held a secret meeting at which they purported to modify the Foundation's organizing documents. And the Foundation has since expressed that it plans to divert from the NRA funds that the NRA helped the Foundation raise. The NRA sued to undo this alleged mutiny.

As intriguing as that dispute may be, it will not be resolved by this Court. The NRA has brought a dozen claims challenging many aspects of the Foundation's recent conduct. The problem

is that only a handful of these claims arise under federal law. The rest are claims under District of Columbia law over which the Court declines to exercise supplemental jurisdiction—except for a common-law trademark infringement claim, which is properly before this Court. As narrowed, this case is a trademark dispute. The NRA alleges that it has revoked its longstanding consent for the Foundation to use its trademarks. The Foundation moves to dismiss, arguing that the NRA may not revoke its consent. But the Foundation identifies no support for that contention. Because the Foundation has allegedly continued using the NRA's marks despite the NRA's revocation, the Court denies the Foundation's motion to dismiss the trademark-related claims.

## BACKGROUND

### A.    Factual Background

The Court draws the facts, accepted as true, from the Plaintiff's Complaint and attachments. *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 619 (D.C. Cir. 2023). The Court also takes "judicial notice of public records from other court proceedings." *Lewis v. DEA*, 777 F. Supp. 2d 151, 159 (D.D.C. 2011).

### 1.    Origins of the Foundation

The NRA was founded in 1871 and has since grown to be the most widely recognized organization advocating for Second Amendment rights. Am. Compl. ¶ 12, ECF No. 19. In addition to its well-known lobbying and other political activity, the NRA publishes firearm-related periodicals and offers "programs and events related to firearm education, training, and safety." *Id.* ¶¶ 12–13, 15.

In 1990, the NRA established the Foundation as a District of Columbia nonprofit organization to achieve tax benefits. *Id.* ¶¶ 29, 37, 39. The NRA is recognized as a tax-exempt organization under Section 501(c)(4) of the Internal Revenue Code, meaning—as relevant here— that donors' contributions to the NRA do not qualify as tax-deductible charitable contributions. *Id.*

¶¶ 8, 30. But the Foundation, a so-called 501(c)(3) organization, may accept tax-deductible contributions. *Id.* ¶ 30. The NRA established the Foundation as "a vehicle through which individuals and corporations could make tax-deductible contributions in support of the NRA's charitable, educational, and scientific activities," which the Foundation would then disburse to "support" certain charitable activities by the NRA. *Id.* ¶¶ 29–31.[1]

On the day the NRA incorporated the Foundation, the NRA Secretary informed the Corporations Division of the District of Columbia Department of Consumer and Regulatory Affairs that the NRA "consented to the use of 'NRA' in the Foundation's name because the Foundation 'is a subsidiary of the NRA.'" *Id.* ¶ 40. According to the NRA, that consent was "implicitly contingent on the Foundation's ongoing relation to the NRA as established in the Foundation's governing documents." *Id.* ¶ 41.

In the decades that followed, the NRA and the Foundation maintained an inextricably close relationship. The Foundation's trustees (who comprise its Board of Directors) were either selected by the NRA Board or were themselves NRA officers serving in an *ex officio* capacity. *Id.* ¶ 48. The NRA used its trademarks, staff, and other resources to raise funds for the Foundation—funds which it expected that the Foundation would in turn use to support the NRA's charitable activities. *Id.* ¶ 51. Indeed, until 2025, the Foundation had no independent employees, and NRA employees conducted the Foundation's business. *Id.* ¶ 50. Over the years, this arrangement proved successful for both the NRA and the Foundation. For instance, the "Friends of NRA" program—just one of the NRA's fundraising programs—has raised about $1.2 billion in contributions for the Foundation since 1993. *Id.* ¶¶ 52–55. In December 2024, the Foundation reported that it held $36,389,536

---

[1] To be precise, the Amended Complaint alleges that attorneys of the firm Cadwalader, Wickersham & Taft—acting as agents of the NRA—incorporated the Foundation. Am. Compl. ¶¶ 37–39, ECF No. 19.

"designated for the NRA as beneficiary in investments and net assets with donor restrictions." *Id.* ¶ 63.

### 2.    Changes at the NRA and the Foundation

Over the past several years, legal trouble has plagued the NRA. An investigation by the New York Attorney General beginning around 2018 "revealed misuse of funds and breach of fiduciary duty by certain NRA officers, including [former NRA Executive Vice President and CEO Wayne] LaPierre, and inadequate oversight." *Id.* ¶ 68. That investigation culminated in a civil suit by New York against the NRA. *Id.* On "the eve of trial" in 2024, Mr. LaPierre announced his resignation. *Id.* And he was "ultimately adjudged liable to the NRA for breach of fiduciary duty and barred from serving in any fiduciary position as an officer or director of the NRA for ten years." *Id.* That judgment also permanently barred certain NRA officers, including two current Foundation trustees, from serving on the NRA Board's Audit Committee. *Id.* ¶ 69.

Around this time, the NRA and the Foundation also faced a lawsuit from the District of Columbia Attorney General. *Id.* ¶ 72. The D.C. Attorney General alleged that the Foundation had violated D.C. law "through a series of loan, grant, and other payments to the NRA," and he sought relief "that would have severed or weakened the relationship between the NRA and the Foundation." *Id.* ¶¶ 72–73. In April 2024, this lawsuit was resolved by consent judgment. *Id.* ¶ 74. The consent judgment required the Foundation to strengthen oversight of its expenditures, including by establishing nonprofit-compliance trainings for its trustees, adopting a new grantmaking policy, and adopting a new shared services agreement with the NRA. *Id.*

The concerns that motivated those lawsuits also impacted the elections for NRA directors. *Id.* ¶ 80. For many years, the NRA Board had been "dominated by directors allied with and deferential to" Mr. LaPierre. *Id.* ¶ 77. But beginning around 2023, directorship candidates

4

unaligned with Mr. LaPierre, and who campaigned "on a platform of reform, transparency, and fiscal restraint," began to receive substantial numbers of votes from NRA members. *Id.* ¶ 78–79. This state of affairs split NRA leadership into two groups: the "Reformers" and the "Old Guard." *Id.* ¶ 79.

In 2025, the Reformer faction gained a majority on the NRA's Board and elected their preferred candidate as NRA President. *Id.* ¶ 81. But the Foundation's Board remained controlled by members of the Old Guard faction. *Id.* ¶ 82.

According to the NRA, the success of the Reformer faction precipitated efforts by the Foundation Board to "entrench the Old Guard's control of the Foundation and sever the Foundation's relationship with the NRA." *Id.* ¶ 83. Among other changes, around August 2024, the Foundation purported to change its bylaws to permit trustees to elect themselves and to strip the NRA President and Executive Vice President of their *ex officio* membership on the Foundation's Board. *Id.* ¶¶ 83–90, 96. Further, whereas the Foundation previously had no employees of its own, the Foundation hired a "disgruntled former NRA employee" as its Executive Director. *Id.* ¶ 100. In late 2025, that Executive Director informed the NRA that the Foundation "intended to conduct its own fundraising and public-facing activities," and demanded that the NRA hand over donor lists and social-media accounts. *Id.* ¶¶ 100–01. In January 2026, the Foundation told the NRA that it would "substantially reduce" its funding of charitable NRA activities, and it threatened to cut off funding of those activities altogether. *Id.* ¶¶ 102–03.

