**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL RIFLE ASSOCIATION OF AMERICA, INC.,

*Plaintiff*,

v.

THE NRA FOUNDATION, INC., *initially sued as* NRA FOUNDATION, INC., *now known as* THE 1791 FOUNDATION, INC.

*Defendant*.

**JURY DEMANDED**

Civil Action No. 1:26-cv-00015 (SLS)

**DEFENDANT'S ANSWER AND COUNTERCLAIMS**

Defendant The 1791 Foundation, Inc., formerly known as "The NRA Foundation, Inc." ("Foundation"), by and through undersigned counsel, hereby answers and responds to the Amended Complaint filed by Plaintiff the National Rifle Association of America, Inc. ("NRA") (ECF 19) and asserts counterclaims against the NRA as follows[1]:

**ANSWER**

The Foundation is an independent charitable organization incorporated under the laws of the District of Columbia and tax-exempt under 26 U.S.C. § 501(c)(3). Since its founding in 1990, the Foundation has faithfully pursued its charitable, educational, and scientific mission of promoting safe and responsible firearms ownership, firearm safety education, hunting and shooting sports, and supporting community programs aligned with Second Amendment values. Far from

[1] The Court's June 24, 2026 Order dismissed Counts VI–XII—the counts in which individual Plaintiffs William Bachenberg and Douglas Hamlin purported to assert claims—under Rule 12(b)(1), without prejudice. ECF 30.

The Foundation does not concede that either individual has standing to pursue any remaining claims. To the extent Messrs. Bachenberg or Hamlin are deemed to remain Plaintiffs, this Answer applies with equal force to them.

the NRA's characterization of a rogue organization "seized" by a disgruntled faction, the Foundation has operated, and will continue to operate, as an independent charity that is committed to safeguarding hundreds of millions of dollars entrusted to it by donors and to ensuring those funds are used in accordance with the law and the Foundation's charitable mission.

The NRA's true motive behind this lawsuit is financial, not legal. The NRA has experienced net losses over the past two years and has been forced to liquidate more than $40 million of its investment portfolio to reduce debt and fund operations. The Foundation's cash, on the other hand, represents nearly 70% of the cash reported on the NRA's consolidated financial statement, and the Foundation's net assets account for nearly 70% of the NRA's consolidated net assets. The parties' disagreement stems from the NRA's efforts to exploit Foundation funds to shore up its balance sheet.

In 2025, the NRA demanded that the Foundation pay the NRA 20% of its gross revenue as a "royalty" to use the "NRA" trademark notwithstanding the NRA's own admission that the fee had no basis in fair market value, as required by applicable charitable laws. When the Foundation refused, the NRA retaliated by bringing frivolous claims, including for trademark infringement. As the NRA well knows (but failed to disclose), the NRA long ago consented to use of the Foundation's former name ("The NRA Foundation") in its perpetual corporate charter. The NRA also knows (but failed to disclose) that at all times relevant to this lawsuit, the Foundation has also lawfully used the "NRA" acronym pursuant to a written trademark license (the "Trademark License") executed in 1998 (appended hereto as Exhibit 1) which the NRA never terminated prior to filing suit. In other words, the Trademark License endures and remains in force and effect. As such, the NRA's remaining trademark-related claims before this Court are frivolous and have no basis in law or fact.

The Foundation therefore denies each and every allegation in the Amended Complaint except as otherwise expressly admitted herein. The Foundation's denial includes, without limitation, any allegations contained in the Amended Complaint's prayer for relief, headings, subheadings, and exhibits. To the extent the Foundation lacks sufficient knowledge or information to form a belief regarding the truth of an allegation, that allegation is deemed to be denied in accordance with Federal Rule of Civil Procedure 8(b)(5). This Answer is based on the Foundation's investigation to date, and the Foundation expressly reserves the right to further amend its Answer to the extent permitted under applicable law. The Foundation further states that by filing this Answer, the Foundation does not waive, and hereby expressly preserves, all defenses.

Subject to and expressly incorporating these reservations of rights and specifically responding to the allegations contained in the Amended Complaint, and subject to and without waiving the other defenses stated herein, the Foundation states as follows:

## NATURE OF ACTION

1. The Foundation admits that it was formed in 1990, and one of its six stated purposes is to support the NRA's activities but only to the extent that such activities are in furtherance of charitable, educational, and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code. The remaining allegations in paragraph 1 of the Amended Complaint purport to describe the action and state conclusions of law to which no response is required. To the extent a response is required, the Foundation denies the allegations in paragraph 1.

2. The allegations contained in paragraph 2 of the Amended Complaint purport to describe the action and state conclusions of law to which no response is required. To the extent a response is required, the Foundation denies that its use of the NRA's trademarks is unlawful, given that the NRA consented to the use of the marks in a perpetual corporate charter and also expressly

through the Trademark License to the Foundation for, *inter alia*, the "NRA" trademark. Ex. 1. But for the avoidance of doubt, the Foundation amended its Articles of Incorporation on May 29, 2026, to change the Foundation's name to "The 1791 Foundation, Inc." Ex. 2, Articles of Amendment. The Foundation denies the remaining allegations in paragraph 2.

3. The allegations contained in paragraph 3 of the Amended Complaint purport to describe the action and state conclusions of law to which no response is required. To the extent a response is required, the Foundation denies the allegations in paragraph 3.

4. The allegations contained in paragraph 4 of the Amended Complaint purport to describe the action and state conclusions of law to which no response is required. To the extent a response is required, the Foundation denies that the NRA is entitled to any such relief and denies the remaining allegations in paragraph 4.

## **JURISDICTION AND VENUE**

5. Admitted except to the extent that paragraph 5 asserts allegations as to Counts VI–XII, which have been dismissed.

6. The Foundation admits that it is incorporated in the District of Columbia. The remaining allegations in paragraph 6 are conclusions of law to which no response is required. To the extent a response is required, the Foundation denies the remaining allegations.

7. The Foundation admits it is incorporated in the District of Columbia. The remaining allegations in paragraph 7 are conclusions of law to which no response is required. To the extent a response is required, the Foundation denies the remaining allegations.

## **THE PARTIES**

8. Admitted.

9. The Foundation admits that William Bachenberg is the NRA President and that he was elected to that position by the NRA's Board of Directors at the NRA's 2025 Annual Meeting in April 2025. The Foundation denies the remaining allegations in paragraph 9.

10. The Foundation admits that Douglas Hamlin is the NRA Executive Vice President and was elected to that position by the NRA's Board of Directors at the NRA's 2024 Annual Meeting in May 2024. The Foundation denies the remaining allegations in paragraph 10.

11. Admitted.

## FACTUAL BACKGROUND

12. The allegations in paragraph 12 are not directed to the Foundation and therefore require no response. To the extent a response is required, the Foundation denies that paragraph 12 accurately characterizes the NRA or its affiliates.

13. The allegations in paragraph 13 are not directed to the Foundation and therefore require no response. To the extent a response is required, the Foundation denies that paragraph 13 accurately characterizes the NRA or its programs.

14. The allegations in paragraph 14 are not directed to the Foundation and therefore require no response. To the extent a response is required, the Foundation denies that paragraph 14 accurately characterizes the NRA or its programs.

15. The allegations in paragraph 15 are not directed to the Foundation and therefore require no response. To the extent a response is required, the Foundation denies that paragraph 15 accurately characterizes the NRA or its programs.

16. Admitted.

17. Paragraph 17 purports to reference and incorporate images from the NRA's website, which speaks for itself. The remaining allegations in paragraph 17 are not directed to the

Foundation and therefore require no response. To the extent a response is required, the Foundation denies that the remaining allegations in paragraph 17 accurately characterize the NRA or its offerings.

18. The allegations in paragraph 18 are not directed to the Foundation and therefore require no response. To the extent a response is required, the Foundation denies that paragraph 18 accurately characterizes the NRA or its programs.

