**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NATIONAL RIFLE
ASSOCIATION OF AMERICA, INC.,
WILLIAM BACHENBERG,
and DOUGLAS HAMLIN,

          Plaintiffs,

v.

THE 1791 FOUNDATION, INC. F/K/A
THE NRA FOUNDATION, INC.,

          Defendant.

**Case No.: 1:26-cv-00015 (SLS)**

**PLAINTIFFS' MEMORANDUM AND STATEMENT OF POINTS AND
AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION TO DISMISS**

Plaintiffs National Rifle Association of America, Inc. ("NRA"), William Bachenberg, and

Douglas Hamlin, (collectively "Plaintiffs"), by and through their attorneys, hereby submit this

memorandum in support of their Motion to Dismiss Counterclaims.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

LEGAL STANDARD.......................................................................................................... 4

ARGUMENT...................................................................................................................... 5

I.     The Court Lacks, or Should Decline to Exercise, Supplemental Jurisdiction over the Foundation's Counterclaims .......................................................................................... 6

     A.     The Court Lacks Jurisdiction over the Foundation's Unfair Competition Counterclaim........................................................................................................ 6

     B.     The Court Should Decline to Exercise Jurisdiction Under 28 U.S.C. § 1367(c).... 8

II.     The Foundation's Counterclaims Fail to State Claims for Relief.................................... 12

     A.     The Foundation Fails to State a Claim for "Unfair Competition" (Counterclaim I) ............................................................................................................................ 12

     B.     The Foundation's Count II Breach of Contract Claim Fails................................ 17

     C.     The Foundation's Count III Breach of Contract Claim Fails .............................. 21

CONCLUSION.................................................................................................................. 24

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*A.B.C. Publications v. New York Times Co.*,
103 N.Y.S.2d 693 (N.Y. Sup. Ct. 1951).................................................................................22

*Ado Home Servs., LLC v. Frykman*,
85 Va. App. 55, 915 S.E.2d 788 (2025) ...............................................................................23

*Advanced Training Grp. Worldwide, Inc. v. Pro-Active Techs., Inc.*,
No. 22-1945, 2023 WL 8945846 (4th Cir. Dec. 28, 2023) ...................................................20

*Akiachak Native Cmty. v. United States Dep't of Interior*,
827 F.3d 100 (D.C. Cir. 2016)...............................................................................................19

*Alston v. D.C.*,
772 F. Supp. 3d 43 (D.D.C. 2025).....................................................................................5, 21

*Alzheimer's Found. of Am., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc.*,
796 F. Supp. 2d 458 (S.D.N.Y. 2011) ..................................................................................13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...............................................................................................................5

*B & W Mgmt., Inc. v. Tasea Inv. Co.*,
451 A.2d 879 (D.C. 1982) .....................................................................................................12

*Blacks in Gov't v. Nat'l Ass'n of Blacks Within Gov't*,
601 F. Supp. 225 (D.D.C. 1983).............................................................................................16

*Blue Dane Simmental Corp. v. Am. Simmental Ass'n*,
952 F. Supp. 1399 (D. Neb. 1997).........................................................................................12

*Brainchild Surgical Devices, LLC v. CPA Glob. Ltd.*,
144 F.4th 238 (4th Cir. 2025) ...............................................................................................23

*Chi. Mercantile Exch. Inc. v. Ice Clear US, Inc.*,
No. 18-cv-1376, 2021 WL 3630091 (N.D. Ill. Aug. 17, 2021)................................................21

*Christian v. TransPerfect Global, Inc.*,
No. 17-cv-5554, 2018 WL 4571674 (S.D.N.Y. Sept. 24, 2018)............................................22

*City of Chi. v. Int'l Coll. Of Surgeons*,
522 U.S. 156 (1997) ...............................................................................................................5

*Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*,
847 F. Supp. 18 (E.D.N.Y. 1994)...........................................................................................21

*Dingley v. Oler*,
117 U.S. 490 (1886) ...............................................................................................................20

*Doe #1 v. Am. Fed'n of Gov't Emps.*,
554 F. Supp. 3d 75 (D.D.C. 2021)...................................................................................4, 5, 7

*Eastman Kodak Co. v. Altek Corp.*,
  936 F. Supp. 2d 342 (S.D.N.Y. 2013) .................................................................. 22

*Econ. Rsch. Servs., Inc. v. Resol. Econ., LLC*,
  208 F. Supp. 3d 219 (D.D.C. 2016) .............................................. 15, 16, 17, 18

*Enomoto v. Space Adventures, Ltd.*,
  624 F. Supp. 2d 443 (E.D. Va. 2009) ................................................................ 23

*Filak v. George*,
  267 Va. 612, 594 S.E.2d 610 (2004) ................................................................ 17

*First Nat'l Bank v. Commercial Travellers' Home Ass'n*,
  108 A.D. 78 (N.Y. Sup. Ct. App. Div. 1905) ..................................................... 22

*Green v. U.S. Dep't of Just.*,
  392 F. Supp. 3d 68 (D.D.C. 2019) ....................................................................... 5

*Gustave-Schmidt v. Chao*,
  226 F. Supp. 2d 191 (D.D.C. 2002) ..................................................................... 5

*Joyner v. Morrison & Foerster LLP*,
  140 F.4th 523 (D.C. Cir. 2025) ....................................................................... 4, 7

*K&D LLC v. Trump Old Post Off. LLC*,
  951 F.3d 503 (D.C. Cir. 2020) ....................................................................... 8, 12

*Kobelia v. FBI*, No. 24-2542 (SLS),
  2025 U.S. Dist. LEXIS 96007, at *16 (D.D.C. May 20, 2025) ............................. 5

*Land & Marine Remediation, Inc. v. BASF Corp.*,
  No. 2:11CV239, 2012 WL 2415552 (E.D. Va. June 26, 2012) .......................... 23

*Loretto v. Teleprompter Manhattan CATV Corp*,
  458 U.S. 419 (1982) ......................................................................................... 14

*Norwood Promotional Prods., LLC v. KustomKoozies, LLC*,
  835 F. Supp. 2d 685 (S.D. Ind. 2011) ............................................................... 22

*Phoenix v. Vital Core Health Strategies*,
  No. 3:23CV357, 2025 WL 2313208 (E.D. Va. Aug. 11, 2025) ........................... 20

*Polaris Pool Sys. v. Letro Prods., Inc.*,
  161 F.R.D. 422 (C.D. Cal. 1995) ...................................................................... 12

*Ray v. Proxmire*,
  581 F.2d 998 (D.C. Cir. 1978) .......................................................................... 15

*RMBS Recovery Holdings, I, LLC v. HSBC Bank USA, N.A.*,
  297 Va. 327 (2019) ........................................................................................... 21