In the NRA's view, the Foundation's conduct demonstrates that the Foundation intends "to undertake fundraising activities in competition with the NRA and to conduct its own programmatic activities in competition with those of the NRA." *Id.* ¶ 104.

### 3.    The NRA's Trademarks

The NRA owns many trademarks, most of which have been registered with the United States Patent and Trademark Office. *Id.* ¶ 21–28. These marks include:

- "NRA" for certain educational, publication, association, and charitable fundraising services, *id.* ¶ 22–23;

- "NRA" for certain goods, including firearm targets, clothing, jewelry, hunting knives, and flashlights, *id.* ¶ 23;

- "THE NRA FOUNDATION TEACH FREEDOM" for charitable fundraising services, *id.* ¶ 25; and

- "FRIENDS OF NRA" for charitable fundraising services, *id.* ¶ 26.

In August 2025, the NRA also applied to register the mark "THE NRA FOUNDATION" for charitable fundraising and educational services. *Id.* ¶ 28. The NRA asserts that it has used that mark "continuously and exclusively" since at least as early as December 31, 1990, meaning that the NRA has common-law rights in the mark. *Id.*

Since 1998, the NRA has owned and operated the domain name "nrafoundation.org." *Id.* ¶¶ 109–10. At the website associated with that domain, the NRA provides information about its charitable fundraising services. *Id.* ¶ 111. And the NRA solicits donations and communicates with donors using a "@nrahq.org" email domain. *Id.* ¶ 112.

In July 2025, the Foundation registered the domain name "thenrafoundation.org." *Id.* ¶ 113. The website associated with the Foundation's domain prominently displays the text "THENRAFOUNDATION.ORG" and "Launching Soon." *Id.* ¶ 123. The Foundation has used the domain to conduct charitable fundraising activities independent from, and in competition with, the

NRA. *Id.* ¶ 125. And it has communicated with donors using an "@thenrafoundation.org" email domain. *Id.*

In September, the NRA requested that the Foundation assign the "thenrafoundation.org" domain to the NRA. *Id.* ¶ 119. The Foundation responded that the Foundation "'would ordinarily comply happily with past practice and assign [the Infringing Domain] to the [NRA], but for certain administrative/practical/legal considerations' [it] declined to do so in this instance." *Id.* ¶ 120 (alterations in original). The NRA then sent the Foundation a letter demanding that the Foundation assign the domain to the NRA. *Id.* ¶ 121. The letter asserted that the domain was confusingly similar to "NRA" and "THE NRA FOUNDATION" and was likely to confuse customers into believing that "thenrafoundation.org" was affiliated with or originated with the NRA. *Id.* The Foundation refused to assign the domain to the NRA. *Id.* ¶ 122.

On January 5, 2026—the same day that the NRA filed this lawsuit—the NRA sent the Foundation a cease-and-desist letter. *Id.* ¶ 129. The letter demanded that "the Foundation cease and desist all use of the NRA Marks (and any marks confusingly similar thereto) immediately," including "uses thereof in the Foundation's trade name, social media platforms, and any other advertising and promotional materials." Am. Compl. Ex. H at 2, ECF No. 19-8 (emphasis omitted). In the NRA's view, this letter "confirmed revocation of any previous license, consent, permission, or other authorization, whether express or implied, for the Foundation to use the NRA's trademarks." Am. Compl. ¶ 129.

The NRA alleges that despite the cease-and-desist letter, the Foundation has continued to use the NRA's trademarks without permission. *Id.* ¶ 130. And the Foundation allegedly "seeks to

offer identical and substantially similar programs, events, and services under trademarks identical to those owned by the NRA without the NRA's authorization." *Id.* ¶ 128; *see also id.* ¶ 132.[2]

## B. Procedural Background

The NRA sued the Foundation on January 5, 2026. ECF No. 1. It filed an Amended Complaint on March 6, 2026. ECF No. 19. The Amended Complaint adds as plaintiffs William Bachenberg, the President of the NRA, and Douglas Hamlin, the Executive Vice President of the NRA. Am. Compl. ¶¶ 9–10. The Court will refer to the Plaintiffs collectively as "the NRA."

The Amended Complaint asserts twelve counts—four under federal trademark law and eight under D.C. law.[3] *Id.* ¶¶ 135–230. And it seeks many forms of relief, including damages for the Foundation's unlawful conduct; an order enjoining the Foundation from using the NRA's trademarks; specific performance of an alleged contract or quasi-contract; an order appointing a temporary independent trustee, director, officer, receiver, or other agent to take custody of certain Foundation funds; and an order enjoining the Foundation from acting under allegedly unlawful amendments to the Foundation's Articles of Incorporation and Bylaws. *Id.* at 44–48.

On March 20, 2026, the Foundation moved to dismiss the Amended Complaint under Federal Rules of Civil Procedure 12(b)(1) and (b)(6). Mot., ECF No. 20. After reviewing the

---

[2] On June 1, 2026, the Foundation filed a notice stating that it had changed its name to "The 1791 Foundation, Inc.," effective May 29, 2026. ECF No. 28. The Foundation has not asked the Court to consider that name change when resolving its motion, so the Court will treat it as immaterial for present purposes.

[3] As described by the Amended Complaint, they are: (1) "Federal Trademark Infringement," (2) "False Designation of Origin and Federal Unfair Competition," (3) "Federal Trademark Dilution," (4) "Common Law Trademark Infringement and Unfair Competition," (5) Cybersquatting Under the Anti-Cybersquatting Consumer Protection Act," (6) "Third Party Beneficiary Breach of Contract," (7) "Third Party Beneficiary and Settlor Breach of Trust," (8) "Breach of Implied Contract," (9) "Promissory Estoppel," (10) "Unjust Enrichment," (11) "Unauthorized Diversion of Charitable Assets," and (12) "Ultra Vires Violations of Organizing Documents." Am. Compl. ¶¶ 135–230.

Parties' briefing on the Foundation's motion, the Court ordered the Parties to file supplemental memoranda addressing this Court's subject-matter jurisdiction to hear the NRA's D.C.-law claims. Min. Order (May 15, 2026). The Parties have filed those memoranda, and the Foundation's motion is fully briefed and ripe for review. *See* Opp'n, ECF No. 22; Reply, ECF No. 25; Pls.' Suppl. Mem., ECF No. 26; Def.'s Suppl. Mem, ECF No. 27.

## LEGAL STANDARD

"When a defendant brings a Rule 12(b)(1) motion to dismiss, the plaintiff must demonstrate that the court indeed has subject-matter jurisdiction to hear his claims." *Hill v. U.S. Dep't of the Interior*, 699 F. Supp. 3d 1, 12 (D.D.C. 2023) (first citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); and then citing *US Ecology, Inc. v. U.S. Dep't of the Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000)). In reviewing a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), courts "construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged." *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005) (quoting *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004)).