19. The allegations in paragraph 19 are not directed to the Foundation and therefore require no response. To the extent a response is required, the Foundation denies that paragraph 19 accurately characterizes the NRA or its programs.

20. The Foundation lacks sufficient knowledge or information to form a belief as to the allegations in paragraph 20 and therefore denies those allegations.

21. The Foundation lacks sufficient knowledge or information to form a belief as to the allegations in paragraph 21 and therefore denies those allegations.

22. Paragraph 22 incorporates by reference Exhibit A to the Amended Complaint, which is a writing that speaks for itself, to which no response is required. Any attempts to characterize Exhibit A or selectively quote it out of context are denied. Paragraph 22 also contains conclusions of law to which no response is required. To the extent a response is required, the Foundation denies those allegations. The Foundation lacks sufficient knowledge or information to form a belief as to the remaining allegations in paragraph 22 and therefore denies those allegations.

23. Paragraph 23 incorporates by reference Exhibit B to the Amended Complaint, which is a writing that speaks for itself, to which no response is required. Any attempts to characterize Exhibit B or selectively quote it out of context are denied. Paragraph 23 also contains conclusions of law to which no response is required. To the extent a response is required, the

Foundation denies those allegations. The Foundation lacks sufficient knowledge or information to form a belief as to the remaining allegations in paragraph 23 and therefore denies those allegations.

24. Paragraph 24 incorporates by reference Exhibit C to the Amended Complaint, which is a writing that speaks for itself, to which no response is required. Any attempts to characterize Exhibit C or selectively quote it out of context are denied. Paragraph 24 also contains conclusions of law to which no response is required. To the extent a response is required, the Foundation denies those allegations. The Foundation lacks sufficient knowledge or information to form a belief as to the remaining allegations in paragraph 24 and therefore denies those allegations.

25. Paragraph 25 incorporates by reference Exhibit D to the Amended Complaint, which is a writing that speaks for itself, to which no response is required. Any attempts to characterize Exhibit D or selectively quote it out of context are denied. Paragraph 25 also contains conclusions of law to which no response is required. To the extent a response is required, the Foundation denies those allegations. The Foundation lacks sufficient knowledge or information to form a belief as to the remaining allegations in paragraph 25 and therefore denies those allegations.

26. Paragraph 26 incorporates by reference Exhibit E to the Amended Complaint, which is a writing that speaks for itself, to which no response is required. Any attempts to characterize Exhibit E or selectively quote it out of context are denied. Paragraph 26 also contains conclusions of law to which no response is required. To the extent a response is required, the Foundation denies those allegations. The Foundation lacks sufficient knowledge or information to form a belief as to the remaining allegations in paragraph 26 and therefore denies those allegations.

27. Paragraph 27 incorporates by reference Exhibit F to the Amended Complaint, which is a writing that speaks for itself, to which no response is required. Any attempts to characterize Exhibit F or selectively quote it out of context are denied. Paragraph 27 also contains

conclusions of law to which no response is required. To the extent a response is required, the Foundation denies those allegations. The Foundation lacks sufficient knowledge or information to form a belief as to the remaining allegations in paragraph 27 and therefore denies those allegations.

28. Paragraph 28 incorporates by reference Exhibit G to the Amended Complaint, which is a writing that speaks for itself, to which no response is required. Any attempts to characterize Exhibit G or selectively quote it out of context are denied. Paragraph 28 also contains conclusions of law to which no response is required. To the extent a response is required, the Foundation denies those allegations. The Foundation lacks sufficient knowledge or information to form a belief as to the remaining allegations in paragraph 28 and therefore denies those allegations.

29. The Foundation admits that it was established in 1990. The Foundation denies the remaining allegations in paragraph 29.

30. The Foundation admits that the NRA is a 501(c)(4) organization and that some of its activities are in furtherance of charitable, educational, and scientific purposes. The remaining allegations in paragraph 30 are conclusions of law to which no response is required. To the extent the allegation speaks to the NRA's motives, the Foundation lacks sufficient knowledge or information to form a belief as to that allegation and therefore denies the allegation. The Foundation denies the remaining allegations in paragraph 30.

31. The Foundation admits that the NRA operates charitable programs, including the "Eddie Eagle GunSafe" program. The Foundation denies that the remaining allegations accurately characterize the NRA or the "NRA Charitable Activities" and therefore denies them.

32. The Foundation admits that any NRA charitable program funded by the Foundation is open to the public. The Foundation lacks sufficient knowledge or information to form a belief as to the remaining allegations in paragraph 32 and therefore denies those allegations.

33. The Foundation admits that it contractually requires the NRA not to use any funds granted by the Foundation for non-qualifying activities, such as lobbying or political activities. The Foundation further requires the NRA to provide post-grant reports demonstrating that any funds granted by the Foundation were only used for qualifying activities. The Foundation lacks sufficient knowledge or information to form a belief as to the remaining allegations in paragraph 33 and therefore denies those allegations.

34. Paragraph 34 is too vague to be reasonably construed and is therefore denied.

35. Paragraph 35 is too vague to be reasonably construed and is therefore denied.

36. Paragraph 36 is too vague to be reasonably construed and is therefore denied.

37. The Foundation admits that three attorneys at Cadwalader, Wickersham & Taft ("Cadwalader") incorporated the Foundation. The Foundation lacks sufficient knowledge or information to form a belief as to the remaining allegations in paragraph 37 and therefore denies those allegations.

38. The Foundation admits that three attorneys at Cadwalader incorporated the Foundation on or around August 3, 1990. The remaining allegations in paragraph 38 are conclusions of law to which no response is required. To the extent a response is required, the Foundation denies those allegations.

39. The Foundation admits that three attorneys at Cadwalader incorporated the Foundation on or around August 3, 1990.

40. Paragraph 40 references the Foundation's corporate charter, which is a writing that speaks for itself, to which no response is required. Any attempts to characterize the document or selectively quote it out of context are denied. The Foundation denies the remaining allegations in paragraph 40.

41. Denied. The NRA gave its consent in the Foundation's perpetual corporate charter, making its consent unconditional and irrevocable.

42. The Foundation admits that James W. Carlson was a Foundation Trustee and President, who signed the Foundation's Form 1023. The remaining allegations in paragraph 42 are not directed to the Foundation and therefore require no response. To the extent a response is required, the Foundation lacks sufficient knowledge or information to form a belief as to the remaining allegations in paragraph 42 and therefore denies those allegations.

43. The Foundation admits that Joe Foss was the Foundation's first Vice President. The remaining allegations in paragraph 43 are not directed to the Foundation and therefore require no response. To the extent a response is required, the Foundation lacks sufficient knowledge or information to form a belief as to the remaining allegations in paragraph 43 and therefore denies those allegations.

44. The Foundation admits that the original Treasurer of the Foundation was J. Warren Cassidy. The remaining allegations in paragraph 44 are not directed to the Foundation and therefore require no response. To the extent a response is required, the Foundation lacks sufficient knowledge or information to form a belief as to the remaining allegations in paragraph 44 and therefore denies those allegations.

45. Paragraph 45 purports to describe the Foundation's Form 1023, which is a writing that speaks for itself, to which no response is required. Any attempts to characterize the document or selectively quote it out of context are denied. The remaining allegations in paragraph 45 are legal conclusions to which no response is required. To the extent a response is required, the Foundation denies those allegations.

46. Denied.

47. Paragraph 47 quotes from the Foundation's Articles of Incorporation, which is a writing that speaks for itself, to which no response is required. Any attempts to characterize the document or selectively quote it out of context are denied. To the extent a response is required, the Foundation denies the allegations in paragraph 47.