*Scanwell Lab'ys, Inc. v. Thomas*,
  521 F.2d 941 (D.C. Cir. 1975) .......................................................................... 15

*Segal v. Geisha NYC LLC*,
  517 F.3d 501 (7th Cir. 2008) ............................................................................ 19

*Smith v. Flagstar Bank, F.S.B.*,
  No. 3:14-CV-741, 2015 WL 1221270 (E.D. Va. Mar. 17, 2015) ............................................ 24

*Stoney Glen, LLC v. S. Bank & Tr. Co.*,
  944 F. Supp. 2d 460 (E.D. Va. 2013) .................................................................................. 23

*Taylor v. Dist. of Columbia*,
  626 F. Supp. 2d 25 (D.D.C. 2009) ......................................................................................... 7

*Title Ins. Co. v. Laws. Title Ins. Corp.*,
  109 F.2d 35 (D.C. Cir. 1939) ................................................................................................ 16

*U.S. Ecology, Inc. v. U.S. Dep't of Interior*,
  231 F.3d 20 (D.C. Cir. 2000) .................................................................................................. 4

*United Mine Workers v. Gibbs*,
  383 U.S. 715 (1966) ........................................................................................................... 4, 7

*United of Omaha Life Ins. Co. v. Womack-Rodriguez*,
  461 F. Supp. 3d 455 (W.D. Tex. 2020) ................................................................................ 11

*Virginia Vermiculite, Ltd. v. W.R. Grace & Co.- Connecticut*,
  156 F.3d 535 (4th Cir. 1998) ................................................................................................ 23

*Virginia-Carolina Chemical Co. v. Carpenter*,
  99 Va. 292 (1901) ................................................................................................................. 23

*Wisey's #1 LLC v. Nimellis Pizzeria LLC*,
  952 F. Supp. 2d 184 (D.D.C. 2013) ............................................................................... 4, 5, 8

*Women Prisoners of the D.C. Dep't of Corr. v. District of Columbia*,
  93 F.3d 910 (D.C. Cir. 1996) .................................................................................................. 7

*Yah Kai World Wide Enters., Inc. v. Napper*,
  292 F. Supp. 3d 337 (D.D.C. 2018) ..................................................................................... 16

**Statutes**

15 U.S.C. § 1114 ........................................................................................................................ 7

28 U.S.C. § 1367(c)(1) ............................................................................................................... 9

28 U.S.C. § 1367(c)(2) ............................................................................................................... 9

28 U.S.C. § 1367(c)(4) ......................................................................................................... 11, 12

N.Y. Bus. Corp. § 715(g) ......................................................................................................... 22

**Rules**

Fed. R. Civ. P. 8(c)(2) ............................................................................................................. 19

Fed. R. Civ. P. 12(b)(1) ............................................................................................................. 4

Fed. R. Civ. P. 12(b)(6) ............................................................................................................. 4

Fed. R. Civ. P. 12(h)(3) ............................................................................................................. 5

**Other Authorities**

2 Fletcher Cyc. Corp. § 495 ................................................................................................ 22

5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350 (2d ed. 1987) ...................................................................................................................... 4

## INTRODUCTION

Consistent with its prior rulings, the Court should dismiss the counterclaims of Defendant The 1791 Foundation, Inc. (the "Foundation") for lack of supplemental jurisdiction, and they also fail on the merits. The Foundation's centerpiece "unfair competition" counterclaim in substance resembles the claims of Plaintiff National Rifle Association of America, Inc. ("NRA") that the Court dismissed under the supplemental jurisdiction statute. That business-tort counterclaim is sufficiently disconnected from the NRA's remaining trademark-related claims as to present a separate case or controversy, requiring that it be dismissed for want of supplemental jurisdiction. At a minimum, the Court should decline to exercise supplemental jurisdiction over that claim for the same reasons that it declined to entertain Plaintiffs' non-trademark-related claims. Likewise, the Foundation's two breach-of-contract counterclaims raise issues far afield from those implicated by the NRA's trademark claims and therefore warrant dismissal on the same bases.

The Foundation also fails to state any viable claim. Its unfair competition counterclaim fails on every element, asserting rights (such as to the "Friends of NRA" program) that the Foundation does not own, in some cases by its own admission. Its first contract claim nonsensically asserts that the NRA was barred from negotiating over continued use of its "NRA" mark while a license for that mark remained in force, such that it would have had to terminate the license (as the Foundation admits it had the right to do) before proposing future terms. And its other contract claim contends that the NRA "wrongfully" terminated the license when the contract gave it that right and the NRA had obvious reasons to do so. If the Court is to exercise jurisdiction over the Foundation's counterclaims, it may dispose of them swiftly.

Finally, the Court should not be swayed by the Foundation's false claim that the NRA knowingly withheld a 1998 trademark license that, by all indications, neither side was aware of until recently. The license's terms support the NRA across the board, such that the NRA only had

1

reason to raise it, not bury it. The license confirms, contrary to the Foundation's claims, the NRA's right to terminate the Foundation's use of the "NRA" name at will; the Foundation's obligation to obtain written authorization for all other uses of the NRA's marks, which the Foundation never did; and the NRA's ownership of donor information generated through the use of the "NRA" mark. Contrary to the Foundation's innuendo, the NRA's claims in this case reach conduct beyond any use authorized by the license, including the Foundation's extensive use of other NRA trademarks, its post-termination use of the "NRA" mark, and future uses of NRA marks. But those things are generally beyond the scope of the Foundation's counterclaims and, by extension, this Motion.

## BACKGROUND

Plaintiffs do not recount the facts for the underlying dispute, which have been addressed in the briefing on the original Motions to Dismiss.

On June 24, 2026, the Court entered an opinion and order denying the Foundation's Motion to Dismiss the NRA's federal and common law trademark violation claims. ECF Nos. 29, 30. The Court exercised its discretion under 28 U.S.C. § 1367(c) to dismiss without prejudice Plaintiffs' non-trademark D.C. common law claims to be refiled in state court, which Plaintiffs proceeded to do.[1]

Subsequently, the Foundation filed its Answer and Counterclaims and later Amended Answer and Counterclaims. ECF Nos. 32, 35. Its factual allegations principally focus on a 1998 trademark license (the "Trademark License"). The Trademark License contradicts the Foundation's prior contention in this Court that it has a perpetual and irrevocable license. *Compare* ECF No. 20 at 39 (Foundation MTD) *with* ECF No. 35-1. By its terms, the Trademark License grants the Foundation a nonexclusive right to use the "NRA" trademark in specified circumstances

---

[1] *See Nat'l Rifle Ass'n of Am. et al. v. The 1791 Found., Inc.*, No. 2026-CAB-004346 (D.C. Super. Ct.).

while confirming that the NRA itself owns the "NRA" trademark, provides that the Foundation must secure "written permission" from the NRA for "each and every" other use of NRA marks, and provides that information generated through use of the NRA's marks "is the property of the NRA." Foundation Ex. 1, ECF No. 35-1 at 2. Furthermore, the Trademark License expressly provides that the NRA's limited license of the "NRA" mark to the Foundation is terminable at will: "This License may be terminated by NRA at the discretion of the Board of Directors of the National Rifle Association of America." *Id*. The Foundation alleges that, under this provision, "the only way that the Trademark License may be terminated is by the Board of Directors of the NRA voting to terminate the license," that the "NRA's Board of Directors never voted to terminate the Trademark License," and that the license therefore remains in force. Counterclaims ¶¶ 13–14.