Under Rule 12(b)(6), a court will dismiss a complaint that does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When reviewing a motion to dismiss under Rule 12(b)(6), courts "must construe the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'" *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)). But courts need not accept as true "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the complaint. *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

**DISCUSSION**

### A.    Subject-Matter Jurisdiction

Because "a court must always assure itself of its subject-matter jurisdiction regardless of whether a party has raised a challenge," the Court begins with jurisdiction. *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 511 (D.C. Cir. 2018). Any claim over which this Court lacks subject-matter jurisdiction must be dismissed. *See Elevance Health, Inc. v. Becerra*, 736 F. Supp. 3d 1, 15 (D.D.C. 2024) ("[T]he Court has an independent duty to assure that it has subject matter jurisdiction with respect to each claim before it[.]"). "The proponent of jurisdiction bears the burden of providing that it exists[.]" *McMillan v. D.C. Bd. of Elections*, 75 F. Supp. 3d 348, 351 (D.D.C. 2014).

"The two most common types of federal subject-matter jurisdiction are federal-question jurisdiction, [2]8 U.S.C. § 1331, and diversity jurisdiction, *see id.* § 1332." *Chambers v. Cap. One Fin. Corp.*, No. 25-cv-3255, 2026 WL 914924, at *2 (D.D.C. Apr. 3, 2026). Here, the Court has federal-question jurisdiction over the NRA's claims for trademark infringement (Count I), unfair competition (Count II), and trademark dilution (Count III), which all arise under the Lanham Act. *See* Am. Compl. ¶¶ 135–58; 15 U.S.C. §§ 1114, 1125(a), 1125(c). The Court also has jurisdiction over the NRA's cybersquatting claim under the Anti-Cybersquatting Consumer Protection Act (Count V). *See* Am. Compl. ¶¶ 166–78; 15 U.S.C. § 1125(d). What remains are eight claims that the NRA asserts under D.C. law (Count IV, Counts VI–XII). *See* Am. Compl. ¶¶ 159–65, 179–230.

The NRA and the Foundation both contend that this Court has supplemental jurisdiction over the D.C.-law claims. Pls.' Suppl. Mem. 5; Def.'s Suppl. Mem. 3. "When a federal court has an independent basis for exercising federal jurisdiction, it may, in certain circumstances, also exercise pendant, or supplemental, jurisdiction over related claims under state law." *Women Prisoners of the D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 920 (D.C. Cir. 1996).

10

"A two-part test guides the supplemental jurisdiction analysis." *Wisey's #1 LLC v. Nimellis Pizzeria LLC*, 952 F. Supp. 2d 184, 188 (D.D.C. 2013). First, a court must determine whether the local claims are "so related" to the federal claims "that they form part of the same case or controversy." *Joyner v. Morrison & Foerster LLP*, 140 F.4th 523, 536 (D.C. Cir. 2025) (quoting 28 U.S.C. § 1367(a)). "If they do, the court has the authority under Article III of the Constitution to hear the state claim[s]." *Wisey's #1*, 952 F. Supp. 2d at 188. Second, even if a court has the power to hear the local claims, the court "may within its discretion decline to exercise supplemental jurisdiction" in circumstances specified in 28 U.S.C. § 1367(c). *Id.* at 189. These circumstances include when the claims raise novel questions of local law, and when the local-law claims predominate over the federal claims. *See* 28 U.S.C. § 1367(c).

For the reasons below, the Court has jurisdiction over the NRA's D.C.-common-law trademark infringement claim. As for the remaining D.C.-law claims, even assuming that the Court has jurisdiction, it declines to exercise that jurisdiction here.

### 1.    Section 1367(a)

"[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). A court determines whether the claims form part of the same Article III case or controversy by asking "whether the state and the federal claims 'derive from a common nucleus of operative fact.'" *Joyner*, 140 F.4th at 536 (quoting *Women Prisoners*, 93 F.3d at 920). "Claims derive from a 'common nucleus of operative fact' only if the plaintiff would ordinarily be expected to try them all in one judicial proceeding." *Doe #1 v. Am. Fed'n of Gov't Emps.*, 554 F. Supp. 3d 75, 113 (D.D.C. 2021) (quoting *Taylor v.*

11

*District of Columbia*, 626 F. Supp. 2d 25, 28 (D.D.C. 2009)). Local-law claims "do not derive from a common nucleus of operative facts if there is almost no factual or legal overlap between the state and federal claims." *Wisey's #1*, 952 F. Supp. 2d at 189 (quoting *Chelsea Condo. Unit Owners Ass'n v. 1815 A St., Condo. Grp., LLC*, 468 F. Supp. 2d 136, 141 (D.D.C. 2007)).

Here, the NRA's D.C.-common-law trademark infringement claim appears to be identical to its federal trademark infringement claim—both allege that the Foundation has wrongfully used the NRA's trademarks. *Compare* Am. Compl. ¶¶ 136–41, *with id.* ¶¶ 160–62. Because the operative facts underlying both claims entirely "overlap," the Court has jurisdiction to hear the common-law infringement claim. *Joyner*, 140 F.4th at 536.

The NRA contends that the factual overlap between its remaining D.C.-law claims and the federal-law claims are sufficient to support supplemental jurisdiction because the claims are all based on "intertwined elements of the Foundation's 'overarching campaign' to use the NRA's brand name and earmarked donor funds to set itself up as an NRA competitor." Pls.' Suppl. Mem. 5. The Court notes that "[s]tate common law claims that only 'relate generally' to federal claims through a broader dispute and do not share any operative facts are insufficient for supplemental jurisdiction." *Wisey's #1*, 952 F. Supp. 2d at 190 (quoting *Chelsea Condo. Unit*, 468 F. Supp. 2d at 138–39); *see Osei v. Standard Chartered Bank*, No. 19-cv-1644, 2020 WL 1270847, at *3 (D.D.C. Mar. 17, 2020) (same). Ultimately, however, the Court need not resolve whether the claims share a common nucleus of operative fact. Even if the Court had supplemental jurisdiction over the NRA's D.C.-law claims, it declines to exercise that jurisdiction. *See Wisey's #1*, 952 F. Supp. 2d at 191 (taking a similar approach).

12

### 2.    Section 1367(c)

Even if a court has authority to hear a local-law claim under Section 1367(a), the court "may decline to exercise supplemental jurisdiction over [such] a claim" if: (1) "the claim raises a novel or complex issue of State law," (2) "the claim substantially predominates over the claim or claims over which the district court has original jurisdiction," (3) "the district court has dismissed all claims over which it has original jurisdiction," or (4) "in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c).