48. Paragraph 48 quotes from the 1990 version of the Foundation's Bylaws and a "subsequent amendment" to those Bylaws, which are writings that speak for themselves, to which no response is required. Any attempts to characterize the documents or selectively quote them out of context are denied. To the extent a response is required, the Foundation denies the allegations in paragraph 48.

49. Paragraph 49 quotes from the Foundation's Articles of Incorporation, which is a writing that speaks for itself, to which no response is required. Any attempts to characterize the document or selectively quote it out of context are denied. To the extent a response is required, the Foundation denies the allegations in paragraph 49.

50. The Foundation admits that the NRA and the Foundation operated under a shared services agreement whereby NRA employees provided services to the Foundation, and the Foundation reimbursed the NRA for the fair market value of those employees' salaries prorated by the amount of time each employee spent on Foundation work. The Foundation denies the remaining allegations in paragraph 50.

51. Denied.

52. The Foundation reimbursed the NRA for resources and employees dedicated to the Friends of NRA program pursuant to the shared services agreement. The Foundation denies the remaining allegations in paragraph 52.

53. Admitted.

54. The Foundation admits that it reimbursed the NRA for resources and employees dedicated to the Friends of NRA program pursuant to the shared services agreement. The Foundation denies the remaining allegations in paragraph 54.

55. The Foundation admits that the Friends of NRA program has raised approximately $1.2 billion in gross revenue since its inception. The Foundation denies the remaining allegations in paragraph 55.

56. Denied.

57. Denied.

58. To the extent the NRA purports to divine donors' intent over the Foundation's more than three decades of fundraising, the Foundation lacks sufficient knowledge or information to form a belief as to the allegations and therefore denies those allegations. The Foundation denies the remaining allegations in paragraph 58.

59. To the extent the NRA purports to divine donors' intent over the Foundation's more than three decades of fundraising, the Foundation lacks sufficient knowledge or information to form a belief as to the allegations and therefore denies those allegations. The Foundation denies the remaining allegations in paragraph 59.

60. Denied.

61. To the extent the NRA purports to divine donors' intent over the Foundation's more than three decades of fundraising, the Foundation lacks sufficient knowledge or information to form a belief as to the allegations and therefore denies those allegations. The Foundation denies the remaining allegations in paragraph 61.

62. Paragraph 62 quotes from the Foundation's 2024 annual report, which is a writing that speaks for itself, to which no response is required. Any attempts to characterize the document

or selectively quote it out of context are denied. To the extent a response is required, the Foundation denies the allegations in paragraph 62.

63. Paragraph 63 quotes from the Foundation's 2024 annual report, which is a writing that speaks for itself, to which no response is required. Any attempts to characterize the document or selectively quote it out of context are denied. To the extent a response is required, the Foundation denies the allegations in paragraph 63.

64. The allegations in paragraph 64 state conclusions of law to which no response is required. To the extent a response is required, the Foundation denies the allegations in paragraph 64.

65. To the extent the NRA purports to divine donors' intent over the Foundation's more than three decades of fundraising, the Foundation lacks sufficient knowledge or information to form a belief as to the allegations and therefore denies those allegations. The Foundation denies the remaining allegations in paragraph 65.

66. Denied.

67. Denied.

68. Paragraph 68 references the civil action, *People of the State of New York v. National Rifle Association of America, Inc., et al.*, Case No. 0451625/2020 (N.Y. Sup. Ct. 2020) ("NY AG Action"). The documents in that case are writings that speak for themselves, to which no response is required. Any attempts to characterize the NY AG Action or selectively quote from case documents out of context are denied. To the extent further response is required, the Foundation denies the remaining allegations in paragraph 68.

69. The Foundation admits that Charles Cotton serves on its Board of Trustees. The Foundation admits that David Coy serves as the Foundation's Treasurer but denies that he is

currently on its Board of Trustees. The remaining allegations in paragraph 69 reference the NY AG Action. The documents in the NY AG Action are writings that speak for themselves, to which no response is required. Any attempts to characterize the NY AG Action or selectively quote from case documents out of context are denied. To the extent further response is required, the Foundation denies the remaining allegations in paragraph 69.

70. The Foundation admits that Bob Barr and Charles Cotton are Foundation Trustees. The Foundation admits that Charles Cotton also served three terms as NRA President. The Foundation lacks sufficient knowledge or information to form a belief as to the remaining allegations in paragraph 70 and therefore denies those allegations.

71. The Foundation lacks sufficient knowledge or information to form a belief as to what "caused a backlash among NRA members and supporters" and therefore denies those allegations. The Foundation denies the remaining allegations in paragraph 71.

72. The Foundation admits that the District of Columbia Attorney General's office brought an investigation and complaint against the Foundation and the NRA, *District of Columbia v. NRA Foundation, Inc., et al.*, Case No. 2020 CA 003454 B (D.C. Super. Ct. 2020) ("DC AG Action"). The documents in that case are writings that speak for themselves, to which no response is required. Any attempts to characterize that action or selectively quote from case documents out of context are denied. To the extent further response is required, the Foundation denies the remaining allegations in paragraph 72.

73. The Foundation admits that the Foundation and the NRA defended the DC AG Action. The case filings in that action speak for themselves. Any attempts to characterize that action or selectively quote from case documents out of context are denied. To the extent further response is required, the Foundation denies the remaining allegations in paragraph 73.

74. The Foundation admits that the DC AG Action concluded on or about April 16, 2024, when the Foundation, the NRA, and the DC AG entered into the Consent Judgment. The remaining allegations in paragraph 74 purport to describe provisions of the Consent Judgment, which is a writing that speaks for itself, to which no response is required. Any attempts to characterize the DC AG Action or selectively quote from the Consent Judgment out of context are denied. To the extent further response is required, the Foundation denies the remaining allegations in paragraph 74.

75. Paragraph 75 purports to state the requirements of the Consent Judgment, which is a writing that speaks for itself, to which no response is required. Any attempts to characterize or selectively quote from the Consent Judgment out of context are denied. To the extent a response is required, the Foundation denies the allegations in paragraph 75.

76. The Foundation lacks sufficient knowledge or information to form a belief as to the allegations in paragraph 76 and therefore denies those allegations.

77. The Foundation admits that NRA directors are elected by the NRA membership. The remaining allegations in paragraph 77 are too vague to be reasonably construed and are therefore denied.

78. The Foundation lacks sufficient knowledge or information to form a belief as to the allegations in paragraph 78 and therefore denies those allegations.

79. The Foundation lacks sufficient knowledge or information to form a belief as to the allegations in paragraph 79 and therefore denies those allegations.

80. The Foundation lacks sufficient knowledge or information to form a belief as to the allegations in paragraph 80 and therefore denies those allegations.

81. The Foundation admits that NRA members elected an NRA President in 2025. The Foundation denies the remaining allegations in paragraph 81.

82. The Foundation admits that Tom King is a Trustee of the Foundation who previously served as an NRA Board member until 2025. The Foundation denies the remaining allegations in paragraph 82.

83. Denied.

84. The Foundation admits that it amended its Bylaws to remove the requirement that the Executive Vice President of the NRA serve as an *ex officio* member of the Foundation Board, but it denies the NRA's characterization of its governance reforms as improper or unlawful. The Foundation denies the remaining allegations in paragraph 84.

85. The Foundation admits that it amended its Bylaws to make the President of the NRA an *ex officio* member of the Foundation Board without the power to vote, but the Foundation denies the NRA's characterization of its governance reforms as improper or unlawful. The Foundation denies the remaining allegations in paragraph 85.

86. The Foundation denies the NRA's characterization of its governance reforms as improper or unlawful. The remaining allegations in paragraph 86 are too vague to be reasonably construed and are therefore denied.

87. The Foundation admits that it amended its Bylaws to eliminate the requirement that a majority of Foundation Trustees be members of the NRA's Board, but the Foundation denies the NRA's characterization of its governance reforms as improper or unlawful. The Foundation denies the remaining allegations in paragraph 87.