The Foundation asserts three counterclaims. The first claim, for unfair competition, alleges that the NRA wrongfully diverted donations intended for the Foundation by redirecting the nrafoundation.org website to the NRA's website, "collecting contact information from potential Foundation donors," using the Foundation's donor lists, using certain social media accounts, and making social media posts using the "#NRAGrant" hashtag." Counterclaims ¶ 57. The Foundation does not plead that the unfair competition claim is premised on rights the Foundation obtained under the Trademark License or any breach of that agreement. The second claim, for breach of contract, alleges that the NRA violated the Trademark License by demanding in negotiations that the Foundation pay a royalty for any continued use of the "NRA" mark, filing this litigation, "cutting off the Foundation's access to its donor lists," and otherwise "interfering with the Foundation's ability to exercise its licensed rights." Counterclaims ¶¶ 67–69. The third claim, another breach claim pleaded in the alternative to the second, alleges that the NRA's termination of the Trademark License was "wrongful" because it was not undertaken by the NRA Board and

3

was made for the "improper purpose of retaliation against the Foundation" and "improper anti-competitive purpose to divert donations and resources from the Foundation." Counterclaims ¶ 74.

At no point does the Foundation allege facts supporting that it owned any rights in the nrafoundation.org domain or website, the social media accounts, or donor lists. Indeed, the only social media account that the Foundation identifies is for the "Friends of NRA" program, Counterclaims ¶ 38, which the Foundation admits is currently owned by the NRA, Answer ¶ 99.

## LEGAL STANDARD

***Supplemental Jurisdiction***. Like any other party asserting claims, counter-plaintiffs like the Foundation "bear[] the burden of establishing that the court has jurisdiction." *Wisey's #1 LLC v. Nimellis Pizzeria LLC*, 952 F. Supp. 2d 184, 188 (D.D.C. 2013) (citing *U.S. Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000)). "[A] Rule 12(b)(1) motion imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." *Id*. (citation and quotation marks omitted). Accordingly, the Foundation's "factual allegations in its counterclaims will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Id*. (citing 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350 (2d ed. 1987)).

Federal district courts may exercise supplemental jurisdiction over only state-law claims that "are 'so related ... that they form part of the same case or controversy' as claims over which a federal court has original jurisdiction." *Joyner v. Morrison & Foerster LLP*, 140 F.4th 523, 536 (D.C. Cir. 2025) (quoting 28 U.S.C. § 1367(a)). "A two-part test guides the supplemental jurisdiction analysis." *Wisey's #1*, 952 F. Supp. 2d at 188. "First, the court assesses whether the federal and non-federal claims 'derive from a common nucleus of operative fact.'" *Doe #1 v. Am. Fed'n of Gov't Emps.*, 554 F. Supp. 3d 75, 113 (D.D.C. 2021) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)). If so, "the court has the authority under Article III of the

4

Constitution to hear the [non-federal] claim[s]." *Wisey's #1*, 952 F. Supp. 2d at 188. Second, the court assesses "whether to decline supplemental jurisdiction based on the factors enumerated in section 1367(c)." *Doe #1*, 554 F. Supp. 3d at 113 (citing *City of Chi. v. Int'l Coll. Of Surgeons*, 522 U.S. 156, 173 (1997)). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

**Failure To State a Claim**. A complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Green v. U.S. Dep't of Just.*, 392 F. Supp. 3d 68, 80 (D.D.C. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted)). Conclusory allegations are "not entitled to the assumption of truth," *Iqbal*, 556 U.S. at 680–81, and a court "need not accept the plaintiff's legal conclusions cast in the form of factual allegations." *Kobelia v. FBI*, No. 24-2542 (SLS), 2025 U.S. Dist. LEXIS 96007, at *16 (D.D.C. May 20, 2025).

A court may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice," *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002). However, "when the bare allegations of the complaint conflict with any exhibits or documents, whether attached or adopted by reference, the exhibits or documents prevail." *Alston v. D.C.*, 772 F. Supp. 3d 43, 55 (D.D.C. 2025).

## ARGUMENT

The Court should dismiss the Foundation's Counterclaims. The Foundation's unfair competition claim does not share a core of operative fact with the NRA's remaining claims, which concern the Foundation's use of the NRA's trademarks, not the NRA's fundraising activities, and therefore must be dismissed. That aside, the Court should wield its discretion to dismiss all three counterclaims, for essentially the same reasons as when it declined to exercise supplemental

5

jurisdiction over the NRA's D.C. corporate law, contract, and trust claims. On the merits, the counterclaims fail. The unfair competition claim identifies no legal rights that the Foundation the NRA is misappropriating, nor does it even attempt to meet the law's definition of "unfair." The contract claims fall together in the face of the NRA's legal termination of the contract and its terms. And any claim to prospective relief fails because the Foundation has admitted that it has abandoned any right to the "NRA" mark and "NRA Foundation" name.

## I.     The Court Lacks, or Should Decline to Exercise, Supplemental Jurisdiction over the Foundation's Counterclaims

The Court should dismiss the claims for lack of supplemental jurisdiction because (1) the unfair competition claim does not derive under a common nucleus of operative fact under 28 U.S.C. § 1367(a); and (2) the Foundation's state-law claims would substantially predominate over the NRA's federal trademark claims and raise novel and complex issues of law under 28 U.S.C. § 1367(c).

### A.     The Court Lacks Jurisdiction over the Foundation's Unfair Competition Counterclaim

The Foundation's unfair competition claim is sufficiently divorced from the NRA's allegations and claims about the Foundation's unlawful uses of the NRA's marks that it does not derive from the same common nucleus of operative fact. The Court should, therefore, dismiss it for lack of subject matter jurisdiction.