The Court agrees with the Parties that it should exercise supplemental jurisdiction over the NRA's D.C.-common-law trademark infringement claim. As yet, there is no indication that the NRA's trademark rights are different in any relevant respect under D.C. common law as opposed to federal law. *See Ward One Democrats, Inc. v. Woodland*, 898 A.2d 356, 361 (D.C. 2006) ("In the District of Columbia, as in most states, trademark statutes and the applicable case law are modeled after the federal Lanham Act."); *Russian Acad. of Scis. v. Am. Geophysical Union*, No. 98-cv-2165, 1998 WL 34333239, at *3 (D.D.C. Dec. 17, 1998) ("The elements that plaintiffs must demonstrate to prevail on trademark infringement claims under the common law and under . . . the Lanham Act are [the same]." (footnote omitted)). And none of Section 1367(c)'s bases for declining jurisdiction pertain. Given the overlap between the common-law infringement claim and the federal infringement claim, adjudicating the common-law claim in this action would advance judicial economy and avoid a risk of inconsistent judgments. *See Floyd v. PNC Mortg.*, 216 F. Supp. 3d 63, 68 (D.D.C. 2016) ("When deciding whether to exercise supplemental jurisdiction over state claims, federal courts should consider 'judicial economy, convenience, fairness, and comity.'" (quoting *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 424 (D.C. Cir. 2005))); *see also Joyner*, 140 F.4th at 536 ("The clearest case for supplemental jurisdiction is where 'the same acts violate

13

parallel federal and state laws[.]'" (quoting *Lindsay v. Gov't Emps. Ins. Co.*, 448 F.3d 416, 424 (D.C. Cir. 2006))). The Court thus concludes that exercising supplemental jurisdiction over the common-law trademark infringement claim is appropriate.

As for the non-trademark D.C.-law claims, the Court declines to exercise supplemental jurisdiction because (1) the D.C.-law claims would "substantially predominate[]" over the NRA's federal trademark claims; and (2) several of the claims raise "novel or complex issue[s] of [D.C.] law." 28 U.S.C. § 1367(c).

### a. Section 1367(c)(2)

The NRA's non-trademark D.C.-law claims "substantially predominate[]" over its federal trademark claims. 28 U.S.C. § 1367(c)(2). "In general, the question of whether state law predominates must be answered by looking to the nature of the claims as set forth in the pleading and by determining whether the state law claims are more complex or require more judicial resources to adjudicate." *Wisey's #1*, 952 F. Supp. 2d at 193 (cleaned up). Relevant comparisons between the federal and local claims include the manner of "proof," the "scope of the issues raised," and "the comprehensiveness of the remed[ies] sought." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726–27 (1966).

It is helpful to begin by outlining what the NRA would have to establish to prevail on its non-trademark D.C.-law claims. These are the elements of each of those claims:

- To prevail on its third-party beneficiary breach of contract claim (Count VI), the NRA would have to prove that it was a third-party beneficiary of a contract, meaning that "the contracting parties intended the third party to benefit." *District of Columbia v. Campbell*, 580 A.2d 1295, 1302 (D.C. 1990). If it demonstrated that it was a qualifying beneficiary, it would then have to "prove four elements: '(1) a valid contract between the parties; (2) an

14

obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach.'" *CorpCar Servs. Houston, Ltd. v. Carey Licensing, Inc.*, 325 A.3d 1235, 1244–45 (D.C. 2024) (quoting *Weatherly v. Second Nw. Coop. Homes Ass'n*, 304 A.3d 590, 595 (D.C. 2023)).

- To prove a breach of trust (Count VII), the NRA must establish that a trustee violated "a duty the trustee owes to a beneficiary." D.C. Code § 19–1310.01(a); *see Fam. Fed'n for World Peace v. Hyun Jin Moon*, 129 A.3d 234, 244 n.15 (D.C. 2015) ("[W]e have recognized the applicability of the rules relating to charitable trusts to [charitable] corporations."). Here, the alleged duty is to refrain from using donated funds for purposes other than the purpose for which they were donated. *See* Am. Compl. ¶¶ 192, 198.[4]

- To establish a breach of an implied contract (Count VIII), the NRA must first show the existence of such a contract. "There is an implied-in-fact contract when: (1) valuable services were rendered, (2) for the person sought to be charged, (3) which services were accepted by the person sought to be charged, used and enjoyed by him or her, and (4) under such circumstances as reasonably notified the person sought to be charged that the person rendering the services expected to be paid by him or her." *Boyd v. Kilpatrick Townsend & Stockton*, 164 A.3d 72, 81 (D.C. 2017) (cleaned up). The NRA would then have to prove the other elements of a breach-of-contract claim. *See CorpCar Servs.*, 325 A.3d

---

[4] In moving to dismiss this claim, the Foundation invokes "the traditional rule that, generally, with respect to charitable trusts and charitable corporations 'only a public officer, usually the state Attorney General, has standing to bring an action to enforce the terms of the trust.'" *Fam. Fed'n for World Peace v. Hyun Jin Moon*, 129 A.3d 234, 244 (D.C. 2015) (quoting *Hooker v. Edes Home*, 579 A.2d 608, 612 (D.C. 1990)); Mot. 13–14, ECF No. 20. The NRA responds by invoking two exceptions to that general rule: first, that "[t]he settlor of a charitable trust . . . may maintain a proceeding to enforce the trust," D.C. Code § 19–1304.05, and second, that "a clearly identified intended beneficiary has a justiciable interest in enforcement of the trust," *Hooker*, 579 A.2d at 612. Opp'n 17, 20–21, ECF No. 22.

at 1244–45; *Steuart Inv. Co. v. The Meyer Grp., Ltd.*, 61 A.3d 1227, 1231 (D.C. 2013) ("An implied-in-fact contract is a true contract, containing all necessary elements of a binding agreement; it differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the milieu in which they dealt." (quoting *Vereen v. Clayborne*, 623 A.2d 1190, 1993 (D.C. 1993))).

- To prevail on a promissory estoppel claim (Count IX), the NRA must advance "evidence of a promise, the promise must reasonably induce reliance upon it, and the promise must [have been] relied upon to the detriment of the promisee." *Simard v. Resol. Tr. Corp.*, 639 A.2d 540, 552 (D.C. 1994).

- To prove unjust enrichment (Count X), the NRA must show that "(1) [it] conferred a benefit on the defendant; (2) the defendant retain[ed] the benefit; and (3) under the circumstances, the defendant's retention of the benefit [was] unjust." *Peart v. D.C. Hous. Auth.*, 972 A.2d 810, 813 (D.C. 2009) (quoting *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005)).

- Finally, to succeed on an *ultra vires* claim against a nonprofit corporation (Count XII), the NRA must prove that the nonprofit took an action that was "expressly prohibited by statute or by-law," or that the nonprofit "exceeded the powers conferred upon it by its certificate of incorporation, bylaws, or statute." *Compton v. Alpha Kappa Alpha Sorority, Inc.*, 64 F. Supp. 3d 1, 18 (D.D.C. 2014) (quoting *Daley v. Alpha Kappa Alpha Sorority*, 26 A.3d 723, 730 (D.C. 2011)).[5]

---

[5] As with the breach-of-trust claim above, the Parties dispute whether the NRA may bring this claim. Under D.C. law, "[t]he power of a nonprofit corporation to act may be challenged in a

16

By contrast, the elements of NRA's federal trademark claims—which are laid out in more detail below— involve "the companies' trademarks, the distinctive nature or secondary meaning of [the NRA's] trademark[s], the likelihood of confusion caused by [the Foundation's] allegedly infringing mark, and the bad faith registration or use of a domain name confusingly similar to [the NRA's] mark[s]." *Wisey's #1*, 952 F. Supp. 2d at 189 (footnote omitted).