88. Denied.

89. The Foundation admits that it amended its Bylaws to eliminate the NRA Board's ability to appoint Foundation Trustees and to allow the Foundation Board to elect new Trustees. The Foundation denies the NRA's characterization of its governance reforms as improper or unlawful. The Foundation denies the remaining allegations in paragraph 89.

90. The Foundation admits that, in 2024, it amended its Bylaws to allow for the election of up to fifteen Trustees, up from fourteen, as was permitted under the preceding version of the Bylaws. The Foundation denies the NRA's characterization of its governance reforms as improper or unlawful. The Foundation denies the remaining allegations in paragraph 90.

91. The allegations in paragraph 91 are conclusions of law to which no response is required. To the extent a response is required, the Foundation denies the allegations in paragraph 91.

92. The allegations in paragraph 92 are conclusions of law to which no response is required. To the extent a response is required, the Foundation denies the allegations in paragraph 92.

93. Denied.

94. Denied. Hamlin, in fact, received notice of the August 23, 2024 meeting where amendments to the Bylaws, including the amendment to remove the Executive Vice President of the NRA as an *ex officio* Board member, were proposed and adopted. Ex. 3, August 2024 Email Exchange. Hamlin received the proposed amendment for review and confirmed he was "OK with" the amendments. *Id.*

95. The allegations in paragraph 95 are conclusions of law to which no response is required. To the extent a response is required, the Foundation denies the allegations in paragraph 95.

96. Paragraph 96 purports to describe the contents of the meeting minutes for the Foundation's Board on August 23, 2024, which is a writing that speaks for itself, to which no response is required. Any attempts to characterize or selectively quote from those meeting minutes out of context are denied. To the extent further response is required, the Foundation denies the remaining allegations in paragraph 96.

97. Denied.

98. To the extent the allegations in paragraph 98 state, suggest, or imply that the NRA was entitled to approve amendments to the Foundation's Articles or Bylaws, the allegations are conclusions of law to which no response is required. To the extent a response is required, the Foundation denies the allegations in paragraph 98.

99. The Foundation admits that, as of this filing, it has continued to fund grants to the NRA pursuant to the parties' grant agreement, including grant funding provided in 2026. The Foundation also admits that it reimbursed the NRA for certain fundraising expenses pursuant to a shared services agreement through 2025, when the Foundation relinquished the Friends of NRA program to the NRA. The Foundation denies the remaining allegations in paragraph 99.

100. The Foundation admits that it hired an Executive Director of the Foundation on or around July 31, 2025. The Foundation admits that its Executive Director worked for the NRA and another nonprofit organization prior to joining the Foundation. The Foundation denies the remaining allegations in paragraph 100.

101. To the extent the allegations in paragraph 101 state, suggest, or imply that the Foundation has not always engaged in its own fundraising efforts since its inception or that the Foundation intended to or did compete with the NRA, the Foundation denies those allegations. The Foundation admits the remaining allegations in paragraph 101.

102. The Foundation admits that it refused to grant funds toward excessive NRA overhead expenses that exceeded more than 15% of the charitable programs and that were in whole or in substantial part unrelated to the operation of the NRA's charitable programs. The Foundation denies the remaining allegations in paragraph 102.

103. Denied.

104. Denied.

105. The allegations in paragraph 105 are conclusions of law to which no response is required. Further, the Foundation lacks sufficient knowledge or information to form a belief as to the allegations in paragraph 105 regarding donors' intent and therefore denies those allegations. To the extent further response is required, the Foundation denies the remaining allegations in paragraph 105.

106. The Foundation lacks sufficient knowledge or information to form a belief as to the allegations in paragraph 106 and therefore denies those allegations.

107. The Foundation lacks sufficient knowledge or information to form a belief as to the allegations in paragraph 107 and therefore denies those allegations.

108. The allegations in paragraph 108 are conclusions of law to which no response is required. To the extent a response is required, the Foundation denies the allegations in paragraph 108.

109. The allegations in paragraph 109 are conclusions of law to which no response is required. To the extent a response is required, the Foundation denies the allegations in paragraph 109.

110. The Foundation lacks sufficient knowledge or information to form a belief as to the allegations in paragraph 110 and therefore denies those allegations.

111. The website associated with the <nrafoundation.org> domain name is a writing that speaks for itself, to which no response is required. Any attempts to characterize or selectively quote from the website out of context are denied. To the extent a response is required, the Foundation denies the allegations in paragraph 111.

112. The Foundation lacks sufficient knowledge or information to form a belief as to the allegations in paragraph 112 and therefore denies those allegations.

113. The Foundation admits that, on or about July 30, 2025, it registered the domain name <thenrafoundation.org> with GoDaddy.com, LLC but denies the NRA's characterization of the domain name as "infringing."

114. Denied.

115. The Foundation admits that it is the current registrant of the domain name <thenrafoundation.org> but denies the NRA's characterization of the domain name as "infringing." The Foundation denies the remaining allegations in paragraph 115.

116. The allegations in paragraph 116 are conclusions of law to which no response is required. To the extent a response is required, the Foundation denies the allegations in paragraph 116.

117. Denied.

118. Denied.

119. The allegations in paragraph 119 purport to describe a letter from the NRA to the Foundation, which is a writing that speaks for itself, to which no response is required. Any attempts to characterize the writing or selectively quote it out of context are denied. To the extent a response is required, the Foundation denies the allegations in paragraph 119.

120. The allegations in paragraph 120 quote from and purport to draw legal conclusions based on a letter from the Foundation to the NRA, which is a writing that speaks for itself, to which no response is required. Any attempts to characterize the writing or selectively quote it out of context are denied. To the extent a response is required, the Foundation denies the allegations in paragraph 120.

121. The allegations in paragraph 121 purport to describe a letter from the NRA to the Foundation, which is a writing that speaks for itself, to which no response is required. Any attempts to characterize the writing or selectively quote it out of context are denied. To the extent a response is required, the Foundation denies the allegations in paragraph 121.

122. The Foundation admits that it did not assign the <thenrafoundation.org> domain name to the NRA. The Foundation denies the remaining allegations in paragraph 122.

123. The landing page associated with the <thenrafoundation.org> domain name is a writing that speaks for itself, to which no response is required. Any attempts to characterize the writing or selectively quote it out of context are denied. To the extent the allegations in paragraph 123 state, suggest, or imply that the Foundation is infringing on the NRA's trademarks, these allegations are conclusions of law to which no response is required. To the extent a response is required, the Foundation denies the allegations. The Foundation denies the remaining allegations in paragraph 123.

124. The landing page associated with the <thenrafoundation.org> domain name is a writing that speaks for itself, to which no response is required. Any attempts to characterize the writing or selectively quote it out of context are denied. The Foundation denies the allegations in paragraph 124 to the extent that they state, suggest, or imply that the Foundation is infringing on the NRA's trademarks. The Foundation denies the remaining allegations in paragraph 124.

125. Denied.

126. Denied.

127. Denied.

128. Denied.

129. The Foundation admits that it received a letter from counsel for the NRA on January 5, 2026, and that the NRA attached a copy of the letter as Exhibit H. The Foundation denies the letter was effective to revoke any previous license, including the Trademark License (which the NRA fails to disclose), consent, permission, or other authorization, whether express or implied, for the Foundation to use the NRA's trademarks, including "uses thereof in the Foundation's trade name." The remaining allegations in paragraph 129 purport to describe the letter, which is a writing that speaks for itself, to which no response is required. Any attempts to characterize the writing or selectively quote it out of context are denied. To the extent a response is required, the Foundation denies the allegations in paragraph 129.

130. The allegations in paragraph 130 are conclusions of law to which no response is required. To the extent a response is required, the Foundation denies the allegations in paragraph 130.