The Court does not have original jurisdiction over state-law claims unless they are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Whether claims form part of the same Article III case or controversy turns on "whether the state and the federal claims 'derive from a common nucleus of operative fact.'" *Joyner v. Morrison & Foerster LLP*, 140 F.4th 523, 536 (D.C. Cir. 2025) (quoting *Women Prisoners of the D.C. Dep't of Corr. v.*

6

*District of Columbia*, 93 F.3d 910, 920 (D.C. Cir. 1996)). "Claims derive from a 'common nucleus of operative fact,'" in turn, "if the plaintiff would ordinarily be expected to try them all in one judicial proceeding." *Taylor v. Dist. of Columbia*, 626 F. Supp. 2d 25, 28 (D.D.C. 2009) (quoting *Gibbs*, 383 U.S. at 725). But such a nucleus is lacking when there is "almost no factual or legal overlap between the state and federal claims." *Doe #1*, 554 F. Supp. 3d at 113.

This Court previously reasoned:

the NRA's D.C.-common-law trademark infringement claim appears to be identical to its federal trademark infringement claim—both allege that the Foundation has wrongfully used the NRA's trademarks. *Compare* Am. Compl. ¶¶ 136–41, *with id.* ¶¶ 160–62. Because the operative facts underlying both claims entirely "overlap," the Court has jurisdiction to hear the common-law infringement claim. *Joyner*, 140 F.4th at 536.

ECF No. 29 at 11. And indeed, the NRA brought parallel common law and federal claims for its trademarks, even alleging in its Count I (Federal Trademark Infringement, 15 U.S.C. § 1114) that the Foundation's use implicated the NRA's "common law and federal trademark rights." Am. Compl. ¶ 138. The NRA's Count IV (Common Law Trademark Infringement and Unfair Competition) alleged the exact same conduct of the Foundation violating the exact same marks of the NRA. Am. Compl. ¶¶ 160–62. The only distinction is that Count I constitutes a claim on the NRA's federal rights to the marks, while Count IV arises under common law. But, as the Court noted, the operative facts underlying both claims "entirely" overlap, because they were "identical." ECF No. 29 at 11.

The Foundation's unfair competition claim lacks that essential overlap with the NRA's trademark claims. It alleges that the NRA "exploited" the internet domain nrafoundation.org and social media accounts and used public statements to divert charitable funds away from the Foundation to the NRA. The Foundation does not and cannot properly assert this unfair competition claim under the Trademark License because that agreement is *nonexclusive* and as

7

such expressly contemplates that the NRA would use the NRA mark to serve its pecuniary interests, regardless of what the Foundation also does with the NRA mark. Instead, the Foundation would need to satisfy the "three species of unfair competition" recognized by D.C. law: (1) passing off one's goods as those of another; (2) engaging in activities designed solely to destroy a rival; and (3) using methods themselves independently illegal. *K&D LLC v. Trump Old Post Off. LLC*, 951 F.3d 503, 509 (D.C. Cir. 2020). None of these species has anything to do with whether the Foundation made "commercial use of identical marks for identical and substantially similar programs, events, and related goods and services" and whether the Foundation's "use of identical marks for identical services is likely to cause confusion, mistake, and deception among the relevant consuming public as to the origin and source of the programs, events, charitable services, merchandise, and related services provided thereunder." Am. Compl. ¶¶ 138, 140. Accordingly, the Foundation's tort counterclaim, as in *Wisey's #1*, stands independently from the federal trademark claim such that "the adjudication of the counterclaims would be unaffected if the Court were to dismiss [plaintiff's] Lanham Act claims." 952 F. Supp. 2d at 190. Therefore, the Foundation's "common law counterclaims do not derive from a common nucleus of operative fact with [the plaintiffs'] Lanham Act claims," and "the Court does not have supplemental jurisdiction under section 1367(a)." *Id*. at 189.

**B.**    **The Court Should Decline to Exercise Jurisdiction Under 28 U.S.C. § 1367(c)**

In addition to lacking supplemental jurisdiction altogether over the Foundation's unfair competition claim, the Court should decline to exercise jurisdiction over all the Foundation's counterclaims for essentially the same reasons that it dismissed the NRA's non-trademark-related claims.

***Section 1367(c)(1).*** In dismissing the NRA's non-trademark-related claims, the Court exercised its discretion under this subsection in part because "although D.C. law may not be so

8

sparse for certain claims, the NRA's historically close relationship with the Foundation gives all its claims a novel tinge." ECF No. 29 at 21. Accordingly, the Court considered the non-trademark claims best addressed by the D.C. Courts: "The D.C. courts are in a far better position than this Court to determine how D.C. law should apply to a relationship like the one between the NRA and the Foundation." ECF No. 29 at 21.

That logic holds true for the Foundation's three counterclaims. Each is not about the NRA's trademarks but about whether the actions surrounding the breakdown of the "historically close relationship" between the two entities violated state law. That is especially true of the Foundation's unfair competition claim, which appears to rely on a novel theory of liability lacking support in District of Columbia precedent. Likewise, the Foundation's two breach claims assert unusual and seemingly novel theories: for Count II, that a trademark licensor cannot propose a royalty for continued use of its trademark prior to terminating an existing license and, for Count III, that a "wrongful" termination of a license states a breach-of-contract claim at all. These sorts of issues, like those implicated by the claims the Court already dismissed, are best left to the state courts "to determine how [state] law should apply to a relationship like the one between the NRA and the Foundation." ECF No. 29 at 21.

***Section 1367(c)(2).*** Applying this provision, the Court previously reasoned that the "NRA's non-trademark D.C.-law claims 'substantially predominate[]' over its federal trademark claims. 28 U.S.C. § 1367(c)(2)." ECF No. 29 at 14. Comparing the elements of the NRA's non-trademark claims to its federal trademark claims, the Court reasoned that "the evidence required to establish the D.C.-law claims would dominate any trial in this case." ECF No. 29 at 18. Whereas the "evidence related to the federal claims would be focused on the Foundation's use of the NRA's trademarks," the D.C. claims "would likely involve witness testimony and documents describing

9

events since 1990" and "contemplate proof spanning decades to demonstrate" the intentions and course of dealing of the two entities. ECF No. 29 at 18. Such "voluminous" discovery would not be "relevant" to the federal trademark claims.

The same holds true for the Foundation's counterclaims.

*First*, the unfair competition claim would require the Court to delve into "the Foundation's alleged attempted divorce from the NRA," ECF No. 29 at 19. That Count is about "actions described" (Counterclaims ¶ 54) such as disputes over nonprofit funding, Counterclaims ¶¶ 25–30, disputes over revenue through donations, *id.* ¶¶ 31–32, public statements directed at each other, *id.* ¶¶ 33, 38, 48, and disputes about access to websites, *id.* ¶¶ 35–38. Count I itself implicates evidence delving into the "more than three decades" of the NRA-Foundation relationship, *id.* ¶ 54, just as this Court has already found problematic for the D.C. law claims brought by the NRA. This Count is not about a trademark but about the NRA's alleged "exploitation" of the Foundation's goodwill, the NRA's alleged diversion of charitable funds, and the NRA's allegedly misleading statements. *id.* ¶¶ 55–58. Adjudicating this catchall claim—meant to delve into thirty years of history to figure out which of the two entities has been "unfair" to the other through the ongoing corporate divorce—would without a doubt be a massive undertaking easily predominating over the remaining trademark claims.