Against this backdrop, the Court finds that adjudicating the NRA's D.C.-law claims would require more judicial resources than the federal claims at every stage of this case. As an initial matter, although not dispositive, the NRA's D.C.-law claims outnumber its federal claims. *See Doe #1*, 554 F. Supp. 3d at 117 (declining supplemental jurisdiction when "[t]he non-federal claims [were] significantly more numerous"); *cf. Araya v. JPMorgan Chase Bank, N.A.*, 775 F.3d 409, 418 (D.C. Cir. 2014) ("[T]he process of discerning, interpreting, and deciding a half-dozen state-law claims could be described as undertaking to resolve a 'complex issue of State law.'" (quoting 28 U.S.C. § 1367(c)(1))). *But see Chelsea Condo. Unit*, 468 F. Supp. 2d at 143 ("[T]his part of the test is not satisfied by a mechanistic calculation of the number of claims[.]"). And— aside from the quasi-contract claims—the D.C.-law claims are each supported by different theories and involve elements different from one another. Even at the motion-to-dismiss stage, addressing each one would be resource-intensive. The space allocated to each claim in the Parties' briefs underscores this. The Foundation's Motion to Dismiss spends four pages discussing the federal

---

proceeding by" specified parties. D.C. Code § 29–403.04(b); *see also* D.C. Code § 29–401.22(a) (permitting a suit to challenge a corporate action by "a person whose status as, or whose rights and duties as, a member, delegate, director, member of a designated body, or officer of a corporation are or may be affected by" that action). The NRA advances several theories to support its ability to sue under those provisions. Opp'n 29–36. The Foundation argues that the NRA lacks statutory standing. Reply 12–13, ECF No. 25.

claims versus twenty-five pages on the D.C.-law claims. For the Opposition, the ratio is five versus thirty-two; for the Reply, two versus twenty.

Further, the evidence required to establish the D.C.-law claims would dominate any trial in this case. *See* 13D Wright & Miller's Federal Practice & Procedure § 3567.3 (3d ed. Apr. 2026 Update) ("[C]ourts may consider whether presentation at trial of the original and supplemental claims will overlap substantially."). The evidence related to the federal claims would be focused on the Foundation's use of the NRA's trademarks. As discussed below, as those claims have thus far been presented to this Court, the crux of the dispute is whether the NRA has given the Foundation permission to use the marks. The scope of the D.C.-law claims is much broader. For instance, the NRA seeks to prove that it intended to establish the Foundation as a trust, which would likely involve witness testimony and documents describing events since 1990. *See* Am. Compl. ¶¶ 190–91. For its breach-of-implied-contract claim, the NRA appears to similarly contemplate proof spanning decades to demonstrate the "mutual understanding and intentions" of the NRA and the Foundation "confirmed by years in the course of dealing." *See id.* ¶ 204. Even the NRA's *ultra vires* claim—which focuses principally on one alleged secret meeting in August 2024—would ostensibly require its own separate evidentiary development given the NRA's allegation that "[t]he minutes of the meeting . . . failed to specify or even describe the substantive changes that the [B]oard purportedly adopted." *Id.* ¶ 96. Discovery for these claims would likely be voluminous, and the Parties have not explained how most of that discovery would be relevant to the NRA's federal trademark claims.

The "comprehensiveness of the remed[ies] sought" for the D.C.-law claims also show their predominance. *Gibbs*, 383 U.S. at 726–27. On its federal claims, the NRA seeks relief related to the Foundation's allegedly infringing use of its trademarks, including a declaration that the

18

Foundation infringed the marks, an injunction against the Foundation's infringing uses, and damages. Am. Compl. at 45–46. The relief requested on the D.C.-law claims, however, contemplates a change in control over the Foundation and its funds. Among other relief, the NRA seeks an order on the validity of the Foundation's Articles of Incorporation and Bylaw amendments, the appointment of a temporary independent agent to take custody of certain funds, and an injunction allocating funds to the NRA. *Id.* at 47–48.

Exercising supplemental jurisdiction would turn this case from a trademark dispute into a comprehensive evaluation of the Foundation's alleged attempted divorce from the NRA. "Given the varied types of [claims] alleged and the judicial resources that would be required to adjudicate" the NRA's D.C.-law claims, "[S]ection 1367(c)(2) counsels using discretion in this case to decline supplemental jurisdiction." *Wisey's #1*, 952 F. Supp. 2d at 193.

### b.  Section 1367(c)(1)

The NRA's non-trademark D.C.-law claims also appear to present novel issues. Start with its breach-of-trust claim. The Parties spend a considerable portion of their briefs disputing whether the NRA has standing. Under D.C. law, a "settlor of a charitable trust . . . may maintain a proceeding to enforce the trust." D.C. Code § 19–1304.05(c). A "settlor" is defined as "a person . . . who creates, or contributes property to, a trust." *Id.* § 19–1301.03(16). The D.C. Court of Appeals recently explained that under the Uniform Trust Code, which has been adopted by the District, "a settlor generally must contribute assets, such as funds or property, to create a trust." *Farina v. Janet Keenan Hous. Corp.*, 335 A.3d 537, 549 (D.C. 2025). The court also acknowledged that "there may be exceptions to the rule that a settlor must contribute trust assets." *Id.* at 550. The Foundation interprets this as a rule that only those who contribute trust assets may qualify as a settlor. Reply 5–6. The NRA highlights that D.C. Code Section 19–1301.03(16) defines a settlor

19

as a person "who creates, *or* contributes property to, a trust," which it interprets to mean that a person that creates a trust is a settlor even if that person contributes no assets. Opp'n 17, 19. But neither of the Parties has identified a case that answers whether the NRA's interpretation of Section 19–1301.03(16) is correct.[6]

The NRA's *ultra vires* claim presents novel issues as well. Recall that this claim is based on an alleged secret Foundation board meeting in August 2024 at which the Board purported (among other things) to eliminate the NRA's right to appoint Foundation trustees, to provide that the Board would be self-perpetuating, and to remove the limitation on the number of trustees authorized by the Foundation's Articles of Incorporation. Am Compl. ¶¶ 89–97. The NRA contends that these acts were void because they were made in the absence of NRA approval, because the Foundation gave inadequate notice of the meeting to the NRA-affiliated *ex officio* trustees, and because the challenged amendments were voted on by more trustees than permitted by the Articles. Opp'n 39–42. The Foundation argues that this claim fails because the Foundation ratified the challenged actions at a meeting held two months after this litigation began. Mot. 25; Reply 14–15. But neither the NRA nor the Foundation cite a D.C. case answering whether these kinds of alleged defects render corporate acts void, or whether such acts may be ratified. *See Re'ese Adbarat Debre Selam Kidest Mariam Ethiopian Orthodox Tewahedo Church, Inc. v. Habte*, 300

---

[6] The NRA also contends that even if contributing trust assets is necessary, it did so by providing (1) the "initial in-kind contributions" of "paying to incorporate, apply for exempt status, and otherwise establish the Foundation"; and (2) "activities raising funds for the Foundation." Opp'n 19–20. As best this Court can tell, the D.C. courts have not addressed whether such acts constitute "contribut[ing] property to[] a trust." D.C. Code § 19–1301.03(16).