131. The allegations in paragraph 131 are conclusions of law to which no response is required. To the extent a response is required, the Foundation denies the allegations in paragraph 131.

132. Paragraph 132 is too vague to be reasonably construed and is therefore denied.

133. Paragraph 133 is too vague to be reasonably construed and is therefore denied.

134. Denied.

## COUNT I
**Federal Trademark Infringement**
**(15 U.S.C. § 1114)**

135. The Foundation repeats and realleges all of the responses contained in the preceding paragraphs of this Answer as though the same were fully set forth herein.

136. The allegations in paragraph 136 are conclusions of law to which no response is required. To the extent a response is required, the Foundation denies the remaining allegations in paragraph 136.

137. Denied.

138. Denied.

139. Denied.

140. Denied.

141. Denied.

142. Denied.

143. Denied.

144. Denied.

## COUNT II
**False Designation of Origin and Federal Unfair Competition**
**(15 U.S.C. § 1125(a))**

145. The Foundation repeats and realleges all of the responses contained in the preceding paragraphs of this Answer as though the same were fully set forth herein.

146. Denied.

147. Denied.

148. Denied.

149. Denied.

150. Denied.

**<u>COUNT III</u>**
**Federal Trademark Dilution**
**(15 U.S.C. § 1125(c))**

151. The Foundation repeats and realleges all of the responses contained in the preceding paragraphs of this Answer as though the same were fully set forth herein.

152. Denied.

153. Denied.

154. Denied.

155. Denied.

156. Denied.

157. Denied.

158. Denied.

**<u>COUNT IV</u>**
**Common Law Trademark Infringement and Unfair Competition**

159. The Foundation repeats and realleges all of the responses contained in the preceding paragraphs of this Answer as though the same were fully set forth herein.

160. The allegations in paragraph 160 are conclusions of law to which no response is required. To the extent a response is required, the Foundation denies the allegations in paragraph 160.

161. Denied.

162. Denied.

163. Denied.

164. Denied.

165. Denied.

**COUNT V**
**Cybersquatting Under the Anti-Cybersquatting Consumer Protection Act (ACPA)**
**(15 U.S.C. § 1125(d))**

166. The Foundation repeats and realleges all of the responses contained in the preceding paragraphs of this Answer as though the same were fully set forth herein.

167. Denied.

168. Denied.

169. Denied.

170. Denied.

171. Denied.

172. Denied.

173. Denied.

174. Denied.

175. Denied.

176. Denied.

177. Denied.

178. Denied.

**COUNTS VI–XII**

179. Counts VI–XII were dismissed by the Court in its June 24, 2026 Order, ECF 30, such that no response is required to paragraphs 179–230.

**PRAYER FOR RELIEF**

The Foundation further denies that the NRA is entitled to judgment against the Foundation or any relief whatsoever, including but not limited to the relief set forth in the section of the Amended Complaint entitled "Prayer for Relief." The Foundation denies that the NRA suffered any actionable harm for which the Foundation is liable.

**AFFIRMATIVE AND ADDITIONAL DEFENSES**

Pursuant to Federal Rule of Civil Procedure 8(c), and without assuming any burden of proof or persuasion that would otherwise rest on the NRA, the Foundation asserts the following affirmative and other defenses to the NRA's claims.

1. The Amended Complaint, and each Count of the Amended Complaint, fails to state a claim upon which relief can be granted against the Foundation.

2. The NRA's claims are barred, in whole or in part, because the NRA gave its consent to the Foundation's use of the NRA's trademarks in a perpetual charter.

3. The NRA's claims are barred, in whole or in part, because the NRA irrevocably contributed the name THE NRA FOUNDATION to the Foundation at the time of its corporate formation pursuant to a perpetual charter.

4. In addition to the affirmative defense of consent raised in paragraph 2 and/or of the grant in paragraph 3 of this section, the NRA's claims are barred, in whole or in part, because the NRA and the Foundation are parties to a written Trademark License executed in 1998 whereby the NRA gave its consent to the Foundation's use of the trademarks and name in question, and the NRA has not lawfully revoked the license pursuant to its terms.

5. The NRA's claims are barred, in whole or in part, by the doctrine of mootness because the Foundation amended its Articles of Incorporation to change the name of the organization to "The 1791 Foundation, Inc." on May 29, 2026. Although the Foundation owns residual goodwill in its corporate name, it ceased active substantial use of the challenged marks, thereby eliminating any live controversy as to prospective injunctive relief.

6. The NRA's claims are barred, in whole or in part, because the NRA suffers no present injury that entitles it to equitable relief, given that the Foundation amended its Articles of

Incorporation to change the name of the organization to "The 1791 Foundation, Inc." on May 29, 2026 and ceased active substantial use of the challenged mark.

7. The NRA's claims are barred, in whole or in part, by the First Amendment to the United States Constitution, to the extent those claims seek to restrict the Foundation's speech, including its communications with donors, its public statements regarding its governance and charitable mission, which reforms it was permitted to make pursuant to its Articles of Incorporation and Bylaws, and its exercise of its right to identify itself by its legal corporate name.

8. The NRA's claims are barred, in whole or in part, because the NRA revoked its consent for the Foundation to use the claimed marks belonging to the NRA in violation of the covenant of good faith and fair dealing and for the improper purpose of coercing the Foundation to cease its governance reforms.

9. The NRA's ACPA claim is barred because the domain name <thenrafoundation.org> was obtained and/or used in good faith as a reflection of the Foundation's own corporate name, without any bad-faith intent to profit from any mark belonging to the NRA, and the Foundation is entitled to the safe harbor provided by 15 U.S.C. § 1125(d)(1)(B)(ii).

10. The NRA's claims are barred, in whole or in part, by the doctrine of unclean hands. Specifically, the NRA purported to terminate the Trademark License without cause and without following the prescribed steps for an effective termination. Moreover, as detailed in the Counterclaim, which is incorporated by reference as if reproduced in full here, the NRA knowingly purported to terminate the license and brought this litigation to punish the Foundation for refusing to bankroll the NRA's fiscal misconduct and mismanagement. In doing so, the NRA violated its obligations of good faith and fair dealing to the Foundation.

11. The NRA's claims are also barred, in whole or in part, by the doctrine of unclean hands because the NRA has used the NRA Foundation name and trademarks even after the Foundation changed its name and did so to create confusion among donors, including by purporting to solicit donations from donors to the Foundation that, upon information and belief, are actually directed to the NRA. As detailed in the Counterclaim, which is incorporated by reference as if reproduced in full here, the NRA, which is not a 501(c)(3) organization, is attempting to use the 501(c)(3) status of the Foundation and otherwise seeking to capitalize in this litigation on the fruits of its own misconduct. As a result, both the Foundation and the public at large have been and will continue to be injured by the NRA's misconduct.

12. The NRA's claims are barred, in whole or in part, because the NRA lacks Article III standing to assert its claims.

13. The NRA's claims are barred, in whole or in part, because the NRA brought such claims for an improper, abusive purpose in retaliation for the Foundation's legitimate governance reforms and to coerce the Foundation to withdraw such reforms. The NRA's conduct constitutes trademark misuse.

14. The NRA's claims are barred, in whole or in part, by laches.

15. The NRA's claims are barred, in whole or in part, by the doctrine of estoppel and reasonable reliance in that the NRA gave perpetual consent to use the name THE NRA FOUNDATION in a perpetual charter which the NRA took no steps to amend or change for decades, including after the Foundation took steps to change the governance thereof to assert greater independence.

16. The NRA's claims are barred, in whole or in part, by the doctrine of waiver, acquiescence, and/or ratification.

17. The NRA's claims are barred, in whole or in part, because any award in this action would constitute unjust enrichment.