Similarly, the breach-of-contract claims would "involve witness testimony and documents describing events since 199[8]" and "proof spanning decades." These claims on their face implicate evidence taken as to the scope of rights under the 1998 Trademark License, *id.* ¶¶ 64–68, evidence of whether the Foundation ever breached the agreement throughout three decades, *id.* ¶ 66, evidence as to the so-called royalty request, *id.* ¶ 67, evidence as to the motivations for the filing of this litigation, *id.* ¶ 68, evidence about the history of the access to various NRA websites,

10

*id.* ¶ 69, evidence about corporate action regarding termination of the agreement, *id.* ¶¶ 72–73, and evidence of the alleged "improper purpose" of various individuals, *id.* ¶ 74. This would require the Court and the parties to undertake a detour far from the trademark-related claims to which the Court previously limited this action.

   ***Section 1367(c)(4).*** The Foundation's unfair competition counterclaim also presents an exceptional circumstance under § 1367(c)(4) with "compelling reasons for declining jurisdiction," based on the Court's prior dismissal of the NRA's state law claims and the NRA's refiling of them in an ongoing D.C. Superior Court action. The existing D.C. Superior Court litigation is the proper venue. The NRA filed its state-law claims there after this Court dismissed them in its discretion in June 2026. The existence of that parallel litigation removes from consideration concerns about "duplicative or inconsistent factual determinations resulting from separate proceedings in D.C. court," ECF No. 29 at 22, or increased "judicial- and party-economy costs," ECF No. 29 at 23. Such concerns, while valid in the first round of supplemental jurisdiction analysis, are now moot because the separate D.C. state litigation already exists. Any additional costs are now sunk and should not factor in favor of discretionary jurisdiction. Where a parallel state proceeding is already pending, Section 1367(c)(4)'s concerns about "economy, fairness, convenience, and comity" counsel dismissal. *See United of Omaha Life Ins. Co. v. Womack-Rodriguez*, 461 F. Supp. 3d 455, 467 (W.D. Tex. 2020) ("a pending state action involving all three counterclaimants may constitute a compelling reason to decline supplemental jurisdiction under § 1367(c)(4)"); *accord Polaris Pool Sys. v. Letro Prods., Inc.*, 161 F.R.D. 422, 425 (C.D. Cal. 1995); *Blue Dane Simmental Corp. v. Am. Simmental Ass'n*, 952 F. Supp. 1399, 1413 (D. Neb. 1997).

**II.    The Foundation's Counterclaims Fail to State Claims for Relief**

    **A.    The Foundation Fails to State a Claim for "Unfair Competition" (Counterclaim I)**

The Foundation alleges that the NRA engaged in unfair competition by using the nrafoundation.org domain to divert traffic to the NRA, using social media accounts to do the same, and making statements confusing donors about the source and purpose of charitable funds supporting the NRA. But these theories fail as a matter of law and because the Foundation has not alleged that it owns domain social media accounts, or donor lists.

D.C. law recognizes "three species of unfair competition": (1) passing off one's goods as those of another; (2) engaging in activities designed solely to destroy a rival; and (3) using methods themselves independently illegal. *K&D LLC*, 951 F.3d at 509. Examples include "defamation, disparagement of a competitor's goods or business methods, intimidation of customers or employees, interference with access to the business, threats of groundless suits, commercial bribery, inducing employees to sabotage, [and] false advertising or deceptive packaging." *Id.* (quoting *B & W Mgmt., Inc. v. Tasea Inv. Co.*, 451 A.2d 879, 881 n.3 (D.C. 1982)).

    1.    None of the three "species" of unfair competition is present here. The Foundation never alleges the NRA's conduct was independently illegal or for the sole purpose of destroying the Foundation, nor does the Foundation allege any of the unfair practices that D.C. courts have deemed actionable. *Id.* ("defamation, disparagement of a competitor's goods or business methods, intimidation of customers or employees, interference with access to the business, threats of groundless suits, commercial bribery, inducing employees to sabotage, [and] false advertising or deceptive packaging.").

*First*, the Foundation has not alleged that the NRA is passing off its goods as if they were the Foundation's. Rather, the Foundation alleges that the NRA has taken a domain name that the

NRA owns and directed it to the NRA website. Counterclaims ¶¶ 35, 37, 55. That is not unfair competition. The Foundation does not allege (nor could it) that the NRA mislabeled the landing website—the "NRA Website" as the Foundation calls it, *id.* ¶ 55—as representing any entity other than itself, the NRA. To the contrary, the screenshot of the NRA Website attached to the Answer prominently identifies the site as the NRA's and does not mention the Foundation or even use the word "Foundation." ECF No. 35-5. Publishing a website literally named the "NRA Website" is not "exploitation of another charity's name." *See Alzheimer's Found. of Am., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc.*, 796 F. Supp. 2d 458, 465 (S.D.N.Y. 2011).

Moreover, the Foundation has not even alleged it has any ownership over any of the so-called "goods" in play. It does not assert ownership of the domain name, the social media accounts, or the donor lists. In fact, the only social media account it identifies is one associated with and named for the "Friends of NRA" program, Counterclaims ¶ 38, which the Foundation admits is an NRA program, Answer ¶ 99. Competition cannot be "unfair" when the competitor has no legal right in play. Rather, the Foundation's theory is that the NRA "exploited" online pages to divert donors. This is not actionable because the NRA is not alleged to have used the Foundation's "goods" or property as the NRA's.

The donor lists are the NRA's. The Counterclaims and the Trademark License itself—which the Foundation has put in play for purposes of this motion to dismiss—make this manifest. The very contract on which the Foundation relies vitiates its theory. The Foundation tries to lay claim to the donor lists because, in its view, it has created goodwill with the donors as a result of its use of the "NRA Foundation" name. *E.g.*, Counterclaims ¶ 42 (alleging that the "donor list" is the "Foundation's" earned through "decades of trustworthy charitable operations"). But, even accepting as true for present purposes that the Foundation did anything itself, these "charitable

13

operations" were undertaken exclusively through use of the "NRA" mark, in the Foundation's name and otherwise. And the Trademark License recognizes and provides that "all information generated with respect to NRA members, as a result of its exercise of this License, is private and confidential and is the property of the NRA. The Foundation cannot use any of this information in any way or for any purpose other than those purposes expressly permitted under this License." Foundation Ex. 1, ECF No. 35-1 at 2. It is inarguable that a donor list is "information generated" by fundraising under the "NRA" banner and the fruit of the exercise of the License. As the License provides, the list is the property of the NRA.