The NRA argues that "the D.C. Circuit and D.C. Court of Appeals have well-developed caselaw on the issues of charitable trusts and donor contracts." Pls.' Suppl. Mem. 10, ECF No. 26. However well-developed that caselaw may be in the abstract, the Parties have not identified cases addressing the novel issues identified above. Exercising jurisdiction would leave to this Court the task of attempting to answer these D.C.-law questions in the first instance.

A.3d 784, 803 (D.C. 2023) (noting that "deficient notice of a [membership corporation's] meeting might well require invalidation of the decisions made thereafter").

Next, Count XI of the Amended Complaint is titled "Unauthorized Diversion of Charitable Assets." Am. Compl. at 42. It alleges that the Foundation violated Sections 29–410.03 and 44–1633 of the D.C. Code, which govern the use of property by nonprofit or charitable institutions. *Id.* ¶¶ 217–23. The Parties only briefly address this claim. *See* Mot. 23–24, 36–38; Opp'n 42–44; Reply 11–13. They do not identify any D.C. case interpreting these provisions—or even indicating whether an "unauthorized-diversion claim" constitutes a separate claim under D.C. law. It might be that proving a violation of Section 29–410.03 or Section 44–1633 is merely one way in which a plaintiff can support a breach-of-contract, breach-of-trust, *ultra vires*, or other similar claim. But the relevant point here is that the Parties do not cite a D.C. case that addresses that question or otherwise explains how these provisions operate.

Finally and more generally, although D.C. law may not be so sparse for certain claims, the NRA's historically close relationship with the Foundation gives all its claims a novel tinge. For instance, does the NRA's alleged fundraising for the Foundation count as providing the Foundation with "valuable services" sufficient to support a breach-of-implied-contract claim—even though the ultimate destination of the funds was the NRA's charitable activities? *See Boyd*, 164 A.3d at 81 (quoting *Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins. Co.*, 870 A.2d 58, 81 (D.C. 2005)); Opp'n 26; Reply 20–21. Or for the NRA's unjust enrichment claim, did the Foundation's alleged assertion of independence cause it to unjustly retain benefits conferred by the NRA, including its mere incorporation? *See* Mot. 36; Opp'n 29. The D.C. courts are in a far better position than this Court to determine how D.C. law should apply to a relationship like the one between the NRA and the Foundation. *See Manyan v. District of Columbia*, No. 23-cv-3192, 2025

21

WL 2759036, at *5 (D.D.C. Sep. 26, 2025) ("[T]he 'interest' in 'having state courts decide issues of developing state law' is 'crucial.'" (quoting *Vigilant Ins. Co. v. EEMAX, Inc.*, 362 F. Supp. 2d 219, 224 (D.D.C. 2005))).

*    *    *

For the reasons above, the Court concludes that it is appropriate to exercise supplemental jurisdiction over the NRA's common-law trademark infringement claim. The same is not true for the NRA's other D.C.-law claims. Even assuming that it could exercise jurisdiction over those claims, the Court declines to do so here. *Cf. APR Energy, LLC v. Am. Power Holdings, LLC*, No. 24-cv-80173, 2025 WL 3541840, at *8–9 & n.3 (S.D. Fla. Nov. 12, 2025) (concluding that a state-law trademark infringement claim shared a common nucleus of operative fact with federal-law trademark claims, whereas state-law claims for breach of fiduciary duty and unjust enrichment did not), *report and recommendation adopted*, 2025 WL 3905156 (S.D. Fla. Dec. 1, 2025).[7]

This result is consistent with interests in "judicial economy, convenience, fairness, and comity." *Floyd*, 216 F. Supp. 3d at 68 (quoting *Shekoyan*, 409 F.3d at 424). Respect for "the D.C. judicial system . . . points toward permitting it" to answer novel questions of D.C. law. *Manyan*, 2025 WL 2759036, at *5. And "[a]lthough the parties have briefed [a] motion[] to dismiss, neither they nor the Court has expended the significant kind of resources in discovery or for trial that might create countervailing fairness or judicial-economy concerns." *Id.* Further, there is a low risk of duplicative or inconsistent factual determinations resulting from separate proceedings in D.C. court. Although the NRA's claims all arise out of the Parties' recent dispute, the elements needed to prove the trademark claims are different than those needed to prove the non-trademark D.C.-law

---

[7] The Court appreciates the NRA's candor in conceding that declining jurisdiction over these D.C.-law claims is within the Court's discretion. Pls.' Suppl. Mem. 10–11.

22

claims. And as the Parties have approached the trademark claims thus far, litigating those claims will not entail examining the parts of the Parties' relationship that the D.C.-law claims implicate.

The Parties argue that litigating the D.C.-law claims in D.C. court would impose judicial- and party-economy costs. Pls.' Suppl. Mem. 2; Def.'s Suppl. Mem. 9. To be sure, the Court recognizes that a separate suit between these same Parties would come with additional costs. But that cost is outweighed by the systemic and case-specific benefits of keeping this action properly focused on the NRA's federal claims. Accordingly, the Court will dismiss the NRA's non-trademark D.C.-law claims (Counts VI through XII) under Federal Rule of Civil Procedure 12(b)(1) without prejudice.

### B.       Trademark Claims

What remains to be resolved, then, is the Foundation's motion to dismiss the NRA's trademark claims under Rule 12(b)(6). As mentioned above, there are five such claims: trademark infringement, false designation and unfair competition, and trademark dilution under the Lanham Act; cybersquatting under the Anti-Cybersquatting Consumer Protection Act; and common-law trademark infringement. Am. Compl. ¶¶ 135–78. Those claims have overlapping but not identical elements. The Court first describes the elements necessary to establish each of these claims and then turns to the Foundation's argument that it has permission to use the NRA's trademarks.

#### 1.       Elements

The Lanham Act "prohibits the unauthorized 'use in commerce [of] any reproduction . . . of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services' when 'such use is likely to cause confusion.'" *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 416 (2023) (alterations in original) (quoting 15 U.S.C. § 1114(1)(a)). It similarly prohibits "the 'us[e] in commerce' of a protected mark, whether

registered or not, that 'is likely to cause confusion.'" *Id.* (alteration in original) (quoting 15 U.S.C. § 1125(a)(1)).

The NRA identifies 15 U.S.C. § 1114 as the basis for its trademark infringement claim. Am. Compl. at 31. That provision "requires that the asserted marks be registered." *Paleteria la Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.*, 69 F. Supp. 3d 175, 197 (D.D.C. 2014). To prove infringement, the "inquiry boils down to two questions: (1) does [the plaintiff] own a valid mark entitled to protection and (2) is [the defendant's] use of it likely to cause confusion." *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 896 F.3d 437, 456 (D.C. Cir. 2018) (cleaned up).