18. The NRA's claims are barred, in whole or in part, because the NRA failed to mitigate alleged damages, if any.

19. The NRA's claims are barred, in whole or in part, because the NRA caused or contributed to its damages, if any, by its own prior breach of contract.

20. The NRA's claims are barred, in whole or in part, because the NRA has not alleged a lack of an adequate remedy at law.

21. The NRA's claims are barred, in whole or in part, because any alleged use by the Foundation was *de minimis* such that consumer or donor confusion is not likely or possible for the brief and reasonable duration during which the Foundation used the mark after the alleged license termination.

22. The NRA's claims are barred, in whole or in part, because the NRA's granting and approval of the Foundation's use of its name in the perpetual corporate charter, Trademark License, and the parties' course of conduct over the past thirty years would make it inequitable to prevent the Foundation from using its corporate name.

23. The NRA's claims are barred, in whole or in part, to the extent that the proposed injunction is vague, ambiguous, and indefinite such that it amounts to a requirement to "obey the law."

24. The Foundation does not currently have sufficient knowledge or information to form a belief as to whether it may have additional, yet unstated, defenses or counterclaims available. Discovery has not yet begun in this action. The Foundation thus reserves the right, in

accordance with the Federal Rules of Civil Procedure, to amend its Answer to assert additional affirmative defenses or counterclaims that may come to light as this action progresses.

## COUNTERCLAIMS

1. For its counterclaims against Counter-Defendant National Rifle Association of America, Inc. ("NRA"), Counter-Plaintiff The 1791 Foundation, Inc., formerly known as The NRA Foundation, Inc. ("Foundation") respectfully states as follows:

## NATURE OF THE COUNTERCLAIM

2. This is an action for unfair competition arising from the NRA's willful, malicious, and retaliatory actions intended to interfere with the Foundation's charitable purposes after the Foundation undertook lawful measures to strengthen its independence from the NRA and refused to use charitable funds to subsidize the NRA's wasteful spending. The Foundation also brings a claim for breach of contract based on the NRA's breach of the parties' 1998 trademark license agreement ("Trademark License").

## JURISDICTION AND VENUE

3. These counterclaims arise under the laws of the District of Columbia. The Court has supplemental jurisdiction over the counterclaims arising under the law of the District of Columbia pursuant to 28 U.S.C. § 1367 because these counterclaims are so related to the claims raised in the NRA's Amended Complaint arising under the Lanham Act that they form part of the same case and controversy under Article III of the United States Constitution.

4. The Court has personal jurisdiction over the NRA because it filed the instant action in this Court. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because by filing its Amended Complaint in this judicial district, the NRA consented to this Court as a proper venue for this action.

## FACTUAL BACKGROUND

***The Foundation's Longstanding and Perpetual Rights to the Name and Trademark "The NRA Foundation"***

5. The Foundation was formed as a District of Columbia nonprofit corporation on August 3, 1990, according to its Articles of Incorporation ("Articles").

6. Since its inception, the Foundation has been and continues to be a grantmaking organization. It was formed for charitable purposes to promote firearms and hunting safety, educate individuals with respect to firearms in their historic, technological, and artistic context, and enhance marksmanship skills of those participating in the shooting sports.

7. The Foundation's Articles also state that another *one* of the Foundation's purposes (among several) is to "support the activities of the [NRA], but only to the extent that such activities are in furtherance of charitable, educational and scientific purposes within the meaning of section 501(c)(3)."

8. For almost a decade, the Foundation operated independently using the name approved and granted by the NRA, "The NRA Foundation," in the Foundation's perpetual corporate charter.

9. In 1998, years after the Foundation was formed under its name, the Foundation and the NRA entered into the Trademark License, which provided the NRA's separate consent and authorization for the Foundation to use the "NRA" trademark. Ex. 1.

10. The NRA knowingly decided not to disclose the existence of the written Trademark License with the Foundation in either its initial or Amended Complaint.

11. Separate and apart from the consent granted by the NRA in the Foundation's perpetual charter, the Trademark License authorizes the Foundation to:

> **[U]se the mark 'NRA' as the directors of the Foundation may deem proper, provided that at all times and in all places, the Foundation may not use the licensed mark 'NRA' unless it is used in the name of the Foundation and is clearly identified as the 'NRA Foundation.' However, the Foundation may use the name 'NRA Foundation' and may license others to use the name, without seeking the prior permission of the NRA.**

12. The Trademark License is a royalty-free license.

13. The Trademark License is not term-limited or subject to renewal. Instead, by its plain terms, the only way that the Trademark License may be terminated is by the Board of Directors of the NRA voting to terminate the license. Ex. 1. Indeed, the Trademark License expressly requires termination by the NRA Board of Directors. *Id.*

14. Upon information and belief, the NRA's Board of Directors never voted to terminate the Trademark License; thus, the Trademark License's terms remain valid and subsisting.

15. Since 1990, the Foundation has continued to support and fund educational programs that advance firearms and hunting safety, promote firearms education, and conduct research to improve firearms safety.

16. Since 1990, the Foundation has raised hundreds of millions of dollars in tax-deductible charitable contributions to support and fund educational programs and other programs that benefit the public. The Foundation did so lawfully, independently, and extraordinarily well.

17. Common Foundation grant recipients include, among others, 4-H shooting sports programs, Junior Reserve Officers' Training Corps, Future Farmers of America, and over 140 local Boy Scouts of America councils. In 2024 alone, the Foundation funded more than $17 million in grants with approximately $7 million (less than half) going to NRA charitable programs.

18. Over the years, some portion of these grant funds were raised by the Foundation through the "Friends of NRA" events, which were nationwide grassroots fundraising events 100% paid for by the Foundation. Each year, NRA employees, known as Field Representatives whose salaries and benefits were 100% paid by the Foundation, worked with local organizers to host hundreds of Friends Events.

19. To encourage local participation, the Foundation earmarked 50% of funds raised by Friends Events to support qualified local groups and programs.

20. Local committees, known as state fund committees, worked with the Foundation to identify and vet qualifying groups and programs to use these funds in the communities in which they were raised. The remaining funds typically went to the NRA's qualifying programs.

21. It was never the case that all funds raised through Friends Events were used to fund NRA activities exclusively.

22. Through decades of use of the NRA Foundation name and trademark, the public and donors are familiar with the NRA Foundation name and trademark and associate it with the Foundation as a 501(c)(3) organization, and not the NRA.

23. As a result, when donors or potential donors donate funds to the Foundation, they intend those funds to be tax-deductible 501(c)(3) donations used by the Foundation to further its charitable mission.

***The NRA's Retaliatory and Unfair Competition with the Foundation***

24. Consistent with common practice for affiliated nonprofit organizations, the Foundation and the NRA have historically worked together to promote shared objectives, and where appropriate, reduce administrative redundancies while maintaining separate legal identities and governance structures.

25. Over the years, the NRA came to treat the Foundation not as an independent charity, but as a piggy bank. Facing mounting financial losses, hemorrhaging membership revenue, and still reeling from a jury verdict finding that its senior management breached fiduciary duties and engaged in self-dealing,[2] the NRA turned its sights on the Foundation's assets.

26. First, in or about spring 2025, the NRA approached the Foundation about purchasing the NRA's headquarters building in Fairfax, Virginia for a cash payment. The Foundation declined this request.

27. In or around August 2025, the NRA approached the Foundation about purchasing a collection of firearms from the NRA for over $800,000. The firearms at issue were of no historical significance (as would further the Foundation's charitable purpose) and were not worth the NRA's asking price. The Foundation declined this request as well.