Similarly, the websites and social media accounts are the NRA's. The NRA has always been the owner of the website, social media accounts, etc., which is why the Foundation never alleges otherwise. To the contrary, the Foundation concedes that the NRA, not the Foundation, had control over them, Counterclaims ¶¶ 35–38, which is a strong indication of ownership, *see, e.g.*, *Loretto v. Teleprompter Manhattan CATV Corp*., 458 U.S. 419, 435–36 (1982). For example, the Foundation (at Counterclaims ¶ 35) admits that the NRA has control over the nrafoundation.org domain to redirect it to the NRA's website. And the Foundation admits that the NRA has control of the social media accounts to post materials on them, while admitting that the Foundation lacks any such control. *Id*. ¶¶ 31, 38. As noted, the only social media account the Foundation identifies is for the "Friends of NRA" program, which is an NRA program by the Foundation's own telling. Answer ¶ 99. There is a reason that the Foundation asserts no claim of ownership over the domain or the social media accounts and does not demand that they be handed over to the Foundation. That is because the Foundation does not own them.

Finally, little need be said about the Foundation's claim that the NRA has posted content meant to "mislead and confuse" donors about the "Friends of NRA" program and grant funding.

14

Counterclaims ¶¶ 56–57. As for the program, the Foundation admits that it relinquished any right in it to the NRA. Answer ¶ 99. As for grant funding, the charge refers to a single post, Counterclaims ¶ 38, on the Friends of NRA social media account about a Friends of NRA grant recipient. Far from that being misleading, the Foundation admits that the Friends of NRA program was carried out by NRA employees. Answer ¶ 52. It is not "unfair competition" for the NRA to identify its admitted role in the Friends of NRA program.

*Second*, the Foundation has not alleged the NRA's activities "designed solely to destroy" the Foundation. *K&D LLC*, 951 F.3d at 509. D.C. law insists that destruction of a rival be the "sole" purpose of actionable conduct "given our society's encouragement of 'aggressive economic competition.'" *Econ. Rsch. Servs., Inc. v. Resol. Econ., LLC*, 208 F. Supp. 3d 219, 231 (D.D.C. 2016) (quoting *Ray v. Proxmire*, 581 F.2d 998, 1002 (D.C. Cir. 1978)). Thus, "legitimate business motivations," *id*., such as "reasonably forwarding personal interest and developing trade," are not actionable. *Scanwell Lab'ys, Inc. v. Thomas*, 521 F.2d 941, 949 (D.C. Cir. 1975). A plaintiff's "own complaint" may plead itself out of court by alleging that the other party's actions "were taken to enhance its own competitive position." *Id*.

Here, given that the Foundation characterizes the License as non-exclusive, the NRA's alleged actions are simply uses of the NRA's own mark for the purpose it was registered for. That is not illegal or unfair. It is a legitimate business motivation. At most, the Foundation alleges the NRA acted aggressively in pursuing donors within the charitable marketplace. But that is no tort. Because the Foundation has given "acknowledgement of legitimate business motivations" of the NRA to compete with it, the Foundation cannot have alleged that the NRA's "*sole* aim was to dismantle" the Foundation. *See Econ. Rsch. Servs.*, 208 F. Supp. 3d at 231.

*Third and finally*, the Foundation never alleges any illegal conduct on the part of the NRA.

2.      The Foundation's request for prospective injunctive relief (ECF No. 35 at 44) fails. The Foundation seeks to enjoin the NRA's use of the "name of the Foundation" (i.e., "NRA Foundation"), the nrafoundation.org domain, and the name "The NRA Foundation, Inc." But it has no right to do so. First off, it has not even alleged that the NRA is currently *using* the name "NRA Foundation." Secondly, for its part, the Foundation has abandoned any ownership of the name "NRA Foundation." It has abandoned any interest in "nrafoundation.org" (Counterclaims ¶ 55), the NRA Foundation's social media pages (*id.* ¶ 56) or the "Friends of NRA" program (*id.* ¶ 57). "Defendant The NRA Foundation, Inc. changed its name, effective May 29, 2026. The entity is now named **The 1791 Foundation, Inc.**" ECF No. 28. It is axiomatic that the NRA cannot be trading on the "Foundation's Name" when the Foundation's name is not "the NRA Foundation."

"[T]o prove a case for … unfair competition" as to the use of a trade name, a plaintiff must show that the public recognizes its trade name as identifying the plaintiff's services. *Blacks in Gov't v. Nat'l Ass'n of Blacks Within Gov't*, 601 F. Supp. 225, 228 (D.D.C. 1983). That in turn requires a showing that the plaintiff's name is fanciful or arbitrary or, if it is not, that the name has become "distinctive because it has attained secondary meaning." *Id*. For that reason, a name can be abandoned, a concept long recognized in D.C. law. *See Title Ins. Co. v. Laws. Title Ins. Corp*., 109 F.2d 35, 45 (D.C. Cir. 1939). When an entity abandons a name, it loses the "right to exclude others" from that use and its own "right to use the name in trade." *Id*. Abandonment in this context is shown by discontinuation and an intent not to resume use. *See Yah Kai World Wide Enters., Inc. v. Napper*, 292 F. Supp. 3d 337, 359 (D.D.C. 2018).

Here, the Foundation has made its intent clear: it is done with the "NRA Foundation" name. That means that the Foundation cannot now sue on the theory that the NRA is wrongly benefiting from use of the nrafoundation.org domain, social media accounts that (going by the Foundation's

16

allegations) do not even employ the "NRA Foundation" name, and a fundraising program (Friends of NRA) that the Foundation concedes it abandoned any right in. The Foundation cannot ask for prospective relief about the use of name it has abandoned.

### B.      The Foundation's Count II Breach of Contract Claim Fails

Count II fails because it is a case of buyer's remorse. When the Foundation signed a contract that granted it *non-exclusive* rights to use the NRA marks and assigned property created through the use of those marks to the NRA, it forever forfeited the ability to claim that the NRA's decision to actually use the marks and that property breached its legal rights.