The false designation and unfair competition claim is based on 15 U.S.C. § 1125(a). Am. Compl. at 32. Although claims brought under that provision may appear to encompass "many different grievances—*i.e.*, trademark infringement, false designation of origin, passing off, and unfair competition—courts have announced that the elements for each of the aforementioned causes-of-action mirror those for a claim of trademark infringement." *Paleteria la Michoacana*, 69 F. Supp. 3d at 212 (quoting *Globalaw Ltd. v. Carmon & Carmon L. Off.*, 452 F. Supp. 2d 1, 26 (D.D.C. 2006)). "[A] party must show that (1) it owns a valid trademark, (2) its trademark is distinctive or has acquired a secondary meaning, and (3) there is a substantial likelihood of confusion between the party's mark and the alleged infringer's mark." *Id.* at 201. The NRA's common-law trademark infringement claim is "evaluated under the same standard." *Id.* at 219; *see also Ward One Democrats*, 898 A.2d at 361.

Next up is the claim for trademark dilution under 15 U.S.C. § 1125(c). To establish a trademark dilution claim, "a party must show that (1) the mark is famous; (2) the defendant is making a commercial use of the mark in commerce; (3) the defendant's use began after the mark

24

became famous; and (4) the defendant's use of the mark dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish goods and services." *Paleteria la Michoacana*, 69 F. Supp. 3d at 219–20.

Finally, to prevail on a cybersquatting claim under the Anti-Cybersquatting Consumer Protection Act, a plaintiff "must demonstrate that: (1) its trademark is a distinctive or famous mark entitled to protection; (2) [the defendant's] domain name is identical or confusingly similar to the [p]laintiff's mark; and (3) [the defendant] 'register[ed], traffic[s] in, or use[s]' a domain name with the bad faith intent to profit from it." *Verizon Trademark Servs. LLC v. Verizon Trademark Servs. LLC*, No. 23-cv-2750, 2024 WL 50970, at \*2 (D.D.C. Jan. 4, 2026) (quoting *Hanley-Wood LLC v. Hanley Wood LLC*, 783 F. Supp. 2d 147, 152 (D.D.C. 2011)); *see* 15 U.S.C. § 1125(d).

### 2.      Consent

In support of dismissal, the Foundation does not argue that the NRA has failed to sufficiently plead any of the elements identified above. Instead, the Foundation argues that the Amended Complaint should be dismissed because it has the NRA's permission to use the NRA's trademarks. Mot. 39–41; *see* 15 U.S.C. § 1114(1)(a) (forbidding the use of a confusingly similar mark "without the consent of the registrant"). The NRA appears not to dispute that it had previously consented to the Foundation's use of its marks. *See* Opp'n 6; Am. Compl. ¶ 40 ("[T]he NRA consented to the use of 'NRA' in the Foundation's name because the Foundation 'is a subsidiary of the NRA.'"). It contends only that it "has, in fact, revoked any consent for the Foundation to use its marks." Opp'n 6. Although the NRA does not specify when exactly that happened, the Amended Complaint states that the January 2026 cease-and-desist letter "confirmed revocation of any previous license, consent, permission or other authorization, whether express or implied, for the Foundation to use the NRA's trademarks." Am. Compl. ¶ 129.

The Court concludes that the Amended Complaint plausibly alleges that the NRA has revoked any authorization it had granted the Foundation. The cease-and-desist letter, which is attached to the Amended Complaint, "demands that the Foundation cease and desist all use of the NRA Marks (and any marks confusingly similar thereto) immediately," including "in the Foundation's trade name, social media platforms, and any other advertising and promotional materials." Am. Compl. Ex. H at 2 (emphasis omitted). This letter, interpreted in the light most favorable to the NRA, certainly suffices to allege that the NRA revoked any consent it previously afforded the Foundation. *See, e.g.*, *GoDigital Media Grp., LLC v. GoDigital, Inc.*, No. 17-cv-7796, 2019 WL 1976452, at *1, *6–7 (C.D. Cal. Mar. 13, 2019) (concluding that a cease-and-desist letter was sufficient at summary judgment to support that a trademark holder had revoked its consent).[8]

The Foundation's argument to the contrary is not persuasive. It contends that its permission to use "THE NRA FOUNDATION" as a trademark for charitable fundraising services is perpetual and irrevocable. Mot. 41. Its argument works like this. The NRA controlled the establishment of the Foundation, including the creation of its Articles of Incorporation. Am. Compl. ¶ 34. The Articles provide that the name of the corporation shall be "The NRA Foundation, Inc." Mot. Ex. 1 at 1, ECF No. 20-2.[9] And the Articles also state that "[t]he duration of the Foundation shall be

---

[8] The Amended Complaint states that the cease-and-desist letter "confirmed revocation," implying that the NRA revoked its consent at some earlier but unspecified point. Am. Compl. ¶ 129. Although the precise point at which the NRA believes it revoked its consent will become relevant later in the case, for now it suffices that the Amended Complaint alleges that the Foundation "continued to use the NRA's valuable trademarks without permission" after it received the cease-and-desist letter. Am. Compl. ¶¶ 130–31; *see All Star Championship Racing, Inc. v. O'Reilly Auto. Stores, Inc.*, 940 F. Supp. 2d 850, 864 (C.D. Ill. 2013) ("While the license is valid, a licensor's use of the mark is not, without more, infringement; it is only when the licensee no longer has consent that the continued use constitutes infringement.").

[9] The Foundation attached the Articles of Incorporation, as well as other documents, to its Motion to Dismiss. It argues that the Court may consider them in this posture because they are "incorporated into or integral to the Complaint" or otherwise "subject to judicial notice." Mot. 6

perpetual." *Id.* According to the Foundation, "the only plausible inference is that the NRA provided irrevocable consent to the Foundation to use the name 'The NRA Foundation, Inc.' . . . in its name and for fundraising purposes at all times since the Foundation's founding in 1990." Mot. 41 (emphasis omitted).

That argument has several problems. As a threshold matter, the Foundation is imprecise about the doctrinal basis for the purported irrevocability of the NRA's consent. An express or implied license seems to be the most natural fit, but the Foundation also distinguishes cases involving licenses and cites a case discussing the doctrine of acquiescence. Mot. 41; Reply 24–25.

If the Foundation meant to argue that it enjoys an irrevocable license to use certain of the NRA's trademarks, that argument fails. It is doubtful that there is such a thing as an irrevocable trademark license. After all,

> [t]here can be no such thing as an "irrevocable" trademark license enforced by state contract law. The federal Lanham Act imposes on the trademark licensor the obligation to control quality. The ability to terminate the license because of the licensee's failure to maintain quality is required to enforce that federally imposed obligation.