28. The NRA, still desperate for money, grew more hostile towards the Foundation and demanded that the Foundation pay a new "royalty" to use the Foundation's own legal name equal to 20% of all Foundation revenue. The NRA made this demand brazenly, notwithstanding its admission that the 20% "royalty" had no tie to fair market value, as required under federal tax law. The NRA demanded this "royalty" as a sham, knowing that the Foundation had been using its own legal name, The NRA Foundation, Inc., pursuant to its Articles of Incorporation. The NRA also knew that decades prior the NRA had already granted a perpetual consent to use the name in the Foundation's charter and in a valid, written, royalty-free Trademark License.

[2] Brian Mann & Emma Bowman, *Jury Finds NRA, Wayne LaPierre Liable in Civil Corruption Case*, NPR (Feb. 23, 2024), https://www.npr.org/2024/02/23/1232229060/nra-wayne-lapierre-corruption-trial-verdict-new-york.

29. The Foundation once again refused to participate in the NRA's attempt to violate tax laws by using 501(c)(3) charitable funds to subsidize the NRA's 501(c)(4) operations under a sham royalty arrangement.

30. When the Foundation refused to purchase the NRA's headquarters building, declined to pay $800,000 to the NRA for a collection of firearms that had no connection to the Foundation's charitable purposes, declined to allow grant funds to go to the NRA's excess overhead instead of charitable programs for the 2026 calendar year, and rejected a sham "royalty" demand of 20% of all Foundation revenue for the Foundation to continue using its legal name and a trademark it already licensed royalty-free—the NRA retaliated.

31. The NRA (through its management, William Bachenberg and Douglas Hamlin) cut off the Foundation's access to its own donor lists, locked Foundation management out of Foundation social media accounts, and barred the Foundation from overseeing its own fundraising events.

32. Moreover, using the very donor relationships and goodwill the Foundation spent decades and tens of millions of dollars building, the NRA launched a competing charity and repurposed at least one other to siphon away the Foundation's donors and revenue.

33. To mask its own financial woes and mismanagement, and in an attempt to deflect blame onto the Foundation and mislead its supporters, the NRA publicly blamed the Foundation for "slashing support" for NRA programs. In reality, the NRA knew that the Foundation pledged over $7 million in grant funding to the NRA while insisting that more of those funds go to direct NRA charitable programming instead of NRA's bloated overhead.

34. In allocating these grant funds to the NRA for its charitable programming, the Foundation complied with the requirements established in the Consent Judgment among the parties and the DC AG.

35. The NRA further, without notice, shut down the Foundation's website hosted on the <nrafoundation.org> domain ("Foundation Website") and instead redirected the domain to the NRA's website without disclosing to visitors that the website was no longer affiliated with the Foundation and that donations made through that website would not go to the Foundation. *Compare* Ex. 4, January 28, 2026 Screenshot of the <nrafoundation.org> Landing Page, *with* Ex. 5, July 21, 2026 Screenshot of the <nrafoundation.org> Landing Page.

36. The NRA replaced the Foundation's website content with a funding request page that solicits donor contact information. Ex. 6, July 21, 2026 Screenshot of <https://fundingrequest.nrafoundation.org/#/index> Landing Page. The website failed to disclose that the NRA was soliciting donations for *itself* rather than the Foundation—the focus of the same website for many years.

37. The NRA also, without notice to the Foundation or donors, improperly redirected hyperlinks embedded in its own website hosted on the <nra.org> domain ("NRA Website"), which previously linked to the Foundation Website, back to the NRA's homepage or its own donation solicitation page. The NRA did this in order to mislead those visiting the site into believing they were making tax-deductible donations to the Foundation rather than non-deductible donations to the NRA.

38. The NRA used the Foundation's social media accounts, including "Friends of NRA HQ," to post misleading and inaccurate statements, including the post below, suggesting that certain NRA charitable programs have been funded by the NRA instead of the Foundation:



Friends of NRA HQ
7h ·

Grant Spotlight 🌟

Today we highlight two North Carolina clubs that hosted Women On Target® clinics last year with NRA grant support:

Durham County Wildlife Club (Morrisville, NC) — received over $2,400 in ammunition for their clinic.

Sir Walter Gun Club (Creedmoor, NC) — awarded over $2,800 in ammunition for their event.

One participant shared:
"I came into this class with fear and apprehension, but I wanted to move beyond that fear and learn to safely handle a gun. Everyone was so kind and patient — it truly changed how I feel about shooting."

Empowering, inspiring, and life-changing; that's the impact of Women On Target®, made possible through your support of Friends of NRA. 💪 🎯

#WomenOnTarget #NRAGrant #FirearmSafety #MarksmanshipMatters #EducationThroughTraining

39. The NRA's misleading and dishonest actions raise significant legal and regulatory concerns.

40. Misleading the public about the source and flow of charitable funds constitutes a violation of state charitable solicitation laws and consumer protection statutes.

41. Public confusion regarding fundraising can trigger IRS scrutiny and even cause the IRS to recharacterize donors' 501(c)(3) contributions as 501(c)(4) contributions, causing donors to lose their tax deductions.

42. Separate and apart from the confusion and harm to the public that the NRA's misleading statements create, the NRA's interference with the Foundation's donor list, websites, and social media pages directly harms the Foundation. The Foundation has earned a strong

reputation through decades of trustworthy charitable operations. The NRA's misleading and deceptive practices directly undermine the goodwill that the Foundation has worked tirelessly to earn.

43. Separately, as a 501(c)(3) charitable organization, the Foundation relies on charitable donations to further its purpose. Confused donors are being, and will continue to be, misled into donating to the NRA or competing charitable organizations controlled by the NRA when those funds or legacies are intended for the Foundation.

44. The NRA is exploiting the Foundation's goodwill built with Foundation funds to divert charitable revenue to the NRA and NRA-controlled organizations, including the NRA Patriot Fund and the NRA Freedom Action Foundation. In attempting to enrich itself, the NRA also diverts Foundation funds from the many third-party charities the Foundation has supported over the years, including 4-H shooting sports programs, Junior Reserve Officers' Training Corps, Future Farmers of America, and local Boy Scouts of America councils.

45. When the Foundation would not capitulate or accede to the NRA's demands and attempts to raid the Foundation coffers, the NRA retaliated by suing the Foundation in this Court claiming trademark violations for the Foundation's use of its own name and its licensed use of the NRA trademark, all while concealing that the NRA had consented to such use and even executed the written Trademark License.

46. The NRA claims to be the victim of trademark infringement by the Foundation despite being aware of the perpetual consent and grant and despite knowing that it licensed the use of the "NRA" trademark royalty-free to the Foundation decades ago.

47. Although the NRA recognizes the harm caused by donor confusion, it steadfastly refuses to comply with the Foundation's request not to misrepresent the source of Foundation grant funds.

48. The NRA even falsely asserted that the Foundation obtained the domain name <thenrafoundation.org> in bad faith, knowing both that the NRA licensed the Foundation to use the "NRA" trademark pursuant to the perpetual charter and written Trademark License and that the NRA had terminated the Foundation's access to its own website.

49. Simply put, the NRA—not the Foundation—is the source of any confusion concerning the Foundation's programs.

50. At all relevant times, the Foundation's use of its name and the NRA trademarks has been licensed, consented to, and authorized by the NRA.

51. Notwithstanding that authorization, the NRA has attempted to dupe the public and donors into believing that they are donating to the Foundation when they are not.

52. This unfair competition and misconduct is designed to mislead the public and cause harm to the Foundation.

## COUNT I: UNFAIR COMPETITION

53. The Foundation realleges and incorporates by reference the allegations set forth in the preceding paragraphs of the Counterclaims as though fully set forth herein.

54. Through the actions described above, the NRA has engaged in unfair competition by using the Foundation's name, donor relationships, donor lists, fundraising infrastructure, social media channels, and goodwill—that the Foundation developed over more than three decades—to divert donations intended for the Foundation and create new 501(c)(3) organizations intended to confuse donors as to the use of their donated funds.