In Count II, the Foundation brings three theories of breach of the Trademark License. *First*, that the NRA requested a 20 percent royalty for continued use of the NRA Foundation name. Counterclaims ¶ 67. *Second*, that the NRA brought this present lawsuit. Counterclaims ¶ 68. And *third*, that the NRA shut down nrafoundation.org, locked the Foundation out of social media accounts, and denied it access to donor lists. Counterclaims ¶ 69. "Under Virginia law, the elements of a breach of contract claim are: '(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation.'" *Econ. Rsch. Servs.*, 208 F. Supp. 3d at 227 (quoting *Filak v. George*, 267 Va. 612, 594 S.E.2d 610, 614 (2004)).

Each breach theory fails.

1.      Beginning with the third theory, the Foundation claims the NRA breached the Trademark License by withholding donor information. Counterclaims ¶ 69. But the License's only relevant provision regarding non-trademark property states that property generated from use of the "NRA" mark is owned by the NRA. Foundation Ex. 1, ECF No. 35-1 at 2 ("all information generated with respect to NRA members, as a result of its exercise of this License, is private and confidential and is the property of the NRA. The Foundation cannot use any of this information in

17

any way or for any purpose other than those purposes expressly permitted under this License."). The Foundation's breach theory is precisely backwards: it is not the NRA breaching the Trademark License by using the property it owns under the License but the Foundation. The Foundation wants to "use" the donor lists—the NRA's property—to set itself up as a competitor to the NRA, surely qualifying as a "purpose" that is not "expressly permitted" under the License. The obvious point of this provision was to ensure that the NRA would maintain ownership and control of donor information raised under the aegis of its famous name, and to prevent the Foundation from making off with or otherwise misusing that information.

Furthermore, nothing in the Trademark License gives the Foundation any legal right to the nrafoundation.org, social media accounts, or donor lists. There can be no breach where there is no right. The Foundation has not alleged that it has a contractual right to the domain, the social media accounts, or the donor lists under the Trademark License. Not only has the Foundation failed to "sufficiently specify which aspect of the Agreement's" provisions on donor lists and websites the NRA has "violated," it cannot do so. *Econ. Rsch. Servs.*, 208 F. Supp. at 228.

2.      The Foundation's second theory focusing on this lawsuit also fails. Count II concerns the limited use of the "NRA" mark authorized by the Trademark License. This undermines the Foundation's theory (at Counterclaims ¶ 68), that the NRA "breached the Trademark License by filing this action alleging trademark infringement and seeking to enjoin the Foundation from using marks that the NRA itself licensed to the Foundation." The NRA's claims cover much more than just the "NRA" mark. For example, the NRA challenges the Foundation's use of the NRA's mark for "THE NRA FOUNDATION TEACH FREEDOM," Am. Compl. ¶¶ 25, 130, which is not subject to the Trademark License.

It cannot be a breach for the NRA to sue over the parties' respective rights to the "NRA" mark, over the Foundation's use of its other marks, and over unlicensed uses of the NRA mark. Even if the Trademark License may provide a defense to liability for some uses of the "NRA" mark, it does not affect the Foundation's liability for post-termination use, does not affect the Foundation's liability for use of other marks or unauthorized use of the "NRA" mark, and does not affect the NRA's requests for prospective relief. The Trademark License addresses none of these things and does not provide in any provision that the NRA may not bring suit to enforce its rights. With the License lacking any such provision, the Foundation has no contractual right that the NRA could have breached.

Furthermore, the License at most would be a *defense* to the NRA's federal trademark claim as to the "NRA" mark, not a proper counterclaim. The Foundation primarily deploys the License as a defense, stating that it has acted legally within the scope of the license. Counterclaims ¶ 66 ("The Foundation has consistently complied with and has never breached the terms of the Trademark License."). That asserts not a claim of right, but only a defense. *See Segal v. Geisha NYC LLC*, 517 F.3d 501, 506 (7th Cir. 2008) (acting within scope of license is defense to Lanham Act claims). At most, this Court should correct the mis-designation of the "defense as a counterclaim" and treat the contract "claims" as what they should have been "correctly designated" as—a "defense." *See* Fed. R. Civ. P. 8(c)(2); *Akiachak Native Cmty. v. United States Dep't of Interior*, 827 F.3d 100, 107 (D.C. Cir. 2016).

3.      The Foundation's theory of breach about the NRA's "demand" for a "royalty" fails because it was just that—a demand. A demand, standing alone, is not an actionable breach. It has long been recognized that words alone do not constitute a breach "unless so acted upon and adopted by the other party." *Dingley v. Oler*, 117 U.S. 490, 503 (1886). Seeking to renegotiate terms, as

19

the NRA did here, is no breach, anticipatory or otherwise. *See Advanced Training Grp. Worldwide, Inc. v. Pro-Active Techs., Inc.*, No. 22-1945, 2023 WL 8945846, at *3 (4th Cir. Dec. 28, 2023) (not reported) ("[N]egotiation, no matter how vigorous or discordant, cannot constitute a breach standing alone"). Along similar lines, the Foundation fails to allege any damages that flowed from the NRA's demand. A breach must cause damage. In Virginia, as elsewhere, "[p]roof of damages is an essential element of a breach of contract claim, and failure to prove that element warrants dismissal of the claim." *Phoenix v. Vital Core Health Strategies*, No. 3:23CV357, 2025 WL 2313208, at *3 (E.D. Va. Aug. 11, 2025).

This theory of breach also makes no sense in light of the License's provisions. The Trademark License provides the NRA the right to terminate the license at will. The Foundation's theory is that any demand for compensation for continued use is a breach. Under that theory, the NRA would have to terminate the license, which it could do at any time, before negotiating royalties for the Foundation's continued use of the mark. The Trademark License says nothing like that—for the reason that it wouldn't make a lick of sense. Instead, the express conferral on the NRA of a right to terminate at will presupposes that the parties may freely negotiate future terms prior to termination. At the least, nothing in the agreement prohibits the NRA from doing so.

4.     As with the unfair competition claim, the prospective relief requested by the Foundation is limited by its abandonment of use of the "NRA" mark. The contractual right the Foundation purportedly wishes to enforce prospectively is that of a supposed trademark license for the Foundation to use the mark "NRA" and the name "NRA Foundation." Counterclaims ¶¶ 64–65; 72. In other words, the Foundation claims a contractual right to use the name "NRA Foundation" going forward. But the Foundation has relinquished that contractual right through

20

knowing and intentional waiver. *RMBS Recovery Holdings, I, LLC v. HSBC Bank USA, N.A.,* 297 Va. 327, 342 (2019).

Specifically, the Foundation has relinquished its right to sue for breach of contract over its use of the "NRA" mark. It has, by its own admission, abandoned use of the mark. *See* ECF No. 28. It no longer seeks to use the NRA Foundation name, the website, or the social media accounts. The Foundation's course of conduct, combined with the explicit repudiation of the name "NRA Foundation," means that it cannot pursue prospective relief based on the agreement's licensing of the "NRA" mark.