2 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 18:43 (5th ed. Mar. 2026 Update); *see, e.g.*, *GCCA, LLC v. MACCG, LLC*, No. 21-cv-5022, 2024 WL 837883, at *17 (S.D.N.Y. Feb. 28, 2024) ("Assuming, as the circumstances suggest, that the parties reached an oral agreement to license use of the marks for the East Village restaurant for an indefinite period, such an agreement cannot be irrevocable; by law it is terminable at-will by the licensor."); *Chi. Mercantile Exch. Inc. v. Ice Clear US, Inc.*, No. 18-cv-1376, 2021 WL 3630091, at *13 (N.D. Ill. Aug. 17, 2021) ("Courts are in agreement that a trademark license is terminable at will by the

---

n.2. The NRA did not dispute that the Court may consider these documents, and in fact itself relied on them in its Opposition. *See* Opp'n 10. Given the Parties' agreement, the Court relies on these documents as well.

trademark owner, even where it is an express license (unless the license is for a particular term) and certainly when the license is only implied."); *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 847 F. Supp. 18, 19 n.1 (E.D.N.Y. 1994) ("An agreement conferring a license to use a trademark for an indefinite time, whether oral, written or by implication, is terminable-at-will by the licensor.").

At this point, however, the Court need not go that far—especially given that the NRA has not raised this argument. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) ("In our adversarial system of adjudication, we follow the principle of party presentation."). It suffices that the Foundation is wrong that "the only plausible inference" that can be drawn from the Articles of Incorporation "is that the NRA provided irrevocable consent to the Foundation to use the name 'The NRA Foundation, Inc.'" *Contra* Mot.41 (emphasis omitted). The Foundation relies heavily on the NRA having caused the creation of a corporation named "The NRA Foundation, Inc.," with a "duration" that "shall be perpetual." Mot. Ex. 1 at 1; Mot. 39; Reply 24. Yet the words of the Articles of Incorporation do not, on their face, purport to confer a trademark license. And even assuming that the inclusion of those clauses in the Articles of Incorporation conferred a license on the Foundation, it does not necessarily follow that the license is irrevocable. *See* 3 Roger M. Milgrim & Eric E. Bensen, Milgrim on Licensing § 27.05A (Matthew Bender, Rev. Ed. 2026) ("The term 'perpetual' is commonly employed to express the duration of a license grant. . . . 'Perpetual' differs from 'irrevocable' because 'perpetual[]' . . . merely means that the license cannot be revoked at will while 'irrevocable' means that it cannot be unilaterally revoked for *any* reason[.]" (footnotes omitted)). Granting the NRA "the benefit of all inferences that can be derived from the facts alleged," the Foundation's Articles of Incorporation do not compel the conclusion

28

that the NRA gave the Foundation an irrevocable trademark license. *Hettinga*, 677 F.3d at 476 (quoting *Schuler*, 617 F.2d at 608).[10]

The Foundation's irrevocable-consent argument is no more successful if it is instead framed as invoking the doctrine of acquiescence. Acquiescence is a defense to trademark infringement. *See* 15 U.S.C. § 1069 ("In all inter partes proceedings[,] equitable principles of laches, estoppel, and acquiescence, where applicable[,] may be considered and applied."). "In the trademark sense, acquiescence means there is some sort of implied consent to a certain action." *Paleteria la Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.*, 79 F. Supp. 3d 60, 78–79 (D.D.C. 2015) (quoting *Marinangeli v. Lehman*, 32 F. Supp. 2d 1, 10 (D.D.C. 1998)). "The acquiescence defense has three elements: (1) the alleged senior user actively represented that it would not assert a right or claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice." *Id.* at 79. It is closely related to the doctrine of laches, the difference being that "laches denotes passive consent and acquiescence denotes active consent." *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1207 (11th Cir. 2008) (quoting *Coach House Rest., Inc. v. Coach & Six Rests., Inc.*, 934 F.2d 1551, 1558 (11th Cir. 1991)); *accord Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 940–41 (7th Cir. 2016).

Here, in addition to its Articles of Incorporation, the Foundation might be relying on the NRA Secretary's 1990 statement—made contemporaneously with the Foundation's incorporation—that the NRA "consented to the use of 'NRA' in the Foundation's name because

---

[10] For its part, the NRA contends that "its consent for the Foundation to use the NRA's marks 'was implicitly contingent upon the Foundation's ongoing relation to the NRA as established in the Foundation's governing documents.'" Opp'n 10 (quoting Am. Compl. ¶ 41). That may be true. But more generally, the decisive point is that the documents that this Court can consider in this Rule 12(b)(6) posture plausibly support that the NRA could revoke its consent regardless.

the Foundation 'is a subsidiary of the NRA.'" Am. Compl. ¶ 40. But even if this were sufficient to establish the first element of an acquiescence defense, the Court cannot say that the record "unambiguously establish[es]" the other two elements. *Hyson USA*, 821 F.3d at 941. That is not surprising, given that "an equitable defense like acquiescence is not ordinarily susceptible to resolution at the pleading stage." *Id.* Because that defense "hinges in large part on the relevant facts and circumstances," it does not provide a basis to grant the Foundation's Motion. *EMSL Analytical, Inc. v. Env't Motoring Sys., Inc.*, No. 07-cv-4018, 2008 WL 11515856, at *2 (E.D. Pa. Mar. 3, 2008).[11]

*   *   *

It is unusual for an organization to bring a trademark infringement claim against an affiliate it created. Discovery may well illuminate the scope of the NRA's grant of consent or reveal a basis for the Foundation to assert equitable defenses. Once that record is developed, the Court may be called to determine how the law applies in these unusual circumstances. But at this stage, the

---

[11] The Foundation also appears to object that it cannot be forbidden from using its legal name, suggesting that would be tantamount to revoking the Articles of Incorporation and dissolving the Foundation. *See* Mot. 41–42. But the Foundation cites nothing supporting that an otherwise infringing use of a trademark is excused simply because the trademark constitutes the infringer's legal name. And this argument is now somewhat stale given the Foundation's reported recent name change. *See* ECF No. 28.

The Foundation further cites *NAACP v. N.A.A.C.P. Legal Defense & Educational Fund*, 753 F.2d 131 (D.C. Cir. 1985). Reply 25. In that case, the D.C. Circuit reviewed cases addressing "a non-profit parent organization's right to revoke use of its name when an affiliate dissociates itself from the parent." *NAACP*, 753 F.2d at 140. The Circuit explained that the cases "do not establish that an affiliate's right to use the parent's name ceases anytime the parent chooses. Rather, they establish that the affiliate's right expires *when the affiliation ceases*." *Id.* Accordingly, the parent organization "must assert its exclusive claim to the trademark when disaffiliation occurs." *Id.* In *NAACP*, the Circuit concluded that the parent organization had waited too long to assert its trademark rights and that laches therefore barred its claim. *Id.* at 138–41. Here, for the reasons above, the Foundation has not established any equitable defense adequate to require dismissal.

dispute is quite simple: the Foundation previously had permission to use the NRA's marks, and now it allegedly does not. That is enough to reject the Foundation's arguments for dismissal.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the Foundation's Motion to Dismiss, ECF No. 20. The Court dismisses Counts VI through XII of the Amended Complaint under Federal Rule of Civil Procedure 12(b)(1) without prejudice. All other claims survive dismissal.

A separate order will issue.

_____
SPARKLE L. SOOKNANAN
United States District Judge

Date:   June 24, 2026

31