55. The NRA exploited the property of the Foundation—its internet domain <nrafoundation.org>—by diverting online traffic from the Foundation Website to the NRA Website, redirecting users to the NRA's homepage or its own donation solicitation page, and collecting contact information from potential Foundation donors, while taking no action to inform users (including donors) that they were no longer dealing with the Foundation.

56. The NRA also exploited the Foundation's social media pages and posted content intended to mislead and confuse donors into believing that the NRA was responsible for programs including the "Friends of NRA" program and Friends Events.

57. The NRA has made misleading public statements designed to confuse donors about the source of charitable funds, including making social media posts using "#NRAGrant" to take credit for Foundation-funded grants that were made before and even after this lawsuit was filed.

58. The NRA's conduct is willfully calculated to divert charitable funds from the Foundation, undermine the Foundation's ability to independently fundraise, and create confusion among donors as to the source and allocation of charitable contributions.

59. The NRA's unfair competition in co-opting the Foundation's goodwill has caused and continues to cause the Foundation substantial harm, including lost revenues and impairment of the Foundation's goodwill and reputation.

60. The Foundation is entitled to recover damages, attorneys' fees and costs arising from the NRA's unfair competition.

61. The NRA's conduct described in this counterclaim was committed with actual malice, bad faith, and a reckless disregard for the Foundation's rights and the public's right to be free from confusion.

62. The Foundation is suffering and will continue to suffer serious and irreparable damage and is therefore entitled to injunctive relief restraining the NRA from engaging in further unfair competition.

**COUNT II: BREACH OF CONTRACT**
**(BREACH OF TRADEMARK LICENSE BY NRA'S CONDUCT)**

63. The Foundation realleges and incorporates by reference the allegations set forth in the preceding paragraphs of the Counterclaims as though fully set forth herein.

64. The Foundation maintains that the Trademark License entered into by the NRA and the Foundation in 1998 remains valid and effective.

65. Pursuant to the terms of the Trademark License,

> NRA grants to the Foundation a non-exclusive, and non-transferable, limited license to use the mark 'NRA' as the directors of the Foundation may deem proper, provided that at all times and in all places, the Foundation may not use the licensed mark 'NRA' unless it is used in the name of the Foundation and is clearly identified as the 'NRA Foundation.' However, the Foundation may use the name 'NRA Foundation,' and may license others to use the same, without seeking the prior permission of the NRA.

Ex. 1.

66. The Foundation has consistently complied with and has never breached the terms of the Trademark License.

67. The NRA breached the Trademark License by acting in a manner inconsistent with the rights it granted to the Foundation. Specifically, in or around November 2025, the NRA demanded that the Foundation pay 20% of its gross revenue as a "royalty" to continue to use the name "NRA Foundation" notwithstanding that the Trademark License expressly authorizes the Foundation to use the name royalty-free and without seeking prior permission from the NRA.

68. The NRA further breached the Trademark License by filing this action alleging trademark infringement and seeking to enjoin the Foundation from using marks that the NRA itself

licensed to the Foundation. By suing the Foundation for exercising rights expressly granted under the Trademark License, the NRA failed to uphold its obligations under the agreement.

69. The NRA also breached the Trademark License by interfering with the Foundation's ability to exercise its licensed rights, including by shutting down the Foundation Website hosted on the <nrafoundation.org> domain, locking the Foundation out of its social media accounts, and cutting off the Foundation's access to its donor lists—all of which were used by the Foundation in connection with its licensed use of the NRA marks.

70. The Foundation has been damaged in an amount to be determined at trial as a direct and proximate result of the NRA's breaches of the Trademark License.

**COUNT III: BREACH OF CONTRACT**
**(*IN THE ALTERNATIVE TO COUNT II ONLY*, BREACH OF TRADEMARK LICENSE BY WRONGFUL TERMINATION)**

71. The Foundation realleges and incorporates by reference the allegations set forth in paragraphs 1–62 of the Counterclaims as though fully set forth herein.

72. In the alternative to Count II, to the extent the NRA's conduct described herein is construed as terminating the Trademark License, the termination was wrongful and constitutes a breach of the Trademark License.

73. The termination was wrongful because, upon information and belief, the NRA's Board of Directors never voted to terminate the Trademark License, as required by its terms.

74. The NRA's termination of the Trademark License was also wrongful because it was made for an arbitrary, capricious, and improper purpose of retaliation against the Foundation for refusing to agree to the NRA's unreasonable and unlawful demands to subsidize its operations with charitable funds.

75. The NRA's termination of the Trademark License was further wrongful because it was made for an improper anti-competitive purpose to divert donations and resources from the Foundation to the NRA and NRA-controlled charitable organizations.

76. The Foundation has been damaged in an amount to be determined at trial as a direct and proximate result of the NRA's wrongful termination of the Trademark License.

## JURY DEMAND

The Foundation requests a jury trial on all issues to which it is entitled under the law.

## PRAYER FOR RELIEF

WHEREFORE, the Foundation respectfully requests this Court enter judgment in the Foundation's favor and grant the following relief:

A. An order preliminarily and/or permanently enjoining Counterclaim-Defendant NRA, its agents, servants, affiliates, representatives, successors, and assigns, and all those persons or entities in active concert or participation who receive actual notice of the injunctive order from:

1. taking any action in the name of the Foundation, including, but not limited to, posting on the Foundation Website or social media accounts or soliciting donors;
2. making any false or misleading statements about the Foundation in publications, websites, or social media owned, controlled, or operated by the NRA;
3. using the <nrafoundation.org> domain or confusingly similar domains; and
4. using the name The NRA Foundation, Inc. or any confusingly similar name.

B. An order requiring the NRA, within thirty (30) days after entry of the injunctive order, to file in this action a report in writing and under oath setting forth in detail the manner and form by which it has complied with the provisions set forth herein.

C. A declaration that the NRA has no right to interfere with the Foundation's use of its former legal name for historical purposes, and that the NRA has no right to solicit donations in the Foundation's former legal name without the Foundation's consent.

D. An award of compensatory, consequential, actual, and/or expectancy damages arising from the breach of the Trademark License.

E. An award of restitution, nominal, and punitive damages arising from the aforementioned unlawful conduct.

F. An accounting and disgorgement of any unlawfully or unfairly obtained profits by the NRA resulting from the NRA's conduct complained of herein.

G. The Foundation's attorneys' fees, costs, pre-judgment and post-judgment interest on any recovery by the Foundation, and such other and further relief as the Court deems just and proper.

Dated: July 22, 2026

Respectfully submitted,

**DLA PIPER LLP**

*/s/ Christopher Oprison*

Christopher Oprison (D.C. Bar No. 489087)
200 S. Biscayne Blvd., Suite 2500
Miami, FL 33131
Tel: (305) 423-8522
Fax: (305) 657-6366
chris.oprison@dlapiper.com

Mary E. Gately (D.C. Bar No. 419151)
Jane W. Wise (D.C. Bar No. 1027769)
500 Eighth Street NW
Washington, DC 20004
Tel: (202) 799-4507
Fax: (202) 799-5507
mary.gately@dlapiper.com
jane.wise@dlapiper.com

Meagan D. Self (admitted *pro hac vice*)
1900 N. Pearl Street, Suite 2200
Dallas, Texas 75201
Tel: (214) 743-4556
Fax: (972) 813-6254
meagan.self@dlapiper.com

Marie Bussey-Garza
1650 Market Street
One Liberty Place, Suite 5000
Philadelphia, PA 19103
Tel: (215) 656-3300
Fax: (215) 656-3301
marie.bussey-garza@dlapiper.com

*Attorneys for Defendant The 1791 Foundation, Inc. f/k/a The NRA Foundation, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 22, 2026, I caused the foregoing to be electronically filed using the Court's CM/ECF system, which will send notification of such filing to all current counsel of record.

*/s/ Christopher Oprison*
Christopher Oprison