### C.    The Foundation's Count III Breach of Contract Claim Fails

The NRA acted within its contractual rights to terminate the License. Count III fails.

1.    *First*, the NRA terminated the Trademark License on January 5, 2026. The Foundation's argument the License may be terminated only by a vote of the NRA's Board is wrong. Indeed, that is not what the contract says at all. The actual language at issue states: The "License may be terminated by NRA at the discretion of the Board of Directors of the National Rifle Association of America." Foundation Ex. 1, ECF No. 35-1 at 2. The Foundation's allegations (at Counterclaims ¶¶ 14, 73) that the License requires a Board vote to terminate are misleading at best. This Court need not credit the Foundation's mistaken legal allegation about the meaning of the attached contract. *Alston*, 772 F. Supp. 3d at 55.

The NRA properly terminated the license. The default rule is that a trademark license is terminable at will by the licensor. *See, e.g.*, *Chi. Mercantile Exch. Inc. v. Ice Clear US, Inc.*, No. 18-cv-1376, 2021 WL 3630091, at *13 (N.D. Ill. Aug. 17, 2021) ("Courts are in agreement that a trademark license is terminable at will by the trademark owner, even where it is an express license (unless the license is for a particular term) and certainly when the license is only implied."); *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 847 F. Supp. 18, 19 n.1 (E.D.N.Y. 1994)

21

("An agreement conferring a license to use a trademark for an indefinite time, whether oral, written or by implication, is terminable-at-will by the licensor."). While a license may provide some other termination process, *see, e.g., Norwood Promotional Prods., LLC v. KustomKoozies, LLC*, 835 F. Supp. 2d 685, 698–700 (S.D. Ind. 2011), the Trademark License here does not. It identifies no steps required to be taken or other procedures, but only that the license may be "terminated by NRA." Its reference to the "discretion of the Board of Directors of the National Rifle Association" does not require any specific action by the Board; had that been the intent, it would have been trivial to require, for example, a majority vote of the Board or some other specific action on its part. Crucially, nothing in this provision restricts the Board's authority to delegate its power and discretion to management, as corporate boards typically do.

The NRA's termination was effective on that basis. The Foundation admits that it received the termination notice sent by the NRA on January 5, 2026. Answer ¶ 129. But it does not allege that the termination was unauthorized by the NRA's Board. The NRA's Board, like essentially all other corporate boards, delegates authority for such matters as legal affairs and trademark licensing to executive leadership. *See* 2 Fletcher Cyc. Corp. § 495; N.Y. Bus. Corp. § 715(g). The Foundation does not and cannot allege that the termination here was unauthorized.

2.    In any case, even if the termination were not otherwise effective, the NRA's Board, acting under the New York law governing its internal corporate actions, has since ratified the termination. Declaration of John Frazer, Ex. 1. That ends this counterclaim. *See Eastman Kodak Co. v. Altek Corp.*, 936 F. Supp. 2d 342 (S.D.N.Y. 2013); *Christian v. TransPerfect Global, Inc.*, No. 17-cv-5554, 2018 WL 4571674, at *5–6 (S.D.N.Y. Sept. 24, 2018); *First Nat'l Bank v. Commercial Travellers' Home Ass'n*, 108 A.D. 78, 82 (N.Y. Sup. Ct. App. Div. 1905); *A.B.C. Publications v. New York Times Co.*, 103 N.Y.S.2d 693, 694–95 (N.Y. Sup. Ct. 1951).

3.    Finally, the Foundation's wrongful termination theory fails because it does not go far enough to allege a violation of the implied covenant of good faith and fair dealing, which "every contract contains." *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 450 (E.D. Va. 2009). This implied covenant may be breached when a party acts dishonestly in exercising contractual right or acts arbitrarily or unfairly in exercising its discretion in performance. *Stoney Glen, LLC v. S. Bank & Tr. Co.*, 944 F. Supp. 2d 460, 466 (E.D. Va. 2013). In other words, Virginia has a "clear rule that the exercise of an explicit contractual right is not subject to the duty of good faith and fair dealing." *Id.* at 468.

Here, the NRA simply exercised its clear right to terminate the license. This is a question of its contractual right to terminate, not a question about discretionary performance. For example, in *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.- Connecticut*, 156 F.3d 535, 542 (4th Cir. 1998), the Fourth Circuit analyzed a contract where the defendant had "sole discretion" of whether to *perform* the contract, holding that "it is a basic principle of contract law in Virginia, as elsewhere, that although the duty of good faith does not prevent a party from exercising its explicit contractual *rights*, a party may not exercise contractual *discretion* in bad faith." But where, as here, a party exercises a "contractual termination right," that is not bound by the implied covenant. *Land & Marine Remediation, Inc. v. BASF Corp.*, No. 2:11CV239, 2012 WL 2415552, at *13 (E.D. Va. June 26, 2012).

Even if the covenant applied, the Foundation never alleges, as it must, that the NRA acted "dishonestly or in bad faith[,]" *Brainchild Surgical Devices, LLC v. CPA Glob. Ltd.*, 144 F.4th 238, 252 (4th Cir. 2025), or fraudulently, *Ado Home Servs., LLC v. Frykman*, 85 Va. App. 55, 91, 915 S.E.2d 788, 806 (2025) (quoting *Virginia-Carolina Chemical Co. v. Carpenter*, 99 Va. 292, 293 (1901) ("To act in bad faith is to act fraudulently")). Nor has the Foundation alleged that the

23

NRA induced a default or prevented the Foundation from performing its obligations under the contract. *Smith v. Flagstar Bank, F.S.B.*, No. 3:14-CV-741, 2015 WL 1221270, at \*7 (E.D. Va. Mar. 17, 2015). Instead, the "Foundation admits that it amended its Bylaws to eliminate the NRA Board's ability to appoint Foundation Trustees," Answer ¶ 89, and took other steps to separate itself from the NRA. That in itself explains why the NRA had good, not-at-all-arbitrary reason to secure the use of its name.

## CONCLUSION

The Court should grant the Motion to dismiss Defendant's Counterclaims.

August 13, 2026

Respectfully submitted,

*/s/ Andrew M. Grossman*
Andrew M. Grossman (D.C. Bar No. 985166)
Mark W. DeLaquil (D.C. Bar No. 493545)
Mark H. Tidman (D.C. Bar No. 441310)
**BAKER & HOSTETLER LLP**
1050 Connecticut Avenue, Suite 1100
Washington, D.C. 20036
Phone: 202.861.1500
Email: agrossman@bakerlaw.com

*Counsel for Plaintiffs NATIONAL RIFLE ASSOCIATION OF AMERICA, WILLIAM BACHENBERG, and DOUGLAS HAMLIN*

24